## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ALTA WIND I OWNER LESSOR C,    )
                                      )
        *et al.*                  )
                                        )
            Plaintiffs,       )     Nos. 13-402, 13-917, 13-972, 13-935,
                                        )     14-174, 14-93, 14-175, and 14-47
v.                              )
                                        )     Judge Wheeler
THE UNITED STATES OF AMERICA,   )
                                        )
          Defendant.       )

---

## PLAINTIFFS' CONTENTIONS OF FACT AND PROPOSED CONCLUSIONS OF LAW

---

Steven J. Rosenbaum
(srosenbaum@cov.com)
*Counsel of Record*
Dennis B. Auerbach
Thomas R. Brugato
Margaret H. Brennan

One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-5568
(202) 778-5568 fax

March 31, 2016                      *Counsel for Plaintiffs*

**TABLE OF CONTENTS**

**INTRODUCTION**................................................................................................ 1

**CONTENTIONS OF FACT AND LAW** ........................................................... 8

I.    **The Section 1603 Program, the Tehachapi Region, and the Alta Wind Facilities.** ....................................................................................................... 8

    A.    The Section 1603 Cash Grant Program. .............................................. 8

    B.    California's Support for Renewable Energy........................................ 11

    C.    The Tehachapi Region. ....................................................................... 13

    D.    Terra-Gen Power LLC. ....................................................................... 14

    E.    Initial Development Efforts. ................................................................ 15

    F.    Terra-Gen's Acquisition of Allco's Interests...................................... 16

    G.    Terra-Gen's Subsequent Development of the Alta Facilities. .............. 17

    H.    Terra-Gen Had to Sell the Alta Wind Lawsuit Facilities for the Section 1603 Cash Grant Program to be Utilized. ............................................ 22

II.    **The Purchase Price Paid for Each Alta Wind Facility Conclusively Establishes Its Basis.** ......................................................................................... 23

    A.    Plaintiffs' Purchases of the Alta Wind Lawsuit Facilities. ................... 23

    B.    Plaintiffs' Bases In the Properties Are Determined By the Price They Paid to Purchase the Facilities. ................................................................... 25

    C.    A Buyer's Basis Includes the Value of Any Tax Benefits or Other Government Benefits Associated With the Assets It Acquires. ............. 28

    D.    The Black Letter Rule that Each Plaintiff's Basis Is the Purchase Price It Paid Is Not Subject to Any Applicable Exception................................ 32

    E.    The Altas II-V Transactions Were Heavily Negotiated By Sophisticated Parties, and the Purchase Prices Paid By the Plaintiff Purchasers Is Determinative of Basis................................................................... 34

    F.    The Alta I Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid by the Plaintiff Purchasers Is Determinative of Basis................................................................... 39

G.     The Alta VIII Outright Purchase Was Heavily Negotiated By Sophisticated Parties. ........................................................................ 49

H.     The Alta VI Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid By the Plaintiff Purchaser Is Determinative of Its Basis. ...................................................................... 50

I.     The Alta IX Outright Purchase Was Heavily Negotiated By Sophisticated Parties. ........................................................................ 53

J.     That the Purchase Prices for the Altas I-V Sale-Leaseback Transactions Were Not "Manipulated" or "Inflated" Is Proven By the Fact That They Are Comparable to the Outright Purchase Prices for Altas VI, VIII, and IX. ...................................................................................................... 54

K.     Plaintiffs Purchased Qualified, Energy Producing Facilities. ................. 55

L.     The Sale-Leaseback Is an Entirely Routine and Legitimate Business Structure, and Does Not Alter the Conclusion that the Purchase Prices Paid for the Altas I through V Facilities Are Dispositive of Basis. ...................... 57

M.     Lease Prepayments. ................................................................. 61

III.    **Plaintiffs Are Entitled to the Award of Damages.** ......................................... 62

IV.    **There Is No Reason to Look Beyond the Purchase Prices to Determine Plaintiffs' Bases.** ............................................................................................ 64

V.     **The Income Method of Valuation Establishes a Value In Excess of the Claimed Bases.** ............................................................................................ 66

A.     If the Purchase Prices Are Not Viewed as Dispositive of Basis, the Income Approach Is the Best Method for Determining the Fair Market Value of the Facilities. ............................................................................. 66

B.     The Income Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities. ............................................... 67

VI.    **The Market Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities.** ............................................................ 75

A.     The Only Truly Comparable Sales Are the Other Altas Themselves. ................. 75

B.     The Prices Paid by Different Buyers for the Different Alta Facilities Are Generally Consistent. ................................................................. 79

**VII.** **The Cost Method Is of Limited If Any Relevance in Valuing the Alta Facilities, But If It Were Applied, It Would Fully Support the Purchase Prices.** ................................................................................................ 80

    A.    The Cost Method Is of Limited If Any Relevance In Valuing the Alta Facilities. ................................................................................................ 80

    B.    If It Were Employed, The Cost Method Would Support Plaintiffs' Claimed Bases. ............................................................................................ 83

        1.    The KPMG Cost Certifications Accurately Reflect the Direct and Indirect Costs Incurred on the Projects. ................................................ 83

        2.    A Turnkey Fee and Developer Fee Must Be Added to Those Direct and Indirect Cost In Order to Determine Total Costs. ............................... 83

**VIII.** **None of the Purchase Prices Should Be Allocated to the PPAs, Goodwill, Going Concern Value, or a "Locational Value" Intangible.** ...................................... 86

    A.    None of the Purchase Price Should Be Allocated to the PPAs. ........................... 86

        1.    The Terms of the PPAs. ...................................................................... 86

        2.    Any PPA Value Should Be Allocated to the Facility's Hard Assets. ........ 88

    B.    Even If the Alta PPAs Could Be Treated as Separable Assets, They Would Have Value Only Insofar as They Were Above Market, and They Were Not. ................................................................................................................ 92

    C.    None of the Purchase Prices Should Be Allocated to Goodwill or Going Concern. ......................................................................................................... 95

    D.    No Allocation Should Be Made to Any So-Called "Locational Value" Intangible. ....................................................................................................... 97

**IX.** **No Value Should Be Allocated to the Land, With a De Minimis Exception.** .......... 101

    A.    The Rented Land Is a Cost Item in the Discounted Cash Flow Analyses, And Any Value of the Land Is Reflected in that Cost. ...................................... 101

    B.    A Small Amount of Fee Land Was Made Available to the Purchasers at No Separate Charge, and the Small Value of that Land Should Be Attributed to It. ................................................................................................ 101

**X.** **Even If There Were Any Intangibles, the Entire Purchase Prices Would Still Be Allocated to the Tangible Assets Because The Fair Market Value of the Tangible Assets Equaled or Exceeded the Purchase Prices.** ...................................... 102

**XI.** **Defendant's Counterclaims Should Be Denied.** ...................................................... 104

A.      Interest During Construction..............................................................................107

B.      Development Costs/Oak Creek Development Rights.........................................108

        1.      Development Costs and Rights Acquired From Allco are Included
                in Cost Basis. ........................................................................................108

        2.      The Development Costs and Rights Acquired from Allco Were
                Properly Calculated................................................................................110

C.      The Oak Creek Development Fee......................................................................111

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABE Schrader Corp. v. Town of Secaucus*, 8 N.J. Tax 390 (1986) ............................................107

*Allegheny Ludlum Corp. v. United States*, 358 F. Supp. 2d 1334 (C.I.T. 2005) ..........................31

*Am.-Hawaiian S.S. Co. v. United States*,
     85 F. Supp. 815 (S.D.N.Y. 1949), *decree aff'd*, 191 F.2d 26 (2d Cir. 1951) .........................31

*Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651 (Minn. 1998) ...................106

*AMF Inc. v. United States*, 476 F.2d 1351 (Ct. Cl. 1973)...............................................................90

*Antisdale v. City of Galesburg*, 362 N.W.2d 632 (Mich. 1984) .....................................................30

*ARRA Energy Co. v. United States*, 97 Fed. Cl. 12 (2011)............................................................26

*In re Barracuda Tanker Corp.*, 281 F. Supp. 228 (S.D.N.Y. 1968)...............................................58

*Brandon Bay, Ltd. P'ship v. Payette Cty.*, 132 P.3d 438 (Idaho 2006) ........................................31

*Calhoun Realty Co. v. Commissioner*,
     No. 7057, 1946 WL 7218 (T.C. July 29, 1946)......................................................................98

*Cane Tennessee, Inc. v. United States*,
     71 Fed. Cl. 432 (2005), *aff'd*, 214 F. App'x 978 (Fed. Cir. 2007) .......................65, 66, 75, 80

*Carty v. Commissioner*, 38 T.C. 46 (1962)...................................................................................81

*Childers v. United States*, 116 Fed. Cl. 486 (2013) ......................................................................78

*Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971)....................................90

*Christensen v.Commissioner*,
     No. 96-70741, 1998 U.S. App. LEXIS 7576 (9th Cir. Apr. 10, 1998)....................................26

*CIT Grp./Equip. Fin., Inc. v. Condere Corp.*,
     65 F. App'x 509, 2003 WL 1922992 (5th Cir. Apr. 3, 2003)..................................................58

*Consol. Coke Co. v. Commissioner*, 70 F.2d 446 (3d Cir. 1934) .................................................26

*In re Cont'l Airlines, Inc.*, 932 F.2d 282 (3d Cir. 1991).................................................................58

*Corbin West Ltd. P'ship v. Commissioner*, T.C. Memo. 1999-7 (Jan. 15, 1999)...............109, 111

*Country Club Estates v. Supervisor of Assessments of Montgomery Cty.*,
No. 1894, 1986 WL 3416 (Md. Tax Ct. Apr. 24, 1986) ........................................30

*In re Creekside Sr. Apartments, LP*, 477 B.R. 40 (B.A.P. 6th Cir. 2012) .............................29, 30

*Crispin v. Commissioner*, 708 F.3d 507 (3rd Cir. 2013) ........................................27

*Crowley, Milner & Co. v. Commissioner*,
76 T.C. 1030 (1981), *aff'd*, 689 F.2d 635 (6th Cir. 1982) .......................................81

*Cty. 20 Storage & Transfer Inc. v. Wells Fargo Bank, NA*,
No. 3:09-CV-104, 2011 WL 826349 (D.N.D. Mar. 3, 2011) ...................................52

*In re De Leon*,
No. 11-56921–ASW, 2013 WL 3805733 (Bankr. N.D. Cal. July 18, 2013)........................30

*Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012)...........................108

*Driscoll v. Edison Light & Power Co.*, 307 U.S. 104 (1939) .......................................106

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).....................................71

*Fairfield Gardens, Inc. v. United States*, 306 F.2d 167 (9th Cir. 1962) .......................................99

*Fed. Home Loan Mortg. Corp. v. Commissioner*,
T.C. Memo. 2006-153 (July 25, 2006) .......................................93

*Ferland Corp. v. Bouchard*, 626 A.2d 210 (R.I. 1993) ...............................................31

*Fieland v. Commissioner*, 73 T.C. 743 (1980) .......................................89, 93

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) .......................................33

*Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed. Cir. 1983)........................8

*Hermes Consol. Inc. v. United States*, 14 Ct. Cl. 398 (1988) .......................................66

*Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560 (Nov. 24, 1986) .......................98

*IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496 (1991) .......................................28

*Ithaca Indus., Inc. v. Commissioner*,
97 T.C. 253 (1991), *aff'd*, 17 F.3d 684 (4th Cir. 1994) .......................................92

*Kennedy v. Washington Cty. Assessor*
070115D, 2007 WL 4463493 (Or. Tax. Ct. Dec. 14, 2007)...............................................107

*Koch v. Commissioner*, 71 T.C. 54 (1978) .......................................89

*Lemmen v. Commissioner*, 77 T.C. 1326 (1981) ....................................................33, 65

*In re Lewis & Clark Apartments, LP*, 479 B.R. 47 (B.A.P. 8th Cir. 2012) ............................29, 30

*Little v. Commissioner*, T.C. Memo 1996-270, 1996 WL 315771 (June 12, 1996) ....................26

*MacKenzie v. United States*, 714 F. Supp. 268 (E.D. Mich. 1989) ...................................27, 32, 65

*Malik v. Falcon Holdings, LLC*, 675 F.3d 646 (7th Cir. 2012) ....................................................28

*Matheson v. Commissioner*,
    31 B.T.A. 493 (1934), *aff'd*, 82 F.2d 380 (5th Cir. 1936) .......................................................27

*Mathis v. Commissioner*, T.C. Memo. 1989-254 (May 24, 1989)................................................99

*McShain v. Commissioner*, 71 T.C. 998 (1979)..........................................................................66

*Meredith Corp. v. Commissioner*, 102 T.C. 406 (1994) ..............................................................30

*Miami Valley Broad. Corp. v. United States*, 499 F.2d 677 (Ct. Cl. 1974) ......................55, 56, 97

*Moore v. Commissioner*,
    T.C. Memo. 2013-249, 2013 WL 5827653 (Oct. 30, 2013) .....................................................32

*Moore v. Dep't of Revenue*, 12 Or. Tax 282 (1992) ....................................................................99

*Muserlian v. Commissioner*, 932 F.2d 109 (2d Cir. 1991) ...........................................................27

*Estate of Nesselrodt v. Commissioner*, T.C. Memo. 1986-286 (July 14, 1986) ...........................98

*New England Elec. Sys. v. United States*, 28 Fed. Cl. 720 (1993).................................................45

*Newark Morning Ledger Co. v. United States*, 507 U.S. 546 (1993) ............................................95

*Ohana v. Commissioner*, T.C. Memo 2014-83 (May 8, 2014)....................................................109

*Oxford Paper Co. v. United States*, 86 F. Supp. 366 (S.D.N.Y. 1949)..........................................26

*Pabst Brewing Co. v. Commissioner*,
    T.C. Memo. 1996-506, 1996 WL 655710 (Nov. 12, 1996).....................................................70

*Pac. Far. E. Line, Inc. v. United States*, 544 F.2d 478 (Ct. Cl. 1976) .................................8, 26, 27

*Peoples Bancorporation v. Commissioner*,
    T.C. Memo. 1992-285, 1992 WL 103657 (May 18, 1992) .....................................................30

*Peters v. Commissioner*, 4 T.C. 1236 (1945)..............................................................................89

*Philip Morris, Inc. & Consol. Subsidiaries v. Commissioner*,
  96 T.C. 606 (1991), *aff'd without op.*, 970 F.2d 897 (2d Cir. 1992) .......................................27

*Pine Pointe Hous., L.P. v. Lowndes Cty. Bd. of Tax Assessors*,
  561 S.E.2d 860 (Ga. Ct. App. 2002) ...................................................................................30

*Regan v. Commissioner*, T.C. Memo 1982-733, 1982 WL 11024 (Dec. 23, 1982) ...............34, 65

*Reichel v. Commissioner*, 112 T.C. 14 (1999) ...................................................................109, 111

*Residents of Buckingham Springs v. Bucks Cty. Assessment Office*,
  60 A.3d 883 (Pa. Commw. Ct. 2013) ....................................................................................98

*In re Robinson*,
  No. BR 14-11559-BAH, 2015 WL 5309513 (Bankr. D.N.H. Sept. 10, 2015)......................78

*RP1 Fuel Cell, LLC v. United States*, 120 Fed. Cl. 288 (2015)....................................................46

*Sacks v. Commissioner*, 69 F.3d 982 (9th Cir. 1995) ..................................................................29

*Sage v. Bernards Twp.*,
  5 N.J. Tax 52 (1982), *aff'd*, 6 N.J. Tax 349 (Super. Ct. App. Div. 1984) ...........................100

*Salomon Inc. v. United States*, 976 F.2d 837 (2d Cir. 1992) .........................................................8

*In re San Francisco Indus. Park, Inc.*, 307 F. Supp. 271 (N.D. Cal. 1969) ................................57

*Schubert v. Commissioner*,
  33 T.C. 1048 (1960), *aff'd*, 286 F.2d 573 (4th Cir. 1961) ......................................................89

*Schwam v. Twp. of Cedar Grove*,
  9 N.J. Tax 406 (1987), *aff'd*, 228 N.J. Super. 522 (App. Div. 1988) ...................................100

*In re Shri Saibaba, LLC*, No. 14-01403-5–DMW, 2015 WL 1518666
  (E.D.N.C. Bankr. Ct. Mar. 27, 2015)....................................................................................80

*Sirovatka v. Commissioner*, T.C.M. 1983-634 (Oct. 12, 1983).....................................................96

*Smith v Commissioner*, No. 19044, 1949 WL 7486 (T.C. Nov. 30, 1949)....................................98

*Solitron Devices Inc. v. Commissioner*, 80 T.C. 1 (1983) ...........................................27, 32, 91, 96

*Southgate Master Fund, LLC v. United States*, 659 F.3d 466 (5th Cir. 2011) .............................27

*Spring Hill, L.P. v. Tennessee State Bd. of Equalization*, No. M2001–02683–
  COA–R3–CV, 2003 WL 23099679 (Tenn. Ct. App. Dec. 31, 2003)....................................100

*People ex rel. State Pub. Works Bd. v. Talleur*, 79 Cal. App. 3d 690 (1978)...............................99

*Steele v. Town of Allenstown*, 471 A.2d 1179 (N.H. 1984) ........................................................31

*Suzy's Zoo v. Commissioner*, 273 F.3d 875 (9th Cir. 2001) ......................................................109

*Symington v. Commissioner*, 87 T.C. 892 (1986) ........................................................................70

*Utilicorp United, Inc. v. Commissioner*,
    T.C. Memo. 1997-47, 1997 WL 28654 (Jan. 27, 1997) ................................................. *passim*

*Van Duzer v. Commissioner*,
    T.C. Memo. 1991-249 (June 5, 1991), *aff'd*, 9 F.3d 1555 (9th Cir. 1993) ............28, 29, 65, 93

*Von-Lusk v. Commissioner*, 104 T.C. 207 (1995)..............................................................105, 109

*Washington Mutual, Inc. v. United States*,
    996 F. Supp. 2d 1095 (W.D. Wash. 2014)..............................................................................48

*Wineman v. Commissioner*, T.C. Memo. 2000-193 (June 28, 2000)...........................................97

## Statutes

15 U.S.C. § 790a(a)(3)...............................................................................................................69

15 U.S.C. § 790f(b)....................................................................................................................69

26 U.S.C. § 38(a) .........................................................................................................................8

26 U.S.C. § 38(b)(1) .....................................................................................................................8

26 U.S.C. § 46(a)(2) (1982) .........................................................................................................8

26 U.S.C. § 48(a)(1)....................................................................................................................25

26 U.S.C. § 48(a)(5)(D) ..................................................................................................11, 45, 56

26 U.S.C. § 167(c)(2)..................................................................................................................89

26 U.S.C. § 263A(f)(2)(A)(i).......................................................................................................107

26 U.S.C. § 1012 .........................................................................................................................26

42 U.S.C. § 7135(a)(1).................................................................................................................69

American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat.
    115................................................................................................................................ *passim*

California Senate Bill 107 § 17 (Sept. 26, 2006).........................................................................12

California Senate Bill 1078 § 3 (Sept. 12, 2002).........................................................................11

Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914(a), 106 Stat. 2776 ................................8

Energy Tax Act of 1978, Pub. L. No. 95-618, § 301, 92 Stat. 3197................................8

I.R.C. § 48 ................................................................................. *passim*

I.R.C. § 263A ................................................................105, 107, 109, 111

I.R.C. § 1060................................................................................102, 103

**Regulations**

26 C.F.R. § 1.263(a)-4(b)(3) ................................................................88

26 C.F.R. § 1.263A-1(c)(3) ................................................................105

26 C.F.R. § 1.263A-11 ................................................................107

26 C.F.R. § 1.467-1(c)(3)(iv), Example 2................................................................62

26 C.F.R. § 1.1012-1(a) ................................................................26

26 C.F.R. § 1.1060-1................................................................102

Treas. Reg. § 1.48-1(d)(4)................................................................45, 46

Treas. Reg. § 1.167(a)-5 ................................................................48

Treas. Reg. § 1.170A-1(c)(2)................................................................66

Treas. Reg. § 1.197-2(b)(1)................................................................95

Treas. Reg. § 1.197-2(b)(2)................................................................96

Treas. Reg. § 1.1060(b)(2)(ii)................................................................96

Treas. Reg. § 1.338-6(b)(2)................................................................103

Treas. Reg. § 1.467-1(c)(1)................................................................61

Treas. Reg. § 1.467-1(h)(12)................................................................61

Treas. Reg. § 1.467-3(a) ................................................................61

**Treasury & IRS Authorities**

53 Fed. Reg. 27040 (July 18, 1988)................................................................103

I.R.S. Chief Counsel Advisory, IRS CCA 201040004, 2010 WL 3937045 (June 24, 2010) ................................................................93

I.R.S., Depreciation Frequently Asked Questions, FAQ 3 ............................................................49

I.R.S. Notice 2013-29, § 4 (May 13, 2013) ...............................................................45

I.R.S. Priv. Ltr. Rul. 200215037, 2002 PLR LEXIS 42 (Apr. 12, 2002) ......................................92

I.R.S. Priv. Ltr. Rul. 201214007, 2012 PLR LEXIS 11 (Apr. 6, 2012) ........................................91

I.R.S. Priv. Ltr. Rul. 201249013, 2012 PLR LEXIS 1325  (Dec. 7, 2012) ...................................92

I.R.S. Priv. Ltr. Rul. 201515007, 2015 WL 1579258 (Apr. 10, 2015)......................................109

I.R.S. Tech. Adv. Mem. 9317001, 1993 WL 134598 (Apr. 30, 1993).............................90, 91, 97

I.R.S. Tech. Adv. Mem. 200326034, 2003 WL 21483117 (June 27, 2003)................................26

I.R.S. Tech. Adv. Mem. 200907024 (Feb. 13, 2009) .......................................................56, 57, 97

U.S. Department of Treasury, Payments for Specified Energy Property In Lieu of
    Tax Credits under the American Recovery and Reinvestment Act of 2009
    (2011)................................................................................................................................45, 46

U.S. Department of Treasury, Payments for Specified Energy Property in Lieu of
    Tax Credits Under the American Recovery and Reinvestment Act of 2009:
    Frequently Asked Questions and Answers, Question 40......................................................106

**Other Authorities**

Appraisal Institute, *The Appraisal of Real Estate* (13th ed. 2008) ................................................81

Aswath Damodaran, *Investment Valuation: Tools and Techniques for
    Determining the Value of Any Asset* (2d ed. 2002)...................................................................32

Aswath Damodaran, Stern School of Business, *The Value of Synergy* (Oct. 2005).....................32

Cal. Exec. Order No. S-14-08 § 1 (Nov. 17, 2008) ........................................................................12

Michael Cole, *Using Governmental Incentives to Finance Solar Renewable
    Energy Projects: Alternative Investments for High-Net-Worth Individuals*............................58

Shannon P. Pratt & Alina V. Niculita, *Valuing a Business*: *The Analysis and
    Appraisal of Closely Held Businesses* (5th ed. 2008).............................................................81

*The PTC and Wind Energy*, 11 Hous. Bus. & Tax L.J. 455 (2011) ................................................9

## INTRODUCTION

1.      In order to encourage renewable energy development, Section 1603 of the American Recovery and Reinvestment Act of 2009 mandated that the Department of Treasury pay cash grants equal to 30 percent of the owner's "basis" in newly constructed renewable energy production facilities.  This lawsuit relates to six such facilities, which are all part of North America's largest wind energy center, the Alta Wind Energy Center located in Tehachapi Pass, 100 miles north of Los Angeles, California.  The six lawsuit facilities are known as Alta Wind Facilities I through VI, and are collectively referred to herein as the "Alta Wind Lawsuit Facilities," and individually as a "Facility."

2.      Each Plaintiff owns an interest in one of the Alta Wind Lawsuit Facilities.  Each Plaintiff purchased its own Facility brand new, shortly before it had gone into service.  Each Plaintiff applied for a cash grant for its Facility, claiming as its "basis" the amount it had paid to buy the Facility from Terra-Gen Power LLC ("Terra-Gen"), an independent company that had developed and constructed all of the Facilities.  Plaintiffs' applications thus followed faithfully the exceedingly well-established legal principle that, absent peculiar circumstances (not present here), the amount paid for a property establishes its basis, without further inquiry.

3.      The Section 1603 cash grant program set the grant amount at 30% of the basis of the electricity-producing components of a wind energy facility.   Plaintiffs' cash grant applications accordingly reflected precise calculations that excluded the small portion of the purchase prices that related to non-energy producing components, chiefly high voltage transmission lines at the "tail end" of a Facility that deliver the electricity to the utility interconnection.  The Government's rule of thumb was that roughly 5% of the value of a wind energy facility relates to such non-energy producing components, and Plaintiffs' much more precise calculations were all consistent with that rule of thumb.  KPMG, LLP ("KPMG"), a

leading accounting firm, certified that Plaintiffs' allocations between eligible and ineligible property were appropriate.

4.      Having appropriately allocated the purchase prices, the work necessary properly to determine the cash grant was finished.  The basis of each energy producing facility was established, and the only remaining step was for the Government to multiply that eligible basis by 30% and pay Plaintiffs that amount.

5.      Rather than paying cash grants equal to 30% of Plaintiffs' purchase prices for the eligible property, Treasury paid grants equal to 30% of seller Terra-Gen's out of pocket costs to construct and develop that property.  This approach defied the bedrock legal principle that the amount paid for property establishes its basis.

6.      Treasury's approach also violated the well-established legal principle that, even under the limited circumstances (inapplicable here) under which the amount paid for property is not recognized as establishing basis, such basis is established by the property's fair market value. Copious evidence demonstrates that the fair market value of each Facility was equal to, if not greater than, the purchase price paid by each Plaintiff, based on well-established valuation methods.  Thus, the applied-for cash grants were entirely warranted, even if the purchase prices were not used to establish basis.

7.      In addition to its legally improper approach to determining a property's basis, Treasury speculated that the assets acquired through the purchases might have included cash grant ineligible intangibles such as going concern value, or goodwill, or "locational value" (arising from the Facility's location in an area with premier wind conditions, near a major metropolitan area, in a State that encourages renewable energy).  But Treasury never attempted

to determine, either at the time of the awards or through its work on this case, whether these purported intangibles actually exist, or their value.

8.      In fact, none of these intangibles do exist here.  Each Plaintiff purchased its properties before it had even gone into service, thoroughly belying any notion of a "going concern value" on the purchase date.  In addition, there was no opportunity to attract additional customers, given that all of the Facilities' output had already been contracted for sale for the next approximately 24 years of each facility's useful life.  The Facilities also could not be physically expanded or otherwise expand electrical production, and in any event they had no right to deliver additional electricity to the utility grid.  No goodwill can exist under those circumstances.

9.      Finally, as best can be determined, "locational" value has never been recognized as an intangible in the annals of tax accounting.  A brand new hotel in Manhattan, New York is likely worth more than a brand new hotel in Manhattan, Kansas, but the law requires that any value associated with a property's location be reflected in the property's basis.

10.      The Facilities' purchase prices did reflect that Plaintiffs were not buying congeries of uncoordinated physical assets, like turbines and transformers and cable wires stacked in a warehouse.  Plaintiffs purchased fully constructed, fully tested, fully operational, wind energy power facilities, each of which had gone through a laborious and risky development process, been constructed and assembled through a massive effort, and was ready to produce prodigious amounts of electricity.  All of the considerable value associated with seller Terra-Gen having surmounted these formidable risks and producing fully developed, assembled, tested, and operational Facilities, capable of performing per design, is reflected in the purchase prices paid *and is by law deemed part of the basis of the assets themselves*.

11.     Plaintiffs are accordingly entitled in these lawsuits to awards totaling the more than $200 million difference between the cash grants they were awarded and the cash grants they should have been awarded applying correct legal principles.

12.     The remainder of this document proceeds as follows.  First, Plaintiffs describe the Section 1603 program, the Tehachapi region where the six Alta Wind Lawsuit Facilities are located, and the development of those Facilities.

13.     Second, Plaintiffs describe the purchase of the Alta Wind Lawsuit Facilities by the Plaintiffs, including the incontrovertible evidence demonstrating that each purchase was negotiated at arm's-length between willing, well-informed parties, all of whom were independent of Terra-Gen and none of whom was under compulsion to buy or sell.  These elements establish that the purchase prices must be respected as determining basis, without resort to further valuation efforts.

14.     Third, Plaintiffs demonstrate that the fact that five of the Facilities were sold in sale-leaseback transactions does not amount to a "peculiar circumstance" that could justify ignoring the purchase prices for purposes of determining basis.  The sale-leaseback has long been recognized as an entirely legitimate and appropriate business structure.  Indeed, Treasury's own Section 1603 Guidance explicitly assumed that this structure would be used with respect to wind facilities for which Section 1603 cash grants were sought.

15.     Nothing about the sale-leasebacks for any of the five Alta Wind Lawsuit Sale-Leasebacks Facilities qualifies as "peculiar" so as to call into question the legitimacy of the purchase prices paid.  Indeed, one simple fact belies that concern: Plaintiffs' purchase prices with respect to the five Alta Wind Lawsuit Sale-Leasebacks Facilities were actually on average *lower than* both the purchase price paid in the outright purchase of the sixth Alta Wind Lawsuit

Facility, **and** the purchase prices paid in the outright purchases of two other Alta Wind Energy Center facilities not at issue in this lawsuit. Thus, there can be no suggestion that the purchase prices for the five Alta Wind Lawsuit Sale-Leaseback Facilities were somehow manipulated and should be rejected on that ground.

16.  Fourth, Plaintiffs show that even if the purchase prices were not used to establish basis (as they should be), the three traditional methods of determining fair market value (and hence basis) in the absence of a purchase price – the income approach, the comparable sales approach, and the cost approach – establish a basis equal to or greater than that established by the purchase prices. Thus, the use of these valuation methods would still justify entirely Plaintiffs' claims in this lawsuit. Specifically, Plaintiffs demonstrate that:

— The income method is widely utilized to value income-generating assets such as the Alta Wind Lawsuit Facilities. The income method projects future net cash flows arising from the sale of electricity generated by the Facilities, and applies a discount rate to translate those cash flows into a present value. This valuation methodology results in a value of each Alta Wind Lawsuit Facility in excess of its purchase price, and thus in excess of the basis claimed in the cash grant application.

— The comparable sales method determines value based on the purchase prices paid for other comparable properties. The only other wind facilities that are truly comparable to the six Alta Wind Lawsuit Facilities are the Alta VIII and Alta IX Wind Facilities, two non-lawsuit wind facilities located at the Alta Wind Energy Center that were sold in outright purchase transactions. The purchase prices paid for these comparable properties establish a value for each of the six Alta Wind Lawsuit Facilities in excess of its purchase price, and thus in excess of its claimed basis.

— As discussed in greater detail below, courts and valuation experts have found the cost method to be the least accurate method to value income-generating assets such as the Alta Wind Lawsuit Facilities.  Nevertheless, the cost approach also establishes values for those Facilities as great as their purchase prices.  The cost method establishes value by combining the costs to construct the facility and a markup paid by the buyer to the builder/developer for having constructed a fully functioning, ready to operate facility, and for having borne the burdens and risks of loss if development were unsuccessful.  Each Plaintiff knew Terra-Gen's projected cost to build its Alta Wind Lawsuit Facility before agreeing on a purchase price, and each Plaintiff thus willingly paid a markup to Terra-Gen equal to the difference between those costs and the purchase prices.  The same is true for the purchasers of non-lawsuit Alta Wind Facilities Alta VIII and Alta IX.  The markups in all of these transactions are quite comparable.  These real world, market-derived markups establish the appropriate markup amount, were the cost method of valuation to be employed.  Those markups result in a value equal to the purchase prices, and thus equal to Plaintiffs' claimed bases.

17.   Fifth, we demonstrate that Plaintiffs rigorously applied a straightforward, commonly used method for allocating the purchase prices between the eligible energy producing portion of the Alta Wind Lawsuit Facilities and the small percentage of the Facilities consisting of non-eligible, non-energy producing property (such as high voltage transmission lines).  The results of that allocation were entirely consistent with the Government's own rule of thumb that five percent of a wind power facility consists of non-eligible property.

18.   Sixth, we demonstrate that no viable factual or legal predicate exists for the Government's suggestion that a portion of the purchase price should be allocated to alleged

intangible assets such as goodwill, going concern value, locational value, or the power purchase agreements by which the electricity produced by the Facilities is sold to the local utility.

19.     The foregoing demonstrates that the Government underpaid the cash grants due to Plaintiffs by more than $200 million.  As an adjunct to that demonstration, we also show why the Government's counterclaims, asserting that it overpaid the cash grants, have no support in fact or law.  The Government's counterclaims start from the false proposition that the Government was correct in rejecting the purchase prices to establish each Plaintiff's basis and relying instead on seller Terra-Gen's out of pocket costs of construction.  The Government then compounds its errors, and creates its misguided counterclaims, by seeking to recalculate the cash grants by excluding three Terra-Gen cost categories as purportedly ineligible, even though the Government had considered these cost categories at the time it made its cash grant awards, and decided then that they should be included.

20.     These three cost items are: interest payments made by Terra-Gen during the construction of the facilities; amounts paid by Terra-Gen to the original developers of the site, in order to acquire various permits, wind data, agreements, and other development milestone achievements necessary to bring the projects from a conceptual stage to operation; and a fee Terra-Gen was contractually required to pay to one of the prior developers.  Plaintiffs' demonstration that basis should *not* be determined using the cost method moots whether those three items should be included.  But we also demonstrate that the Tax Code and case law construing it would affirmatively *require* all three items to be included in determining basis, were the cost method to be utilized.  Thus, the counterclaims are fatally flawed because they both pursue the wrong valuation method and then fail properly to apply it.

## CONTENTIONS OF FACT AND LAW

I.     **The Section 1603 Program, the Tehachapi Region, and the Alta Wind Facilities.**

     A.     **The Section 1603 Cash Grant Program.**

     21.     Since 1962, the United States has used the investment tax credit ("ITC") to promote capital investment in targeted industries and activities. *Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063, 1064 (Fed. Cir. 1983); *Pac. Far. E. Line, Inc. v. United States*, 544 F.2d 478, 483 (Ct. Cl. 1976) (the ITC was adopted "to encourage modernization and expansion of the Nation's productive facilities and to improve its economic potential by reducing the net cost of acquiring new equipment" (quoting H.R. Rep. No. 87-2508, at 14 (1962) (Conf. Rep.))).

     22.     An ITC provides a dollar for dollar reduction in income taxes otherwise owed by a taxpayer for a specified percentage (currently 30% for qualified wind energy properties) of every investment dollar the taxpayer expends on property eligible for the credit.  The ITC thus provides a powerful incentive for taxpayers to make capital investments in the industries and activities Congress has targeted. *See* 26 U.S.C. §§ 38(a), (b)(1); *Salomon Inc. v. United States*, 976 F.2d 837, 839 (2d Cir. 1992) ("The investment tax credit reduced dollar-for-dollar the tax due . . . .").

     23.     Among the industries whose development the federal government has long sought to foster through the use of ITCs is renewable energy, including wind energy.  Congress first provided tax benefits specific to renewable energy in the Energy Tax Act of 1978, Pub. L. No. 95-618, § 301, 92 Stat. 3197, which provided a 10% ITC for investments in renewable energy facilities, including wind.  26 U.S.C. § 46(a)(2) (1982).  Congress next used tax credits to promote wind energy in the Energy Policy Act of 1992, Pub. L. No. 102-486, § 1914(a), 106 Stat. 2776, which provided for *production* tax credits based upon the amount of wind energy

produced.  Then, in the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5,

§ 1102(a), 123 Stat. 115, Congress added wind energy facilities to the kinds of renewable energy

facilities (such as solar) that were already eligible for a 30% ITC under Section 48 of the Internal

Revenue Code, 26 U.S.C. § 48(a)(5).

24.     While ITCs can provide a powerful incentive for investment in the targeted

industry or activity, an ITC is of economic value to a taxpayer only insofar as it can be applied as

a credit against income taxes otherwise owed by the taxpayer.  A given wind energy developer

may not have sufficient income tax liabilities itself to make use of an ITC.  In addition, the

investments required to develop and run a wind energy facility are in the hundreds of millions of

dollars, and wind energy developers routinely need to raise capital from third parties to support

projects.  *See, e.g.*, *The PTC and Wind Energy*, 11 Hous. Bus. & Tax L.J. 455, 459 (2011) ("The

high start-up costs for wind facilities often cause wind developers to rely on equity investors to

supply the necessary capital.").  Thus, wind energy developers often seek the involvement in

their projects of well-funded third party investors that both have the necessary capital and can

take advantage of the ITC and other available tax benefits such as depreciation.  *Id.*

25.     While such arrangements have historically worked well, a sharp economic

downturn hit the entire U.S. economy in 2008.  Investors facing financial losses or even just

significantly reduced profits had relatively little use for ITCs, given that these tax credits are of

value only if one has income tax obligations that the credit will reduce.  As Congress explained:

> The Congress understands that some investors in renewable energy
> projects have suffered economic losses that prevent them from benefitting
> from the renewable electricity production credit and the energy credit.
> The Congress further believes that this situation, combined with current
> economic conditions, has the potential to jeopardize investment in
> renewable energy facilities.  The Congress therefore believes that, in the
> short term, allowing renewable energy developers to elect to receive direct

> grants in lieu of the renewable electricity production credit and the energy credit is necessary for the continued growth in this important industry.

Joint Committee on Taxation, General Explanation of Tax Legislation Enacted In The 111th Congress 109-110 (Mar. 2011), JCS-2-11 NO 6 (I.R.S.), 2011 WL 940372, at *11 ("General Explanation").

26.     Congress addressed the situation through Section 1603 of the American Recovery and Reinvestment Act of 2009, entitled "Grants for Specified Energy Property In Lieu of Tax Credits."  Section 1603 created a temporary program under which those qualifying for an ITC under Internal Revenue Code Section 48 could elect to receive the same economic benefit as an ITC, but as an immediate cash grant, rather than as a tax credit.

27.     Section 1603 provided in relevant part:

> (a) IN  GENERAL.—Upon  application,  the  Secretary  of  the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). . . .

> (b) GRANT AMOUNT.—
> (1) IN GENERAL.—The amount of the grant under subsection (a) with respect to any specified energy property shall be the applicable percentage of the basis of such property . . . [for wind projects, 30 percent of the basis]
> […]

> (d)  SPECIFIED  ENERGY  PROPERTY.—For  purposes  of  this section, the term ''specified energy property'' means any of the following:
> […]

> (1) QUALIFIED FACILITIES—Any qualified property . . . which is part of a qualified facility . . . described in paragraph (1) ["Wind facility"] . . . of section 45(d) of [the Internal Revenue] Code.
> […]

> (h) DEFINITIONS.—Terms used in this section which are also used in section 45 or 48 of the Internal Revenue Code of 1986 shall have the same meaning for purposes of this section as when used in such section 45 or 48.
>
> […]

Pub. L. No. 111-5, § 1603, 123 Stat. 115 ("ARRA").

28.     Section 1603 provided that cash grants would be 30% of the basis of the "specified energy property," which the statute then defined as "qualified property" which is part of a wind facility.  Section 48 of the Internal Revenue Code, in turn, defines qualified property as "tangible property . . . used as an integral part" of the wind energy facility.  26 U.S.C. § 48(a)(5)(D); *id.* § 48(a)(5)(C); *id.* § 45(d)(1).  Further IRS and Treasury guidance establishes in essence that the entire facility is deemed eligible except for land, certain buildings, and high voltage transmission lines.  This topic is discussed further in paragraphs 133-135 below.

29.     The Conference Report accompanying Section 1603 emphasized that "[i]t is intended that the grant provision mimic the operation of the credit under section 48 [of the Internal Revenue Code]."  General Explanation, 2011 WL 940372, at *12.  The basis of property under Section 1603 must thus be determined under the same well-established rules for determining basis under the ITC program, and under the Tax Code more generally.

**B.     California's Support for Renewable Energy.**

30.     Like the federal government, the State of California has long encouraged the development of renewable energy.  As early as 1980, California had passed a 25% state investment tax credit for renewable energy facilities.

31.     In addition, going well beyond such tax credits, California in 2002 created a Renewable Portfolio Standard, which initially required that utilities in the state obtain 20% of their electricity from renewable resources, including wind, by 2017.  California Senate Bill 1078 § 3 (Sept. 12, 2002) ("Beginning on January 1, 2003, each electrical corporation shall . . .

increase its total procurement of eligible renewable energy resources by at least an additional 1 percent of retail sales per year so that 20 percent of its retail sales are procured from eligible renewable energy resources no later than December 31, 2017.").  In 2006, this timetable was shortened, such that the 20% target had to be met by 2010.  California Senate Bill 107 § 17 (Sept. 26, 2006) ("Each retail seller shall . . . increase its total procurement of eligible renewable energy resources by at least an additional 1 percent of retail sales per year so that 20 percent of its retail sales are procured from eligible renewable energy resources no later than December 31, 2010.").  In 2008, the standard was further amended by executive order to require that utilities obtain 33% of their electricity from renewable sources by 2020.  Cal. Exec. Order No. S-14-08 § 1 (Nov. 17, 2008) ("[T]he following Renewable Portfolio Standard target is hereby established for California:  All retail sellers of electricity shall serve 33 percent of their load with renewable energy by 2020.  State government agencies are hereby directed to take all appropriate actions to implement this target in all regulatory proceedings . . . .").

32.     These renewable energy requirements provided a very powerful incentive for the development of renewable energy in the state, given that utilities had to engage in whatever economic conduct was necessary to achieve the legislatively mandated levels.  As part of its efforts to satisfy the Renewable Portfolio Standard requirements, public utility Southern California Edison filed an application in 2004 with the California Public Utilities Commission to construct the ambitious Tehachapi Renewable Transmission Project, which was subsequently approved.  The first phase of this project consisted of the construction of 173 miles of new and upgraded high-voltage transmission lines for the transmission of electricity from wind energy facilities and other sources in Kern County, California, to Los Angeles County.  The Project was the first major transmission project in California built specifically to access renewable generation

in a wind-rich resource area.  Construction, which began in 2008, cost approximately $1.8 billion.  The Project resulted in a high-voltage transmission system capable of delivering 4,500 megawatts ("MW") to the Los Angeles metropolitan area, located only 100 miles south of Tehachapi.

### C.     The Tehachapi Region.

33.     The Tehachapi Region is a hilly area ranging from 2,500 to 8,000 feet in elevation.  The Mojave Desert lies to the east.

34.     These geographical features render the Tehachapi region a uniquely valuable wind resource.  The desert to the east heats up in the morning, creating a thermal low pressure region.  Cooler, higher-pressure air masses move in from the Pacific Ocean in the west to fill that thermal low.  That west-to-east air flow naturally goes through various mountain passes in the Tehachapi region to reach the desert to the east.  It is this geography that creates high wind speeds in the area.  Even better, those winds are strongest at favorable times: during the day, when power demand is higher, rather than at night.

35.     Wind power development began in the Tehachapi area during the early 1980s.  At the time, wind turbines produced far less electricity and were far shorter than they are today.  For instance, Terra-Gen's Cameron Ridge facility in Tehachapi, which began operations in the 1980s, consisted of 41 turbines that were approximately 80 feet high, and produced a maximum output of 108 kW.  Likewise, Terra-Gen's Ridgetop Energy facility in Tehachapi, which began operations in 1986, initially consisted of 155 75 kW turbines of a similar height.  By contrast modern turbines are between 200 and 500 feet tall and each produce one to three megawatts of power (1 MW = 1,000 KW).  For instance, a modern Vestas V90 turbine is between 200 and 350 feet fall, and a single turbine can produce three megawatts of electricity.  Four of these V90

turbines produce more electricity than all 155 turbines initially installed at the Ridgetop Energy facility in the 1980s.

36.     The Tehachapi region has continued to be a prime location for wind energy development in California.  By 2009, over 3,500 wind turbines had been installed in the Tehachapi region, accounting for 5% of all wind power generation in the entire United States.

**D.     Terra-Gen Power LLC.**

37.     Terra-Gen Power is a renewable energy company focused on developing, owning, and operating utility-scale wind, geothermal and solar electricity generation facilities.  Terra-Gen has owned, operated or developed 36 renewable energy facilities across six states.  Terra-Gen was the top wind power facility developer in the United States in 2011, as measured by installed megawatts.

38.     Terra-Gen developed the Alta Wind Energy Center.  The Alta Wind Energy Center is the largest wind energy center in North America, and one of the largest in the world.

39.     The Alta Wind Energy Center consists of 1,547 megawatts of wind energy capacity, enough to provide power to 464,000 homes.  Terra-Gen developed, and constructed between 2010 and 2013, eleven separate wind facilities at the Alta Wind Energy Center, sequentially numbered Alta I through Alta XI.  The eleven facilities are largely adjacent to one another, and are between 90 and 168 megawatts in size.  Eight of the eleven facilities (including five of the Alta Wind Lawsuit Facilities) use Vestas V-90 3 MW turbines.  The other three, including Alta I, located on the steepest slope, uses 1.5 MW General Electric turbines.

40.     Except for the facilities with smaller turbines, if one were standing at the Alta Wind Energy Center, one would not know where one facility began and another ended.  They are essentially identical.  The Alta Wind Energy Center was developed as eleven separate facilities in order to facilitate their construction, financing and ultimate sale, and to allow for sequential

development.  It would have been prohibitively expensive to finance and develop, or sell, all 1,547 megawatts of wind energy in a single transaction, or at one time.

### E.    Initial Development Efforts.

41.    In late 2005, utility Southern California Edison issued a request for proposals for the development of renewable energy resources, in order to help the utility meet its obligations under California's Renewable Portfolio Standard to obtain a specified percentage of its electricity from renewable resources, including wind, by 2017.  In early 2006, Allco Wind Energy ("Allco"), and Oak Creek Energy Systems ("Oak Creek"), a renewable energy developer, partnered to propose to Southern California Edison what would ultimately become the Alta Wind Energy Center.

42.    In December 2006, Southern California Edison and an Oak Creek/Allco subsidiary entered into a Master Power Purchase and Wind Project Development Agreement (the "Master PPA"), which provided for the development by the Oak Creek/Allco subsidiary of multiple wind facilities totaling an aggregate capacity between 1,500 and 1,550 MW, with all of that output to be sold to Southern California Edison for a period of roughly 25 years.  In the Master PPA, Oak Creek/Allco agreed to construct at least 1,500 megawatts of wind generating capacity in Kern County, California (where Tehachapi is located), and to arrange for those facilities to sell their output to Southern California Edison.  In exchange, Southern California Edison agreed to enter into a separate long-term power purchase agreement to purchase all electricity generated by each such facility, with the price to be set in accordance with a formula set forth in the Master PPA.

43.    Between December 2006 and July 2008, some progress was made by Allco/Oak Creek in developing the Alta Wind Energy Center.  For example, Allco/Oak Creek entered into a turbine supply agreement for the GE turbines ultimately used for the first of the Alta Wind

facilities (Alta I); acquired important wind data pertinent to locating wind turbines and assessing the economic viability of the project; acquired transmission queue rights to the Tehachapi Renewable Transmission Project; acquired rights to some of the land that would ultimately be needed for the Center; began collecting environmental data necessary for the permitting process; and had begun that very extensive process. However, no actual construction had begun during this period.

###### F.  Terra-Gen's Acquisition of Allco's Interests.

44.  In early 2008, Allco chose to cease its efforts at the site and began a competitive process to sell its interests in what ultimately became the Alta Wind Energy Center. Numerous companies expressed interest in acquiring those assets. The auction process had two stages: an initial bid round, and then a second phase for those bidders whose initial bids were deemed by Allco to be sufficiently attractive. There were at least three second phase bidders, including Terra-Gen.

45.  Terra-Gen submitted an initial bid range of $285-$335 million on April 8, 2008, with the range based upon the assumptions contained in the Confidential Information Memorandum prepared by Allco. Terra-Gen was invited to participate in the second phase, in which it submitted an initial offer of $280 million, which as part of the competitive bidding process, it subsequently increased first to $310 million and then to $325 million.

46.  Terra-Gen was selected as the winning bidder and completed its acquisition of assets from Allco on July 15, 2008, for approximately $394 million (consisting of approximately $390 million in equity and approximately $4 million in assumed liabilities). The increase from the $325 million to $394 million primarily reflects a $55.875 million turbine payment, as well as certain closing costs and adjustments. The assets acquired included development rights, transmission rights, some leased land, some fee land, and a separate, under-construction, non-

lawsuit wind facility located outside the Alta Wind Energy Center (the Alite facility, which had a single commercial customer, to which electricity was to be supplied only on an as-needed basis). Some of the land included with the Allco assets was acquired outright, but a majority came in the form of unperfected land rights, in which Allco had secured an option to lease the land, to be negotiated at a future date.

47. Terra-Gen's acquisition of the Allco assets occurred in the midst of the 2008 international financial crisis. An enormous amount of development work remained to be done on the Alta facilities, and success was far from assured, even assuming that Terra-Gen was able to obtain the billions of dollars in loans to carry out such development, at a time when credit markets were tightening dramatically. The financing risk created by the international financial crisis was exacerbated by the absence of any precedent for financing a wind farm on this scale. Had Terra-Gen been unable to obtain the permits, environmental approvals, land rights, easements, financing, or other requisites, due to the financial crisis or otherwise, it risked losing most and perhaps all of its $394 million investment. Had the construction gone poorly, slowly or unsuccessfully, serious losses would likely be incurred. Moreover, Terra-Gen faced the risk that the Government might cease providing incentives to invest in renewable energy before the facilities were completed, thus diminishing their value.

### G.     Terra-Gen's Subsequent Development of the Alta Facilities.

48. While Allco and Oak Creek had made a highly valuable start, the vast majority of the work to develop and construct the Alta Wind Energy Center remained to be performed after the date of purchase. Terra-Gen had to secure a variety of required permits (such as environmental permits and Federal Aviation Administration permits); negotiate and enter into turbine and construction contracts; execute interconnection and crossings agreements; obtain

additional land rights; obtain interconnection rights; obtain construction financing; and oversee and implement the actual construction of the massive Alta Wind Energy Center.

49.     **Permits & Approvals**:   Terra-Gen had to obtain a variety of permits and regulatory approvals, some of the most significant of which were:

- **Re-Zoning Application**.   Terra-Gen had to secure Kern County resolutions approving amendments to the zoning plan, in order to be able to construct wind turbines.  This required securing three separate zoning ordinances and one zoning resolution from the Kern County Board of Supervisors, which were not obtained until December 15, 2009.  These changes were far from guaranteed, and final approval was obtained only after Terra-Gen agreed to give up development rights to one of the primary land parcels acquired from Allco due to public opposition.

- **California Environmental Quality Act (CEQA) Review.**  California is one of the most, if not the most, environmentally protective states in the country.  The rezoning application triggered the need for a comprehensive environmental review under CEQA, including the preparation of a comprehensive environmental impact report.  The notice of preparation of the environmental impact report was not filed until December 2008, and a draft was not complete until the third quarter of 2009.  As part of the CEQA process, Terra-Gen implemented over 100 mitigation measures that were imposed by Kern County and covered various areas.   The CEQA review was the largest wind power CEQA review in California's history.   Had the CEQA review not been completed, or been completed erroneously or inadequately, suit could have been brought by third

parties to enjoin development of the project pending completion of the environmental impact report.

- **California Department of Fish & Game Permits**.  Terra-Gen had to obtain so-called incidental take permits relating to the desert tortoise and the Bakersfield cactus, which were issued in May 2010.  Both of these are California endangered species, meaning that such permit applications are given rigorous environmental scrutiny and their grant is subject to a wide variety of restrictions and mitigation provisions designed to eliminate or minimize the adverse impact of development on those species.  As part of its requisite mitigation effort, Terra-Gen had to spend over $13 million installing temporary tortoise-proof fencing to prevent tortoises from entering the wind turbine sites during construction.  Terra-Gen spent an additional $17 million on land mitigation efforts, including the creation of a conservation easement for the protection of the desert tortoise and the relocation of affected Bakersfield cacti.  Additional cacti and tortoises were encountered in April 2010, when construction was underway on Alta I.  The need to address these species with additional mitigation efforts resulted in placing the construction efforts for 27 turbines (27% of the Alta I facility) and a transmission line on hold for several weeks.  Terra-Gen's sponsors were informed that these delays could well place the schedule at risk and have a budget impact, and if such permits were not secured, those turbines simply could not have been installed and operated.

- **Federal Aviation Administration Permits.**  Terra-Gen had to obtain an FAA determination of no hazard to air navigation for each and every turbine it planned to construct.  It would not have been authorized to construct the facilities without

such FAA authorizations given the area's proximity to Mojave Airport and Edwards Air Force Base.

50.     **Real Estate**:  Terra-Gen had to obtain a number of real estate rights in order to have land on which to construct and operate the Alta facilities.

- **Perfection of Allco land rights.**  A majority of the land acquired from Allco came in the form of unperfected land rights, in which Allco had secured options to lease certain lands, but those leases needed to be negotiated and finalized at a later date.  Many of these unperfected land rights involved CalPortland Cement Company, where Terra-Gen acquired a base "master lease" from Allco, but needed to meet a number of requirements before it could finalize parcel-specific leases or even finance the land.

- **Land acquisition/leases.**  The acquisition from Allco did not entail sufficient land to construct even Alta I (much less the additional Alta facilities).  Terra-Gen had to acquire additional land to develop these facilities.

- **Rights of way and Easements.**  Terra-Gen had to obtain numerous rights of way and easements necessary to construct or support the wind turbines – for instance, to allow for access roads, electricity collection systems, and similar items.

51.     **Other Development Activities:** There were a variety of other development tasks in which Terra-Gen had to engage, including the following.

- Negotiate and execute construction contracts for construction of the Facilities.

- Negotiate and execute turbine supply agreements to obtain the turbines for Facilities other than Alta I.

- Obtain construction financing to fund construction of the Facilities in the extremely difficult financing environment created by the international financial crisis.

- Construct the Facilities, which for Altas I through VI was an immense effort that involved *inter alia* digging and constructing 340 massive, rebar reinforced concrete foundations; building crane pads; installing 340 turbines and hundreds of transformers; cutting over 80 miles of roads; installing meteorological towers to gauge wind characteristics; digging over 119 miles of cable trenches and laying that many miles of cable wiring; building control centers, and much, much more.

52.     These are only examples of the extensive development work in which Terra-Gen engaged.   To accomplish all these necessary development tasks, Terra-Gen increased its development group from a single individual to more than 25 in-house development professionals, staffed a finance team of five professionals to handle financing, hired nine construction management professionals to oversee the project construction, and engaged the construction firm Blattner Energy, which staffed the Alta project with 1,225 full time construction workers and 766 part time workers.   Terra-Gen also engaged 23 additional third party consultants.

53.     At the time of the acquisition of assets from Allco, all of these tasks remained outstanding, and there was substantial risk that the project could be derailed – and Terra-Gen's investment wiped out – if necessary real estate, permits, or other development requirements were not obtained.   Terra-Gen contemporaneously identified numerous risks, several of which it categorized as "fatal flaws."   If any of these terminal risks came to fruition, the project would fail entirely.   Indeed, the head of the development team of NextEra Energy, a major renewable

energy company, told Terra-Gen that he thought the development would never happen, and that not a single generating megawatt would ever be constructed.

54.     These kinds of risks resulted in a high "mortality rate" for development projects in California, which Terra-Gen roughly estimated at over 50% in 2010, significantly higher than in other states.

55.     Terra-Gen ultimately spent over $2.15 billion to develop and construct the six Alta Wind Litigation Facilities, and a total of $4.23 billion developing all eleven facilities at the Alta Wind Energy Center.  This amount was more than ten times Terra-Gen's initial cost to acquire the Allco assets.

**H.      Terra-Gen Had to Sell the Alta Wind Lawsuit Facilities for the Section 1603 Cash Grant Program to be Utilized.**

56.     Section 1603 prohibits any "pass-thru entity" from receiving a cash grant if ***any*** "holder of an equity or profits interest" in the pass-thru entity is a nonprofit organization.  ARRA § 1603(g)(4).  This is unusual, in that the ITC, for example, allows nonprofit ownership and merely reduced the ITC proportionately.  Given that a small percentage of Terra-Gen's ownership was held by nonprofit entities, Terra-Gen was rendered ineligible for a cash grant. Through its trade association, Terra-Gen sought a legislative solution, without success.

57.     Terra-Gen could have become eligible for a grant only if it had established a C corporation blocker entity between Terra-Gen and the individual Alta project entity.  While this would have made Terra-Gen eligible for the cash grant, it would have imposed a very costly double layer of income taxation.

58.     Terra-Gen therefore needed to sell the Alta Wind Lawsuit Facilities, which it did.

II.    **The Purchase Price Paid for Each Alta Wind Facility Conclusively Establishes Its Basis.**

A.    **Plaintiffs' Purchases of the Alta Wind Lawsuit Facilities.**

59.    As noted, the Alta Wind Energy Center is comprised of eleven separate wind facilities, six of which – the Altas I, II, III, IV, V, and VI (which is also known as Mustang Hills) Facilities – are at issue in these consolidated lawsuits.

60.    Terra-Gen developed and constructed these Alta Wind Lawsuit Facilities, which were ultimately placed in service between the end of 2010 and May 2012.  Prior to each Facility being placed in service, Terra-Gen sold the facility in arm's-length transactions with one or more well-informed third-party buyers, each unrelated to Terra-Gen, after engaging in lengthy negotiations and competitive processes to secure a competitive price, a process detailed further below.  Five of the Alta Wind Lawsuit Facilities (Altas I through V) were sold in sale-leaseback transactions, in which Terra-Gen sold the facilities and then leased back the sold property for approximately 24 years.  Alta VI (Mustang Hills) was sold outright, with no leaseback.  The Facilities were conveyed at a point when construction was complete and the purchasers thus did not face any development risk when they acquired the Facilities.

61.    A wind energy facility's value lies in the amount of electricity it can produce and then sell.  Value is commonly expressed on a per-kilowatt basis (*i.e.*, the purchase price divided by the "rated" maximum amount of electricity the facility can produce based on its size and type of turbine), adjusted for capacity factor (*i.e.*, adjusted for differences in actual electrical output versus rated capacity due to variations in the windiness of the individual facility location or other factors).   Per-kilowatt values, adjusted for capacity factor, allow for apples to apples comparisons between facilities (subject to the existence of any other distinguishing characteristics).

62.     The purchase prices paid for each of the five Alta Wind Lawsuit Facilities sold in a sale-leaseback transaction were essentially the same on a per kilowatt basis (after adjusting for differences in electrical generating capacity), **and** essentially the same as the price paid for the outright purchase of the Alta VI (Mustang Hills) Lawsuit Facility. *Moreover,* all six of those purchase prices were essentially the same as the purchase prices paid for two Alta Wind Center facilities that are not the subject of this litigation, which were purchased in outright purchases in March and November 2012, respectively, by unrelated third parties without any leaseback: the Alta VIII and Alta IX facilities.[1]

63.     Thus, eight separate Alta Wind Facilities were purchased, by seven separate purchasers,[2] five through sale-leasebacks and three through outright purchases. The capacity-adjusted price for each was essentially the same. The average price paid for the five sale-leaseback facilities was actually a bit *less* than the average price for the three outright purchases, demonstrating that the sale-leaseback mechanism did not somehow result in inflated values:

---

[1]     A ninth Alta Wind Energy Center facility, the Alta VII facility, was also sold in November 2012 in an outright purchase transaction, at a price essentially the same as the capacity-adjusted sale price for the other Alta facilities. However, Alta VII is somewhat difficult to make fully comparable because it contains unique transmission assets. Two other developed and constructed facilities, Altas X and XI, were also sold, but (a) they were sold, along with other valuable assets, for a single lump sum, such that determining the price paid for each or even both facilities is challenging if even possible, and (b) their purchase date (2014) was materially later than the purchase dates for the six Alta Wind Lawsuit Facilities, rendering a comparison less useful.

[2]     In this context, "purchaser" refers to the purchaser or its parent or ultimate beneficial owner, specifically: Brookfield Renewable Power, Inc.; Citibank NA; EverPower Wind Holdings, Inc.; General Electric Company; Google Inc.; Mid-American Energy Company; and UnionBanCal Corporation.

| Transaction | Capacity Adjusted Price, $ / kw |
|---|---|
| **Outright Purchase Transactions** | |
| Alta VI | $2,929 |
| Alta VIII | $3,018 |
| Alta IX | $3,157 |
| **Average** | **$3,035** |
| **Sale-Leaseback Transactions** | |
| Alta I | $2,906 |
| Alta II | $2,926 |
| Alta III | $2,835 |
| Alta IV | $2,971 |
| Alta V | $2,989 |
| **Average** | **$2,926** |

**B.  Plaintiffs' Bases In the Properties Are Determined By the Price They Paid to Purchase the Facilities.**

64.  Under Section 1603, the amount of the cash grant payable to the owner of a wind power generating facility is 30 percent of "the basis of such property." ARRA § 1603(b)(1).

65.  Section 1603 defines "basis" by reference, stating that "[t]erms used in this section which are also used in [Internal Revenue Code] section 45 or 48 . . . shall have the same meaning for purposes of this section as when used in such section 45 or 48." ARRA § 1603(h). Indeed, as noted above, Congress intended that "the grant provision mimic the operation of the credit under section 48 [of the Internal Revenue Code]."  General Explanation, 2011 WL 940372, at *12.

66.  "Basis" is a term specifically used in Internal Revenue Code Section 48, the Code provision authorizing ITCs for renewable energy property.  Section 48 provides that the ITC for renewable energy property is calculated as a percentage of such property's "basis."  *See* 26 U.S.C. § 48(a)(1).  Basis under Section 48 is, in turn, determined in accordance with the general

rules for determining basis under the Internal Revenue Code. *See, e.g.*, 26 U.S.C. § 1012; *Pac. Far E. Line, Inc. v. United States*, 544 F.2d 478, 485 (Ct. Cl. 1976); *ARRA Energy Co. v. United States*, 97 Fed. Cl. 12, 21 (2011). Basis is used for many purposes under the tax code, including computing deductions for depreciation, amortization, and depletion, as well as the computation of taxable gain or loss if the asset is later sold.

67. Accordingly, "[b]asis" has a well-established meaning in federal tax law. By regulation, where the taxpayer has purchased property from another, the taxpayer's basis is "the amount paid [by the taxpayer] for such property in cash or other property." 26 C.F.R. § 1.1012-1(a). *See also ARRA Energy*, 97 Fed. Cl. at 21 ("Under the IRC, the term 'basis' is generally used to refer to the cost of the property to the taxpayer," citing 26 U.S.C. § 1012).

68. If the purchase price includes both cash and the assumption of liabilities, the basis is the combination of both, *i.e.*, the combination of the "cash and other property given in exchange for the property and any liabilities [the buyer] assumed or to which the property is subject." *Little v. Commissioner*, T.C. Memo 1996-270, 1996 WL 315771, at *15 (June 12, 1996) (citing *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983)), *aff'd*, *Christensen v. Commissioner*, No. 96-70741, 1998 U.S. App. LEXIS 7576 (9th Cir. Apr. 10, 1998); *Consol. Coke Co. v. Commissioner*, 70 F.2d 446, 447-49 (3d Cir. 1934) (basis of purchased plant includes debt assumed by taxpayer); *Oxford Paper Co. v. United States*, 86 F. Supp. 366, 367-68 (S.D.N.Y. 1949) (basis of purchased plant includes assumed lease obligation); I.R.S. Tech. Adv. Mem. 200326034, 2003 WL 21483117, at *3 (June 27, 2003) ("Under general tax law principles, the amount paid for property generally includes the amount of the seller's liabilities assumed by the buyer.").

69.     The Court of Claims, in a controlling decision, held that a taxpayer's acquisition cost for assets constitutes its basis in those assets as a matter of law, for purposes of calculating the ITC due under Internal Revenue Code Section 48: "The cost of property to the taxpayer is the amount of money that he paid to acquire the property, whatever the source of the money." *Pac. Far E. Line*, 544 F.2d at 485.

70.     The notion that a taxpayer's basis in property is equal to its acquisition cost is so well established that the Tax Court has described it as "[o]ne of the verities of tax law." *Solitron Devices Inc. v. Commissioner*, 80 T.C. 1, 23 (1983).  Numerous other decisions are to the same effect.  *See, e.g.*, *Crispin v. Commissioner*, 708 F.3d 507, 510 n.3 (3rd Cir. 2013) ("taxpayer's basis in property is generally equal to the purchase price paid by the taxpayer"); *Southgate Master Fund, LLC v. United States*, 659 F.3d 466, 471 (5th Cir. 2011) ("ordinarily, the taxpayer takes a cost basis in a piece of property equal to the property's purchase price"); *Muserlian v. Commissioner*, 932 F.2d 109, 114 (2d Cir. 1991) (basis is equal to "the cost to the taxpayer of acquiring the asset"); *Philip Morris, Inc. & Consol. Subsidiaries v. Commissioner*, 96 T.C. 606, 623 (1991) (taxpayer's basis in stock it purchased "equals the purchase price of such stock"), *aff'd without op.*, 970 F.2d 897 (2d Cir. 1992).

71.     Indeed, the purchase price governs basis even if objective evidence indicates that the purchaser overpaid for the asset.  *See Solitron Devices*, 80 T.C. at 23 (whether the taxpayer paid a "premium" for the asset is irrelevant to a determination of the proper basis).[3]  Likewise,

---

[3]     *Accord MacKenzie v. United States*, 714 F. Supp. 268, 271-72 (E.D. Mich. 1989) ($150,000 purchase price established basis even where a jury found the fair market value of the property to be only $60,000, noting that purchase price established basis regardless of whether the price paid was a "sensible bargain[] from the buyer's, but exceptionally good from the seller's point of view," and even if "the purchaser pays too much" and the purchase price was a "[b]ad bargain[] from the buyer's point of view" (quoting *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir 1976)); *Matheson v. Commissioner*, 31 B.T.A. 493, 495-96 (1934) (continued…)

the purchase price establishes basis regardless of whether or the extent to which the seller earns a profit or suffers a loss on the sale.

72.     In short, the case law uniformly holds that the courts "should not reject actual transactions prices when they are available," given that "what a willing buyer will pay a willing seller in an arms'-length transaction . . . is the gold standard of valuation; other measures are approximations." *Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 648 (7th Cir. 2012).  That is so because "[t]he value of a thing *is* what people will pay. . . .  [When] we have a willing buyer and willing seller dealing at arms'-length[,] the price they agree on *is* the value of the asset." *Id*.

73.     This is consistent with finance literature, which widely accepts that the most objective way to determine value is to look at the price of an arm's-length sale.

74.     Accordingly, each Plaintiff's basis is what it paid Terra-Gen to acquire its interests in its Alta Wind Lawsuit Facility.

**C.     A Buyer's Basis Includes the Value of Any Tax Benefits or Other Government Benefits Associated With the Assets It Acquires.**

75.     The basis of an acquired property includes the value of tax benefits associated with that property.  As the Tax Court has explained, "[t]he Supreme Court … has recognized that the tax savings generated by an asset can be an identifiable component of its value, and that sophisticated taxpayers may consider such savings in assigning a value to property.  'We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.'" *IT&S of Iowa, Inc. v. Commissioner*, 97 T.C. 496, 532 n.28 (1991) (quoting *Frank Lyon Co. v. United States*, 35 U.S. 561, 580 (1978)); *see also Van Duzer v. Commissioner*, T.C. Memo. 1991-249 (June 5, 1991) (courts have long recognized that "Federal income tax laws affect and shape every

---

(taxpayer's basis in stock was its $130,700 acquisition cost, notwithstanding clear indications that the stock's fair market value was $19,500 less), *aff'd*, 82 F.2d 380 (5th Cir. 1936).

business transaction, and parties to such transactions are entitled to take into account and to maximize favorable tax results so long as the transaction has economic substance and a business purpose . . . ."), *aff'd*, 9 F.3d 1555 (9th Cir. 1993).

76.     Courts have thus explicitly recognized that one must include the value of tax benefits in determining basis, because "[a] willing buyer would most certainly consider the availability of . . . tax credits when determining the fair cash value of the property." *In re Creekside Sr. Apartments, LP*, 477 B.R. 40, 60 (B.A.P. 6th Cir. 2012) (citation and quotation marks omitted).  This is because a buyer would consider "both the benefits and the burdens associated with property ownership." *Id.*  Tax benefits can have "a significant impact on the value of the property and must, therefore, be analyzed when determining the fair value of the property." *Id.* at 58.

77.     Other decisions are to the same effect.  *E.g.*, *In re Lewis & Clark Apartments, LP*, 479 B.R. 47, 53-54 (B.A.P. 8th Cir. 2012) ("In the same way that [price] caps and other restrictions on use of the property may affect its value negatively, the tax credits available to the owners as a result affect its value positively.  For that reason, valuation without consideration of the tax credits does not accurately reflect what a willing buyer would pay to purchase the property from the Debtor.").

78.     Accordingly, courts routinely include the value of tax benefits in valuing the property to which those benefits attach.  *See, e.g.*, *Van Duzer*, T.C. Memo. 1991-249 (approving of valuation that included "the Federal and State tax benefits petitioners expected to receive from the windfarms"); *Sacks v. Commissioner*, 69 F.3d 982, 991 (9th Cir. 1995) (investors are entitled to "tak[e] depreciation deductions and tax credits [based on the purchase price] even though the investor paid more because [the investor] anticipated the benefit of the depreciation deductions"

(citation and quotation mark omitted)); *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *1 (Jan. 27, 1997) (approving valuation incorporating income tax considerations); *Meredith Corp. v. Commissioner*, 102 T.C. 406, 461-62 (1994) (where a party to a transaction included tax benefits "in determining a reasonable purchase price" and there was no "substantial doubt that such tax benefits would ultimately be allowed," inclusion of the tax benefits in the income approach to valuation was proper); *Peoples Bancorporation* v. *Commissioner*, T.C. Memo. 1992-285, 1992 WL 103657 (May 18, 1992) (approving taxpayers' inclusion as "part of the value the full tax benefit of amortization of the core deposits using a reasonable method."); *In re Creekside*, 477 B.R. at 60 (accurate valuation of a property must reflect the value of tax benefits); *In re Lewis & Clark Apartments*, 479 B.R. at 53-54 (valuation of a property must reflect the value of tax benefits to be accurate); *In re De Leon*, No. 11-56921– ASW, 2013 WL 3805733, at *9 (Bankr. N.D. Cal. July 18, 2013) (following *In re Lewis & Clark Apartments* and explaining that "an analysis of a property's fair market value . . . should take into account any tax credits which accrue to the owner of the property, because the existence of the tax credits have an impact on what a buyer would be willing to pay for the property"); *Pine Pointe Hous., L.P. v. Lowndes Cty. Bd. of Tax Assessors*, 561 S.E.2d 860, 863 (Ga. Ct. App. 2002) ("[When] tax credits are generated by a designated property, a third party would pay for the value as part of that property's sale price in a bona fide, arm's length transaction."); *Antisdale v. City of Galesburg*, 362 N.W.2d 632, 641 (Mich. 1984) ("To the extent that tax benefits to a typical owner affect the 'usual selling price' of property, they are properly included within the true cash value of the property."); *Country Club Estates v. Supervisor of Assessments of Montgomery Cty.*, No. 1894, 1986 WL 3416, at *5 (Md. Tax Ct. Apr. 24, 1986) ("We find that where income producing property has attached to it favorable financing and other tax related

benefits yet income generating restrictions, the willing purchaser will be one wishing to obtain those benefits of ownership of such property.  Therefore, the approach to valuing the property for property tax purposes should include the consideration of those benefits.  Just as . . . the failure to consider contract rent of an income producing property is at odds with the willing seller-willing purchaser approach to market value, so too, the failure to consider the tax benefits of the property undermines this long recognized approach."); *Brandon Bay, Ltd. P'ship v. Payette Cty.*, 132 P.3d 438, 442 (Idaho 2006) ("When determining the market value of low-income housing developments, the value of [low income housing] tax credits should be included in the assessment.").

79.    A property's basis similarly reflects the impact of Government policies in general, both those that increase value and those that diminish it, given that both will impact what a willing buyer will pay a willing seller.  *See Allegheny Ludlum Corp. v. United States*, 358 F. Supp. 2d 1334, 1339 (C.I.T. 2005) ("[t]he fair market value of the company takes into account all of a company's liabilities and assets including assets that were incurred with government support"); *Am.-Hawaiian S.S. Co. v. United States*, 85 F. Supp. 815, 817, 821, 833 (S.D.N.Y. 1949) (proper valuation "gave due regard to the testimony concerning the effect of [g]overnment restrictions"), *decree aff'd*, 191 F.2d 26 (2d Cir. 1951); *Steele v. Town of Allenstown*, 471 A.2d 1179, 1181-82 (N.H. 1984) ("The master's finding that the federal subsidies should not be considered is inconsistent with the well-established rule that all relevant factors to property value should be considered when making an appraisal in order to arrive at a just result" (citations and quotation marks omitted)); *Ferland Corp. v. Bouchard*, 626 A.2d 210, 215 (R.I. 1993) (federal regulations limiting the rents of an apartment complex are a relevant factor to consider in assessing its value).

80.     Finance literature also reflects that the tax benefits and government incentives associated with an asset must be considered in determining the asset's value.  *See, e.g.*, Aswath Damodaran, Stern School of Business, *The Value of Synergy* 3 (Oct. 2005) (tax benefits are important components of property value); Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* 255 (2d ed. 2002) ("Firms sometimes obtain tax subsidies from the government for investing in specified areas or types of businesses.  These tax subsidies can either take the form of reduced tax rates or tax credits.  Either way, these subsidies should increase the value of the firm.").

### D.     The Black Letter Rule that Each Plaintiff's Basis Is the Purchase Price It Paid Is Not Subject to Any Applicable Exception.

81.     The only exception to the black letter rule that purchase price establishes basis arises when "peculiar circumstances" establish that the parties were not truly dealing at arm's-length or that the transaction lacked real economic substance.  *See*, *e.g.*, *Solitron Devices,* 80 T.C. at 17; *Moore v. Commissioner*, T.C. Memo. 2013-249, 2013 WL 5827653 at *3-4 (Oct. 30, 2013).   "Generally, … in those cases in which courts limited the basis of an asset to [a calculated] fair market value [rather than the purchase price], the courts found that the taxpayers were not dealing at arms-length, that there was not a real indebtedness, or that there was not a bona fide business purpose."  *MacKenzie v. United States*, 714 F. Supp. 268, 271 (E.D. Mich. 1989).

82.     As detailed in Sections II.E through II.M below, no such peculiar circumstances exist here.  The Alta Wind Lawsuit Facilities purchase transactions were at arm's-length between well-informed parties, with the purchasers being unrelated to Terra-Gen, and none of the parties under a compulsion to buy or sell.  Those transactions were funded by cash consideration and the assumption of debt.  The transactions all had a bona fide business purpose.

83.     Alta VI was an outright purchase transaction between two unrelated parties, in which the buyer received the plant and the ability to earn income from its operations and electricity sales.  Altas I through V were sale-leasebacks in which the buyers acquired ownership of the Facilities, the entitlement to the cash grant and depreciation benefits, a (hopefully) steady income stream from lease payments funded by electricity sales, and the significant value projected to remain at the end of the lease terms.  The seller-developer, in turn, obtained a return on its capital and profits for its construction and development efforts, and, from the lease and operation of the facilities, a portion of the revenue generated by electricity sales if it operated the Facilities efficiently.

84.     Sale-leasebacks with economic substance and legitimate business purposes are fully respected, a conclusion which is unaffected by the tax benefits generated.  *Frank Lyon Co. v. United States*, 435 U.S. 561, 580, 583-84 (1978) (sale leaseback held to have economic substance, with the Court noting that "[w]e cannot ignore the reality that the tax laws affect the shape of nearly every business transaction.").  Indeed, Treasury's own guidance for the Section 1603 program explicitly contemplated the employment of sale-leasebacks.

85.     Courts in a few instances have found that a purchase price does not establish basis because the purchase price was clearly excessive and the parties entered into a separate agreement to which some of the purchase price should be allocated.  *See, e.g.*, *Lemmen v. Commissioner*, 77 T.C. 1326, 1348-49 (1981) (finding purchase price for cattle excessive, and that part of price should be allocated to underpriced maintenance contract entered between same parties).  In those situations, however, the purchase price was "highly inflated" in light of market evidence.  *Lemmen*, 77 T.C. at 1348-49 ("it is clear that the stated price of herds was *highly inflated* above the market value of the animals" and that the simultaneously entered maintenance

contract was "less than the cost of comparable service[s]" (emphasis added)); *Regan v. Commissioner*, T.C. Memo 1982-733, 1982 WL 11024, at *6 (Dec. 23, 1982) ("the … purchase price was *highly inflated* when compared to the . . . fair market value" (emphasis added)).

86.     But there is no possible ground to reach that conclusion here.  As noted in paragraph 63 above and detailed in Sections II.J and VI.B below, the average price paid by Plaintiffs in the Altas I through V sale-leaseback transactions was actually *lower* than the average price paid by the buyers in the Alta VI, VIII and IX outright purchase transactions (on a per kilowatt basis after adjusting for capacity factor).  Thus, as detailed in Section II.J below, there is no ground to conclude that the Altas I through V purchase prices were inflated at all, much less that they were so highly inflated as to trigger application of the "peculiar circumstances" rule.

87.     Appraisals prepared at the times of the transactions by an appraisal firm DAI Management Consultants, Inc. ("DAI") determined that the transaction prices were consistent with fair market value.

88.     We now turn to each of the purchase transactions, in the order in which they occurred.

**E.      The Altas II-V Transactions Were Heavily Negotiated By Sophisticated Parties, and the Purchase Prices Paid By the Plaintiff Purchasers Is Determinative of Basis.**

89.     The Alta II Facility is comprised of 50 Vestas wind turbines, which together comprise 150 Megawatts of rated capacity.  The Alta III Facility is comprised of 50 Vestas wind turbines, which together comprise 150 Megawatts of rated capacity.  The Alta IV Facility is comprised of 34 Vestas wind turbines, which together comprise 102 Megawatts of rated capacity.  The Alta V Facility is comprised of 56 Vestas wind turbines, which together comprise 168 Megawatts of rated capacity.

90.     Terra-Gen commenced the process for selling each of the Altas II through V facilities in late 2009.  Terra-Gen distributed information to at least 13 institutions relating to a potential purchase, including Barclays, Credit Suisse, ING, and others.  Discussion with Citibank NA began in November 2009, when Terra-Gen sent Citi a financial model, nondisclosure agreement, and other materials.  Citibank had considerable experience in the renewable energy industry, with a total of $30 billion in renewable energy investments as of 2010.

91.     The Terra-Gen financial model included in the materials provided to potential bidders reflected a $3,389/kw value for the facilities, $3,259/kw of which related to eligible property.  Terra-Gen regarded this as a reasonable value.

92.     Citibank was well aware that Terra-Gen had issued a request for proposals to multiple parties, and that Citibank needed to put a fair price on the table to "win the deal."  Terra-Gen received proposals from other entities, including Credit Suisse.

93.     Citibank proposed to Terra-Gen a purchase price of approximately $3,000 per kilowatt for eligible property, with the exact price to be determined by appraisals of the facilities.  This $3,000 per kilowatt proposal was approximately 8% less than the value Terra-Gen had placed on the property.

94.     Terra-Gen responded by asking for a fixed purchase price of $3,000 per kilowatt.  Citibank refused, holding out for an agreement under which the exact price would be subject to appraisal, to avoid overpayment.

95.     Citibank was ultimately selected because it offered a better purchase price for the facilities than the other bidders.  But there continued to be negotiation of specific terms, and during this period, Citibank conducted extensive due diligence of the facilities, including a review of hundreds of documents loaded to the data room for the site, such as the independent

engineer's report, the wind study for the facilities, the power purchase agreements, interconnection agreements, turbine supply agreements, balance of plant agreement for construction of the facilities, land leases and real estate deeds, and other documents material to the construction and operation of the facilities.

96.    Before making its bid and finalizing its purchase, Citibank conducted an analysis of whether a $3,000 per kilowatt price was justified.  This analysis was memorialized in a May 2010 Credit Approval Memorandum, prepared by the Citibank project team seeking formal Bank approval of the transaction.  That document reflects two separate and independent valuations of the Altas II through V facilities.

97.    First, Citibank conducted a discounted cash flow analysis, which projected the income streams for the Alta II-V facilities from the sale of electricity, deducted operating expenses, and then discounted the future cash flows to their present value.  Citibank determined that the discounted cash flow value of the facilities was within a range, with a mid-point of $3,015.8 per kilowatt.  Citibank believed that this mid-point was the best measure of the fair market value of the facilities, and justified a $3,000 per kilowatt purchase price.

98.    Second, Citibank applied the EBITDA Multiple methodology, which involves multiplying the EBITDA (earnings before interest, taxes, depreciation, and amortization) of the facilities by a representative multiplier.  That resulted in a $2,985.2/kW value for the Altas II-V facilities.

99.    Citibank's proposed purchase price of approximately $3,000 per kilowatt was based solely on these internal valuations.

100.   The enterprise values calculated by Citibank's valuations included the value of tax benefits associated with the assets (deemed to constitute roughly a quarter of the value), but did not include any of the financial benefits of bonus depreciation.

101.   Terra-Gen and Citibank entered into an equity commitment letter on June 18, 2010, under which Citi agreed to purchase eligible property at the Altas II through V facilities for the following amounts, subject to appraisal: Alta II, $450 million; Alta III, $450 Million; Alta IV, $306 million; Alta V, $504 million.   Actual payments were deferred pending completion of the facilities, and if all necessary conditions were satisfied, including the facility being certified as ready to commence commercial operations and sell electricity, the parties would execute the sale-leaseback on the "lease commencement date."

102.   DAI, the independent appraiser preferred by Citibank, subsequently conducted appraisals of the Alta II-V Facilities.   In those appraisals, DAI concluded that the value of the eligible property was a few percent below $3,000/kW.   The parties transacted at those lower appraised values, as agreed in the equity commitment letter.

103.   Construction was completed, and the transactions were consummated.   Between the execution of the equity commitment letter and the consummation of the sale-leaseback transaction, a subsidiary of Google Inc. ("Google") stepped into Citibank's shoes with respect to the purchase of 50% of Alta IV and 50% of Alta V.   Google was provided access to the data room of relevant materials, and conducted a site visit.

104.   On December 30, 2010, Terra-Gen sold only eligible property at the Alta II Facility, in a sale-leaseback transaction to Alta Wind II Owner Lessors A through E for $440,249,843.61, or $2,935/kw.   Citibank was the beneficial owner of each of the Owner Lessors.   The purchase price was paid through $173,441,843.61 in a series of wire transfers from

the buyers to a Terra-Gen account, together with an assumption by the buyers of $266,808,000.00 in outstanding liabilities incurred by Terra-Gen to develop the Alta II Facility.

105.    On April 13, 2011, Terra-Gen sold eligible property at the Alta III Facility in a sale-leaseback transaction to Alta Wind III Owner Lessors A through D for $444,534,902.68, or $2,964/kw.  Citibank was the beneficial owner of each of the Owner Lessors.  The purchase price was paid through $162,433,406.31 in a series of wire transfers from the buyers to a Terra-Gen account, together with an assumption by the buyers of $282,101,496.37 in outstanding liabilities incurred by Terra-Gen to develop the Alta III Facility.

106.    On May 20, 2011, Terra-Gen sold eligible property at the Alta IV Facility in a sale-leaseback transaction to Alta Wind IV Owner Lessors A through D for $288,792,166.89, or $2,831/kw.  Citibank was the beneficial owner of Owner Lessor A and B, while a Google subsidiary was the beneficial owner of Owner Lessors C and D.  The purchase price was paid through $107,113,014.70 in a series of wire transfers from the buyers to a Terra-Gen account, together with an assumption by the buyers of $181,679,152.19 in outstanding liabilities incurred by Terra-Gen to develop the Alta IV Facility.

107.    On June 13, 2011, Terra-Gen sold eligible property at the Alta V Facility in a sale-leaseback transaction to Alta Wind V Owner Lessors A through D for $488,003,048.83, or $2,905/kw.  Citibank was the beneficial owner of Owner Lessor A and B, while a Google subsidiary was the beneficial owner of Owner Lessors C and D.  The purchase price was paid through $197,447,915.21 in a series of wire transfers from the buyers to a Terra-Gen account, together with an assumption by the buyers of $290,555,133.62 in outstanding liabilities incurred by Terra-Gen to develop the Alta V Facility.

108.   The average purchase price for eligible property at the Alta II-V Facilities was $2,915/kw — roughly 3% (or $49 million) below the fixed $3,000/kw price that Terra-Gen had sought based on Citibank's offer.

109.   Citi had been a major investor and advisor with respect to renewable energy ever since renewable energy came into existence.   Google had hired and relied on experienced advisors in connection with the Alta Wind IV and Alta Wind V transactions.   Citibank, Google and Terra-Gen are unrelated to each other.

**F.   The Alta I Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid by the Plaintiff Purchasers Is Determinative of Basis.**

110.   The Alta I Facility is comprised of 100 General Electric wind turbines, each with a rated capacity of 1.5 Megawatts.   The Facility as a whole comprises 150 Megawatts of rated capacity, enough to power 45,000 average U.S. households.

111.   The Alta I Facility is built on the ridges and plateaus of the rugged Tehachapi Mountains, with elevations ranging from 4,080 to 5,612 feet above sea level.   Alta I thus benefits from the windiest location of all the Alta Wind Lawsuit Facilities, with projected electrical output per kilowatt of generating capacity exceeding that of the Alta VI Facility by more than 28 percent.

112.   In the Spring and Summer of 2010, Terra-Gen engaged in discussions with a number of entities, including Bankers Commercial Corporation, a unit of UnionBanCal ("Union Bank"), GE, and others about possibly purchasing Alta I upon completion of construction.

113.   Discussions between Union Bank and Terra-Gen began by mid-May 2010.   Union Bank was familiar with Terra-Gen and the Alta I Facility, because it had previously participated in construction financing for the facility in March 2010.

114.     An internal Union Bank memorandum dated May 26, 2010, discussed a potential sale-leaseback of the Alta I Facility, but no offer was made at that time.   Discussion between Union Bank and Terra-Gen continued during the summer of 2010, and picked up pace in late August 2010, when Terra-Gen provided a draft term sheet to Union Bank laying out a proposed sale-leaseback structure for the transaction, without indicating a specific purchase price.

115.     Terra-Gen conducted an internal analysis of a reasonable purchase price for the grant-eligible property at Alta I.   The analysis indicated that the value of the grant-eligible property alone would be in the range of $3,312/kW, or $496.8 million, with an income approach valuation for the facility coming in higher, at $3,455/kW or $518.25 million.   Terra-Gen then provided pricing guidance to Union Bank on September 9, 2010, indicating that it sought an approximate purchase price of $502.5 million for the grant-eligible property only.

116.     In parallel with its ongoing discussion with Union Bank over a possible sale leaseback transaction, Terra-Gen solicited bids from third parties for a potential outright purchase of Alta I, seeking to obtain the best possible price for the facility.   Terra-Gen distributed bidding materials to and solicited first round bids from 10 parties on October 1, 2010, and subsequently provided materials to three additional bidders.   The bidding materials consisted of a detailed 44-page confidential information memorandum with information about the facility, as well as a financial model for the facility.

117.     While this outright purchase bidding process was underway, and before any first-round bids had been received, Terra-Gen received a sale leaseback proposal from Union Bank on October 8, 2010 with an assumed asset cost of $465 million.

118.     Terra-Gen viewed this October 8 Union Bank proposal as a first low ball offer that really "wasn't the answer [Terra-Gen] [was] looking for."   Terra-Gen proceeded with the

bidding process for an outright purchase, and in mid-October, received indications of interest from seven bidders.  Terra-Gen invited four parties to participate in the second round of bidding, in which bidders were provided access to an extensive data room of relevant agreements and information, and the opportunity to conduct due diligence.

119.    In mid-October 2010, Union Bank learned that Terra-Gen was engaging in this competitive process for a possible outright sale of Alta I.  Union Bank in late October conducted an economic analysis of the value to a buyer of an outright purchase of the entire Alta I Facility.  The analysis concluded that $550 million would be a reasonable price for an outright purchaser.  Union Bank concluded it needed to offer substantially more than $465 million in order to be competitive.

120.    Union Bank did not want to shoulder the entire purchase price, and in late October 2010, it and GE Energy Financial Services ("GE"), a unit of General Electric Company, began discussing a potential joint bid for a sale-leaseback of the Alta I facility.

121.    Both Union Bank and GE were sophisticated, experienced renewable energy investors, with GE's renewable energy portfolio including equity investments in 47 wind facilities totaling 6 gigawatts of power, and Union Bank having made investments in 20 renewable energy projects totaling over 1,750 MW of power.  Union Bank, GE and Terra-Gen are unrelated to each other.  Union Bank had no direct or indirect interests in Terra-Gen.  GE had a small (3.4%) indirect interest in Terra-Gen, by virtue of its small equity stake in one of Terra-Gen's owners.  This small ownership interest had no bearing on the purchase price GE and Union Bank were willing to offer.

122.    Before GE and Union Bank submitted their joint bid for Alta I, Terra-Gen received second round bids for the outright purchase of the facility.  The two strongest bids were

from Brookfield Renewable Power, Inc. ("Brookfield") and Sumitomo.   The Sumitomo bid, received on November 2, 2010, was for $566.5 million.   The Brookfield bid, received two days later, was for $540 million, which Brookfield later increased to $550 million.

123.   While the Sumitomo bid was somewhat higher, its ultimate interest was harder to gauge, whereas Brookfield was considered by Terra-Gen Power to be a highly credible bidder. Brookfield is a large, sophisticated energy company, owning one of the world's largest, publicly-traded, pure-play renewable power portfolios with close to $14 billion in power assets, including more than 4,500 MW of installed capacity.   Brookfield later owned other wind power facilities in the Tehachapi area, and, indeed, it later won a similar competitive process that led to its purchase of the Alta VIII facility in 2012.

124.   One day after Terra-Gen received Brookfield's bid, GE and Union Bank on November 5, 2010 issued a joint proposal to Terra-Gen, proposing a sale-leaseback of Alta I with a purchase price of $510 million.   This proposal represented a $45 million increase from Union Bank's initial assumed asset cost in its October 8, 2010 letter to Terra-Gen.   Three days later, GE and Union Bank revised their proposal, increasing the purchase price by another $10 million, to $520 million.   A $520 million offer for the eligible property was equivalent to a $560 million offer for the entire facility.

125.   Around November 16, 2010, Terra-Gen decided to pursue the sale-leaseback transaction with GE and Union Bank.   Terra-Gen regarded the $520 million offer as applying to the eligible property only, which was equivalent to a $560 million offer for the entire facility. That amount was slightly higher than the Brookfield offer, and a sale-leaseback had the advantage of allowing Terra-Gen to remain involved as the operator of the projects.   Terra-Gen viewed that as important for ensuring continued good relations with private and public entities in

the region, and for assisting with its future development efforts for other Alta Wind facilities.  A sale-leaseback would also allow Terra-Gen to earn money as an operator.

126.     On November 17, 2010, GE and Union Bank each entered into non-binding mandate letters with Terra-Gen for a purchase price of $520 million.  Negotiations continued. Union Bank and GE were given access to a comprehensive electronic data room in mid-November 2010, which contained hundreds of documents relevant to the transaction, such as the independent engineer's report, the wind study for the facility, the power purchase agreement, interconnection agreements, the turbine supply agreements, the balance of plant agreement for construction of the facilities, land leases and real estate deeds, and other documents material to the construction and operation of the facilities.

127.     Union Bank and GE reviewed those documents as part of their due diligence efforts.  Union Bank and GE also visited the Alta I site in person in late November to view the turbines and the site.  Union Bank and GE hired their own independent engineer, Sigma Energy Solutions, wind consultant, AWS TruePower, and transmission consultant, Navigant, to review independently the facilities and agreements.

128.     Further discussions among GE, Union Bank and Terra-Gen led to the resolution that Union Bank and GE would purchase the entire facility, both eligible and ineligible, and the parties tentatively reached agreement on a roughly $560 million purchase price.

129.     However, in late December 2010 Union Bank, consistent with its effort to negotiate aggressively the best possible price for the Alta I Facility, attempted to secure a purchase price reduction, based on a comparison between the Alta I Facility and the Alta III Facility.  Union Bank argued that Alta III had a value approximately 14% lower than Alta I, because of its lower capacity factor, and that when one adjusted the Alta III purchase price of

$477.8 million upwards by 14%, the implied value of Alta I was only $542 million, not the $560 million price to which the parties had tentatively agreed.

130.    The negotiations grew somewhat heated, but Terra-Gen and its consultants were able to explain in detail why the Alta III purchase price was in fact comparable to the proposed $560 million purchase price for Alta I once appropriate adjustments were made.  Union Bank ultimately dropped its last-minute request for a reduction in the purchase price of Alta I.

131.    During these last minute efforts by Union Bank and GE to reduce the purchase price, Terra-Gen re-engaged with Brookfield in December 2010.  Brookfield explained that it was still interested in buying the Alta I facility for $550 million, and that it would be able to close in the first quarter of 2011.  Ultimately, however, Union Bank and GE decided to proceed with a $560 million purchase price, and the transaction closed on December 31, 2010.  Both GE and Union Bank believed that $560 million reflected the fair market value of the Alta I Facility, based upon the value of the income that the facility would produce.

132.    Accordingly, on December 31, 2010, Terra-Gen sold the Alta I Facility for $560,000,000 to Alta Wind I Owner Lessors A, B, C and D, four statutory trusts that each acquired a 25% undivided interest in the facility.  This purchase price was consistent with the appraised value of the facility, as determined by DAI in an independent appraisal.  GE was the beneficial owner of Alta Wind I Owner Lessors A and B, and a Union Bank subsidiary was the beneficial owner of Alta Wind I Owner Lessors C and D.  The fact that Brookfield had made a competitive bid for the outright purchase of the Alta I Facility of $550 million, less than two percent below GE's and Union Bank's winning bid, further demonstrates that the sale-leaseback structure was not manipulated to artificially inflate the purchase price.

133.    As noted earlier, Section 1603 provided that cash grants would be 30% of the basis of the "specified energy property," which the statute then defined as "qualified property" that is part of a wind facility.  Section 48 of the Internal Revenue Code, in turn, defines qualified property as "tangible property . . . but only if such property is used as an integral part" of the wind energy facility.  26 U.S.C. § 48(a)(5)(D); *id.* § 48(a)(5)(C); *id.* § 45(d)(1).  Property is "used as an integral part . . . if it is used directly in the activity and is essential to the completeness of the activity," Treas. Reg. § 1.48-1(d)(4), a definition interpreted broadly by the Tax Court and the Court of Federal Claims.  *See, e.g.*, *New England Elec. Sys. v. United States*, 28 Fed. Cl. 720, 724-25 (1993) (property "is used as an integral part of an activity if it is used directly in the activity and is essential to the completeness of [that] activity[,]" and "courts have interpreted these requirements quite broadly" (emphasis omitted)).

134.    IRS guidance issued in 2013 relating to the Section 48 ITC program provides that eligible property includes "property integral to the production of electricity," which includes "[r]oads that are integral to the facility," including "roads for equipment to operate and maintain the qualified facility."   I.R.S. Notice 2013-29, § 4 (May 13, 2013), *available at* https://www.irs.gov/irb/2013-20_IRB/ar09.html.  The IRS guidance further specifies that step-up transformers and similar power conditioning equipment are eligible, explaining that "physical work on a custom-designed transformer that steps up the voltage of electricity produced at the facility to the voltage needed for transmission is physical work of a significant nature with respect to the facility because power conditioning equipment is an integral part of the activity performed by the facility."  *Id.*  Treasury's Section 1603 program guidance adopted the same tests.  U.S. Department of Treasury, Payments for Specified Energy Property In Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 11 (2011) ("Treasury

Guidance")[4]; *see also RP1 Fuel Cell, LLC v. United States*, 120 Fed. Cl. 288, 359 (2015) ("Treasury's guidance document issued for the Section 1603 program … happens to have been based on the language of Treasury Regulation § 1.48–1(d)(4)").

135.   The Treasury Guidance went on to explain:

Property is an integral part of a qualified facility if the property is used directly in the qualified facility and is essential to the completeness of the activity performed in that facility.  Roadways and paved parking areas located at the qualified facility and used for transport of material to be processed at the facility or equipment to be used in maintaining and operating the facility are integral to the activity performed there, but roadways or paved parking lots that provide solely for employee and visitor vehicle traffic are not an integral part [of] a qualified facility.  Property is considered used as an integral part of a qualified facility if so used either by the owner of the property or by the lessee of the property.

. . .

For qualified property that generates electricity, qualified property includes storage devices, power conditioning equipment, transfer equipment, and parts related to the functioning of those items but does not include any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines.

Treasury Guidance, at 11-12.

136.   Here, the value of the eligible and ineligible property was in their ability jointly to produce and deliver electricity to the customer, and their *relative* value to the entire facility is reflected in their relative share of the cost of the entire facility.  Applying the foregoing IRS and Treasury guidance and principles, the $560 million purchase price was allocated between eligible and ineligible property, based on the relative cost to construct each.  Terra-Gen and KPMG evaluated the costs incurred by Terra-Gen to construct each component of the facility, and

---

[4]     *Available at* https://www.treasury.gov/initiatives/recovery/Documents/GUIDANCE.pdf

determined whether the costs associated with each were eligible or ineligible. This involved assessing over 200 different categories of costs.

137.     For wind power facilities, the vast majority of total costs are typically incurred in connection with eligible tangible property, such as the turbines, turbine towers and foundations, and related equipment. The remaining costs are typically incurred in connection with ineligible tangible property, such as transmission infrastructure and interconnection infrastructure. KPMG ultimately determined that approximately 93.1% of total construction costs were incurred in connection with grant-eligible assets, and that 93.1% figure was applied to the $560 million purchase price, to derive a $521,360,000 value for grant-eligible property.

138.     KPMG had "conduct[ed] its examination in accordance with standards established by the American Institute of Certified Public Accountants with the objective of expressing an opinion as to whether costs reported . . . have been determined in accordance with the general rules for determining the basis of property" under the Section 1603 program. This review was performed by individuals in KPMG's cost segregation group who "are qualified to perform and have performed similar construction cost reviews" for a number of renewable energy projects. In response to Treasury inquiries, KPMG took a second look at its conclusion regarding the eligible basis of the Alta Wind I Facility. KPMG determined that its initial conclusion was correct and issued a letter recertifying that conclusion.

139.     An NREL reviewer with responsibility for the Alta Wind facilities considered KPMG's independent accountant reports (both in general and for the Alta facilities specifically) to be "the most thorough and accurate reviews that I have ever seen, and the same opinion applies for these applications," and that the KPMG reviews "are very thorough, detailed and exclude all ineligible costs."

140.    KPMG's method of allocating purchase price between grant-eligible and ineligible assets is a reasonable and widely-accepted accounting practice.

141.    According to Edward Settle of the National Renewable Energy Laboratory ("NREL"), which assisted Treasury in evaluating Section 1603 applications, NREL applied a 95%-5% eligible/ineligible ratio as a "typical rule of thumb," which NREL validated based on its review of multiple projects early in the life of the Section 1603 program.

142.    The allocation method employed by the Plaintiffs is also entirely consistent with applicable case law and regulations, which require that a lump-sum purchase price for a group of assets be allocated among assets based on their relative value.  As one court has put it:

> In transactions where one lump-sum purchase price is paid for a conglomeration of assets—as is the case here—the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition.  *See, e.g.*, *Bixby v. Comm'r*, 58 T.C. 757, 785, 1972 WL 2458 (1972) (holding that "when a taxpayer buys a mixed group of assets for a lump sum, the purchase price will be allocated among the assets in accordance with the relative value that each item bears to the total value of the group of the assets purchased"); *Victor Meat Co. v. Comm'r*, 52 T.C. 929, 931, 1969 WL 1734 (1969) (holding that "when a taxpayer buys a mixed aggregate of assets for a lump sum, an allocation of the purchase price will be made to the separate items upon the relative value of each item to the value of the whole"); [*C.D. Johnson Lumber Corp. v. Commissioner*], 12 T.C. 348, 363, 1949 WL 166 (1949) (same).

*Washington Mutual, Inc. v. United States*, 996 F. Supp. 2d 1095, 1104 (W.D. Wash. 2014).

143.    Likewise, IRS regulations provide that, if an entity acquires "a combination of depreciable and nondepreciable property for a lump sum," the "basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of the acquisition bears to the value of the entire property at that time."  Treas. Reg. § 1.167(a)-5.  The IRS has also explained that, if land and a building are purchased for a lump-sum purchase price in excess of their assessed values, the purchase price

should be allocated based on the relative assessed values.  The IRS provides an example where a building and land are purchased for $100,000, the assessed value of the building is $60,000, and the assessed value of the land is $20,000.  The IRS instructs that the relative assessed values should be used to determine the allocation of the purchase price, and so in this example $75,000 should be allocated to the building and $25,000 to the land.  I.R.S., Depreciation Frequently Asked Questions, FAQ 3, *available at* https://www.irs.gov/pub/irs-regs/depreciation_faqs_v2.pdf.

144.    Accordingly, the allocations between eligible and ineligible properties were correctly performed.

**G.    The Alta VIII Outright Purchase Was Heavily Negotiated By Sophisticated Parties.**

145.    The next Alta Wind sale transaction was an outright purchase of a non-lawsuit facility, Alta VIII.  Alta VIII is a 150 megawatt system comprised of 50 Vestas 3 megawatt turbines.  Alta VIII was sold through the familiar two-step bidding process, in which round one consisted of the submittal of indicative bids, based upon information set forth in a confidential information memorandum and other materials.  A selected group of bidders was then invited to participate in round 2, in which bidders made refined bids based upon data room materials, site visits, and other due diligence, followed by a negotiation of the final agreement with the winning bidder.

146.    Prior to the bidding process, Terra-Gen had analyzed the value of Alta VIII to a taxpaying purchaser in an outright purchase transaction, and concluded that the value would range from $436 million to $480 million for the entire facility.

147.    After a competitive bidding process, the 150 MW Alta VIII Facility was sold to Brookfield, the same entity that had previously submitted an unsuccessful bid for Alta I.  The transaction took place in March 2012, for $439.834 million.

148.    As discussed in connection with the Alta I bidding process, Brookfield was an experienced wind power company, which already owned wind power facilities in the Tehachapi region.  Brookfield is and always has been completely unrelated to Terra-Gen.  The companies did not share any common employees, officers, or directors.

**H.      The Alta VI Transaction Was Heavily Negotiated By Sophisticated Parties, and the Purchase Price Paid By the Plaintiff Purchaser Is Determinative of Its Basis.**

149.    The Alta VI Facility (also known as Mustang Hills) is comprised of fifty 3 megawatt Vestas wind turbines, which together comprise 150 Megawatts of rated capacity.

150.    The Alta VI transaction was an outright purchase.  Alta VI was sold using the familiar two-step bidding process, in which round one consisted of the submittal of indicative bids, based upon information set forth in a confidential information memorandum and other materials, and a selected group of bidders was then invited to participate in round 2, in which bidders made refined bids based upon data room materials, site visits, and other due diligence, followed by a negotiation of the final agreement with the winning bidder.

151.    Prior to the bidding process, Terra-Gen had analyzed the value of Alta VI based upon the price that had been paid for Alta VIII, and concluded that the equivalent price for Alta VI would be in the same range.

152.    Terra-Gen approached Brookfield, which had just purchased Alta VIII, but that company did not make an offer that Terra-Gen deemed acceptable.  Terra-Gen also engaged in discussions with Citibank regarding a potential leveraged tax equity partnership for the Alta VI

Facility, which Terra-Gen did not elect to pursue. Accordingly, Terra-Gen decided to approach a third company, EverPower.

153.     EverPower is a developer, owner, and operator of onshore wind facilities, owning and operating seven U.S. wind power facilities, with a combined capacity of over 751 megawatts. EverPower and Terra-Gen are, and have always been, completely unrelated companies, and have never shared employees, officers, directors, or owners.

154.     Terra-Gen sent bidding materials, including a confidential information memorandum, bidding instructions, and a financial model, to EverPower on January 26, 2012. EverPower's initial offer, in early February 2012, was $415 million (plus the assumption of a "swap" liability, the amount of which would be determined on the closing date), and subsequently increased that offer to $420 million (plus assumption of the swap liability).

155.     EverPower's offers were based on its assessment of the cash flows that the Alta VI Facility would generate over its operating life. On that basis, EverPower calculated that the Alta VI Facility was worth more than $437 million.

156.     EverPower conducted further due diligence of the transaction before entering into a purchase agreement, including a review of all relevant documentation, the retention of a technical consultant to review independently engineering, construction, and operating/maintenance cost issues, and the retention of its own wind experts to provide a wind analysis for the facility. EverPower also had its own in-house wind and development experts review the various diligence materials, and conducted a site visit.

157.     EverPower's ability to close quickly was an important factor in its bid being selected by Terra-Gen. This offset the fact that EverPower was unable to make use of depreciation benefits associated with the facility, and that its bid was lower as a result.

158.   EverPower entered into an agreement for the purchase of the Alta VI Facility on March 31, 2012.  EverPower did so by acquiring Terra-Gen's membership interest in the pass-through entity that owned the Alta VI facility, which the tax code deems equivalent to the purchase of the Facility itself.  The purchase price was $439.4 million.  The NREL personnel hired by Treasury to conduct the review of the Section 1603 cash grant application concluded that the $439.4 million purchase price reflected fair market value, and that the Alta VI transaction was "a sale between unrelated parties at arms' length."

159.   The $439.4 million in consideration that EverPower paid included $19.4 million in the form of an assumption of an interest rate swap liability held by the pass-through entity EverPower acquired.  An interest rate swap is an agreement between two parties to exchange a fixed rate of interest on a notional principal amount for a floating rate of interest on the same principal amounts.  Interest rate swaps are commonly used to hedge interest rates or change the risk profile of existing debt, and their value changes over time as interest rates change.  The value of the swap is tied to the status of interest rates – for instance, if a company enters a swap where it pays a rate of interest that changes with the market rate, but only receives a fixed rate of interest, if interest rates increase, the company has a liability: it has to make a higher payment, but receives only the same fixed rate in return.

160.   A swap is a liability on the balance sheet, as settling (*i.e.*, discharging) a swap obligation would require a payment to the counterparty.  Accordingly, assuming a seller's swap is conceptually similar to assuming other types of liabilities, such as a seller's mortgage.  As one court has put it, an "interest rate swap transaction is . . . an asset for the party who receives net payments and a liability for the party who owes net payments."  *Cty. 20 Storage & Transfer Inc. v. Wells Fargo Bank, NA*, No. 3:09-CV-104, 2011 WL 826349, at *1 (D.N.D. Mar. 3, 2011).

Likewise, Financial Accounting Stands Board Topic 815 "requires that an entity recognize all interest rate swaps on its balance sheet as either assets or liabilities and measure them at fair value." FSAB, Derivatives and Hedging (Topic 815) 1, No. 2014-03 (Jan. 2014).  Here, the swaps were a liability, and EverPower's assumption of them constitutes part of the purchase price for the Alta VI Facility and hence part of its basis.

161.    Using the methodology described above in Paragraphs 133-144, EverPower and Terra-Gen determined that $420,874,334 of the purchase price paid by EverPower related to eligible property.

I.     **The Alta IX Outright Purchase Was Heavily Negotiated By Sophisticated Parties.**

162.    The next transaction was an outright purchase of a non-lawsuit property, Alta IX. Alta IX was sold through the familiar two-step bidding process, in which round one consisted of the submission of indicative bids, based upon information set forth in a confidential information memorandum and other materials, and a selected group of bidders was invited to participate in round two, in which bidders made refined bids based upon data room materials, site visits, and other due diligence, followed by a negotiation of the final agreement with the winning bidder.

163.    The 132 MW Alta IX Facility was sold to Mid-American Energy Company ("MidAm"), a subsidiary of Berkshire Hathaway Energy, after the competitive bidding process. MidAm is a sophisticated renewable energy company that owns more wind-powered generation capacity than any other U.S. rate-regulated utility.  MidAm is and always has been completely unrelated to Terra-Gen.

164.    The Alta IX sale closed in November 2012 at a price of $416.097 million.

J.    **That the Purchase Prices for the Altas I-V Sale-Leaseback Transactions Were Not "Manipulated" or "Inflated" Is Proven By the Fact That They Are Comparable to the Outright Purchase Prices for Altas VI, VIII, and IX.**

165.    After normalizing for net capacity factor, the transaction prices for the Altas I through V sale-leaseback transactions are entirely consistent with the prices in the outright purchase transactions involving the Altas VI, VIII, and IX Facilities, as demonstrated in the following table:

| Transaction | Transaction Price ($000s) | % Acquired | Capacity | $ / kw | Net Capacity Factor (NCF)[5] | Capacity Adjusted $ / kw |
|---|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] = [1] / ([2] * [3]) | [5] | [6] = [4] * ([5] / 26.64%) |
| **Outright Purchase Transactions** | | | | | | |
| Alta VI | $439,388 | 100.0% | 150 | $2,929 | 26.6% | $2,929 |
| Alta VIII | $439,834 | 100.0% | 150 | $2,932 | 25.9% | $3,018 |
| Alta IX | $416,097 | 100.0% | 132 | $3,152 | 26.6% | $3,157 |
| **Average** | | | | | | **$3,035** |
| **Sale Leaseback Transactions** | | | | | | |
| Alta I | $560,000 | 100.0% | 150 | $3,733 | 34.2% | $2,906 |
| Alta II | $440,250 | 93.0% | 150 | $3,156 | 28.7% | $2,926 |
| Alta III | $444,535 | 93.1% | 150 | $3,183 | 29.9% | $2,835 |
| Alta IV | $288,792 | 90.7% | 102 | $3,122 | 28.0% | $2,971 |
| Alta V | $488,003 | 93.8% | 168 | $3,097 | 27.6% | $2,989 |
| **Average** | | | | | | **$2,926** |

166.    As demonstrated above, all of the facilities were sold within a narrow price range – between $2,906 and $3,157 per kW. The average of the five sale-leaseback transaction prices

---

[5]    Net capacity factor for Altas II through V reflect the internal waking payments between these facilities.  Waking refers to the negative effect on one wind power facility's electrical production due to the effect on wind flow caused by a neighboring wind power facility. Payments are made by one facility to another to make up for any such waking.

is actually somewhat *lower* than the average of the three outright purchase transactions, by $109 per kW.

167.    In sum, the purchase prices paid in the sale-leaseback transactions for Altas I through V are entirely consistent with the purchase prices paid in the outright purchase transactions for Altas VI, VIII and IX on a per kilowatt basis, after adjusting for differences in production capacity.   This demonstrates that the sale-leaseback prices were not artificially inflated – if they were, the purchase prices in the sale-leaseback transactions would materially exceed those in the outright purchases, and they are instead somewhat lower.

### K.    Plaintiffs Purchased Qualified, Energy Producing Facilities.

168.    Plaintiffs each purchased an undivided interest in a fully developed, constructed, tested, ready-to-operate energy facility.   The basis of such a facility, like any other property, is determined by what the purchaser actually paid to buy it, *see* Section II.B *supra*.   The basis is not what a purchaser hypothetically would have paid to purchase its individual components.

169.    As the Court of Claims has explained:  "[W]e agree with plaintiffs that fair market value would take into account the fact that this buyer received (and was entitled under its contract to receive) a put-together plant in good all-round working shape, not a congeries of uncoordinated physical assets liable as not to fail to work as a unit.   The 'turnkey' product was worth more than the sum of the untested and uncoordinated parts, even though they were all constructed and installed in place.   Normally a buyer would pay an increment for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination."   *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974).

170.    Thus, there is a value, often a quite considerable value, associated with a facility being already or soon to be capable of operation.   *Id.* at 681 (describing turnkey value as "the

increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order"); *see also, e.g.*, *Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at 7 ("The turnkey risk is the risk inherent in promising a working facility.") ***Courts have uniformly recognized that turnkey value is an incident of the tangible assets themselves, not a separate and distinct intangible.*** *Miami Valley Broad. Corp.*, 499 F.2d 677 at 681; *Utilicorp,* T.C. Memo. 1997-47, 1997 WL 28654, at *6-7.

171.    Viewing the property as a whole makes perfect sense in the context of Section 1603.  Eligible property for purposes of the Section 1603 program is defined as "tangible property . . . [*which is*] *an integral part of a [wind energy] facility*," 26 U.S.C. § 48(a)(5)(D) (emphasis added); *id.* § 48(a)(5)(C); *id.* § 45(d)(1).  Treasury Guidance makes explicit that the property must be "installed, tested, and is ready and capable of being used for its intended purpose," the production of electricity, with the facility have been "placed in service," *i.e.*, "ready and available for its specific use."  Treasury Guidance at 5, 10.  Accordingly, the eligible property here must be valued as an "integral part" of an installed, tested, ready-for-use wind energy facility — not as a mere collection of uncoordinated physical assets.

172.    Furthermore, a facility can have not only turnkey value, but "synergistic value." The IRS has recognized that a group of interrelated assets may have value above and beyond the value of each individual asset considered in isolation, but that ***such value is treated as part of the value (basis) of the assets themselves:*** "case law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets . . . ."  I.R.S. Tech. Adv. Mem. ("TAM") 200907024, at 9 (Feb. 13, 2009).

173.    The TAM makes plain that synergistic value applies in the same fashion to all assets, both physical or other: "Although the Network comprises individual contracts, it functions as a single, integrated unit and therefore should be considered as a single asset rather than the sum of individual assets.  There are many examples of circumstances in which it is more reliable to view a collection of assets in this manner.  For instance, a business that purchases a new car does not treat a portion of the cost as goodwill to the extent the price of the car exceeds the sum of the values of the car's parts.  Likewise, the business does not depreciate the car's separate parts but rather the car as a whole."  TAM 200907024, at 6.

174.    Thus, the property at issue here is the entire eligible energy facility, and its basis, as captured by the purchase price paid, is inclusive of turnkey value and synergistic value, which make each eligible energy facility worth considerably more than the sum of its individual parts.

**L.     The Sale-Leaseback Is an Entirely Routine and Legitimate Business Structure, and Does Not Alter the Conclusion that the Purchase Prices Paid for the Altas I through V Facilities Are Dispositive of Basis.**

175.    We have already demonstrated the only truly salient fact: that the purchase prices paid in the sale-leaseback transactions for Altas I through V are completely consistent with, indeed, on average, slightly lower than, the prices paid in the outright purchases of Altas VI, VIII and IX.  This fact, standing alone, demonstrates the integrity of the Altas I through V purchase prices as establishing basis, and the Court should end its inquiry here.  But out of an abundance of caution, we will also demonstrate that there was nothing unusual or remarkable regarding these sale-leaseback structures.

176.    Each Plaintiff Owner Lessor purchaser of the Alta I through Alta V Facilities (*i.e.*, Alta Wind I Owner Lessors C and D, Alta Wind II Owner Lessors A through E, Alta Wind III Owner Lessors A through D, Alta Wind IV Owner Lessors A through D, and Alta Wind V Owner Lessors A through D, collectively referred to as the "Owner Lessors") is a statutory trust

whose beneficiary is a passive investor without hands-on experience operating wind power generating plants.  The Owner Lessors have leased the Facilities back to Terra-Gen for roughly the first 24 years out of their 30 year plus expected useful lives.

177.   The sale-leaseback has long been recognized as "a commercially acceptable device which affords significant advantages to both purchaser-lessor and seller-lessee."  *In re San Francisco Indus. Park, Inc.*, 307 F. Supp. 271, 276 (N.D. Cal. 1969); *see also, e.g.*, *In re Barracuda Tanker Corp.*, 281 F. Supp. 228, 231-32 (S.D.N.Y. 1968) ("The transaction between Barracuda and Union is similar to the 'sale-leaseback' arrangements commonly used in real estate transactions."); *In re Cont'l Airlines, Inc.*, 932 F.2d 282, 293 (3d Cir. 1991) ("Sale-leasebacks have been used in the transportation industry for some time."); Michael Cole, *Using Governmental Incentives to Finance Solar Renewable Energy Projects: Alternative Investments for High-Net-Worth Individuals*, 1 LSU J. Energy L. & Res. 67, 77 (2012) (sale-leasebacks are "common structures used in [renewable energy project] transactions"); *see also CIT Grp./Equip. Fin., Inc. v. Condere Corp.*, 65 F. App'x 509, 2003 WL 1922992, at *1 (5th Cir. Apr. 3, 2003) (describing sale-leaseback as "a common commercial transaction").

178.   Treasury's Section 1603 guidance acknowledges the legitimacy of sale-leaseback structures, by referencing those structures and setting forth specific rules that, for example, decide when the "placed in service" date will be determined in a sale-leaseback transaction. Treasury Guidance at 9.

179.   As noted above, a sale-leaseback structure is a transaction structure in which the developer or asset owner sells an asset to the purchaser and leases it back pursuant to a long term lease.  There are multiple reasons for parties to use a sale-leaseback structure.  Most relevant to the renewable energy context, the structure allows a financial institution with capital but no

development or operational expertise to provide capital to developers that have development and operational expertise but limited access to capital.  In a sale-leaseback, the financial institution (buyer) can use its capital to purchase and own a power facility and, in turn, lease it back to the developer who has the expertise to operate it.

180.    Another important purpose of a sale-leaseback is to utilize more effectively tax benefits associated with the asset.  Many renewable energy developers are not able to efficiently make use of these substantial benefits.  Through the sale-leaseback structure, the tax benefits available to the owner of the renewable energy property can be used by the purchaser/lessor.

181.    The Alta I through V sale-leasebacks operated in the following manner.  Terra-Gen sold the facilities to each of the relevant Owner Lessors, which included transferring legal title and possession of the facilities (or the grant-eligible property of the facilities) to the Owner Lessors, in return for hundreds of millions of dollars of cash and the assumption of liabilities incurred in constructing the facilities.  The Owner Lessors then leased back such property to a Terra-Gen subsidiary (the "project company" for each facility) for approximately 24 years, pursuant to a lease agreement.  The Terra-Gen subsidiary agreed to operate and maintain the facilities, and to make periodic rent payments to the Owner Lessors.

182.    To the extent the cash flows generated by the sale of electricity from the facilities exceeded the value of those rent payments, those cash flows would go to the Terra-Gen subsidiary operating the facility.  However, if the cash flows were insufficient to cover those rent payments, the Owner Lessors would bear the risk of loss.  That is because the sole source of revenue for the lessee entity was revenue from the sale of electricity generated by the facilities.  The Owner Lessors had no recourse to Terra-Gen itself.  The Owner Lessors accordingly bore a real risk that, if the facilities could not operate or for any other reason did not generate enough

revenue to cover the lease payments, they would not receive their anticipated return on their investment, or could lose much of that investment.

183.    At the end of the lease period, the lessee has the option, but not the obligation, to purchase the facility, so long as the lessee is not in default under the lease.  The purchase price that the lessee would need to pay was specified in the facility lease for each facility, and was an amount not less than the projected fair market value of the property at the time of lease expiration.  Because the lessees were not obligated to purchase the facilities at the end of the lease term, the Owner Lessors bore the entire risk that the facilities might be unprofitable (due to a collapse of electricity prices, or otherwise), technologically obsolete or for some other reason worth far less than the price set by contract for the option to purchase the facility at the end of the lease period.

184.    Accordingly, each Owner Lessor's investment was at risk, including if the property (1) failed to generate adequate electricity to make the periodic rent payments, or (2) declined in value by the end of the lease period.

185.    These risks were recognized by the purchasers in deciding whether to move forward with the transactions.  Union Bank's credit approval memorandum assessed the risk that the facilities could generate less electricity due to poor wind condition, the risk that operating and maintenance expenses could be higher, and the risk that revenue could be reduced by congestion-related curtailment of the facility's electricity production.  Citibank's memorandum evaluated similar concerns with respect to Altas II-V.

186.    Indeed, these kinds of risks have materialized in connection with other Terra-Gen projects.  For instance, Citibank is among the parties that engaged in a sale-leaseback to purchase the Coso geothermal wind energy facility from Terra-Gen.  The geothermal resources are not

performing as expected and the project will likely go bankrupt in the next few years.  Citibank and the other purchasers anticipate suffering losses in excess of $100 million.

### M.     Lease Prepayments.

187.     Sale-leaseback transactions often contain a lease prepayment, whereby the seller-lessee makes a significant lease payment to the buyer-lessor early within the lease term, often on the day the lease commences.  This is a standard feature of sale-leaseback transactions.

188.     Lease prepayments are so common that an Internal Revenue Code provision explicitly addresses the subject, spelling out a specific method by which pre-paid rents are to be accounted for tax purposes.  *See* Treas. Reg. § 1.467-1(c)(1) (defining a "[s]ection 467 rental agreement" to include "rental agreements" that provides for "prepaid rents").  A "rental agreement" is any agreement that provides for the rental of tangible property that is treated as a lease for federal tax purposes.  Treas. Reg. § 1.467-1(h)(12).  The regulations under section 467 clearly contemplate that prepaid rents may arise in a sale-leaseback context.  *See* Treas. Reg. § 1.467-3(a) (defining a "leaseback" as a rental agreement where the "lessee (or a related person) had any interest (other than a *de minimis* interest) in the property at any time during the two-year period ending on the agreement date").

189.     Lease prepayments serve a number of purposes.  One function is to ensure that the lessee operator has "skin in the game" so that it has a strong incentive not to walk away from its obligations under the lease if the project is less productive than anticipated.  This incentive exists because the lessee will forfeit the prepayment if it defaults on its obligations; it is only by continuing to make lease payments and operating the facility that it can earn back its prepayment and make a profit on facility revenues in excess of it ongoing lease payments.

190.     Lease prepayments also lower the periodic lease payments going forward.  Because more rent is due up-front, the lease payments going forward do not need to be as large.

This increases the "coverage ratio," *i.e.*, the ratio of the expected income of the facility to the lease payments. This enhances the credit quality of the rental stream, because there is a lower risk that the facility will not generate enough revenue from electricity sales to cover the smaller lease payments. This is particularly important in so-called leveraged lease transactions, such as the Alta II-V transactions, for which achieving a target coverage ratio is essential for obtaining an investment grade for the debt that will be issued.

191.    Although lease prepayments can be as high as 49% or even 100%, lease prepayments of 15-20 percent of a property's purchase price are typical in the case of leases of assets where the revenue from that asset is the only source of funds to pay rent. The IRS Regulation addressing lease prepayments uses as an example a 10-year lease in which all of the lease obligations are paid at the end of the first year. 26 C.F.R. § 1.467-1(c)(3)(iv), Example 2.

192.    Terra-Gen, made a rent prepayment for each of the facilities, on the closing date for each sale-leaseback transaction. The prepayments for the Alta Wind I-V Facilities ranged from 15.37% to 19.735% of the facility purchase prices.

193.    The existence and amounts of the prepayments had no bearing on the purchase prices, which as noted earlier were essentially the same for the five sale-leasebacks as for the three outright purchases.

III.    **Plaintiffs Are Entitled to the Award of Damages.**

194.    As demonstrated above, Plaintiffs' basis in the Facilities is determined by the purchase prices they paid, and for those Plaintiffs that purchased both eligible and ineligible property, the purchase prices were properly allocated between those two types of properties to establish the basis of each.

195.    Each Plaintiff properly applied to Treasury for a cash grant equal to 30% of the basis of its eligible property. Treasury had entered into an interagency agreement with the

National Renewable Energy Laboratory ("NREL") of the U.S. Department of Energy, which performed a review of cash grant applications and completed an "application checklist" for each Plaintiff application, confirming that all statutory requirements to receive a Section 1603 grant were satisfied.

196.    Each Plaintiff is accordingly entitled to recover the difference between the cash grant it requested, and the cash grant Treasury actually awarded, as summarized in the following table.  [The figures for eligible basis, cash grant to which each Plaintiff is entitled, and cash grant shortfall (damages) in the table have been adjusted downwards slightly to reflect a small allocation of value to land that Plaintiffs' expert has determined is appropriate, as further explained in Section IX.B]:

| Plaintiff | Basis of Eligible Property | Cash Grant To Which Plaintiff is Entitled | Cash Grant Paid | Cash Grant Shortfall (Damages) |
|---|---|---|---|---|
| Alta I Owner Lessor C | $130,300,750 | $39,090,225 | $29,974,983 | $9,115,242 |
| Alta I Owner Lessor D | $130,300,750 | $39,090,225 | $29,974,983 | $9,115,242 |
| Alta II Owner Lessor A | $110,043,250 | $33,012,975 | $22,791,621 | $10,221,354 |
| Alta II Owner Lessor B | $110,043,250 | $33,012,975 | $22,791,621 | $10,221,354 |
| Alta II Owner Lessor C | $88,034,600 | $26,410,380 | $18,233,297 | $8,177,083 |
| Alta II Owner Lessor D | $66,025,950 | $19,807,785 | $13,674,973 | $6,132,812 |
| Alta II Owner Lessor E | $66,025,950 | $19,807,785 | $13,674,973 | $6,132,812 |
| Alta III Owner | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |

| Lessor A | | | | |
|---|---|---|---|---|
| Alta III Owner Lessor B | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta III Owner Lessor C | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta III Owner Lessor D | $110,993,750 | $33,298,125 | $23,093,966 | $10,204,159 |
| Alta IV Owner Lessor A | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor B | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor C | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta IV Owner Lessor D | $72,058,000 | $21,617,400 | $15,482,478 | $6,134,922 |
| Alta V Owner Lessor A | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor B | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor C | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta V Owner Lessor D | $121,860,750 | $36,558,225 | $25,649,674 | $10,908,551 |
| Alta VI/Mustang Hills | $418,774,000 | $125,632,200 | $86,905,263 | $38,726,937 |

## IV.  There Is No Reason to Look Beyond the Purchase Prices to Determine Plaintiffs' Bases.

197.  For the reasons discussed above, one need not, indeed, under governing law, cannot, look beyond the purchase prices to determine the eligible bases of the Alta Wind Lawsuit Facilities.  Absent "peculiar circumstances," purchase price is dispositive of basis, and as shown

above, there are no peculiar circumstances in connection with any of the Alta Wind Lawsuit Facilities.  Most of the remaining sections of these proposed findings of fact and conclusions of law are rendered irrelevant if the Court accepts this proposition.

198.    If the Court were to reject reliance on purchase price to establish basis, then basis would be determined by the Facilities' fair market values, as determined by traditional valuation methodologies (although all methods are not equally suited to the task, as explained below).  *See generally, e.g.*, *Mackenzie*, 714 F. Supp. at 271 ("Generally, … in those cases in which courts limited the basis of an asset to its fair market value, the courts found that the taxpayers were not dealing at arms-length, that there was not a real indebtedness, or that there was not a bona fide business purpose."); *Van Duzer*, T.C. Memo. 1991-249 (if basis is not established by the purchase price, then "the basis of property for tax purposes may be limited to its fair market value at the time of purchase"); *Regan*, T.C. Memo 1982-733, at *7-8 (same); *Lemmen*, 77 T.C. at 1348 (same).

199.    The three valuation methods are the income approach, the comparable sales approach, and the cost approach.  The income approach determines fair market value based on the "earnings that reasonably could be expected to be derived from the property, discounted for risks and other variables, to arrive at a present value."  *Cane Tennessee, Inc. v. United States*, 71 Fed. Cl. 432, 438 (2005), *aff'd*, 214 F. App'x 978 (Fed. Cir. 2007) (citation and quotation marks omitted).  The comparable sales approach determines fair market value based on a comparison of the property at issue to other comparable properties that have been sold.  *Id.*  The cost approach determines value based on an estimate of "the cost to replace the property, less depreciation, at a different but comparable site."  *Id.* at 438-39 (citation and quotation marks omitted).  This

includes a "turnkey fee and developer's profit," which "represent different components of the reproduction cost." *Utilicorp*, T.C. Memo 1997-47, at *7.

200.    All of these valuation methodologies support values equal to, or higher than, the basis claimed in Plaintiffs' cash grant applications.  These methodologies accordingly support in their entirety Plaintiffs' claims to an award of the difference between the cash grants they sought and the grants they were awarded.

**V.    The Income Method of Valuation Establishes a Value In Excess of the Claimed Bases.**

**A.    If the Purchase Prices Are Not Viewed as Dispositive of Basis, the Income Approach Is the Best Method for Determining the Fair Market Value of the Facilities.**

201.    Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Treas. Reg. § 1.170A-1(c)(2); *see also* Treas. Regs. §§ 1.148-5(d)(6), 1.704-4(a)(3), *and* 1.897-1(o)(2); *McShain v. Commissioner*, 71 T.C. 998 (1979).

202.    Where the purchase price is not dispositive of the basis of property, the Court of Claims has said that "the next strongest evidence is the property's projected earnings," known as the income approach.  *Hermes Consol. Inc. v. United States*, 14 Ct. Cl. 398, 412 (1988).  Under the income approach, "the value of a particular piece of property is shown by calculating the present value of the income the property could be expected to generate over its useful economic life."  *Cane Tennessee*, 71 Fed. Cl. at 438 (citation and quotation marks omitted).

203.    The income approach is particularly important and appropriate where a property is an income-producing asset.  This is the principal and most appropriate valuation method used for the kinds of properties at issue in this lawsuit because their value is derived from their ability

to generate income and is the method that parties to transactions to buy and sell income-producing property (including the parties here) typically use in assessing value.

**B.     The Income Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities.**

204.    The income approach involves projecting the revenue from operating the facility and selling the electricity produced, deducting the costs of operation to calculate the net cash flow, and then applying a discount rate to that anticipated future cash flow, to reduce those future cash flows into a net present value.   The key components of the analysis include electrical output, electricity prices, operations and maintenance costs, and tax considerations.   Plaintiffs' expert Professor Blaydon has performed the income approach to valuation as follows.

205.    **Electricity production**.   Electricity production estimates are based on a combination of wind study reports and independent engineering reports.   Garrad Hassan prepared the wind study reports for each of the Alta Wind Lawsuit Facilities.   Garrad Hassan is the world's largest dedicated renewable energy consultancy.   As of 2012, it had provided due diligence services for over 25% of the world's project financed wind energy facilities and independent engineering services to over 45% of U.S. facilities.   NREL recognizes Garrad Hassan as one of the leading advisors in the wind energy industry.

206.    An independent engineer was retained to review each of the Alta Wind facilities. Garrad Hassan also served as the independent engineer for Altas II through V, while E3 served as the independent engineer for Altas I and VI.   Like Garrad Hassan, E3 is a leading wind energy expert.

207.    The independent engineers prepared extensive, 100-plus page reports regarding various aspects of each facility, after conducting a technical due diligence review.   The independent engineers reviewed project design documents, construction plans, turbine

specifications, project agreements, permits and licenses, site assessment documents, and the wind studies, to project how much electricity would be produced by the facilities. The conclusions were set forth in the independent engineers report for each facility, which in each case confirmed that the model's calculations were consistent with the energy production estimates contained in the Garrad Hassan wind studies, and that revenues were appropriately calculated based on the energy production estimates and PPA prices. The independent engineers also reviewed operating and maintenance cost projections for the facilities and determined that they were reasonable.

208.    For purposes of Dr. Blaydon's income approach valuation, energy production estimates are based on the "P50" estimates from the Garrad Hassan wind study reports. A P50 scenario corresponds to a 50% probability that actual wind power will be at least that specified level over the long run. Other probability scenarios can also be calculated – for instance, a P75 exceedance probability corresponds to a 75% probability that actual wind power will exceed the specific level, representing a lower level of power generation than a P50 exceedance probability. But a P50 figure is appropriate to use in applying the income approach, because it is the expected forecast of cash flows.

209.    The reasonableness of Garrad Hassan's conclusions was confirmed by AWS Truepower, which was retained by the purchasers independently to review the wind estimates for the Alta I facility. AWS's conclusions were within 2.2% of Gerard Hassan's, and based on its own experience in the wind industry, GE made certain adjustments to AWS's calculations, resulted in a 10-year forecast *higher* than that of Garrad Hassan.

210.    **Electricity prices**. Electricity prices are based on the PPA pricing for each of the Altas Wind Lawsuit Facilities, including the PPA time of day and seasonality adjustments, for

the period of time when each PPA is in effect (approximately 24 years).   All electricity production is sold under the PPAs during this approximately 24-year period.

211.   Each facility is assumed to continue in operation for an additional approximately six years after the expiration of the PPA, consistent with the minimum 30-year projected life for each facility discussed below.   The electricity prices for this approximately six-year period are based on the "reference case" projections contained in the U.S. Energy Information Administration's Annual Energy Outlook Report.   The Energy Information Administration was established by Congress to implement "a central, comprehensive, and unified energy data and information program," and is charged by statute with developing forecasts and providing information to other government agencies with "energy-related policy decisionmaking responsibilities."   42 U.S.C. § 7135(a)(1); 15 U.S.C. §§ 790a(a)(3), 790f(b).

212.   **Cash Grant and Depreciation**.   In calculating the discounted cash flows for the Alta Wind Lawsuit Facilities, the value of the cash grant and depreciation benefits is included.   It is entirely appropriate to include these values, as they are economic components of the facilities.

213.   **Depreciation benefits**.   A taxpayer that receives a Section 1603 cash grant is allowed to take tax depreciation on 85% of its eligible basis in a wind power facility. Depreciation thus provides the taxpayer a deduction from its income taxes, in recognition of the fact that assets deteriorate and become obsolete over time.

214.   Accelerated depreciation permits the property to be depreciated on an accelerated basis, rather than over the asset's useful life.   While the total amount of depreciation remains the same, accelerated depreciation allows the depreciation to take place earlier in the asset's life, and so is more valuable because of the time value of money.   Bonus depreciation refers to tax deductible depreciation in excess of what would otherwise be available, during the first year of

the life of an asset.  For example, a taxpayer that acquires a $10,000 facility depreciable over five-years and is eligible for depreciation would be entitled to $8,500 of total depreciation ($10,000 times 85%), of which $5,100 in depreciation could be taken in the first year of the life of the asset (50% of $8,500, plus 20% of the remaining $4,250), and then $3,400 spread over the next four years.

215.   To be conservative, the valuations conducted by Professor Blaydon assume that only half of the legally available bonus depreciation would actually be available to the owner of the facility, *i.e.*, that the owner would only have sufficient taxable income to be able to make use of half the bonus depreciation as an offsetting deduction, or that only half of the available bonus depreciation would otherwise be realized by the seller in sales of the facilities.  However, it would have been appropriate to assume that all bonus depreciation and other tax benefits would be available, because fair market value is to be established based on the "highest and best use to which the property could be put on the valuation date."  *Pabst Brewing Co. v. Commissioner*, T.C. Memo. 1996-506, 1996 WL 655710, at *11 (Nov. 12, 1996); *see also Symington v. Commissioner*, 87 T.C. 892, 896 (1986) ("The fair market value of property, by definition, should reflect the highest and best use to which such property could be put on the date of valuation.").

216.   **Operating costs.**  In calculating future cash flows for the Alta Wind Lawsuit Facilities, projected costs are subtracted from the revenue estimates.  Those costs are based on the cost estimates in the Terra-Gen financial models, which were in turn validated by the independent engineering studies conducted for the Alta facilities described above.

217. **Terminal value.** The discounted cash flow analysis also includes a terminal value for each project, equal to three years of additional cash flows assuming a zero percent growth rate, based on each project having an expected useful life in excess of 30 years.

218. Professor Blaydon included a terminal value because the useful life for each facility was determined to be *at least* 30 years, indicating that the facilities would continue to operate for some time after 30 years. Indeed, three of Terra-Gen's wind projects, TGP Mojave, Ridgetop, and 251, were placed in service in 1986 and 1987, and based on recent independent engineering reports, are expected to have useful lives of 40 years. Accordingly, it was reasonable, and indeed conservative, to only include three additional years of cash flow for the facility as the terminal value (*i.e.*, cash flows for years 31-33). The financial models for the Alta Wind Lawsuit Facilities include a variety of types of maintenance expenses, including a "major maintenance" program that was specifically designed to ensure that the projects would have a useful life in excess of 30 years.

219. **Discount rate.** The discount rate is the required rate of return that will attract investors to a project or company, which compensates investors for the time value of money and the risk associated with a particular investment. *See Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) (appropriate discount rate takes into account both the time value of money and adjusts to account for risk).

220. The discount rate is calculated based on both the cost of equity and the cost of debt to the company – that is, the returns that must be achieved on equity financing and debt financing in order for the company to obtain that financing. This is referred to as the cost of capital. The weighted average cost of capital refers to the weighted average cost of both debt and equity. Because debt and equity have different risk profiles (debt is less risky, because debt

service is paid before distributions to equity holders), the cost of capital for each differs, hence the need to use a weighted average cost of capital, or "WACC."

221.    The debt-to-capital ratio and the cost of debt used for purposes of computing the discount rate were taken from a 2012 NREL study of 15 wind projects completed in 2010 and 2011.  That study found that debt-to-capital ratios ranged between 40% and 55%, with a baseline of 45%.  The study also found that the cost of debt ranged between 6.75% and 8.0%, with a baseline of 7.125%.  Here, the baseline figures of 45% and 7.125% were used for purposes of calculating the discount rate.

222.    Professor Blaydon calculates the cost of equity using the capital asset pricing model, which is the most commonly used financial model for estimating the cost of equity. Under the capital asset pricing model, the cost of equity is determined by starting with a risk-free rate of capital, then adding a premium for market risk that takes account of the specific risk (or "Beta") associated with the particular investment being evaluated.  Professor Blaydon calculates the investment-specific risk here based on five guideline public companies.  Those five companies were selected because they are renewable energy companies with operations in North America that own significant operating stage projects, but not significant non-renewable power generation assets.  Professor Blaydon then adds a size premium in deriving the cost of equity for each facility.  Professor Blaydon in turn blends the cost of equity and the tax-adjusted cost of debt (based on the debt-to-capital ratio discussed above) to derive each facility's WACC. Finally, Professor Blaydon adds a 1% premium to this WACC for the period after each facility's PPA expired to reflect the arguably higher market risk associated with not having in place a contractually-fixed electricity price.

223.    Dr. Blaydon's approach to discount rates was quite conservative (*i.e.*, tended to overestimate the appropriate discount rate), given that: (a) the Alta Wind Lawsuit Facilities at the time of purchase faced only operation risks and using a set of comparable companies that also have development stage risk to calculate the cost of capital tends to overstate the discount rate; (b) the selected debt-to-capital ratio of 45% is conservative (i.e., the projects could support more debt and therefore a lower weighted average cost of capital) based on the cash generating potential and the relatively low risk of the Alta facilities; (c) while four of the guideline companies trade on a Canadian stock market, Dr. Blaydon used an estimate of the U.S. market risk premium in his cost of equity calculations notwithstanding  the relatively lower market risk premium observed for Canadian stocks; (d) the inclusion of a size premium is debatable; and (e) adding a post-PPA risk premium is a conservative approach, especially given that certain of the guideline companies have exposure to energy and commodity price fluctuations and this risk is already partly reflected in the cost of equity calculations.

224.    Based on the above calculations, Professor Blaydon uses the following WACC for each facility:

| Project | Valuation Date | WACC | Post-PPA WACC |
|---------|----------------|------|---------------|
| Alta I | 12/31/10 | 7.65% | 8.65% |
| Alta II | 12/30/10 | 7.65% | 8.65% |
| Alta III | 2/24/11 | 7.83% | 8.83% |
| Alta IV | 5/20/11 | 7.76% | 8.76% |
| Alta V | 6/13/11 | 7.92% | 8.92% |
| Alta VI | 5/18/12 | 7.51% | 8.51% |

225.    The WACC is applied to discount the income streams (less expenses) projected to be generated by the facility based on the inputs described above.  That results in the following values for each of the Altas I through VI facilities:

| Project | Valuation As Of | DCF Value | Purchase Price |
|---|---|---|---|
| Alta I | 12/31/10 | $633,170 | $560,000 |
| Alta II | 12/30/10 | $468,102 | $440,250 |
| Alta III | 2/24/11 | $468,581 | $444,535 |
| Alta IV | 5/20/11 | $306,295 | $288,792 |
| Alta V | 6/13/11 | $495,498 | $488,003 |
| Alta VI | 5/18/12 | $546,115 | $439,388 |

226.    These valuations show that the purchase price for each of the Alta Wind Lawsuit Facilities is fully supported by the discounted value of the net income streams projected to be generated by the income of the facilities.  If the sales prices for the facilities had been manipulated or inflated, they would exceed the anticipated discounted cash flows.  However, the prices paid do not exceed the discounted cash flows values; in fact, the discounted cash flow value exceeds the transaction price for each facility.  Thus, for every single one of the Alta Wind Lawsuit Facilities, if basis were determined using the discounted cash flow method, its basis would be higher than the basis claimed in the Section 1603 application, given that the claimed basis was determined using the lower purchase prices.

227.    Professor Blaydon has confirmed that this conclusion remains true even if certain variables are adjusted in the DCF analysis.  For instance, the DCF value supports the purchase price even under scenarios assuming: (1) a higher debt-to-capital ratio and a higher cost of debt (2) different projected electricity prices after the PPAs expire, (3) zero terminal value for each facility after 30 years of operation, and (4) zero bonus depreciation benefit.

## VI. The Market Method Establishes Values that Fully Support the Bases Claimed for the Alta Wind Facilities.

### A. The Only Truly Comparable Sales Are the Other Altas Themselves.

228.    The market method, also known as the comparable sales method, determines value based upon the sales prices paid in arm's-length transactions for assets that are sufficiently similar to the subject assets being valued and that were sold during a reasonably similar time period.  The notion is that an asset can be valued by comparing it to other assets, but only if the assets are sufficiently similar in terms of salient characteristics for them to be comparable to one another.  *See Cane Tennessee*, 71 Fed. Cl. at 438 ("It is understood that the value of comparable sales data varies directly with the similarity of the comparable properties to the property [at issue].").

229.    Professor Blaydon has conducted a comparable sales analysis.  He concludes that only other Alta facilities, specifically, Altas VIII and IX, are truly comparable to the Alta Wind Lawsuit Facilities.  Non-California facilities are not comparable because they are not subject to California's stringent Renewable Portfolio Standard requirements and difficult permitting environment, which combine to dramatically increase the value of completed wind energy facilities.  Other utility-scale (*i.e.*, 100 plus megawatt) California facilities sold during the same general period as the Alta Wind Lawsuit Facilities are not comparable because they vary in one or more salient characteristics that materially affect value: either they are not located in the uniquely valuable wind resource that is the Tehachapi region; or they are not located near a major metropolitan area with substantial electricity demand; or they use inferior turbines; and/or the circumstances under which they sell electricity are not comparable to those of the Alta facilities.  The specifics are as follows.

230.   As discussed in greater detail earlier, California has adopted a stringent Renewable Portfolio Standard, which obligates utilities to ensure that 33% percent of their electricity comes from renewable resources by 2020, and creates an increased demand for renewable energy resources.  This is one of the highest Renewable Portfolio Standards in the country, trailing only Hawaii and Maine.  These stringent requirements increase the demand for renewable energy projects in California, and hence their value.

231.   As discussed in paragraphs 49-54 *supra*, California also has a very challenging development environment, which places a premium value on those facilities that can successfully navigate this regulatory maze and reach fruition.

232.   The combination of these two factors means that California has a unique environment that increases the value of wind facilities in the state.  The stringent renewable portfolio standard and the relative difficulty of developing facilities in California mean that wind energy facilities sold in other states are not valid comparables for those in California.

233.   Focusing on utility-scale wind energy facilities in California purchased during the same general period as the Alta Wind Lawsuit Facilities, there are only nine potentially comparable facilities, other than Alta VIII and Alta IX.  However, these nine facilities were either not sold in arm's-length transactions, or vary significantly from the Alta Wind Lawsuit Facilities based one or more key value drivers, and so cannot be viewed as comparable.

234.   A number of key value drivers are important for wind energy facilities located within California.  Location is important because wind speed, when the wind blows the most (*i.e.*, at during periods of peak demand or during off-peak periods), and directionality of wind can vary and affect the value of a facility.

235.    The fact that the Tehachapi area is a well-proven peak wind resource located in an area with superb wind speeds is a major driver of value.  Moreover, the unidirectional nature of the wind flow allows a greater percentage of the prevailing winds to be harnessed by the wind facilities constructed there, and also reduces wear and tear on the facility, providing additional value beyond what is reflected by average wind speed without regard to direction.  The fact that the wind tends to blow the most during periods of peak demand also enhances the value of wind facilities in the region because wind power generated during peak periods is more valuable than wind power generated during non-peak periods.

236.    Location near a major metropolitan area also impacts the value of a facility. Closer facilities are worth more because their energy is less likely to suffer from congestion charges or require upgrades to transmission infrastructure, and there will be lower losses of electricity during transmission.  The Alta Wind Lawsuit Facilities are located approximately 100 miles from Los Angeles, the second-largest metropolitan area in the United States, and so benefit from being close to very substantial energy demand.

237.    Also relevant to value is the turbine technology used, which can differ along multiple dimensions.  Those used in the Alta Wind Lawsuit Facilities were top-tier.

238.    Each of the nine potentially comparable facilities was either not sold in an arm's-length transaction, or differs significantly from the Alta Wind Lawsuit Facilities with respect to one or more of these key value drivers, and so none can be considered comparable.  With one exception,[6] the other facilities are located in parts of California that do not share the ideal wind

---

[6]    One of the other facilities is located near the Alta Wind Lawsuit Facilities but it has a unique PPA with a single industrial offtaker, California Portland Cement, under which California Portland Cement is only obligated to purchase the electricity as required for its operations. Accordingly, the facility could face considerable periods where it is operating at less than full output, or even not operating at all, thus sharply reducing its revenue generation and value.

features of the Alta Wind Energy Center; two of the other facilities utilize second-tier turbines; one of the other facilities is located in a remote part of northern California (and thus cannot viably be compared to facilities in close proximity to Los Angeles); and three of the other facilities have unusual power purchase agreements that render them not comparable to the Alta Wind Lawsuit Facilities.

239.    By contract, the Alta VIII and Alta IX facilities are highly comparable to the Alta Wind Lawsuit Facilities.  Alta VIII and Alta IX are located in the same area, are part of the same wind energy center, use either identical, or largely similar, wind turbines, were placed into service at roughly the same time, have similar power purchase agreements with the same utility purchaser, and are visually indistinguishable from the Alta Wind Lawsuit Facilities.  For these reasons, Altas VIII and Alta IX are for all practical purposes equivalent to the Alta Wind Lawsuit Facilities, and can appropriately be used for purposes of a comparable sales analysis. *See Childers v. United States*, 116 Fed. Cl. 486, 499 n.11 (2013) (focusing for purposes of comparable sales analysis on a "comparable sale that was more similar to the subject property than any of [the other valuation's] comparables"); *In re Robinson*, No. BR 14-11559-BAH, 2015 WL 5309513, at *8 (Bankr. D.N.H. Sept. 10, 2015) (selecting one comparable for use as the "best indicator of value" because it was "the most similar to the Property" being valued).

240.    As discussed in paragraphs 63 and 165-167 above, the purchase prices paid for Alta VIII and Alta IX are essentially identical to the purchase prices paid for the Alta Wind Lawsuit Facilities, on a per kilowatt basis, adjusted for capacity factor.  Thus, if used as comparables, Altas VIII and Alta IX confirm that the purchase prices for the Alta Wind Lawsuit Facilities establish their fair market values.

241.     Three additional Alta Wind facilities were sold, but none are appropriate comparables.  The Alta VII facility was sold during the same general period as the Alta Wind Lawsuit Facilities, but Alta VII is difficult to treat as a comparable because it includes transmission facilities that accommodate not only its own transmission needs, but also the transmission needs for other Alta facilities that were to be constructed later.  Accordingly, to be conservative, Professor Blaydon omitted Alta VII from his comparable sales analysis, although if it were included, the Alta VII purchase price, adjusted for net capacity factor, of $3,029/kW, would be fully consistent with the prices for the Alta Wind Lawsuit Facilities.

242.     Finally, Alta X and Alta XI facilities are not comparable to the Alta Wind Lawsuit Facilities.  Alta X and XI were sold in August 2014, more than 2 years after the last of the purchases of the Alta Wind Lawsuit Facilities, so they are not comparable from a timing perspective.  In addition, Alta X and Alta XI were sold, together with other Terra-Gen assets, for a single lump sum, and no allocation of the purchase price between the various assets was performed at the time.  Deriving a purchase price for either facility is not readily feasible.  For both those reasons, Alta X and Alta XI are not useful comparables.

**B.     The Prices Paid by Different Buyers for the Different Alta Facilities Are Generally Consistent.**

243.     As discussed in paragraphs 63 and 165-167 *supra*, and reflected in the table reproduced below, the prices paid in the outright purchases of Altas VI, VIII and IX are consistent with those paid for Altas I through V.

| Transaction | Transaction Price ($000s) [1] | % Acquired [2] | Capacity [3] | $ / kw [4] = [1] / ([2] * [3]) | Net Capacity Factor (NCF) [5] | Capacity Adjusted $ / kw [6] = [4] * ([5] / 26.64%) |
|---|---|---|---|---|---|---|
| **Outright Purchase Transactions** | | | | | | |
| Alta VI | $439,388 | 100.0% | 150 | $2,929 | 26.6% | $2,929 |
| Alta VIII | $439,834 | 100.0% | 150 | $2,932 | 25.9% | $3,018 |
| Alta IX | $416,097 | 100.0% | 132 | $3,152 | 26.6% | $3,157 |
| **Average** | | | | | | **$3,035** |
| **Sale Leaseback Transactions** | | | | | | |
| Alta I | $560,000 | 100.0% | 150 | $3,733 | 34.2% | $2,906 |
| Alta II | $440,250 | 93.0% | 150 | $3,156 | 28.7% | $2,926 |
| Alta III | $444,535 | 93.1% | 150 | $3,183 | 29.9% | $2,835 |
| Alta IV | $288,792 | 90.7% | 102 | $3,122 | 28.0% | $2,971 |
| Alta V | $488,003 | 93.8% | 168 | $3,097 | 27.6% | $2,989 |
| **Average** | | | | | | **$2,926** |

244.    Accordingly, the comparable sales approach further shows that the purchase prices for Alta Wind Facilities reliably establish their fair market values.

## VII.    The Cost Method Is of Limited If Any Relevance in Valuing the Alta Facilities, But If It Were Applied, It Would Fully Support the Purchase Prices.

### A.    The Cost Method Is of Limited If Any Relevance In Valuing the Alta Facilities.

245.    The cost approach "produces a valuation estimate by establishing the cost to replace the property, less depreciation, at a different but comparable site." *Cane Tennessee*, 71 Fed. Cl. at 438 (citation and quotation marks omitted).  This includes a "turnkey fee and developer's profit," which "represent different components of the reproduction cost." *Utilicorp*, T.C. Memo 1997-47, at *7; *see also In re Shri Saibaba, LLC*, No. 14-01403-5–DMW, 2015 WL 1518666, at *2 (E.D.N.C. Bankr. Ct. Mar. 27, 2015) ("The cost approach calculates the estimated value of the land, and estimates the reproduction or replacement cost of the

improvements, other costs incurred after construction to bring the building to market condition, and entrepreneurial profit. The appraiser then adds all of these estimates together to arrive at a total cost of the main structure."); Appraisal Institute, *The Appraisal of Real Estate* 386-87 (13th ed. 2008) ("To develop cost estimates for the total [project], appraisers must consider direct (hard) and indirect (soft) costs . . . Because the entrepreneur provides the inspiration, drive and coordination necessary to the overall project, the cost approach should include an appropriate entrepreneurial profit or incentive . . .").

246. Courts have disfavored the cost approach in many contexts. *See, e.g.*, *Crowley, Milner & Co. v. Commissioner*, 76 T.C. 1030, 1037 (1981) ("actual construction costs do not necessarily measure fair market value"), *aff'd*, 689 F.2d 635 (6th Cir. 1982); *Carty v. Commissioner*, 38 T.C. 46, 66 (1962) ("The replacement cost of the equipment, although some indication of fair market value, is by no means conclusive and in fact has been held to be of questionable weight as valuation evidence.").

247. One basic flaw in the cost approach is that it is not directly tied to the income-producing capability of the property. The cost approach estimates value as the cost to replace or reproduce an asset, without consideration of the income an asset is expected to generate.

248. Another flaw is that the cost approach assumes that assets are fungible or mutually interchangeable. However, if the "subject asset is unique in one or more respects, the cost approach may not be a viable valuation approach." Shannon P. Pratt & Alina V. Niculita, *Valuing a Business*: *The Analysis and Appraisal of Closely Held Businesses* 358 (5th ed. 2008).

249. The Alta Wind Facilities are far from fungible. Before construction can even begin, a facility in California must first achieve compliance with the various permitting requirements imposed by the California Environmental Quality Act, the California Department

of Fish & Game, and any additional federal requirements.  Compliance is costly and far from assured.  After the proper permitting is in place, construction is an immense effort, involving the construction of miles of road, the excavation of hundreds of foundations (each of which can involve digging 30 feet into the ground and pouring hundreds of cubic yards of concrete per turbine) and the installation of each individual turbine component.  After the turbines are installed, each must be connected to a transformer and then through hundreds of miles of cabling to a newly constructed substation and additional transformers which, in turn, must be connected to the electrical grid through a high voltage transmission line.  Before the substation can interconnect with the grid, the facility must meet many requirements, including appropriate synchronization and other steps.  Finally, the electrical grid itself must be prepared for connection with the wind facility.  It is only after all of these steps have been completed that a wind facility can become operational.

250.     The cost approach suffers from a number of additional limitations in the context of the Alta Wind Facilities.  First, it fails to capture essential components of the facilities' value, such as location in a peak wind resource area.  For example, if two wind energy facilities are identical in all respects except one is located in a windier location and so would produce more energy, the cost method would treat the two facilities as having an equivalent value, even though the wind energy facility in the windier location would have higher cash flows and so would be worth more to a buyer.

251.     Second, the cost approach is of limited use because the profits earned by developers vary from project to project and are largely a function of what the market will bear.

252.     Third, the cost approach ignores all tax benefits, as well as the cash grant, associated with the underlying assets, and so necessarily understates their value.  This runs

directly counter to the copious case law demanding that tax benefits and credits be included in determining a property's fair market value, *see* ¶¶ 75-79, above.

**B.    If It Were Employed, The Cost Method Would Support Plaintiffs' Claimed Bases.**

253.    If one were nonetheless to apply the cost approach, it would support Plaintiff's claimed bases.  One would first determine the direct and indirect costs incurred by Terra-Gen Power to construct the facilities, and add to that an appropriate return to the developer.  These figures support the claimed bases, as discussed below.

**1.    The KPMG Cost Certifications Accurately Reflect the Direct and Indirect Costs Incurred on the Projects.**

254.    KPMG reviewed and certified all direct and indirect cost incurred in the construction and development of the Alta Wind Lawsuit Facilities.

**2.    A Turnkey Fee and Developer Fee Must Be Added to Those Direct and Indirect Cost In Order to Determine Total Costs.**

255.    As NREL has admitted, it is entirely appropriate to include a turnkey fee and a developer fee in determining the cost to develop a turnkey facility.  A developer profit/fee "represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer."  *Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at *7.  A turnkey fee is designed to compensate the builder for "the risk inherent in promising a working facility."  *Id.* The developer fee and turnkey fee accordingly compensate for different risks: the risk of not being able to sell the facility for a certain price (or at all), and the risk that the facility might not be operational, or at an appropriate cost, or under the expected timetable.  Accordingly, where one company takes on both of those risks, a developer fee and a turnkey fee should be added.  As *Utilicorp* explained, "Respondent cites no authority prohibiting both a turnkey fee and a developer's profit, and petitioner has convinced us that the two address different economic risks.

The turnkey risk is the risk inherent in promising a working facility. The developer's profit represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer. Insofar as the turnkey fee and the developer's profit address different components of reproduction cost, we see no logical reason why they cannot coexist." *Utilicorp*, T.C. Memo. 1997-47, 1997 WL 28654, at *7.

256.    Here, Terra-Gen bore the risks entitling it to both a turnkey fee and a developer fee. As described in ¶¶ 46-54 above, Terra-Gen expended an enormous sum, $394 million, acquiring the initial building blocks of the Alta Facilities in July 2008, with no guarantee it would ever be able to develop the Alta Wind Energy Center and recoup that expenditure. Then, it spent billions of dollars developing the Center. Accordingly, Terra-Gen took on the kinds of risk that form the basis for a developer fee.

257.    Terra-Gen also took on the types of the risks that give rise to a turnkey fee. Under its contracts with the Plaintiffs, Terra-Gen was obligated to deliver a working facility, one that had been certified by the independent engineer to have commenced commercial operations, to have passed operational testing, to have acquired all necessary permits and government approvals, and to be in compliance with law and contract requirements necessary for the operation of the facility. While Terra-Gen had retained multiple contractors to assist in the effort, the facilities did not have a turnkey contractor, and Terra-Gen bore the risk of delay or nonperformance by one contractor as it affected another contractor, and any claims it might have against the contractors and suppliers were typically capped at a fraction of the contracted for price.

258.    The fact that California presents greater risks in developing a wind project and, indeed, has been a graveyard for over 50% of contracted for projects (*see* ¶ 54 above) supports a

higher developer and turnkey markup then might be appropriate elsewhere. NREL itself recognized that the California permitting process is more rigorous and risker than in other states, and as a result, "it's going to cost more, it's going to take a lot more effort to be put upfront, and it's much harder to do deals."

259. In a valuation analysis, there is no one-size-fits all profit (comprised of a turnkey and developer fee) that can be generically applied to project costs. Instead, the profit is determined by what the market will bear at a given time considering a variety of factors, such as the economic benefits, the efficiency of the developer, etc. Ultimately, the best measure of an appropriate profit or "markup" for a given project is what a buyer is willing to pay in an arm's-length transaction.

260. All of the Plaintiffs were aware, in advance of purchase, of Terra-Gen's estimated or actual costs to construct its Alta Wind Lawsuit Facility, from the KPMG cost certifications and other sources of information, such as the confidential information memoranda, DAI appraisal reports, independent engineering reports, and financial models. For example, in a preliminary evaluation of the Alta Wind I grant-eligible assets, GE observed that the cost to construct grant-eligible property was $402 million, with a preliminary grant-eligible estimate of $522 million, resulting in a markup of $120 million.

261. Given that each Plaintiff knew Terra-Gen's costs, the purchase price each paid for each Alta Wind Lawsuit Facility implicitly reflects, between parties engaged in an arm's-length transaction, an agreed-upon appropriate markup over Terra-Gen's costs to construct the facilities.

262. Moreover, the "markups" for the three outright purchases of the Altas VI, VIII and IX facilities were quite comparable to the markups for the sale-leasebacks of the Altas I through V facilities:

| Transaction | Transaction Price ($000s) [1] | Estimated Cost (Known by the Purchasers) ($000s) [2] | Markup Over Estimated Cost [3] = ([1] / [2]) − 1 |
|---|---|---|---|
| **Outright Purchases** | | | |
| Alta VI | 439,388 | 322,279 | 36.3% |
| Alta VIII | 439,833 | 313,795 | 40.2% |
| Alta IX | 416,097 | 301,200 | 38.1% |
| **Average** | | | **38.2%** |
| **Sale Leaseback Transactions** | | | |
| Alta I | 560,000 | 430,279 | 30.1% |
| Alta II | 440,250 | 321,171 | 37.1% |
| Alta III | 444,535 | 325,647 | 36.55% |
| Alta IV | 288,792 | 214,974 | 34.3% |
| Alta V | 488,003 | 361,686 | 34.9% |
| **Average** | | | **34.6%** |

263.    Thus, the proper level of markups is determined by the markup actually set by the market.  Those markups, when added to the underlying direct and indirect costs of construction, establish bases equal to the purchase prices.

**VIII.  None of the Purchase Prices Should Be Allocated to the PPAs, Goodwill, Going Concern Value, or a "Locational Value" Intangible.**

264.    None of the purchase prices should be allocated to intangibles like the PPAs, goodwill, going concern value, or a "locational value" intangible, because no such intangibles with separate value exist here.

**A.    None of the Purchase Price Should Be Allocated to the PPAs.**

**1.    The Terms of the PPAs.**

265.    At the time of the Allco acquisition, a "Master PPA" was in place for the first phases of the Alta Wind Energy Center.  The Master PPA was essentially a framework agreement, under which utility Southern California Edison agreed to enter into facility-specific PPAs for each of the Alta Wind facilities once they were closer to being developed.  The Master

PPA framework was used to establish the facility-specific PPAs for the Alta Wind Lawsuit Facilities.

266.    The Master PPA established a two-step procedure for determining electricity prices under the daughter PPAs.  First, an energy price would be calculated, based upon a formula whose principal inputs were the prices of the wind turbines installed at the facility and the prevailing interest rate.  Second, that price would be compared to the market price referent established by the California Public Utilities Commission.  If the formula's price was above the market price referent, Southern California Edison had the option of rejecting the price, in which case the market price referent price would be used, provided, however, that if the price was below a minimum threshold referred to as the energy price minimum, the developer had the option of requiring that the energy price minimum be used.

267.    The price for each of the Altas I through V PPAs using the first step of this process was $121.22, but Southern California Edison rejected that price as exceeding the market price referent.   The price was thus reduced to the market price referent level of $117.30/MW, and the separate Altas I through V PPAs were then entered into at that price on November 13, 2009.  The price for the Alta VI PPA using the first step of this process was $129.24, but Southern California Edison again rejected that price as exceeding the market price referent, and the price was thus reduced to the market price referent level of $121.60/MW.  The Alta VI PPA was entered into at that price on March 9, 2010.

268.    Each PPA is subject to "time-of-day" and seasonality adjustments, under which the price actually paid for generated electricity is adjusted up or down from the base PPA price depending on the time of day and the season of the year.  The projected time-of-day adjusted price for the Alta I facility was $116.62 per MWh for Alta I, $115.50 per MWh for Altas II-V,

and 120.04 per MWh for Alta VI.  These time-of-day adjusted levels are between 98.47% and 99.42% of the base values specified in the PPA, which is extremely high for wind facilities.

269.    Pursuant to each Alta Wind Lawsuit Facility's PPA, the entire electrical output from that facility must be sold to Southern California Edison through December 31, 2035.  The PPA for each of Alta Wind Lawsuit Facilities is facility specific, meaning that each one provides solely for the sale of electricity generated by the facility identified in the PPA; it does not apply to power generated from any other source.  Accordingly, as a practical matter none of the PPAs may be sold or assigned separate and apart from the specific facility to which it attaches, nor may such facility be sold or assigned separate from its PPA.

### 2.   Any PPA Value Should Be Allocated to the Facility's Hard Assets.

270.    A contractual or other right constitutes a separate intangible property interest only when it can be separately sold or assigned.  A Treasury regulation defines "separate and distinct intangible asset" to mean property "the possession and control of which is intrinsically capable of being sold, transferred, or pledged (ignoring any restrictions imposed on assignability) separate and apart from a trade or business."  26 C.F.R. § 1.263(a)-4(b)(3).  If a contractual or other right lacks that character, it may not be treated separately from the property to which it is tied.

271.    This rule has been specifically applied by courts in the context of property leases.  When a taxpayer leases land or space in a building it owns, the lease obviously is specific to that property.  It is not an asset, intangible or otherwise, that may be sold or assigned separate and apart from the land or the building itself.  Moreover, a lease encumbers the property — during the lease term, the property may only be used in the manner provided in the lease.

272.    Accordingly, courts have held that leases do not qualify as separate and distinct property interests.  For instance, where a taxpayer acquires property subject to a lease, its "right

to the rent is not a separate and distinct item of property but is a part of the bundle of rights incident to the ownership of the fee.  That bundle of rights and its related obligations are inextricably . . . wrapped up in the fee simple interest."  *Koch v. Commissioner*, 71 T.C. 54, 66 (1978); *Fieland v. Commissioner*, 73 T.C. 743, 755-56 (1980) ("a right to receive rents under a lease is not a depreciable asset separable from ownership of real property").[7]

273.    This is true even where a lease contains favorable terms not available in the current market.  In such instances, the Tax Court has explained that "[w]e see no justification for the separability of the favorable lease value from the many elements that determine the entire value of realty."  *Schubert v. Commissioner*, 33 T.C. 1048, 1053 (1960), *aff'd*, 286 F.2d 573 (4th Cir. 1961); *see also Peters v. Commissioner*, 4 T.C. 1236, 1240 (1945) ("[I]t is immaterial whether the lease was advantageous or detrimental to the fee owner.  If advantageous . . . the value of the property as a whole would be increased; if detrimental, the value would be depressed.").

274.    The Alta PPAs share the salient substantive characteristics of a lease and so should not be treated as separate and distinct assets.  All of the Alta PPAs are facility specific – that is, each PPA only provides for the sale of power generated from its corresponding Alta facility, and not from any other source.  As such, they are not contracts that can be sold or assigned separate and apart from the facility to which each relates.  Nor may any the Alta Wind Lawsuit Facility be sold or assigned separate and apart from its PPA.  In short, the PPAs are inexorably tied to the underlying power producing assets.

---

[7]     In 1993, Congress codified the rule articulated in these cases, amending the Internal Revenue Code to provide that "[i]f any property is acquired subject to a lease . . . no portion of the adjusted basis shall be allocated to the leasehold interest."  26 U.S.C. § 167(c)(2).

275.    The rule set forth in the lease cases has been applied in other contexts, further supporting its application to the Alta PPAs.

276.    The lease rule has been applied to the conversion feature of a convertible debenture.  A convertible debenture is a financial instrument that the owner may elect either to treat as debt, *i.e.*, as a right to collect principal and interest, or to convert to equity.  In *Chock Full O' Nuts Corp. v. United States*, 453 F.2d 300 (2d Cir. 1971), the Second Circuit considered whether a convertible debenture's conversion feature could be treated as an item of property separate from the debenture.  The court held that it could not, explaining that a "convertible debenture is an indivisible unit" and that "the conversion feature of a bond is not assignable apart from the bond itself," and so no separate allocation to the value of the conversation feature may be made.  *Id*. at 305; *accord AMF Inc. v. United States*, 476 F.2d 1351, 1353 (Ct. Cl. 1973).

277.    The rule articulated in the lease cases has also been applied in the context of satellite transponders (the device that receives and retransmits incoming signals).  The IRS has considered whether a portion of the amount paid by a taxpayer to acquire transponders should be allocated to purported intangible benefits associated with the tangible assets – the "neighborhood effect," *e.g.*, the value derived from the taxpayer's access to others using the same satellite, or "protected status," *e.g.*, "the existence and availability of … spare components" in case the transponder failed.  TAM 9317001, 1993 WL 134598, at *4-6 (Apr. 30, 1993).

278.    While acknowledging that "[t]he [p]rice paid by the [taxpayer] for transponders aboard [the] Satellite … reflects the added value [the "neighborhood effect"] creates," *id*. at *4, *see also id.* at *5 (regarding "protected status"), the IRS reasoned that "such added value, by itself, does not give rise to a separate and distinct intangible asset."  *Id.* at *4; *see also id.* at *5 ("It would be difficult to argue that the existence and availability of the spare components in this

case represents a separate and distinct asset rather than its value being part of the purchase price of the equipment."). The IRS ruled that no amount of the purchase price could be allocated to such intangibles because they were attributes of the transponders themselves — not "separate and distinct" property interests. *Id*. at *5. In so determining, the IRS relied on cases holding that, where a taxpayer acquires property subject to a favorable lease, no separate value may be attributed to that lease because it may not be separately sold or assigned. *Id*. at *4-5.

279. In *Solitron Devices*, the Tax Court rejected the petitioner's assertion that a portion of the amount paid to purchase a company's stock should be attributed to an indirect benefit petitioner realized from the ownership of such stock, in the form of a more positive company image after the purchase. The Tax Court disagreed, holding that even if petitioner paid a premium for the stock, "such premium would still be allocable to petitioner's cost basis in the . . . stock rather than to the enhanced value of petitioner's own corporate entity indirectly resulting from the acquisition." 80 T.C. at 23-24. The indirect benefit associated with the stock could not be sold or assigned separately from the stock itself, and thus must be treated as a component of the stock's own value rather than as a separate and distinct intangible. *See id*. at 22-24.

280. The IRS specifically resolved in a Private Letter Ruling the very question presented here: that no separate value may be attributed to a wind facility PPA if the PPA cannot as a practical matter be sold or assigned separate from a specific wind facility. *See* I.R.S. Priv. Ltr. Rul. 201214007, 2012 PLR LEXIS 11 (Apr. 6, 2012). The IRS analogized the PPA to a lease (*id*. at *6-*7) and ruled that, upon the wind facility's sale, "the . . . facility [specific] PPA should not be treated as an asset separate from the wind energy facility subject to such PPA." *Id*. at *8. Rather, "the portion of the purchase price of the wind energy facility that is attributable to

[its] facility-specific PPA is taken into account *as part of the basis of the wind energy facility* for depreciation purposes." *Id.* (emphasis added).

281.    NREL specifically found that "the [Alta I] PPA probably fits within the [Private Letter Ruling] summary provided by the IRS."

282.    The IRS later revoked this ruling, I.R.S. Priv. Ltr. Rul. 201249013, 2012 PLR LEXIS 1325 (Dec. 7, 2012), but did so only prospectively and without substantive explanation.  Treasury officials responsible for administering the Section 1603 program, discussed the original PLR with the IRS, including at least one in-person meeting and one phone call.  The discussions included Treasury's explanation of the PLR's impact on the Section 1603 application reviews.

**B.      Even If the Alta PPAs Could Be Treated as Separable Assets, They Would Have Value Only Insofar as They Were Above Market, and They Were Not.**

283.    Even if the PPAs were deemed to be distinct assets for tax purposes, they would be allocated value only to the extent the prices were above market.  For instance, the Tax Court has held that value may be attributed to a raw material supply contract only to the extent the contract prices are favorable compared to market prices.  *Ithaca Indus., Inc. v. Commissioner*, 97 T.C. 253, 276-77 (1991), *aff'd*, 17 F.3d 684 (4th Cir. 1994); *see also Utilicorp*, T.C. Memo 1997-47, at *2 (noting that "[t]he power purchase agreement was not significant to [buyer's] decision to purchase [the company owning the power generation facility], since the power purchase agreement was a market rate contract," and rejecting expert's position that value should be allocated to the PPA as part of a group of intangible assets); I.R.S. Priv. Ltr. Rul. 200215037, 2002 PLR LEXIS 42, at *18-19 (Apr. 12, 2002) (explaining that the value of the PPA was to be "determined by [a comparison to] prevailing market rates"); IRS Field Service Advisory, 1992 WL 1355768, at 3 (Feb. 11, 1992) (value should be allocated to a PPA only if "at the time of the

purchase the purchaser could not have entered into" a PPA at all or if the terms of such a PPA "would have been less favorable").

284.     Other contracts are similarly only allocated value as distinct intangibles if they are above-market.   For example, the Tax Court has remarked that while leases are not an "asset separable from ownership of real property" and so have no value separate from the real property to which they attach, even if they were separable, they would only be allocated value to the extent they were "favorable" or "premium" leases.   *See*, *e.g.*, *Fieland v. Commissioner*, 73 T.C. 743 (1980).   Debt instruments are similarly only allocated value if they provide for "favorable financing."   *Fed. Home Loan Mortg. Corp. v. Commissioner*, T.C. Memo. 2006-153, at 9 (July 25, 2006) (the value of the favorable financing was "based on the difference between the interest payments on an existing debt obligation and the interest payments made at the prevailing market rate.   The value of the favorable financing benefit equals the present value of this difference.").   Likewise, contractual warranties that "are offered as the standard practice of an industry" are not allocated value because "such warranties generally add little or nothing to the value of the warranted asset."   *Van Duzer*, T.C. Memo. 1991-249.   Finally, governmental licenses and permits may only be allocated value if there is a "showing of some clear premium."   I.R.S. Chief Counsel Advisory, IRS CCA 201040004, 2010 WL 3937045 (June 24, 2010).

285.     The question is whether a hypothetical available replacement PPA would have had a lower price than the actual PPA prices for the Altas I-VI Facilities.   For purposes of making that determination, one must compare the actual PPAs with PPAs approved by the California Public Utility Commission 6-12 months before the facility's in-service date, given that an entity developing a wind facility cannot obtain financing necessary to construct a wind facility

without having an approved PPA in place, and a PPA approved by the CPUC must therefore be in place approximately 6-12 months before a facility is scheduled to go into service.

286.    The Alta I through V Facilities went into service between December 2010 and June 2011.  Accordingly, PPAs approved by the CPUC in 2010 are the relevant universe of PPAs to consider in determining whether a hypothetical replacement PPA would have had a lower price than the actual PPA prices for the Altas I-V Facilities.  An annual report compiled pursuant to California law, known as the Padilla Report, reports average PPA prices, not individual PPA pricing terms, but the report is nonetheless sufficient to assess whether the prices under the Alta Wind Facility PPAs were above market.  The average time of day adjusted PPA price for wind power facilities was $117.40 in 2010 and $117.70 in 2011.  This is ***above*** the average time of day-adjusted PPA price of Alta I, of $116.62 per MWH, and Altas II-V, of $115.50 per MWh.  Accordingly, there is no basis to conclude that any of the Altas I through V PPAs were above market, and no basis to allocate any of the purchase prices to those PPAs.  That conclusion is further supported by publicly-available information relating to two specific PPAs, for the Windstar 1 and Coram Brodie facilities, both of which were approved in 2010 and had pricing comparable to that of the Altas I-V PPAs.

287.    The Alta VI Facility was placed in service in May 2012.  Accordingly, PPAs approved in 2011 are the relevant universe of PPAs to consider in determining whether a hypothetical replacement contract would have had a lower price than the actual PPA prices.  The time of day adjusted Alta VI PPA price is $120.04 per MWh, slightly above the $117.70 per MWh time of day adjusted average price for wind PPAs in 2011.  However, by definition some PPAs are above the average and below the average.  Moreover, the 2011 time of day adjusted PPA price for all renewable sources is $124.40, above the Alta VI PPA price.  Given the small

difference between the Alta VI PPA price and the average wind PPA price, and the fact that the Alta VI PPA price is below the average renewable energy PPA price, the Alta VI PPA should not be deemed to be above-market.  Even if the Alta VI PPA was viewed as above market, the Alta VI PPA would constitute only approximately 2% of the total value of Alta VI.

288.    In short, no value should be attributed to any of the Alta Wind Lawsuit Facilities' PPAs.  And, even if the Alta VI PPA was viewed as a separate intangible with a slightly above market price, that PPA would constitute only approximately 2% of the total value of Alta VI.

C.    **None of the Purchase Prices Should Be Allocated to Goodwill or Going Concern.**

289.    The Alta Wind Lawsuit Facilities perform only one function: the generation of electricity.  The Alta PPAs commit the Facilities to sell 100% of that electricity to a single customer, Southern California Edison, for the approximately 24-year term of the PPAs.  The Alta Wind Lawsuit Facilities cannot be physically expanded, both because they have used up all of their physical space, and because the Alta Wind Energy Center has used up all of the Tehachapi Renewable Transmission Project transmission line allocated to it.

290.    Accordingly, for each facility, the purchaser had neither the need nor the ability to maintain existing customers, attract new customers, or expand sales in any manner.  The PPA already committed the sale of all the electricity the facility could produce, for roughly the first 80% of each facility's expected useful life.

291.    Goodwill is defined as "the value of a trade or business attributable to the expectancy of continued customer patronage."   Treas. Reg. § 1.197-2(b)(1); *see also id.* § 1.1060(b)(2)(ii).  The Supreme Court has described the concept as "a useful label with which to identify the total of all the imponderable qualities that *attract customers to the business*." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555-56 (1993) (emphasis added);

*see also Solitron*, 80 T.C. at 18 ("More succinctly, [*goodwill*] *has been described as the probability that 'old customers will resort to the old place'*" (citation omitted; emphasis added)).

292.   Goodwill cannot exist when a business is brand new, and where all output of the facility is contractually obligated to be sold to a customer.  No new customers can be sought, and the continued patronage of existing customers does not need to be sought out, because the one customer is contractually committed.  Accordingly, no goodwill could attach to the Alta facilities.

293.   "Going concern value is the ability of an acquired business to generate sales without any interruption because of a takeover [by the buyer]," *Sirovatka v. Commissioner*, T.C.M. 1983-634, at 7 n.23 (Oct. 12, 1983) (citing *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 685 n.12 (5th Cir. 1971)), *see* Treas. Reg. §§ 1.197-2(b)(2), § 1.1060(b)(2)(ii).  But here, the sales of the Alta assets were negotiated and the purchase prices agreed upon before the facilities were even placed in service.[8]  The Alta facilities had no earnings history at the time they were sold.  As noted, they had essentially no potential for growth, save for natural variation in the wind blowing.  All of the power that the facilities would produce was committed under the PPAs, so there was no ability to gain new customers or new sales.  No workforce was transferred in the purchases of the Alta facilities.  No goodwill or going concern value can exist in this fact pattern.

---

[8]     Treasury's Guidance allows the entire wind energy facility to be treated as a single, unified unit for purposes of determining the in-service date.  Treasury Guidance, at 8. Furthermore, if new property is originally placed in service by a person, then sold through sale-leaseback within three months of the in-service date, such property shall be treated as originally placed in service not earlier than the date on which such property is used under the leaseback. *Id.* at 9.

294.    As discussed above, the facilities did have turnkey value, which is the value associated with a facility already or soon to be capable of operation. *Miami Valley*, 499 F.2d at 681 (describing turnkey value as "the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order"). Purchasers pay a premium to acquire assets in turnkey form, as distinct from a series of untested uncoordinated parts. *Id.* But courts have recognized that turnkey value is an incident of the tangible assets themselves, not a separate and distinct intangible. *Id.*; *Utilicorp,* T.C. Memo. 1997-47, 1997 WL 28654, at *6-7; *see also* TAM 200907024 (a group of interrelated assets may have value above and beyond the value of each individual asset considered in isolation, and such value is conceptually distinct from goodwill or going concern value: "case law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets rather than a conceptually distinguishable goodwill or going concern value element.")

### D.    No Allocation Should Be Made to Any So-Called "Locational Value" Intangible.

295.    The Government suggests that a portion of the Alta Wind Facilities' values should be allocated to an intangible called "locational value," reflecting that the Facilities are located: (a) in a place (Tehachapi) that is especially suited to wind energy production, (b) near a major metropolitan area (Los Angeles) that has a large demand for electricity, and (c) in a state (California) that promotes renewal energy.  But no authority supports the notion that the location of an asset constitutes a separate asset (intangible or otherwise) to which value can be allocated. Indeed, the law is directly to the contrary: Any "locational value" must be reflected in the basis of the property itself.  *See, e.g.*, TAM 9317001, 1993 WL 134598 ("there is no separate and distinct intangible asset attributable to favorable location/position"); *Wineman v. Commissioner*,

T.C. Memo. 2000-193, at 13 (June 28, 2000) ("Considering the paramount importance of location in valuing real estate, [the appraiser's] failure to adjust for location in his report was material. Our determination of fair market values takes into account his failure to adjust for location and for differences in zoning, irrigated land, water rights, and other factors for which he should have adjusted but did not."); *Estate of Nesselrodt v. Commissioner*, T.C. Memo. 1986-286 (July 14, 1986) ("Generally, properties containing less than 10 acres cost more per acre than the properties in excess of 100 acres. Other factors such as soil, drainage, and location are, however, more critical to a determination of value than the size of the parcel.") (valuing farm); *Calhoun Realty Co. v. Commissioner*, No. 7057, 1946 WL 7218 (T.C. July 29, 1946) (court "carefully considered" a number of factors including "the desirable location of the property" when determining its fair market value) (valuing a warehouse); *Smith v Commissioner*, No. 19044, 1949 WL 7486 (T.C. Nov. 30, 1949) ("[T]here was other testimony bearing upon the fair market value of the property, such as its desirable location, the well landscaped lot, the type of construction of the building and things of that sort which are relevant factors in the determination of the fair market value of residential property.") (valuing a house); *Estate of Hillebrandt v. Commissioner*, T.C. Memo. 1986-560, at 8 (Nov. 24, 1986) ("[The witness] indicated that the Hillebrandt farm, although zoned agricultural, was subject to 'urban influence,' which essentially meant buyers were willing to pay higher prices for land located closer into Kearney. While urban influence may be a somewhat indefinable concept, location is always an important factor in valuing real estate. . . . Proximity to land being sold for development, whether labeled 'urban influence' or the realtor's talismanic 'location, location, location,' impacts on the value of the Hillebrandt farm and cannot be completely disregarded, as petitioner's experts chose to do.") (valuing a farm); *Residents of Buckingham Springs v. Bucks Cty. Assessment Office*, 60 A.3d

883, 886 (Pa. Commw. Ct. 2013) (affirmed trial court's valuation that relied on trial testimony that "the location of any house will affect its fair market value; indeed, location is one of the most important elements in a valuation. This is why two identical houses in two different locations may have very different values.") (manufactured housing); *Moore v. Dep't of Revenue*, 12 Or. Tax 282, 283 (1992) ("location affects not only the land value but all other aspects of the property's worth") (pizza parlor); *Mathis v. Commissioner*, T.C. Memo. 1989-254, at 7 (May 24, 1989) ("We agree with petitioner that location is an important factor in determining the fair market value of the subject property. We conclude that [the appraiser] erred in disregarding the value of access to an interchange in valuing the subject property.") (valuing land).

296.     The Government's notion of "locational" value appears to relate in part to the policies of the State of California, which are simultaneously: (a) supportive of renewable energy, given the State's establishment of its Renewable Portfolio Standard for state utilities, yet (b) challenging to the actual construction of a new wind energy farm, due to the stringent state environmental review processes. These factors may combine to make more valuable any wind energy farm that can successfully be developed and built in the State. But those considerations are simply reflected in the property's fair market value, given that they affect what a willing buyer would pay a willing seller for the property. *Fairfield Gardens, Inc. v. United States*, 306 F.2d 167, 170 (9th Cir. 1962) ("All kinds of governmental action may directly affect the value of property, such as wartime price or rent controls, zoning regulations, etc."); *People ex rel. State Pub. Works Bd. v. Talleur*, 79 Cal. App. 3d 690, 698 (1978) ("evidence of the effect of the [California Coastal] Commission's regulations on the value of the property was relevant to the determination of the value of respondents' property," given that the property was excluded from Coastal Commission regulations and "coastal lands of California which are free of the hindrance

of the Coastal Commission and available for development are so scarce that they are going up at very rapid rates of increase in price."); *Sage v. Bernards Twp.*, 5 N.J. Tax 52, 62, 68 (1982), (new zoning ordinance that liberalized the zoning restrictions for the property at issue must be taken in account "[i]n order to determine the full and fair market value of the lots [which turns on] the price a willing seller and a willing purchaser would agree upon."), *aff'd*, 6 N.J. Tax 349 (Super. Ct. App. Div. 1984); *Spring Hill, L.P. v. Tennessee State Bd. of Equalization*, No. M2001–02683–COA–R3–CV, 2003 WL 23099679, at *10 (Tenn. Ct. App. Dec. 31, 2003) (endorsing "longstanding policy of including the value of government incentives that make projects economically feasible, such as rent subsidies, mortgage interest subsidies, and government insured low-interest mortgages, as a factor in determining fair market value of real property."); *Schwam v. Twp. of Cedar Grove*, 9 N.J. Tax 406, 412-13 (1987) ("It is, of course, well settled that <u>governmental restrictions may affect the value of real property for property tax purposes</u>.  Zoning regulations affect value; so do pinelands development controls, sewage disposal requirements, and flood zone regulations."  (citations omitted)), *aff'd*, 228 N.J. Super. 522 (App. Div. 1988).

297.    Moreover, the notion of an allocation to locational value would have wide-ranging consequences for tax law, as it would mean that for many real property purchases, some of the purchase price would be allocated to an intangible with a 15-year depreciation period, as opposed to land, which is not depreciable, or buildings, which are depreciated over 39 years.  It is difficult to imagine that the Government seriously supports this proposition.

298.    In short, none of the purchase prices should be allocated to the PPAs, goodwill, going concern value, or "locational value."

IX.     **No Value Should Be Allocated to the Land, With a De Minimis Exception.**

A.      **The Rented Land Is a Cost Item in the Discounted Cash Flow Analyses, And Any Value of the Land Is Reflected in that Cost.**

299.    To acquire a majority of the land for development of the Alta Wind Lawsuit Facilities, Terra-Gen entered into lease agreements with various landowners providing for the landowners to receive royalties based on the revenues generated from the Facilities.  These royalty payments were among the operating expenses used to calculate the facility values, and were reflected in the financial models for each Alta Wind Lawsuit Facility.  Accordingly, the values of the facilities take appropriate account of these royalty expenses.

B.      **A Small Amount of Fee Land Was Made Available to the Purchasers at No Separate Charge, and the Small Value of that Land Should Be Attributed to It.**

300.    The purchasers of the Alta Wind Lawsuit Facilities were allowed to use certain land owned by Terra-Gen without separate charge.  The aggregate value of this land is approximately $4 million (less than 1% of the value of each facility), as reflected in the table below.

| Transaction | Transaction Price ($000s) | Estimated Cost ($000s) | Rent-Free Land as Percentage of Transaction |
|---|---|---|---|
| Alta I | $560,000 | $157 | 0.02% |
| Alta II | $440,250 | $77 | 0.02% |
| Alta III | $444,535 | $560 | 0.13% |
| Alta IV | $288,792 | $560 | 0.19% |
| Alta V | $488,003 | $560 | 0.11% |
| Alta VI | $439,388 | $2,100 | 0.48% |

301.    These values are based on the acquisition costs incurred to acquire land for the Alta Wind Energy Center.  There were 49 such transactions, with an average cost per acre of $7,864.  That figure was multiplied by the number of acres made available to the buyers of the

Alta Wind Lawsuit Facilities at no separate charge.  The result of that calculation is the amount of the purchase price that should be allocated to land, and that amount has been excluded in performing the damages calculations set forth in ¶ 196, which are limited to the eligible property.

**X.  Even If There Were Any Intangibles, the Entire Purchase Prices Would Still Be Allocated to the Tangible Assets Because The Fair Market Value of the Tangible Assets Equaled or Exceeded the Purchase Prices.**

302.   Under Section 1060 of the Internal Revenue Code and its implementing regulations 26 C.F.R. § 1.1060-1, even if there were value associated with the PPAs, goodwill, going concern value, or other purported intangibles, a portion of the purchase prices would be allocated to such purported intangibles only if and to the extent the purchase prices exceeded the value of the Class I through Class V assets (*i.e.*, tangible assets).  If the fair market value of the Class I through Class V assets equaled or exceeded the purchase prices, then there would be no basis remaining to allocate to Class VI (Sec. 197 intangible assets except for goodwill and going concern value) or Class VII (goodwill and going concern value).

303.   There are seven classes of assets, Class I through Class VII.  Under Section 1060 of the Tax Code, purchase price is to be allocated to each asset class up to the fair market value of each class of assets conveyed in the transaction in a "waterfall" method, beginning with Class I assets and then proceeding through Class II, III, etc. through Class VII.  For example, if a purchase price of $10 million entailed a sale of Class I, II, V, and VII assets, with the fair market values of $2 million, $1 million, $7 million, and $2 million, respectively, $2 million would be allocated to the Class I assets, $1 million to the Class II assets, $7 million to the Class V assets, and none to the Class VII assets, because the entirety of the purchase price had already been allocated.

304.   As the *Utilicorp* court observed, "Where assets are purchased and the fair market value of assets other than goodwill or going concern value equals or exceeds the purchase price,

goodwill or going concern value is not generally attributable to the purchase price.   [This is because] Sec. 1060 provides special allocation rules for certain asset acquisitions.   Under the residual method described in sec. 1.1060–1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988), consideration is first allocated among cash and other items, including both tangible and intangible property (but not intangibles in the nature of goodwill and going concern value), before being allocated to goodwill and going concern value." *Utilicorp*, T.C. Memo 1997-47, at 7-8 n.1.

305.   The IRS has defined each class of assets as follows: Class I assets are cash and general deposit accounts; Class II assets are actively traded personal property; Class III assets are assets that a taxpayer marks-to-market at least annually for federal income tax purposes and debt instruments; Class IV assets are stock in trade or inventory of a taxpayer; Class V assets are all assets *other than* Class I-IV and VI-VII assets; Class VI assets are section 197 intangibles other than goodwill and going concern value; and Class VII assets are goodwill and going concern value.   Treas. Reg. § 1.338-6(b)(2); IRS, Instructions for Form 8594.

306.   Here, all of the physical components of the facilities, such as the turbines, transmission assets, etc., are neither Class I-IV assets nor Class VI or VII assets, and so by definition are Class V assets.

307.   The fair market value of those assets, as determined by Dr. Blaydon, equaled or exceeded the purchase price for each of the Altas I-VI facilities:

| Facility | FMV of Class V Assets | Purchase Price |
|---|---|---|
| Alta I | $633.170 million | $560 million |
| Alta II | $468.102 million | $440.2 million |
| Alta III | $468.581 million | $444.5 million |
| Alta IV | $306.295 million | $288.8 million |
| Alta V | $495.498 million | $488 million |
| Mustang Hills | $546.115 million | $439.4 million |

308.    Accordingly, under the residual method the *entire* value of each of the Altas I-VI facilities has been fully allocated under the waterfall once one has gone through the Class V assets.  That means there can be no allocation to Class VI or Class VII intangible assets, even assuming they existed.

309.    For all these reasons, Plaintiffs' bases are as set forth in ¶ 196, and they are entitled to damages equal to the difference between the cash grants calculated using those bases and the cash grants in accordance they were actually paid.

## XI.    Defendant's Counterclaims Should Be Denied.

310.    The Government's counterclaims are based on the notions that basis should be determined by the developer's costs rather than by the purchase price paid by the property owner, and that three cost items should be excluded in determining the basis of grant-eligible property.  These costs items are: (1) interest incurred by Terra-Gen during the construction of the Alta Wind Lawsuit Facilities (so-called interest during construction, or "IDC"); (2) amounts paid by Terra-Gen to the prior owner of the Alta Wind Energy Center (Allco) to acquire various permits, wind data, agreements and other development milestone achievements necessary to

bring the Alta projects from a conceptual stage to operation (so-called "Development Costs" or "Oak Creek Development Rights"); and (3) a fee paid by Terra-Gen to a prior developer of the Alta Wind facilities (the so-called "Oak Creek Development Fee" or "AIPC" Development Fee).

311. For the reasons explained above, basis is in fact determined by the amounts Plaintiffs paid to purchase eligible property at the Alta Wind Lawsuit Facilities, not by Terra-Gen's costs. Defendant's counterclaims should be dismissed on that ground alone.

312. Moreover, the proposition that the three cost items should be excluded if basis were to be determined by the developer's costs is contrary to clearly established tax law.

313. Section 263A of the Internal Revenue Code governs the treatment of indirect costs related to the construction of property, such as the three cost items here. Section 263A provides that in the case of a developer like Terra-Gen such indirect costs must be capitalized to, *i.e.*, included in the basis of,[9] the property constructed, rather than treated as operating expenses of the taxpayer. *See Von-Lusk v. Commissioner*, 104 T.C. 207, 214 (1995) (under Section 263A, proper share of indirect costs must be capitalized to property produced by taxpayer).

314. The requirement that such indirect construction costs be capitalized into basis rather than expensed generally benefits the Government: it means that such costs must be depreciated as a deduction against the taxpayer's taxable income over a period of years, rather than treated as an expense used as an immediate offset to that income. *See id.* at 207-08.

315. Treasury has also recognized that cost basis under Section 1603 "includes all items properly included by the taxpayer in the depreciable basis of the property . . . ." Because Section 263A requires that indirect costs of construction be included in the depreciable basis of

---

[9]    *See* 26 C.F.R. § 1.263A-1(c)(3) ("Capitalize means, in the case of property that is inventory in the hands of a taxpayer, to include in inventory costs and, *in the case of other property, to charge to a capital account or basis*."  (emphasis added)).

property, such costs must be included in cost basis under Section 1603. Specifically, Treasury's "Frequently Asked Questions and Answers" for the Section 1603 program include the following question and answer:

> Question: What costs qualify for a Section 1603 payment?
>
> Answer: The amount of the Section 1603 payment is a percentage of the eligible basis of the property. *The basis of property generally is its cost* (IRC section 1012), unreduced by any other adjustment to basis, such as that for depreciation, *and includes all items properly included by the taxpayer in the depreciable basis of the property*, such as installation costs and the cost for freight incurred in construction of the specified energy property.

U.S. Department of Treasury, Payments for Specified Energy Property in Lieu of Tax Credits Under the American Recovery and Reinvestment Act of 2009: Frequently Asked Questions and Answers, Question 40, *available at* https://www.treasury.gov/initiatives/recovery/Documents/A%20FAQs0411%20-%20general.pdf (emphasis added).

316.     Moreover, these same principles regarding what costs are included in a property's basis apply when using the cost approach to valuation. *See, e.g.*, *Driscoll v. Edison Light & Power Co.*, 307 U.S. 104, 118 (1939) (affirming commission determination to include indirect costs in reproduction cost valuation, where the indirect costs "are of the character of interest, supervision, cost of financing, taxes and legal expense"); *Am. Express Fin. Advisors, Inc. v. Cty. of Carver*, 573 N.W.2d 651, 660 (Minn. 1998) ("Reproduction cost requires the consideration of all costs, including capital expenditures for direct costs such as labor and materials, and indirect costs such as financing and marketing costs. *The Appraisal of Real Estate*, at 345-47. Construction contingencies and construction period interest are indirect costs of construction which would be encountered in the construction of a new building and must be accounted for in

the reproduction cost."); *Kennedy v. Washington Cty. Assessor*, TC–MD 070115D, 2007 WL 4463493, at *6 (Or. Tax. Ct. Dec. 14, 2007) ("In addition to direct costs and entrepreneurial profit, a cost estimate for a structure must include indirect costs such as architectural and engineering fees, appraisal, consulting, accounting and legal fees, and other carrying costs including insurance, property taxes, and interest on construction loans."); *ABE Schrader Corp. v. Town of Secaucus*, 8 N.J. Tax 390, 394-95 (1986) ("The cost approach utilized by plaintiff's expert is not probative of the true value of the subject property. . . . [E]xcept for engineering and architect's fees, the expert failed to include indirect costs in his cost estimates. These costs are, in addition to engineering and architect's charges, financing, insurance and permits, taxes, management and other overhead and entrepreneurial profit.").

317.    The law is clear that the developer, Terra-Gen, was required to capitalize the three cost items under Section 263A.

## A.    Interest During Construction.

318.    The first category of such costs is interest Terra-Gen incurred on the debt financing it obtained to construct the Alta facilities.  Only those interest payments incurred during construction were capitalized.  Section 263A expressly provides that such interest must be capitalized.    It states: "interest on any indebtedness directly attributable to production expenditures with respect to such property shall be assigned to such property."   26 U.S.C. § 263A(f)(2)(A)(i).  Section 263A and its implementing regulations at 26 C.F.R. § 1.263A-11 plainly require capitalization into the tangible assets of "the portion of the total interest expense incurred during the construction period that could have been avoided if funds had not been expended for construction.  Interest expense that could have been avoided includes interest costs incurred by reason of additional borrowings to finance construction, and interest costs incurred by reason of borrowings that could have been repaid with funds expended for construction."

*Dominion Resources, Inc. v. United States*, 681 F.3d 1313, 1315-16 (Fed. Cir. 2012) (quoting S. Rep. No. 99-313, at 140, 144 (1986)) (emphasis omitted); *see also Utilicorp United*, T.C. Memo 1997-47, at *3 n.1, *5 (accepting cost basis of property that included "construction interest").

319.    Interest costs incurred by the taxpayer in connection with property produced by that taxpayer may be capitalized so long as the costs were "paid or incurred during the production period," and either (1) the property has "a long useful life," (2) the property has "an estimated production period exceeding 2 years," or (2) the property has "an estimated production period exceeding 1 year and a cost exceeding $1,000,000." Here, the interest on loans was incurred during the construction period, and the second and third requirements were satisfied – each facility had an estimated production period exceeding 2 years, and also a cost exceeding $1 million.

**B.    Development Costs/Oak Creek Development Rights.**

**1.    Development Costs and Rights Acquired From Allco are Included in Cost Basis.**

320.    The second cost category covers the amounts Terra-Gen paid Allco, the prior owner of the Alta site, to acquire the various work in progress (permits, wind data, agreements and other development milestone achievements) that were ultimately necessary to bring the projects from a conceptual stage to operation.

321.    Development costs incurred by a developer must be capitalized into the property being developed (and depreciated over time). As the Tax Court has explained: "While the pursuit of building permits and zoning variances, negotiating permit fees and similar activities may not readily spring to mind as examples of production activity, we think that upon reflection they are properly classifiable as such. Such activities are ancillary to actual physical work on the land and are as much a part of a development project as digging a foundation or completing a

structure's frame.  The project can not move forward if these steps are not taken."  *Von-Lusk*, 104 T.C. at 216; *see also Suzy's Zoo v. Commissioner*, 273 F.3d 875, 879 (9th Cir. 2001) (agreeing with *Von-Lusk*); *Corbin West Ltd. P'ship v. Commissioner*, T.C. Memo. 1999-7, at *5-6 (Jan. 15, 1999) (holding that fees incurred in developing an apartment building, including evaluating zoning requirements and ensuring compliance and preparation of an environmental report, should be capitalized into the property); I.R.S. Priv. Ltr. Rul. 201515007, 2015 WL 1579258 (Apr. 10, 2015) (following *Von-Lusk* and holding that easement relocation costs are allocable to a constructed residential building because such costs "directly benefit, or are incurred by reason of, the construction of the residential rental building and are capitalizable indirect costs").

322.    This is consistent with the case law interpreting Section 263A, which holds that "the term 'produce' is to be broadly construed," and includes all costs "from the moment of acquisition through production and disposition of the property."  *Suzy's Zoo*, 273 F.3d at 879; *see also Reichel v. Commissioner*, 112 T.C. 14, 18 (1999) (holding that "[p]reproduction costs" are to be capitalized under section 263A).  Costs that must be capitalized under Section 263A even include costs like real estate taxes that relate to the ownership of land on which construction occurs.  *See Reichel,* 112 T.C. at 17 (explaining that "by its terms, the statute requires taxpayers to capitalize indirect costs, such as real estate taxes, that they incur in connection with property they develop"); *see also Ohana v. Commissioner*, T.C. Memo 2014-83, at *7 (May 8, 2014) ("[S]ection 263A requires the [taxpayer] to capitalize their direct and indirect costs related to building the [facility] . . . .  These expenses include property taxes, outside services expenses such as the architect's fees, and expenses for licenses, insurance, and utilities directly benefiting or incurred by reason of the [facility].").

### 2. The Development Costs and Rights Acquired from Allco Were Properly Calculated.

323.     Less than half the $394 million Allco acquisition cost was allocated to the Allco development rights, which represented the collection of permits, wind data, agreements, and other developmental work that had been done to develop the facility at the time of the Allco acquisition.

324.     These development rights accordingly are entirely distinct from goodwill or going concern value – the development rights relate to items that are valuable only insofar as they are necessary to develop and place a project in service.  The rights were acquired before construction of the Alta facilities, before operations commenced, with no accompanying workforce, no earnings history, and no customers, and so neither goodwill nor going concern value could possibly have existed.

325.     Duff & Phelps was retained by Terra-Gen to perform an appraisal of the assets acquired from Allco, addressing both the allocation of the purchase price for the Allco assets to the various assets that were acquired, and subsequently the determination of the proportion of each asset that was properly attributable to each future phase of the Alta Wind projects.

326.     Duff & Phelps is one of the largest independent valuation firms in the United States, and has a sizable energy team.  Duff & Phelps received hundreds of documents from Terra-Gen to prepare these reports.  Before the appraisal was finalized, it was independently reviewed by individuals from Duff & Phelps separate from the engagement team to perform quality control regarding the appraisal.  Duff and Phelps determined that the Allco purchase price should be apportioned as follows:

$1.55 million to land

$34.6 million to the Alite Wind Facility

$78.93 million to construction work in progress

$77 million to transmission queue rights

$195 million to development rights

327.    These numbers reflect the best professional judgment of Duff & Phelps concerning the value of the assets that Terra-Gen acquired from Allco, as did its subsequent allocation of these costs to the various individual Alta facilities.

### C.    The Oak Creek Development Fee.

328.    The third of costs is the so-called "Oak Creek Development Fee" — a fee Terra-Gen was required to pay a prior initial developer of the Alta Wind facilities (Oak Creek) in acquiring basic but far from completed building blocks of the projects from the prior owner.  The Tax Court has held that such a development fee incurred in connection with acquiring property must likewise be capitalized under Section 263A.  *See Corbin West*, T.C. Memo 1999-7, at *6 ("We conclude that the 'acquisition fee' and 'developer's fee' were incident to Corbin West's acquisition of the property, and they must be considered part of the property's acquisition cost. We therefore conclude that Corbin West is entitled to capitalize both the 'acquisition fee' and 'developer's fee' into its basis in the property."); *see also Reichel*, 112 T.C. at 18 (noting that the legislative history of Section 263A requires capitalization "of costs of producing, *acquiring*, and holding property" (quoting S. Rept. 99-313, at 140 (1986) (emphasis added, other emphasis omitted)).

329.    In short, the Government's counterclaims are based on excluding the three cost items from the developer's cost basis in the eligible property, but the law is clear that such exclusion is improper.  Even if the Government's approach to valuing the eligible property at the Alta Wind facilities based on Terra-Gen's construction costs were to be applied, the law precludes excluding the three cost items from that value.

Respectfully submitted,

/s/ Steven J. Rosenbaum
(srosenbaum@cov.com)
*Counsel of Record*
Dennis B. Auerbach
Thomas R. Brugato
Margaret H. Brennan

One CityCenter
850 10th Street, NW
Washington, DC  20001-4956
(202) 662-5568
(202) 778-5568 fax

March 31, 2016                          *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

  I hereby certify that, on March 31, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to the following:

  Michael J. Ronickher

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum
*Counsel of Record*
Covington & Burling LLP
One CityCenter
850 10th Street, NW
Washington, D.C. 20001
Phone: (202) 662-5568
Fax: (202) 778-5568
Email: srosenbaum@cov.com
