# In the United States Court of Federal Claims

Nos. 13-402T, 13-917T, 13-935T, 13-972T, 14-47T, 14-93T, 14-174T, 14-175T

(Filed Under Seal: October 24, 2016)

(Reissued for Publication: October 31, 2016)[1]

| | |
|---|---|
| ************************************ * <br> * <br> ALTA WIND I OWNER-LESSOR C, and * <br> ALTA WIND I OWNER-LESSOR D, *et al.*, * <br> * <br> Plaintiffs, * <br> * <br> v. * <br> * <br> THE UNITED STATES, * <br> * <br> Defendant. * <br> * <br> ************************************ * | Grants Made Under the American Recovery and Reinvestment Act, Section 1603; Cost Basis; Allocation of Purchase Price; 26 U.S.C. § 1060; Goodwill; Going Concern Value; Turn-Key Value |

*Steven J. Rosenbaum*, with whom were *Dennis B. Auerbach*, *Thomas R. Brugato*, and *Margaret H. Brennan*, Covington & Burling LLP, Washington, D.C., for Plaintiffs.

*Michael J. Ronickher*, with whom were *Caroline D. Ciraolo,* Acting Assistant Attorney General, *David I. Pincus*, Chief, *G. Robson Stewart,* Assistant Chief, *Miranda Bureau* and *Margaret E. Sheer*, Trial Attorneys, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

<u>OPINION AND ORDER</u>

WHEELER, Judge.

Plaintiffs are the owners of six wind farm facilities in the Alta Wind Energy Center near Los Angeles, California. They commenced these actions on June 14, 2013, alleging that the Government underpaid them by over $206 million when it made a grant to them pursuant to Section 1603 of the American Recovery and Reinvestment Act of 2009, Pub.

---

[1] The Court issued this decision under seal on October 24, 2016, and invited the parties to submit proposed redactions of any proprietary, confidential, or other protected information on or before October 31, 2016. Neither party proposed any redactions. Thus, the Court reissues the opinion in full. Additionally, the Court has corrected three typographical and citation-related errors.

L. No. 111-5, 123 Stat. 115 ("ARRA").  Congress passed the ARRA in the wake of the 2008 financial crisis to stimulate the United States economy.  As part of this strategy, Section 1603 created a system whereby certain renewable energy facility owners became entitled to cash grants.  Owners of "specified energy property" like Plaintiffs became entitled to grants equal to thirty percent of "the basis of such property."  Id. § 1603(b)(1)–(2)(A).

And therein lies the dispute.  Plaintiffs argue that "basis" means the purchase prices of their wind farm facilities, minus small allocations for ineligible property such as land and energy transmission lines.  The Government maintains that basis really should be calculated from the value of each wind farm's grant-eligible constituent parts and their respective development and construction costs, citing a myriad of factors that allegedly made the purchase prices an unfair measure of each wind farm's value.  To bolster its arguments, the Government maintains that the purchases were subject to Section 1060 of the Internal Revenue Code, which calls for the residual method of tax accounting.  Using the residual method, the Government argues that a substantial portion of the wind farms' purchase prices must be allocated to intangibles such as goodwill and going concern value.

The Court conducted a nine-day trial in this case from May 9 to May 23, 2016.  At trial, the Court heard the testimony of eleven witnesses.  Plaintiffs' nine witnesses were, in the order presented: James Pagano, George Revock, James Spencer, Lance Markowitz, Damon Huplosky, Anthony Johnston, Donald Edward Settle, Dr. Edward Maydew, and Dr. Colin Blaydon.  The Government's witnesses were Ellen Neubauer and Judson Jaffe.

The Government sought to introduce expert testimony from Dr. John Parsons in the areas of economics, finance, and valuation.  Parsons, Tr. 1889.  Dr. Parsons is a Senior Lecturer at the Massachusetts Institute of Technology ("MIT") Sloan School of Management, where he has worked since 2005.  See Parsons Expert Report App'x 1, at 2.  Previously, he worked at MIT in 1984–1990 as an Assistant Professor of Finance, before moving to the City University of New York, Baruch College in 1990–1993 as Associate Professor of Finance, and later to Columbia University, Graduate School of Business, in 1993–1995 as Visiting Associate Professor of Finance.  From 1995–2005, Dr. Parsons worked for the consulting firm of Charles River Associates as Senior Associate, Principal, and Vice President.  Id.

Dr. Parsons' Curriculum Vitae lists forty-seven articles and publications that he authored or co-authored from 1985 to the present.  Id. at 3–7.  Rule 26(a)(2)(B)(iv) of the Court of Federal Claims ("RCFC") requires an expert witness to list "all publications authored in the previous ten years."  On voir dire examination, Dr. Parsons confirmed that he had provided a complete listing, both at trial and in his earlier deposition, of all of his articles and publications—not only from the previous ten years, but also from 1985 to the present.  Parsons, Tr. 1890–94.

2

Plaintiffs' counsel also introduced Dr. Parsons' March 10, 1997 expert report from another case, <u>Babson-United Investment Advisors, Inc. v. Hulbert</u>, No. 96 Civ. 11349-REK (D. Mass.).  PX 804.  Dr. Parsons included a list of his articles and publications in that report as well, pursuant to a requirement in the 1997 Federal Rules of Civil Procedure that an expert witness list "all publications authored by the witness within the preceding ten years."  Fed. R. Civ. P. 26(a)(2)(B) (1997); PX 807.  The 1997 expert report contained a comparable listing of Dr. Parsons' articles and publications for the period 1985–1995, which he confirmed was a complete list.  Parsons, Tr. 1897–1908.

However, Dr. Parsons' lists of articles both in this case and in <u>Babson-United</u> were not complete, as he attempted to conceal articles he wrote for Marxist and East German publications.  Plaintiffs' counsel confronted Dr. Parsons with the fact that his current Curriculum Vitae and his 1997 expert report in the <u>Babson-United</u> case omitted five published articles that he authored from 1986–1989.[2]  Dr. Parsons also was listed as an Editorial Board member of Science & Society in 1994-1995, <u>see</u> PX 810, and a contributing editor for the same publication from 1995 to 2010.  <u>See</u> PX 810, 819.  Science & Society touts itself as "A Journal of Marxist Thought and Analysis," that is "the longest continuously published journal of Marxist scholarship in the world, in any language."  PX 809 at 1.

After Plaintiffs' counsel revealed these glaring omissions in Dr. Parsons' publication history, the Court had no choice but to exclude Dr. Parsons' testimony.  The Court found that Dr. Parsons failed to disclose his articles relating to Marxist and socialist economic thought, and thereby provided untruthful testimony under oath to the Court.  It is reasonable to infer that when Dr. Parsons left academia in 1995 to join a private-sector consulting firm, he likely found it uncomfortable to have these articles associated with his name.  The Court based its ruling to exclude Dr. Parsons' testimony solely on the conclusion that he was untruthful under oath at trial and in his deposition, and not in any way on the substance of any articles he authored when he was a college professor.  The Court simply could not rely on the substantive expert testimony of a witness who was untruthful in describing his background and qualifications.  This outcome was especially dispositive here because Dr. Parsons' untruthfulness related to his writing on economics

---

[2]  These articles are: (1) <u>Bubble, Bubble, How Much Trouble?  Financial Markets, Capitalist Development and Capitalist Crises</u>, 52 Sci. & Soc'y 260–89 (Fall 1988), PX 808; (2) <u>Forms of GDR Economic Cooperation With the Nonsocialist World</u>, 29 Ass'n of Comp. Econ. Stud. 7–37 (Summer 1987), PX 813; (3) <u>Plan and Market in the Marxist Imagination: Changing of the Guard Among GDR Economists</u>, 17 German Pol. and Soc'y 39–49 (Summer 1989 Special Issue on "The GDR at Forty"), PX 812; (4) <u>Which Road to Oz?  New Thinking in East Germany About the World Economy and the Course of Socialism</u>,) Working Paper No. 2045-88, Leopold Classic Library (Jan. 1989), PX 818; and (5) <u>Credit Contracts in the GDR: Decentralized Investment Decisions in a Planned Economy</u>, 20 Econ. of Planning 28–51 (1986), PX 817.

topics, which was the area in which he was called to testify as an expert.  As one court facing a similar situation noted:

> The court cannot trust the word of an expert witness who would brazenly lie about her credentials and then further lie when caught.  If she would lie about her academic credentials, there is no reason to believe that she would not provide erroneous and/or misleading valuation testimony if she believed it would benefit her client.  The court, therefore, will not ascribe any weight to the evidence supplied by [this expert].

Contreras v. Sec'y of Health & Human Servs., 121 Fed. Cl. 230, 240–41 (2015) (quoting In re WRT Energy Corp., 282 B.R. 343, 371 (Bankr. W.D. La. 2011)).[3]

For these reasons, the Court excluded the expert testimony of Dr. Parsons.  The Government did not identify any other experts on its pretrial list of witnesses, and therefore had no expert testimony to rebut Plaintiffs' experts, Dr. Maydew and Dr. Blaydon, or to support the Government's counterclaims.  Therefore, the Government's counterclaims fail for lack of evidence.

After weighing the evidence and applicable law, the Court finds in Plaintiffs' favor.  The Court holds that Plaintiffs' basis in their wind farm facilities must be calculated according to the facilities' purchase prices, minus reasonable allocations for land and other grant-ineligible property.  Therefore, the Government underpaid Plaintiffs when it awarded them Section 1603 grants, and Plaintiffs are entitled to damages in amounts equal to the difference between the grants they received and the grants they were owed.

## Findings of Fact

### I.    Developing Wind Power in the Tehachapi Region

This case centers on six of the wind farms that make up the Alta Wind Energy Center.[4]  The Alta Wind Energy Center is the largest wind center in North America, and possibly in the world.  Pagano, Tr. 50, 70–72.  It is located in the Tehachapi Region, which

---

[3] There is ample precedent for the trial court to exclude the testimony of an expert witness deemed not credible.  See, e.g., Contreras, 121 Fed. Cl. 230, 240–41 (2015) (finding expert witness who perjured himself as to his qualifications should have been excluded); In re Unisys Savings Plan Litig., 173 F.3d 145, 156–57 (3d Cir. 1999) (excluding expert who provided testimony on voir dire inconsistent with his deposition testimony as unreliable).

[4] These six wind farms will be referred to herein as "Alta I" through "Alta VI."  As noted below, Alta VI was renamed "Mustang Hills."

is a hilly area west of the Mojave Desert about ninety miles north of Los Angeles. Pagano, Tr. 62; PX 10 at 8. The Tehachapi Region is uniquely suited to wind production. The Mojave Desert heats in the morning, which creates a thermal low pressure region. JX 12 at 13. Cool air then moves in from a high pressure region over the Pacific Ocean in the west. Id.; DX 706 at 8–9. To get to the desert, this cooler air first must pass through the Tehachapi hills and valleys, and this effect generates substantial wind. Id. Moreover, the Tehachapi Region is at its windiest during the day—i.e., during the time when people use the most energy. Pagano, Tr. 64–65, 72–73.

In short, if one were going to build a wind farm, this would be the ideal place to do it. Unsurprisingly, companies have been developing wind power facilities in the Tehachapi region since the early 1980s. PX 299 at 12 ¶ 14. By 2009, five percent of all wind power generation in the United States came from the Tehachapi Region. Id.

II.   Developing and Constructing the Alta Wind Projects

Building and operating a wind farm requires many physical assets. For example, a wind farm requires turbines, foundations to support them, meteorological towers, roads, and interconnection and transmission equipment. See, e.g., JX 67 at 11–12, 17; Markowitz, Tr. 927; Revock, Tr. 686. Beginning power production also requires navigating a maze of various contracts. For example, the wind farm must enter into a power purchase agreement ("PPA") with a utility customer. See JX 67 at 11. It must also enter into transmission and interconnection agreements, which allow wind farms to access the wider electrical grid. See JX 67 at 11–12. Operation and maintenance contracts allow wind farm purchasers who do not intend to run the wind farms themselves to keep their purchased facilities running. See JX 67 at 11. Finally, shared facilities and wake impact agreements allow wind farms to share their resources and to offset a phenomenon known as "waking," in which one wind farm blocks a certain amount of wind from another wind farm. JX 67 at 18. Naturally, wind farms also require adequate land, and their owners may acquire land outright or lease it from other owners.

The Alta Wind projects at the center of this lawsuit were developed in two stages. In the first stage, Oak Creek Energy Systems ("Oak Creek") began the development process and partnered with Allco Wind Energy Management Pty. Ltd. ("Allco") to finance the projects' development. Stip. ¶ 5;[5] JX 1 at 7. In the second stage, Terra-Gen Power LLC ("Terra-Gen") acquired the projects from Allco, completed developing and constructing them, and sold the finished products to Plaintiffs. Stip. ¶ 6. The finished product, the Alta Wind Energy Center, is made up of eleven wind farm facilities. See PX 221. These facilities are numbered sequentially from Alta I through Alta XI. Id. Altas I through VI are the subject of this lawsuit. The Energy Center was divided into eleven

---

[5] References to "Stip. ¶ __" are to the parties' April 15, 2016 joint Stipulation of Facts (Dkt. No. 115).

facilities essentially to facilitate their construction, sale, and development. Pagano, Tr. 96, 396. Still, an observer would not be able to tell where one facility ended and another began. Pagano, Tr. 82–83.

### A.   Oak Creek and Allco Begin Development and Construction

In December 2006, Southern California Edison ("SCE") and a subsidiary of Oak Creek and Allco entered into a Master Power Purchase and Wind Project Development Agreement (the "Master PPA"). See JX 6. The Master PPA provided that the Oak Creek/Allco subsidiary would develop multiple wind facilities totaling an aggregate capacity between 1,500 and 1,550 Megawatts, with all of that output to be sold to SCE for a period of roughly 24 years. In return, SCE agreed to enter into a separate long-term PPA to purchase all electricity generated by each of these facilities, with the price to be set in accordance with a formula set forth in the Master PPA. JX 6 at 15, JX 12 at 26; Pagano, Tr. 388–90. The parties amended the Master PPA four times. See JX 9; JX 10; JX 21; JX 23.

Oak Creek and Allco completed development work on the promised wind facilities, but did not actually begin construction. See Pagano, Tr. 86. Specifically, by June 2008, they had (1) completed environmental studies; (2) secured key transmission and interconnection queue requests in the Tehachapi Renewable Transmission Project (a project designed to generate more electricity to customers in Southern California, see JX 12 at 18); (3) secured land rights; (4) begun the permitting process; (5) completed site analysis for turbines and other major equipment; (6) purchased GE turbines and executed turbine-related contracts; (7) constructed meteorological towers and collected wind data; and (8) secured the Master PPA with SCE. JX 12 at 10–26, JX 6; Stip. ¶ 15.

### B.   Terra-Gen Acquires Allco's Assets

In July 2008, Terra-Gen acquired Allco's U.S. wind energy business, including the Tehachapi Projects, for approximately $394 million. Stip. ¶ 6. In the transaction, Terra-Gen acquired development rights, transmission rights, some leased land, some land in fee simple, and an unrelated wind facility (Alite). Pagano, Tr. 119–21, 130; JX 14 at 17–39. Most of the land rights Terra-Gen acquired were unperfected; Allco had secured an option to lease the land, with the lease itself to be negotiated later. Pagano, Tr. 86–90, 457; JX 14 at 29–36; PX 223.

When Terra-Gen purchased Allco's assets, it engaged Duff & Phelps ("Duff"), an appraisal firm, to perform an appraisal of all of these assets in July 2008. Stip. ¶¶ 9–13. Duff's first appraisal report describes Duff's estimation of the fair market value of the identifiable tangible and intangible assets acquired by Terra-Gen for the purpose of allocating the purchase price among the acquired assets. Stip. ¶ 9; JX 32; Pagano, Tr. 120.

Duff allocated approximately $36 million of the $394 million purchase price to the Alite wind farm, $1.5 million dollars to land owned by Allco, as well as other assets. JX 32 at 7; Huplosky, Tr. 1136. Duff estimated that the remaining $350 million pertained to the Tehachapi Projects. Of that amount, $68 million of the purchase price reflected payments that Terra-Gen had made for GE turbines that would be used in what later became Alta I. JX 32 at 35; Huplosky, Tr. 1137–38. The remaining $282 million reflected the acquisition of certain rights and intangible assets for the Tehachapi Projects. JX 32 at 35. Duff determined that $272 million of this amount reflected the value of the development rights Terra-Gen had acquired from Allco (valued at $195 million) and power transmission rights (valued at $77 million). Stip. ¶¶ 11, 12; JX 32 at 45. Duff allocated both of these intangible asset values solely across Altas I through XI. See Stip. ¶ 14.

C.     <u>Terra-Gen Finishes Developing and Constructing the Alta Wind Energy Center</u>

Even though Oak Creek and Allco had made valuable progress on developing what eventually became the Alta Wind Energy Center, much work remained to be done when Terra-Gen took over the project. Terra-Gen had to secure required permits, negotiate and enter into turbine and construction contracts, execute interconnection and crossings agreements, obtain additional land rights, obtain construction financing, and oversee and implement the actual construction of the Alta Wind Energy Center. Pagano, Tr. 110–15. Terra-Gen did all of these things, at a total cost of over $4 billion for the entire Alta Wind Energy Center (of which over $2 billion related to costs associated with Altas I through VI). See Pagano, Tr. 78–79; 115–16, 121. Terra-Gen developed the Energy Center at great risk, as it would have lost its entire $394 million investment if it had failed to obtain necessary real estate, permits, or other development requirements. See Pagano, Tr. 103–04.

Several factors outside Terra-Gen's control also increased the value of Altas I-VI during their development. First, California instituted and then increased its Renewable Portfolio Standards, which dictated that utilities were required to purchase a certain percentage of their electricity from renewable sources. Pagano, Tr. 73–74. Second, Section 1603 was passed during this development period. The grants available under the Section 1603 program were much more valuable than the preexisting tax credits that would have applied to the Alta projects. See Huplosky, Tr. 1192. Finally, SCE built the transmission lines that would carry power from the Alta projects. Pagano, Tr. 113–14.

D.     <u>Terra-Gen Sells Altas I-VI to Plaintiffs</u>

After Terra-Gen had invested the necessary resources into the Alta projects, it began the process of selling them. Terra-Gen would have preferred to keep and continue to develop the Alta projects, but Section 1603 made this approach impractical. See Pagano,

Tr. 157, 166.  Under Section 1603, "pass-thru" entities are not eligible for cash grants if any "holder of an equity or profits interest" in the pass-thru entity is a nonprofit organization.  ARRA § 1603(g)(4).  During the period relevant to this case, Terra-Gen was a pass-thru entity owned by ArcLight Capital and Global Infrastructure Partners, each of which had a small percentage of non-profit owners.  Pagano, Tr. 53–54; 157, 166. Therefore, Terra-Gen could not take advantage of the Section 1603 cash grant program itself.  Terra-Gen even sought a legislative solution to this problem, but to no avail.  Pagano, Tr. 156–60; PX 1; PX 2.  Terra-Gen could have established a C corporation blocker entity between itself and each individual Alta entity to become eligible for a Section 1603 grant, but this approach would have imposed a costly double layer of income taxation.  Pagano, Tr. 161.  Terra-Gen therefore decided to sell the Alta projects.  It sold Alta VI in an outright sale, and sold Altas I-V in sale-leaseback transactions.  Pagano, Tr. 166–67, 186.

The weight of the evidence demonstrates that all of the Alta I-VI transactions were negotiated by sophisticated parties at arm's length.  Specifically, Citibank, N.A. ("Citi") and Google, Inc. negotiated the Alta II-V transactions, General Electric Capital Corporation ("GE") and Union Bank of California (through UnionBanCal Corporation) ("UBOC") negotiated the Alta I transaction, and Everpower Wind Holdings, Inc. ("EverPower") negotiated the sale of Alta VI (all parties negotiated with Terra-Gen).  The testimony at trial cumulatively showed that these parties extensively negotiated to achieve the best possible purchase prices.

### 1.   Sale-Leaseback of Altas II-V

First, Terra-Gen sold Altas II-V to Citi and additional investors after an initial bidding process in a series of transactions that lasted from December 2010 to June 2011. See Stip. ¶¶ 18–21; Revock, Tr. 740, 771–72, 774.  To facilitate the purchase transactions, Citi and Terra-Gen created multiple trusts (which are Plaintiffs in this case), each of which acquired an undivided percentage interest in the applicable Alta project.  JX 225; JX 286; JX 344; JX 402.

Citi and Terra-Gen then individually closed all four project transactions, with Citi divesting some or all of its interest in each individual phase to other potential investors, either by recruiting a co-investor before closing (as with Google) or divesting its interest in an owner-lessor entity after closing.  Revock, Tr. 740–41, 773–74, 707; PX 13.  The agreements also leased Altas II-V back to Terra-Gen.  Essentially, this meant that Terra-Gen would continue to operate Altas II-V while paying a steady income stream to Plaintiffs.  This income stream was generated by the wind farms as integrated facilities, and reflected benefits derived from use of each entire wind farm.  Revock, Tr. 735, 785. As Mr. Revock testified on behalf of Citi, the parties used a computer program to generate a leaseback transaction that optimized Plaintiffs' income from the leaseback and met Terra-Gen's objectives.  Revock, Tr. 746, 747.  In total, the purchase prices that Plaintiffs paid

Terra-Gen in the Alta II-V transactions were (approximately): $440.25 million for Alta II, $444.5 million for Alta III, $288.8 million for Alta IV, and $488 million for Alta V. <u>See</u> Stip. ¶¶ 18–21; JX 225; JX 286; JX 344; JX 402. These purchase prices reflect only property that the parties deemed eligible for grants under Section 1603; the parties exchanged grant-ineligible property in separate agreements. <u>See</u> Huplosky, Tr. 1114; JX 225; JX 286; JX 344; JX 402.

### 2.    Sale-Leaseback of Alta I

In December 2010, Terra-Gen closed a similar sale-leaseback transaction for Alta I. GE and UBOC formed a consortium to participate as equal co-investors in the sale-leaseback. Markowitz Tr. 925–27. To accomplish the deal, GE and UBOC formed trusts that became the owner-lessors in the leaseback (as with Altas II-V, these trusts are Plaintiffs in this case). Stip. ¶ 17. The overall transaction created a structure whereby Terra-Gen continued to operate Alta I, and Plaintiffs received an income stream from the cash flows Alta I generated. Markowitz, Tr. 989–90. The overall purchase price for Alta I was $560 million. Stip. ¶ 17; JX 212. In contrast to the sale-leaseback transactions of Altas II-V, the Alta I transaction conveyed both grant-eligible and ineligible property. JX 212.

### 3.    Outright Sale of Alta VI

EverPower bought Alta VI from Terra-Gen in 2012 for $439.388 million. Mr. Spencer, on behalf of EverPower, testified that the purchase price reflected the fact that Alta VI was a complete facility with all of its necessary contracts and was capable of generating income. Spencer, Tr. 850. EverPower also acquired some project land free of charge in the transaction. Spencer, Tr. 895–97. Terra-Gen also required EverPower to change the name of Alta VI to "Mustang Hills." Huplosky, Tr. 1211. The parties changed the name because they hoped Treasury would not lower the claimed Section 1603 grant amount for Alta VI (as Treasury had for the other Alta facilities). <u>Id.</u>

### 4.    Section 1603 Indemnities

The parties to the Alta I-VI transactions also included indemnity provisions in their transactions. With the indemnities, Terra-Gen agreed to accept the risk that the Government would not pay the full amount Plaintiffs would claim under Section 1603, using the purchase price as basis. Specifically, the Alta II-V transactions provided that Terra-Gen would take the financial risk of any difference between the payments requested using the purchase price as the basis (as Plaintiffs argue basis should be calculated in this case) and any actual reduced payment, up to a certain amount. Revock, Tr. 723–24. In the Alta I transaction, Terra-Gen went even further: it agreed to indemnify the purchasers for any difference between the Government's actual grant and a purchase price-basis grant with no upper limit on Terra-Gen's liability. <u>See, e.g.</u>, JX 223. The Alta VI indemnity

essentially guaranteed that EverPower would receive $87 million, regardless of the Government's Section 1603 award (with any grant amount in excess of $87 million payable to Terra-Gen). See Spencer, Tr. 886. Thus, the Alta I-VI deals allowed Plaintiffs to apply for a Section 1603 grant using their purchase price as a basis, but protected them to a certain extent from any reduced grant award.

III.   Plaintiffs' Applications for Section 1603 Grants are Denied

A.   Terra-Gen Creates and KPMG Certifies Purchase Price Allocations

Before Plaintiffs submitted Section 1603 applications, Terra-Gen first prepared cost schedules for the Alta projects that broke down the total development and construction costs into various components, including property that was eligible for a Section 1603 grant and property that was not. Huplosky, Tr. 1041–50, 1052–53. Terra-Gen "capitalized" the indirect costs into the hard assets—meaning that the indirect cost effectively becomes part of the hard asset. Huplosky, Tr. 1046–48. In some instances, indirect costs were entirely eligible—for instance, if they were associated with only eligible assets, such as permits for the wind turbines. Huplosky, Tr. 1049. In other instances, indirect costs were entirely ineligible, such as costs related solely to electricity transmission. Id. Finally, some indirect costs, like interest during construction, related to the entire Facility and were thus partially eligible and partially ineligible. Such indirect costs were apportioned pro rata among all of the direct costs. To illustrate, if the Facility's eligible direct costs were twice as high as the Facility's ineligible direct costs, then the indirect costs were spread among the direct cost items using the same 2:1 ratio. Huplosky, Tr. 1049–50. KPMG approved this method of allocating indirect costs. Huplosky, Tr. 1051, 1094.

Treasury required companies applying for a Section 1603 grant to provide an opinion from an independent auditor validating the claimed grant-eligible costs. Plaintiffs retained KPMG to examine, and prepare an opinion validating, Plaintiffs' claimed eligible costs. Johnston, Tr. 1215–16. Terra-Gen and KPMG first evaluated the costs incurred by Terra-Gen to construct each component of the facility, and determined which of these costs were eligible and which were ineligible. Huplosky, Tr. 1038; see also JX 168 at 1–5. Terra-Gen relied on Treasury's Section 1603 Guidance to determine what costs were eligible, and, in accordance with that guidance, classified as eligible the items that were necessary to create electricity, and classified as ineligible items that were not. Huplosky, Tr. 1041–44. Members of KPMG's Fixed Assets team then reviewed these determinations. Johnston, Tr. 1229–30, 1282; Huplosky, Tr. 1044.

In addition to classifying costs as eligible or ineligible, KPMG also confirmed that the costs had actually been incurred, a process referred to as "vouching" the costs. Huplosky, Tr. 1202, 1282. KPMG vouched eighty percent or more of the construction costs for each Alta Wind lawsuit facility. Johnston, Tr. 1220, 1226–29; JX 86 at 3. Based

on this vouching work, KPMG verified "that management's assertion of the eligible cost basis" for each Facility with respect to Terra-Gen's construction costs "is accurately stated." Johnston, Tr. 1227–29.

Terra-Gen then prepared cost schedules that set forth Plaintiffs' claimed allocations of the purchase price to eligible and ineligible property. Huplosky, Tr. 1079–80. Thus, for Altas I and VI, Plaintiffs submitted applications for Section 1603 grants that multiplied the percentage of construction costs that Terra-Gen deemed eligible for Section 1603 grants by the purchase price. Huplosky, Tr. 1080, 1117. Plaintiffs' analysis deemed 93.1 percent of Alta I to be eligible property under Section 1603. Huplosky, Tr. 1080, 1100. Similarly, Plaintiffs deemed 96.9 percent of Alta VI to be eligible for a Section 1603 grant. See Huplosky, Tr. 1117–19. Terra-Gen performed no allocation for Altas II-V because those transactions were structured such that no ineligible property was transferred. In addition to certifying that Terra-Gen's breakdown of the construction costs for the Alta Wind Lawsuit Facilities into eligible and ineligible components was reasonably stated, KPMG also issued a certification regarding the amount of the purchase price for each Alta Wind Lawsuit Facility that was eligible for a cash grant under Section 1603, using the pro rata methodology. These certifications are sometimes known as fair market value (or "FMV") certifications. See Johnston, Tr. 1223; JX 194.

Plaintiffs' expert, Dr. Maydew, testified that this allocation method was reasonable. Maydew, Tr. 1411–14, 1415–16; PX 326 at 27–28 ¶¶ 2–4. He also testified that at least three of the "Big 4" accounting firms have approved and used the pro rata allocation method to determine the basis of eligible property at wind power facilities. Maydew, Tr. 1418–19. Mr. Settle's testimony further showed that both the industry and the National Renewable Energy Laboratory ("NREL") accept, as a "rule of thumb," that generally ninety-five percent of the construction costs of a wind farm are eligible. Settle, Tr. 1305–06. Indeed, Mr. Settle noted that NREL "tested" this ninety-five-percent ratio "early on multiple projects and determined that a good representation is five percent nonqualifying, ninety-five percent eligible out of total project costs." Settle, Tr. 1309–10, 1314. Thus, the 93.1 percent and 96.9 percent allocations for Altas I and VI would be within the range of this "rule of thumb."

B.     Plaintiffs Apply for Section 1603 Grants

Each Plaintiff timely applied to Treasury for a cash grant equal to thirty percent of the purchase-price basis of its eligible property. JX 195; Stip. ¶¶ 36–37. Treasury had entered into an interagency agreement with NREL, which performed a review of cash grant applications and completed an "application checklist" for each Plaintiff application. These application checklists confirmed that Plaintiffs had satisfied all statutory requirements to receive Section 1603 grants. Settle, Tr. 1306–07; PX 205; PX 132. Instead of paying Plaintiffs cash grants equal to thirty percent of their purchase price basis, the Government

paid cash grants equal to thirty percent of Terra-Gen's construction and development costs for each facility. See JX 196; Pagano, Tr. 418; see also Jaffe, Tr. 2014 (noting that all of the Alta awards were based on the schedule provided by Terra-Gen summarizing Terra-Gen's construction and development costs). Therefore, Plaintiffs now seek reimbursement of the difference between the Government's reduced grant award and a grant reward that is thirty percent of their claimed purchase price basis (after applicable allocations for ineligible property).

Discussion

ARRA Section 1603 allows owners of "specified energy property" to apply for grants. ARRA § 1603(a). Wind facilities are one type of specified energy property, Id. § 1603(d)(1); 28 U.S.C. § 45(d)(1), and the parties do not dispute that Altas I-VI are wind facilities that qualify for grants under Section 1603. Section 1603 incorporates the definitions in Section 48 of the Internal Revenue Code ("IRC"), see § 1603(h), which defines "qualified property" as "tangible property . . . used as an integral part" of grant-eligible facilities. 26 U.S.C. § 48(a)(5)(D). Treasury guidance for the Section 1603 program excludes as qualified property "electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines." JX 126 at 11–12. Grants under Section 1603 therefore are calculated by taking thirty percent of the owner's basis in this qualified property. See ARRA § 1603(b)(2)(A).

The question in this suit has always been what the basis of Altas I-VI is. If the Court were to follow the Government's approach in awarding the Section 1603 grants, basis would mean the development and construction costs of each Alta facility—i.e., a grant predicated on the "cost method" of tax valuation. See Def. Post-Trial Br. at 111, Dkt. No. 118. Plaintiffs' approach, on the other hand, would mean that the Alta Wind facilities' purchase prices, minus reasonable allocations for ineligible property under Section 1603, would be used to calculate basis. See Pl. Post-Trial Br. at 40, Dkt. No. 158.

I.    Plaintiffs' Purchase Prices Determine Their Basis for Section 1603 Grants

Basis, as defined in the IRC, is the cost of property to its owner. See 26 U.S.C. § 1012(a).[6] Therefore, if someone built a wind farm facility, his development and construction costs would be his basis in the facility because this is what the cost of the facility is to him. Conversely, a buyer's basis in a wind farm facility he purchases generally would be the facility's purchase price, as this is the cost of the facility to the buyer. See Solitron Devices, Inc., v. Comm'r, 80 T.C. 1, 23 (1983), aff'd, 744 F.2d 95 (11th Cir. 1984)

---

[6] Ms. Neubauer, the Section 1603 Program Director, agreed that concepts such as "cost basis" "come from the Internal Revenue Code." Neubauer, Tr. 1771–72, 1777–78.

("One of the verities of tax law is that the cost basis of property is equal to the amount of cash paid for such property.").

There are exceptions to the general rule that purchase price determines basis, and the Government argues that several of them apply here. Essentially, the Government argues that the purchase prices cannot be Plaintiffs' basis in the wind farm facilities because they do not capture the fair market value of the tangible property that is eligible for Section 1603 grants. The Government first points to the fact that the purchase prices included ineligible property to show that the fair market value of the eligible property is not ascertainable from the purchase prices. Next, the Government argues that Section 1060 of the IRC, and its accompanying "residual method" of tax valuation, applies because intangible goodwill or going concern value was included in the purchase prices. Finally, the Government argues that the purchase prices cannot serve as Plaintiffs' basis because (a) the transactions were not "conducted at arm's-length by two economically self-interested parties;" and (b) the transactions were "based upon 'peculiar circumstances' which influence[d] the purchaser to agree to a price in excess of the property's fair market value." Lemmen v. Comm'r, 77 T.C. 1326, 1348 (1981) (quoting Bixby v. Comm'r, 58 T.C. 757, 776 (1972)). The Court will address each of the Government's arguments in turn.

A. Section 1060 of the IRC Does Not Apply to the Transactions

Both parties agree that the price Plaintiffs paid for Altas I-VI was higher than the mere cost of developing and assembling the facilities. Therefore, the question is whether some of this additional value constitutes goodwill or going concern value. If it does, then Section 1060 applies, and the parties would have to use the "residual method" promulgated under Section 338(b)(5) of the IRC to value the grant-eligible assets. The residual method allocates value on a waterfall basis among several categories of tangible and intangible assets, and the Government argues that much of the value in the Alta I-VI transactions would be allocated to ineligible intangibles (such as goodwill or going concern value) if the residual method applied.

Section 1060 applies to "applicable asset acquisitions." 26 U.S.C. § 1060(a). An applicable asset acquisition "means any transfer . . . of assets which constitute a trade or business, and with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets." Id. § 1060(c). The Treasury promulgated regulations that further elaborate on the circumstances in which assets constitute a trade or business. See 26 C.F.R. § 1.1060-1(b)(2). Under that Regulation, assets constitute a trade or business within the meaning of Section 1060 if their "character is such that goodwill or going concern value could under any circumstances attach to such

[assets]."  Id. § 1.1060-1(b)(2)(i)(B).[7]  "Goodwill is the value of a trade or business attributable to the expectancy of continued customer patronage."  Id. § 1.1060-1(b)(2)(ii). "Going concern value is the additional value that attaches to property because of its existence as an integral part of an ongoing business activity."  Id.  It "includes the value attributable to the ability of a trade or business . . . to continue functioning or generating income without interruption notwithstanding a change in ownership."  Id.  Going concern value "also includes the value that is attributable to the immediate use or availability of an acquired trade or business . . . ."  Id.  To determine whether goodwill or going concern value could attach to a group of assets, "all the facts and circumstances surrounding the transaction are taken into account," including:

> (A) The presence of any intangible assets . . . ;
> (B) The existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased (other than goodwill and going concern value) as shown in the financial accounting books and records of the purchaser; and
> (C) Related transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller . . . in connection with the transfer.

Id. § 1.1060-1(b)(2)(iii).

There is a structural problem that becomes apparent when one tries to parse this Treasury Regulation.  First, in subsection 1.1060-1(b)(2)(ii), the Regulation sets out specific definitions for goodwill and going concern value, which are presented as two distinct (if related) terms.  Further, the definitions for goodwill and going concern value appear largely to incorporate the terms' common law meanings.  See, e.g., Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555 (1993) (citing "the shorthand description of good-will as 'the expectancy of continued patronage'") (citation omitted); UFE, Inc. v. Comm'r, 92 T.C. 1314, 1323 (1989) ("Going concern value is manifested in the business' ability to resume business activity without interruption and to continue generating sales after an acquisition.") (citing Computing & Software Inc. v. Comm'r, 64 T.C. 223, 235 (1975)).

In the next subsection, however, the Regulation enumerates situations in which both of these two concepts "could apply."  So, if one were to read the categories in subsection 1.1060-1(b)(2)(iii) as mandatory triggers for finding that either goodwill or going concern

---

[7]  Assets also constitute a trade or business if "[t]he use of such assets would constitute an active trade or business under section 355" of the IRC.  Id. § 1.1060-1(b)(2)(i)(A).  The Government does not make any substantive argument that Altas I-VI constitute an active trade or business under Section 355.

value could apply, then the definitions in the previous subsection—and, indeed, the body of case law that gave rise to them—would be meaningless. It is hard to believe the Treasury intended such a drastic result, particularly given the Regulation's phrasing: "Factors to be considered *include* . . . ." 26 C.F.R. § 1.1060-1(b)(2)(iii) (emphasis added). Therefore, it is more appropriate to view subsection 1.1060-1(b)(2)(iii) as a non-exhaustive list of factors that *may* mean goodwill or going concern value could apply. The Court must consider these factors along with the totality of the circumstances in the Alta transactions. As shown below, the Court finds that other factors are dispositive here.

### 1.   No Goodwill Value Could Attach to the Alta Facilities

As noted above, goodwill is the "expectancy of continued patronage." Newark Morning Ledger, 507 U.S. at 555. This is "a useful label with which to identify the total of all the imponderable qualities that attract customers to the business." Id. (citation omitted); see also Lorvic Holdings, Inc. v. Comm'r, T.C. Mem. 1998-281, 1998 WL 437287, at *7 (1998) ("[G]oodwill is the aggregate value of the relationships and reputation developed by a business with its present and potential customers and associates over a period of time."). Thus, goodwill is not a free-floating residual category to which one must allocate any value attached to a group of assets that exceeds the development and construction costs of those assets. Rather, goodwill is a distinct concept that represents the value a business acquires from its ability to attract and maintain customer relationships over time.

The Court is aware of authority that appears at first blush to contradict this view. See, e.g., Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1039 (Fed. Cir. 2003) ("Goodwill, an intangible asset, is the excess of cost over the fair value of the identifiable net assets acquired.") (citation omitted); Deseret Mgmt. Corp. v. United States, 112 Fed. Cl. 438, 449 (2013) (same). However, this "residual goodwill" approach would completely eclipse authority and Treasury regulations that attach different and distinct meanings to goodwill and going concern value. If goodwill is all value over the fair value of identifiable assets, then going concern value is squeezed out as a concept. Furthermore, the IRS has found that Newark Morning Ledger "had the effect of rendering irrelevant the early depreciation cases in so far as they used the term 'goodwill and going concern value' as shorthand for any intangible that was nondepreciable." IRS Tech. Adv. Mem. 0907024 (Feb. 13, 2009). Therefore, a more internally consistent approach differentiates between the goodwill and going concern value, and gives unique meaning to each. See UFE, 92 T.C. at 1323 ("While courts have blurred these distinctions between goodwill and going concern value, they are different conceptually.").

With that definition in mind, there are a few Alta Wind-specific factors that deserve consideration here. When sold, Altas I-VI (1) were not yet operational, (2) had lined up only one long-term customer (SCE) to buy the entirety of their electricity output for the

foreseeable future, and (3) were not capable of taking on any other customers. Thus, any "expectancy of continued patronage" would have to come from an expectancy that the Alta facilities would keep doing business with SCE, their sole customer.

It is true that goodwill may attach even where one customer purchases all of a business's output "for a long series of years." See Pfleghar Hardware Specialty Co. v. Blair, 30 F.2d 614, 617 & n.9 (2d Cir. 1929). Still, the fact that the Alta facilities—unlike the business in Pfleghar—were not yet operational when purchased is dispositive here. At the time of sale, SCE and Altas I-VI had not yet begun performing under the PPAs. After a period of performance under the contract during which the facilities were kept in good working order and SCE continued buying electricity, goodwill might accumulate in the form of an expectation that the parties would not breach the PPAs, or that the parties might renew the PPAs—i.e., that Altas I-VI would keep "attracting" SCE's business. This would be the "expectancy of continued patronage" to which the cases refer. Because both parties had not yet begun performance under the PPAs at the time of purchase, however, this expectancy could not have existed at that time, so goodwill could not have attached. See, e.g., J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc., No. CIV. A. 95-2179, 1998 WL 47379, at *11 (E.D. Pa. Jan. 30, 1998), aff'd, 173 F.3d 421 (3d Cir. 1998) (citing "cases that hold that goodwill cannot be fairly calculated for a business that is just starting up and has no record of earnings or profits").

The Government's argument that the location of Altas I-VI adds goodwill also fails. It is undisputed that the Alta facilities' location added value to the wind farm facilities. However, the value of an asset's permanent location is part of the basis of the asset itself, and is not goodwill or any other separate intangible asset. See, e.g., IRS Tech. Adv. Mem. 9317001, 1993 WL 134598 (Apr. 30, 1993) (finding that a transponder's physical location "is reflected in its value, and cannot be separated from the transponder itself"). Any other approach would not make sense, as it would mean that property values in places like New York City would be made up largely of goodwill as a separate intangible asset. Plaintiffs' expert, Dr. Maydew, confirmed that this is not standard practice. See Maydew, Tr. 1450–51, 1453. Therefore, no goodwill could have attached at the time of the Alta transactions.

## 2.  No Going Concern Value Could Attach to the Alta Facilities

Going concern value, while related conceptually to goodwill, is a distinct form of value. See United States v. Cornish, 348 F.2d 175, 184 (9th Cir. 1965); UFE, 92 T.C. at 1323. Essentially, going concern value is the "special value inherent in a functioning established plant continuing to operate, to do business, and to earn money, with its staff and personnel." Miami Val. Broad. Corp. v. United States, 499 F.2d 677, 682 (Ct. Cl. 1974). It "is manifested in the business' ability to resume business activity without interruption and to continue generating sales after an acquisition." UFE, 92 T.C. at 1323.

Here, there was no "functioning established plant" at any of the Alta facilities at the time of the Alta I-VI transactions. Altas I-VI were fully developed and constructed when Terra-Gen sold them, but they were not yet operational; therefore, they were not "established." As noted above, performance under the PPAs had not yet begun, so there were no cash flows that would continue to be generated after an acquisition—these cash flows, at the time of the transactions, were prospective only. In short, there was no going concern value at time of the Alta transactions because there was not yet a going concern.

Because the Court finds that neither goodwill nor going concern value could have attached to Altas I-VI at the time of the transactions, the transactions were not "applicable asset acquisitions" within the meaning of Section 1060. Therefore, Section 1060 and its accompanying residual method do not apply to the transactions.

B.    Altas I-VI had Turn-Key Value

Obviously, Altas I-VI had additional value over their development and construction costs because they were ready-to-use wind farm facilities located in the windy Tehachapi Region, not just collections of turbines lying on the ground somewhere. This is the real sticking point in this case. The Government argues that this value is goodwill or going concern value, but those labels do not capture the situation of Altas I-VI, as shown above. Rather, Altas I-VI had "turn-key" value because they were ready-to-use wind farm facilities.

Ready-built facilities may have value over and above the sum of their construction and development costs. Part of this value is turn-key value, which essentially describes value a facility has when it is ready for immediate use after purchase. Here, Miami Valley is instructive. In that case, the plaintiffs bought new radio station facilities that had already been "tested and coordinated." 499 F.2d at 680. The court held that those facilities had turn-key value because they were ready for operation at the time of purchase, noting:

> [F]air market value would take into account the fact that this buyer received (and was entitled under its contract to receive) a put-together plant in good all-round working shape, not a congeries of uncoordinated physical assets liable as not to fail to work as a unit. The 'turnkey' product was worth more than the sum of the untested and uncoordinated parts, even though they were all constructed and installed in place. Normally a buyer would pay an increment for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.

499 F.2d at 680. It is important to note that turn-key value is not the same thing as "going concern" value. In a turn-key transaction, the buyer is not purchasing an operating business; rather, he is purchasing a put-together facility that is *ready* for operation. See id. at 681–82. This distinction is important because turn-key value, unlike going concern value or goodwill, is considered part of the tangible assets in a transaction rather than a separate intangible asset. See, e.g., IRS Tech. Adv. Mem. 0907024, 2009 WL 356169 ("[C]ase law supports a conclusion that it is appropriate to value interrelated assets in the aggregate and that the synergistic value of a collection of assets is attributable to those assets rather than a conceptually distinguishable goodwill or going concern value element.").

Altas I-VI were ready-to-operate wind farm facilities at the time of purchase. Terra-Gen had completed the necessary development and permitting work before the purchase. Therefore, the wind farm facilities had turn-key value, and their tangible assets were more valuable than they would have been if the wind farm facilities were not ready to operate. This value was part of the fair market value of Altas I-VI.

C.    No "Peculiar Circumstances" Counsel Against Using the Purchase Prices as Basis

Even when Section 1060 does not apply to a transaction, the Tax Court historically has looked to other measures of a property's fair market value if evidence shows that a "transaction [was] not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon 'peculiar circumstances' which influence the purchaser to agree to a price in excess of the property's fair market value." Lemmen, 77 T.C. at 1348 (quoting Bixby, 58 T.C. at 776). The Court finds this approach sensible. At bottom, "peculiar circumstances" exist if the parties appear to be unduly manipulating the purchase price by entering into separate agreements at or near the time of purchase, causing the purchase price to be highly inflated. For example, in Lemmen, the parties agreed to transfer herds of cattle. Id. at 1348. In addition to the herd purchase contracts, the parties also entered into several "maintenance contracts" at the time of purchase. Id. The transactions, taken together, were peculiar because the herd purchase prices were "highly inflated above the market value of the animals," while the maintenance contracts had below-market prices. Id. at 1348–49. This was especially true because the seller was selling "managed breeding herds to investors," so maintenance was an integral part of the transaction. Id. at 1349.

Further, it is important to note that the Court should disregard the purchase price as basis only if the evidence shows that peculiar circumstances have *highly* inflated the purchase price. For example, in Lemmen, the herd's price had been inflated by nearly 500 percent. Id. at 1348. In another case, the evidence failed to prove "that the facts stand for anything other than an elaborate tax-avoidance scheme." Bixby, 58 T.C. at 777.

18

As stated above, the Court finds that all of the Alta transactions occurred at arm's length between sophisticated and self-interested parties. Therefore, the only question remaining is whether any peculiar circumstances were present in the Alta transactions that highly inflated the Alta facilities' purchase prices. The Government argues that there were such peculiar circumstances, citing the sale-leaseback transactions for Altas I-V, several side-agreements between the parties to the transactions, and Terra-Gen's agreements to indemnify Plaintiffs' Section 1603 payments.

1. The Sale-Leaseback Transactions did not Create
   Peculiar Circumstances

The parties to the Alta I-V transactions entered into sale-leaseback transactions in which Terra-Gen sold its facilities to Plaintiffs but immediately leased the facilities in order to operate them itself. See Findings of Fact, supra Point II.D.1–2. The structure of the sale-leaseback transactions does not mean that these transactions created peculiar circumstances. A sale-leaseback is "a commercially acceptable device which affords significant advantages to both purchaser-lessor and seller-lessee." In re San Francisco Indus. Park, Inc., 307 F. Supp. 271, 276 (N.D. Cal. 1969). Indeed, the guidance for the Section 1603 grant program explicitly envisioned sale-leaseback structures. See JX 0126.009.

Therefore, to create peculiar circumstances, there must be some indication that the parties to the transactions adjusted various aspects of the sale and leaseback prices in order to highly inflate the purchase prices, as in Lemmen. The Government did not present evidence at trial to show that this occurred. The purchase prices paid for Altas I-V, which were sold in sale-leaseback transactions, were essentially the same on a per-kilowatt basis (after adjusting for differences in electrical generating capacity). Furthermore, they were essentially the same on a per-kilowatt basis as the prices paid for the outright purchase of Alta VI (Mustang Hills). Blaydon, Tr. 1596–97, 1601; Pagano, Tr. 173–76; PX 281. Moreover, all six of those purchase prices were essentially the same on a per-kilowatt basis as the purchase prices paid for two Alta Wind Energy Center facilities that are not involved in this litigation. Those two non-lawsuit facilities (Altas VIII and IX) were the subject of outright-purchase transactions in January and November 2012, respectively, by unrelated third parties. PX 299 at 33 ¶ 57; PX 154.

Other factors also show that the leasebacks did not fundamentally alter the Alta I-V transactions. First, the Alta II-V leasebacks were negotiated after Citi and Terra-Gen had separately agreed on a per-kilowatt purchase price. For example, Mr. Revock testified that "the value [sale price] is determined separately in advance of running the lease profile" in these sale-leaseback transactions. Revock, Tr. 809–10. Further, in the Alta I transaction, a competing bidder—Brookfield Renewable Power, Inc.—made a last-minute bid for an

19

outright purchase of Alta I that was less than two percent lower than the price UBOC and GE eventually paid.  See Pagano, Tr. 325–26; see also PX 299 at 27.  Moreover, all of the Alta I-V sale-leaseback transactions closely tracked an independent analysis of the Alta facilities' fair market values by DAI Management Consultants that did not take the leaseback transactions into account.  See JX 112 at 13 (Alta I appraisal); JX 59 at 12 (Alta II appraisal); JX 62 at 12 (Alta III appraisal); JX 60 at 12 (Alta IV appraisal); JX 61 at 12 (Alta V appraisal).  In sum, the evidence demonstrates that the leaseback portion of the sale-leaseback transactions did not highly inflate the purchase prices for Altas I-V.[8]

The rent prepayments in the sale-leaseback transactions also did not create peculiar circumstances.  The purpose of such prepayments was merely to reduce the periodic rent payments due under the lease agreements, as this helps ensure that the project cash-flows will be enough to cover Terra-Gen's rent payments to Plaintiffs.  See Pagano, Tr. 527.  Lowering the periodic rent payments through an up-front prepayment gives the lessee some breathing room in case, for example, the wind does not blow as strongly in a particular month.  Again, there is simply no evidence that these prepayments inflated the purchase price in any way.  Therefore, because the weight of the evidence demonstrates that the facilities sold in sale-leaseback transactions had similar capacity-adjusted prices-per-kilowatt, the sale-leasebacks did not create peculiar circumstances.

### 2.   The Various Side-Agreements Between Terra-Gen and Plaintiffs did not Create Peculiar Circumstances

The Government points to land agreements and indemnification for certain financial obligations such as "wake payments" to show that the Alta I-VI transactions contained peculiar circumstances.  However, there is nothing in the agreements to which the Government refers that would lead to a "highly inflated" purchase price for the Alta facilities.  See Lemmen, 77 T.C. at 1348.

First, Terra-Gen obligated itself during the construction and development phase to make wake payments from Alta VI to the other Alta facilities.  These wake payments compensated facilities that were downwind of Alta VI for the disruption in wind-flow that Alta VI caused.  In other words, facilities downwind of Alta VI could not generate as much electricity because they were in Alta VI's wake.  Terra-Gen itself—not Alta VI—therefore took on the obligation to make wake payments to the downwind facilities because it was the developer of all six facilities.  See Pagano, Tr. 414; 534–35; Spencer, Tr. 911.  Because Terra-Gen took on this responsibility, it did not pass the obligation to make wake payments on to Plaintiffs when it sold Alta VI, so it did not effectively refund part of the purchase

---

[8]  Although the Government elicited testimony in which certain witnesses acknowledged that it was possible to manipulate the leaseback and sale prices, no witness testified that Plaintiffs and Terra-Gen had actually used these techniques to inflate the purchase prices.

price by making these wake payments on Plaintiffs' behalf.  Therefore, the wake payments cannot be construed as a peculiar circumstance that inflated the purchase price.

Second, it is undisputed that Terra-Gen conveyed some fee land to Plaintiffs at no charge, and that it also transferred leased land to Plaintiffs as part of the Alta transactions. However, Plaintiffs have accounted for the fee land in their Section 1603 allocation.  As shown below, the Court finds this allocation for land to be reasonable.  Because Plaintiffs acknowledge that the land's value cannot be part of their basis in Altas I-VI, there is no reason to believe that Plaintiffs are attempting to highly inflate their basis by including ineligible fee land value.

Further, the evidence shows that the lease terms on the leased land that Plaintiffs acquired during the Alta transactions were not more favorable than other similar leases during the same time period.  See Pagano, Tr. 408–09.  Terra-Gen did not own all of the land in the Alta projects; rather, it had an obligation to make royalty payments to certain landowners based on the output of each wind farm facility.  It transferred this obligation to Plaintiffs.  If the royalty rates due under the land lease agreements were better than market rates at the time of the Alta transactions, then Plaintiffs would have gained a benefit when they acquired the leases.  Because the weighted average of these royalty rates was 5.37 percent and other Terra-Gen leases had royalty rates of about five percent, however, these royalty rates were worse than market rate and could not have added value to the Alta facilities.  See id; Maydew, Tr. 1466.  While the Government takes issue with Plaintiffs' evidence on this point (for example, Mr. Pagano's reliance on a "weighted average" for all of the facilities) it cannot point to evidence that favorable leases "highly inflated" the value of the Alta transactions.

In sum, no evidence demonstrates that the value of wake payments or grant-ineligible land highly inflated the Alta I-VI purchase prices.  Therefore, these agreements do not constitute peculiar circumstances.

### 3.   The Section 1603 Indemnities did not Create Peculiar Circumstances

Terra-Gen indemnified Plaintiffs for the difference between their claimed Section 1603 grant amounts and lower grant amounts they might receive.  Still, this is not a peculiar circumstance.  One of the reasons Terra-Gen sold, and Plaintiffs bought, the Alta facilities was the existence of the Section 1603 cash grant program.  Both Terra-Gen and Plaintiffs believed the facilities to be worth as much as they would be worth had the Government awarded a Section 1603 grant using the purchase price as basis.  Nothing about this enhanced value estimate is peculiar; rather, "[w]hen examining a transaction, the reality that the tax laws affect the shape of most business transactions cannot be ignored." Tanner v. Comm'r, T.C. Mem. 1992-235, 1992 WL 79077 (April 21, 1992) (citing Frank Lyon Co. v. United States, 435 U.S. 561, 576–80 (1978)).  Further, the weight of the evidence

confirmed that similar tax-related indemnities are common in complex commercial transactions like this one.  For example, Mr. Revock testified that tax indemnities were in every lease agreement he worked on.  Revock, Tr. 724.  Thus, the indemnities simply confirmed the fair market value of the facilities once expected grant amounts were taken into account, and did not give rise to peculiar circumstances.

D.    Plaintiffs' Pro-Rata Allocations are Reasonable

In the absence of peculiar circumstances that highly inflated the Alta I-VI purchase prices, the Court looks to these purchase prices to determine basis for purposes of Section 1603.  See Solitron Devices, 80 T.C. at 23.  Section 1603's divisions between grant-eligible and grant-ineligible property, however, mean that part of the purchase price cannot be counted as basis in the transactions that transferred both eligible and ineligible property: those involving Altas I and VI.  To solve this problem, Plaintiffs used a pro-rata allocation method in which they (1) noted the percentage of construction and development costs that applied to eligible property, and (2) applied that percentage to Altas I and VI's purchase prices to determine the eligible basis for those facilities.[9]  The Government objects to this allocation method, but did not present evidence at trial to show that it was unreasonable.  Instead, the Government challenges the sufficiency of Plaintiffs' evidence underlying the allocations.

Courts allow pro-rata allocations where they are necessary to determine the percentage of a purchase price that should be allocated to a particular asset.  For example, in Washington Mutual, Inc. v. United States, 996 F. Supp. 2d 1095 (W.D. Wash. 2014), the court faced an analogous situation.  It held that, "[i]n transactions where one lump-sum purchase price is paid for a conglomeration of assets . . . the cost of each asset must be determined by apportioning the purchase price among the assets according to each asset's relative fair market value at the time of the acquisition."  Id. at 1104 (citing Bixby, 58 T.C. at 785; see also Victor Meat Co. v. Comm'r, 52 T.C. 929, 931 (1969) ("[W]hen a taxpayer buys a mixed aggregate of assets for a lump sum, an allocation of the purchase price will be made to the separate items upon the relative value of each item to the value of the whole.").

Plaintiffs appear to have made such an allocation here for Altas I and VI (the transactions in which the parties conveyed both eligible and ineligible property).  Their auditor, KPMG, prepared certifications of the fair market value of eligible and ineligible property in Altas I-VI.  See JX 194.  After the Treasury awarded reduced Section 1603

---

[9]   Plaintiffs used the same allocation approach when they purchased Altas II-V from Terra-Gen.  See Revock, Tr. 729.  The difference between these transactions is that Plaintiffs purchased only the eligible property from Terra-Gen in the Alta II-V transactions.  Because the Court finds Plaintiffs' allocations to be reasonable, the Court also agrees that only eligible property was transferred in the Alta II-V purchases.

grants, KPMG reviewed its work and recertified its allocations.  See Johnston, Tr. 1252–54, PX 120.  For Alta I, KMPG found that 93.1 percent of total construction costs related to grant-eligible assets, so Plaintiffs claimed 93.1 percent of the purchase price as the basis for Alta I.  Huplosky, Tr. 1095–1100.  For Alta VI, 96.9 percent of construction costs related to grant-eligible assets, so Plaintiffs claimed this percentage of the Alta VI purchase price as basis.  See Huplosky, Tr. 1117–19.  These two values appear reasonable, particularly because Mr. Settle testified that both the industry and NREL use a "rule of thumb" that treats ninety-five percent of wind farm construction costs as grant-eligible.  Settle, Tr. 1305–06.  This rule of thumb indicates that it is reasonable to allocate ninety-five percent of a purchase price to eligible property.

Plaintiffs' expert witnesses also endorsed KPMG's allocations.  Dr. Maydew testified to the reasonableness of KPMG's pro-rata allocation work.  See Maydew, Tr. 1411–16; PX 326 at 27–28 ¶¶ 2-4; PX 329 at 6–7 ¶¶ 6-7.  Dr. Blaydon also testified that the pro rata methodology is a "common rule that is generally used in this industry."  Blaydon, Tr. 1605–07, 1719–20; PX 299 at 86–87 ¶ 167.

Further, Plaintiffs' analysis takes into account the value of the fee land conveyed in the Alta transactions free of charge.  This value is just over $4 million, which is about two-tenths of one percent of the total Alta I-VI purchase price.  Blaydon, Tr. 1625; PX 219; PX 218; PX 299 at 92–93 ¶¶ 180–82.  The Court finds that the value attributed to land—which is essentially de minimis, given its value compared to the overall value of the Alta transactions—is reasonable, and that Dr. Blaydon properly deducted this value in performing his damages calculations.  See Blaydon, Tr. 1625–26.

The Government argues that the KPMG allocation documents and related testimony are inadmissible as expert testimony under Rules 701 and 702 of the Federal Rules of Evidence.  See Def. Post-Trial Br. at 96–98, Dkt. No. 163.  However, the Government did not object on these grounds at trial, so this objection is waived.  See Fed. R. Evid. 103(a)(1) (noting that objections to admission of evidence must be timely); Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1367 (Fed. Cir. 1998) ("CCI argues first that the . . . declarations are hearsay, and that the court erroneously admitted them into evidence . . . . CCI waived that argument, however, by not objecting to the admission of the declarations on that ground at trial.").  Additionally, the Government's objection to the KMPG allocation documents is waived because the Government moved these documents into evidence as joint exhibits.  See Ronickher, Tr. 10 (moving KPMG documents into evidence as joint exhibits); Ohler v. United States, 529 U.S. 753, 755–56 (2000) ("[A] party introducing evidence cannot complain on appeal that the evidence was erroneously admitted).

The Government further argues that Plaintiffs' allocation fails to account for the PPAs, which it maintains are intangible, ineligible property.  The Government argues that

PPAs must be classified as "customer-based intangibles" within the meaning of 26 U.S.C. § 197(d)(2)(A)(iii). However, the Court finds Plaintiffs' treatment of the PPAs more persuasive. Plaintiffs' approach treats the PPAs like land leases. A land lease is not considered a separate asset from the underlying land, even if the land lease terms are better than market. See Schubert v. Comm'r, 33 T.C. 1048, 1053 (1960), aff'd, 286 F.2d 573 (4th Cir. 1961). As with land leases—which relate only to the specific parcel of land leased—the PPAs each relate only to their specific wind farm facilities and are not transferable or assignable. Maydew, Tr. 1439; Pagano, Tr. 393–94; PX 326 at 19 ¶ 1c. Dr. Maydew found that these characteristics mean the PPAs may not be viewed as separate assets from their underlying facilities from a tax accounting perspective. Maydew, Tr. 1438; PX 326 at 18 ¶ 1. Therefore, the close nexus between the wind farm facilities and their respective PPAs means that the PPAs cannot be viewed as separate intangible assets.[10]

Many of the Government's arguments essentially boil down to an attack on the logic behind any pro-rata allocation method Plaintiffs could possibly use in this case. However, because the Court finds that the purchase price is the best measure of the Alta facilities' fair market value (and, therefore, basis), a pro-rata allocation method appears on the evidence to be the most reasonable solution to the problem Section 1603 presents. Under Section 1603, the value of certain property is ineligible as basis for a grant. In the real world, this grant-ineligible property is hopelessly intertwined with grant-eligible property. Having both types of property in one place makes a wind farm valuable as a wind farm generating cash flows, and not just as a disjointed collection of random assets. See PX 328 at 20 ¶ 40. Therefore, any pro-rata allocation method will necessarily involve extrapolation based on the construction and development costs of the grant-eligible property under Section 1603, and the Court finds Plaintiffs' allocations to be reasonable.

II.    Plaintiffs are Entitled to Damages

In sum, the Court finds that applying the Government's preferred valuation approach, which would value the Alta facilities solely based on their construction and development costs, improperly excludes value from Plaintiffs' basis in these facilities in a way that is not supported under Section 1603 or the IRC. If Congress had intended some other definition of "basis" to apply in situations like this, then it should have said so when it drafted the statute. In the absence of such guidance, the Court finds that Plaintiffs have calculated the basis of their wind farm assets in the least imperfect way possible.

---

[10]   The Government also argues that transmission agreements associated with the Alta facilities are intangible and thus ineligible. See Def. Post-Trial Br. at 64–65, Dkt. No. 163. However, Plaintiffs treated these agreements as part of the (ineligible) transmission lines for allocation purposes. See Huplosky, Tr. 1073–75. Therefore, the point appears to be moot.

The Court finds that the Government should have used Plaintiffs' purchase prices, subject to reasonable allocations in the cases of Altas I and VI (and with de minimis deductions for land conveyed in fee simple), as basis in calculating Plaintiffs' grants under Section 1603. Therefore, the Court awards Plaintiffs damages in amounts equal to the shortfall between the grant amounts to which Plaintiffs were entitled and the amounts the Government awarded. In total, the Court awards Plaintiffs damages of $206,833,364. The following table shows the damages each Plaintiff is awarded:

| Plaintiff | Basis of Eligible Property | Cash Grant to Which Plaintiff was Entitled | Cash Grant Paid by Treasury | Damages Awarded |
|---|---|---|---|---|
| Alta I Owner Lessor C | $130,300,750 | $39,090,225 | $29,974,983 | **$9,115,242** |
| Alta I Owner Lessor D | $130,300,750 | $39,090,225 | $29,974,983 | **$9,115,242** |
| Alta II Owner Lessor A | $110,043,250 | $33,012,975 | $22,791,621 | **$10,221,354** |
| Alta II Owner Lessor B | $110,043,250 | $33,012,975 | $22,791,621 | **$10,221,354** |
| Alta II Owner Lessor C | $88,034,600 | $26,410,380 | $18,233,297 | **$8,177,083** |
| Alta II Owner Lessor D | $66,025,950 | $19,807,785 | $13,674,973 | **$6,132,812** |
| Alta II Owner Lessor E | $66,025,950 | $19,807,785 | $13,674,973 | **$6,132,812** |
| Alta III Owner Lessor A | $110,993,750 | $33,298,125 | $23,093,966 | **$10,204,159** |
| Alta III Owner Lessor B | $110,993,750 | $33,298,125 | $23,093,966 | **$10,204,159** |

| | | | |
|---|---|---|---|
| Alta III Owner Lessor C | $110,993,750 | $33,298,125 | $23,093,966 | **$10,204,159** |
| Alta III Owner Lessor D | $110,993,750 | $33,298,125 | $23,093,966 | **$10,204,159** |
| Alta IV Owner Lessor A | $72,058,000 | $21,617,400 | $15,482,478 | **$6,134,922** |
| Alta IV Owner Lessor B | $72,058,000 | $21,617,400 | $15,482,478 | **$6,134,922** |
| Alta IV Owner Lessor C | $72,058,000 | $21,617,400 | $15,482,478 | **$6,134,922** |
| Alta IV Owner Lessor D | $72,058,000 | $21,617,400 | $15,482,478 | **$6,134,922** |
| Alta V Owner Lessor A | $121,860,750 | $36,558,225 | $25,649,674 | **$10,908,551** |
| Alta V Owner Lessor B | $121,860,750 | $36,558,225 | $25,649,674 | **$10,908,551** |
| Alta V Owner Lessor C | $121,860,750 | $36,558,225 | $25,649,674 | **$10,908,551** |
| Alta V Owner Lessor D | $121,860,750 | $36,558,225 | $25,649,674 | **$10,908,551** |
| Mustang Hills | $418,774,000 | $125,632,200 | $86,905,263 | **$38,726,937** |

CONCLUSION

The Clerk is directed to enter final judgment against the Government in the amount of $206,833,364.  Pursuant to RCFC 54(d), the Court awards reasonable costs to Plaintiffs.

IT IS SO ORDERED.

s/Thomas C. Wheeler<br>
THOMAS C. WHEELER<br>
Judge