# In the United States Court of Federal Claims

Nos. 13-402, 13-917, 13-935, 13-972, 14-47, 14-93, 14-174, 14-175, 17-997 (consolidated)
(Filed: 21 October 2020)

```
*******************************************
ALTA WIND I OWNER LESSOR C,          *
et al.,                              *
                                     *
            Plaintiffs,              *
                                     *     Motion to Dismiss; RCFC 12(b)(1);
v.                                   *     RCFC 12(h)(3); Subject Matter Jurisdiction;
                                     *     Indemnification; Article III standing; Injury
THE UNITED STATES,                   *     in Fact; Redressability
                                     *
            Defendant.               *
                                     *
*******************************************
```

      *Steven J. Rosenbaum*, with whom was *Dennis B. Auerbach*, and *Thomas R. Brugato*, Covington & Burling LLP, of Washington, D.C., for plaintiffs.

      *Miranda Bureau*, Trial Attorney, with whom were *Margaret E. Sheer*, Trial Attorney, *G. Robson Stewart*, Assistant Chief, *David I. Pincus*, Chief, Court of Federal Claims Section, *Richard E. Zuckerman*, Principal Deputy Assistant Attorney General, Department of Justice, all of Washington, D.C.

## OPINION AND ORDER

**HOLTE, Judge.**

      Plaintiffs, the owners of six wind farm facilities in the Alta Wind Energy Center ("Alta Facilities") in southern California, allege the government underpaid them by over $225 million pursuant to a grant under § 1603 of the American Recovery and Reinvestment Act of 2009. The government counterclaimed, asserting it overpaid plaintiffs by over $59 million. This case was transferred to the undersigned Judge on 29 July 2019. On 21 January 2020, the government filed a motion to dismiss for lack of subject matter jurisdiction under Rules 12(b)(1) and 12(h)(3) of the Rules of the Court of Federal Claims ("RCFC"). Plaintiffs are indemnified through a series of contractual agreements and must turn over any proceeds of litigation to a third party; the government now argues these indemnity agreements defeat plaintiffs' standing to bring suit. The Court held oral argument on 17 July 2020 on the government's motion to dismiss. For the following reasons, the Court **DENIES** the government's motion to dismiss.

## I.   Factual History[1]

### A.  Construction and Sale of Alta Facilities

In 2006, Oak Creek Energy Systems ("Oak Creek") and Allco Wind Energy Management Pty. Ltd. ("Allco") entered into a partnership "to finance, develop, and construct windfarms in the Tehachapi region of California." *Alta Wind I Owner Lessor C*, 897 F.3d at 1370.  In December 2006, Oak Creek and Allco entered into a Master Power Purchase and Wind Project Development Agreement with Southern California Edison, which "provided that the Oak Creek/Allco subsidiary would develop multiple wind facilities totaling an aggregate capacity between 1,500 and 1,550 Megawatts, with all of that output being sold to [Southern California Edison] for a period of roughly 24 years." *Alta Wind I Owner-lessor C*, 128 Fed. Cl. at 709.  Over the next two years, Oak Creek and Allco "secured land rights, constructed meteorological towers, collected wind data, completed environmental studies, started the environmental permitting process, and purchased some of the needed turbines." *Alta Wind I*, 897 F.3d at 1370.  In July 2008, Terra-Gen Power LLC ("Terra-Gen") acquired Allco's United States wind energy business, completing the development and construction of the Alta Facilities.  *Id.*  "In the transaction, Terra-Gen acquired development rights, transmission rights, some leased land, some land in fee simple, and an unrelated wind facility." *Alta Wind I*, 128 Fed. Cl. at 709.

In 2009, Congress enacted the American Recovery and Reinvestment Act ("ARRA"), allowing "each person who place[d] in service specified energy property" during a designated time frame to receive a cash grant equal to 30 percent of the "basis" of the specified property. American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115, § 1603(b) (2009) ("§ 1603").  "Congress passed the ARRA in the wake of the 2008 financial crisis to stimulate the United States economy.  As part of this strategy, Section 1603 created a system whereby certain renewable energy facility owners became entitled to cash grants." *Alta Wind I*, 128 Fed. Cl. at 706.  Under § 1603, owners of the Alta Facilities could apply to receive a cash grant in lieu of a tax credit.  "Terra-Gen itself was not qualified to receive a section 1603 payment, as section 1603(g)(4) barred a 'pass-thru entity' from receiving a grant if any 'holder of an equity or profits interest' in the entity was a nonprofit, and Terra-Gen had some nonprofit equity holders." *Alta Wind I*, 897 F.3d at 1370.  Terra-Gen was unable to take advantage of the § 1603 grants in its current business structure and decided against taking the costly step of establishing a C corporation blocker entity between itself and each Alta entity; it therefore sold the Alta Facilities.[2]  *Alta Wind I*, 128 Fed. Cl. at 710.

---

[1] In May 2016, this court held a nine-day bench trial in this case and issued its findings of fact and conclusions of law, holding for plaintiffs.  *See Alta Wind I Owner-Lessor C v. United States*, 128 Fed. Cl. 706–08, 724 (2016).  The government appealed, and on 27 July 2018, the United States Court of Appeals for the Federal Circuit issued an opinion vacating this court's judgment and remanding the case on the grounds the previously undersigned judge applied an incorrect calculation method in determining the owners' basis in the Alta Facilities and improperly excluded testimony of an expert offered by the United States.  *See Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1382–83 (Fed. Cir. 2018).  A full recitation of the factual history in this case can be found in these two prior cases.  The factual history in this Opinion and Order contains only those facts pertinent to the government's pending motion to dismiss.

[2] Additionally, Terra-Gen "sought a legislative solution to this problem, but to no avail."  *Alta Wind I*, 128 Fed. Cl. at 710.  During trial before the previously undersigned judge, an executive for Terra-Gen testified a trade

Between 2010 and 2012, plaintiffs purchased the Alta Facilities from Terra-Gen in six separate transactions. *Alta Wind I*, 897 F.3d at 1369. "Five of the six transactions were sale-leasebacks, in which plaintiffs both acquired the windfarm and leased it back to Terra-Gen, which was to operate the windfarm and pay rent to plaintiffs." *Id.* "As part of the transactions, plaintiffs agreed to apply for the section 1603 grant . . . [and] [f]ive of the six transactions included an indemnity provision, whereby Terra-Gen agreed to cover the shortfall that would occur if Treasury did not" pay the full amount of the "unallocated purchase price as their basis in" the Alta Facilities. *Id.* at 1371. "With the indemnities, Terra-Gen agreed to accept the risk that the Government would not pay the full amount Plaintiffs would claim under Section 1603."[3] *Alta Wind I*, 128 Fed. Cl. at 711. Subsequent to purchase, plaintiffs brought the facilities online and applied "for over $703 million in section 1603 grants." *Alta Wind I*, 897 F.3d at 1371. The Treasury Department awarded plaintiffs "approximately $495 million" for the Alta Facilities, "equal to 30 percent of each facility's grant-eligible construction and development costs . . . instead of awarding payments equal to 30 percent of each facility's unallocated basis as requested." *Id.*

In June 2013, plaintiffs filed separate claims against the government, which were later consolidated, "seeking over $206 million in additional section 1603 grants." *Id.* The government counterclaimed, arguing it "had overpaid plaintiffs in the amount of $59 million."[4] *Id.* At trial, the previously undersigned judge "raised questions regarding the ownership of plaintiffs because of financial interests that [the previously undersigned judge] held in certain publicly traded entities that owned plaintiffs." Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction at 6, ECF No. 208 ("Def.'s Mot."). In response, "plaintiffs' counsel provided copies of the documents, which are dated between November of 2013 and March of 2014, reflecting additional agreements that plaintiffs in Altas II-V entered into with Terra-Gen shortly before bringing these suits" which "acknowledge that Terra-Gen paid plaintiffs for the Grant Shortfalls . . . [and] also provide that any funds plaintiffs receive as the result of a judgment in

---

association, of which Terra-Gen was a member, sent letters to both the United States House of Representatives and the United States Senate seeking a legislative fix so Terra-Gen could qualify for § 1603 grants. *See* Tr. 159: 4–25, ECF No. 140. Additionally, Terra-Gen "met with Joint Tax, . . . met with Members of the House, Members of the Senate . . . but at the end of the day, to fix it, it was a legislative fix, which was not practical." *Id.* at Tr. 160: 8–13.

[3] "In the Alta I transaction, Terra-Gen went even further: it agreed to indemnify the purchasers for any difference between the Government's actual grant and a purchase price-basis grant with no upper limit on Terra-Gen's liability. The Alta VI indemnity essentially guaranteed that [plaintiffs] would receive $87 million, regardless of the Government's Section 1603 award (with any grant amount in excess of $87 million payable to Terra-Gen). Thus, the Alta I-VI deals allowed Plaintiffs to apply for a Section 1603 grant using their purchase price as a basis, but protected them to a certain extent from any reduced grant award." *Alta Wind I*, 128 Fed. Cl. at 711 (internal citations omitted).

[4] At the Court's 17 July 2020 oral argument, the government confirmed the Department of Justice and the Treasury Department have no position whether the government would have rights to recapture all cash grants paid if its Motion to Dismiss is granted, stating "[s]o there is a right to recapture in the Section 1603 terms and conditions, . . . but in terms of what might happen to the counterclaim . . . whether [the Treasury Department] and DOJ might consider a motion to transfer . . . that just hasn't been decided yet, and so I can't provide the official position at this time." Tr. 26:19–25; 27:1–4, ECF No. 242.

their favor will be turned over to Terra-Gen."[5]  *Id.* at 6–7.  On 31 October 2016, the previously undersigned judge held for plaintiffs' claim of damages stemming from underpayment under § 1603 and "award[ed] Plaintiffs damages in the amounts equal to the shortfall between the grant amounts to which Plaintiffs were entitled and the Government awarded."  *Alta Wind I*, 128 Fed. Cl. at 722.  On appeal, the Federal Circuit vacated and remanded the case, holding the sales of the Alta Facilities were "applicable asset acquisitions," so consideration paid for the Alta Facilities should be allocated using the residual method under I.R.C. § 1060.  *Alta Wind I*, 897 F.3d at 1376.  Additionally, the Federal Circuit found the previously undersigned judge improperly excluded testimony of the government's expert, noting "credibility is not relevant to the inquiry under [Federal Rule of Evidence] 702."  *Id.* at 1382.

## II.    Procedural History

On 14 June 2013, plaintiffs filed separate complaints against the government.  The complaints, later consolidated, allege the government underpaid plaintiffs pursuant to § 1603 grants.  *See* Compl., ECF No. 1; Order, ECF No. 27; Order, ECF No. 196.[6]  In February 2016, the government counterclaimed, alleging overpayment to plaintiffs "in the amount of nearly $59 million."  Def.'s Mot. at 3.  On 28 October 2016, the previously undersigned judge issued an opinion holding for plaintiffs.  *Alta Wind I*, 128 Fed. Cl. at 724.  The government appealed, and on 27 July 2018, the Federal Circuit reversed and remanded the case to this court.  *Alta Wind I*, 897 F.3d at 1382–83.  On remand, this court ordered the parties to submit simultaneous supplemental briefing and responses regarding "the issues of (1) whether the Federal Circuit's mandate requires us to hold an entirely new trial; [and] (2) whether any additional discovery in the form of supplemental expert reports is appropriate."  Order, ECF No. 188.  The parties submitted their simultaneous briefing on 9 November 2018 and simultaneous responses on 30 November 2018.  *See* Government's Memorandum, ECF No. 190; Pls.' Brief Regarding Three Remand Issues, ECF No. 191; Response to Pls.' Memorandum, ECF No. 194; Pls.' Combined Response to Def.'s Brief Regarding Three Remand Issues, ECF No. 195.

---

[5] At trial, in response to the previously undersigned judge's question regarding ownership and payment of any proceeds, plaintiffs' counsel confirmed such an agreement:  "Terra-Gen did indemnify the Plaintiffs, and as a result, an award in this case would, although passing through the hands of the owner lessors, would go to Terra-Gen Power in all respects."  Def.'s Mot. At 7.  Additionally, plaintiffs' counsel stated:  "[A]dditional indemnification agreements were reached whereby, if counterclaims were brought, Terra-Gen Power would indemnify the owner lessors in the unlikely event that any such counterclaims were successful. . . .  So, as a practical matter, neither success in this litigation on the Plaintiffs' own claims, nor success by the Government on the counterclaims will have a financial impact upon the owner lessors themselves."  *Id.*  During the Court's 17 July 2020 oral argument, the government stated plaintiffs filed the indemnity agreements in their § 1603 application materials with Treasury, and the government received copies of the agreements during discovery in this case:

> THE COURT:  So at some point prior to 2015, there was acknowledgment of the indemnity issue that's at stake with the motion to dismiss, though, correct?
> Ms. BUREAU:  Yes, but we did have some information about the facts that are underlying this motion.  That's true, Your Honor.

Tr. 24:24–25; 25:1–5.

[6] Two plaintiffs filed their initial complaints on 24 July 2017, and the cases were stayed pending appeal to the Federal Circuit of this case.  On 19 December 2018, this Court consolidated all plaintiffs under case number 13-402. Order, ECF No. 196.

On 29 July 2019, this case was reassigned to the undersigned Judge.  *See* Order, ECF No. 197.  On 21 January 2020, the government filed a motion to dismiss.  *See* Def.'s Mot.  The government argues plaintiffs lack Article III standing because Terra-Gen agreed to compensate plaintiffs for any § 1603 grant shortfalls under the terms of the purchase agreements.  According to the government, these indemnification agreements eliminated any potential injury to plaintiffs from such shortfalls.  Def.'s Mot. at 11–13.  On 18 February 2020, plaintiffs filed their response to the government's motion to dismiss, and the government filed its reply on 3 March 2020.  *See* Pls.' Opp'n to Def.'s Mot. to Dismiss ("Pls.' Resp."), ECF No. 215; Reply in Support of Mot. to Dismiss for Lack of Subject Matter Jurisdiction ("Def.'s Reply"), ECF No. 217.  Following the government's reply to plaintiffs' response to its motion to dismiss, on 6 March 2020, plaintiffs filed a motion for leave to file a surreply.  *See* Pls.' Mot. for Leave to File a Surreply to Def.'s Reply Brief in Support of its Mot. to Dismiss ("Pls.' Surr."), ECF No. 218.  On 20 March 2020, the government filed its response in opposition to plaintiffs' motion for leave to file a surreply.  *See* Opp'n to Pls.' Mot. to File a Sur-Reply, ECF No. 219.  The Court granted plaintiffs' motion for leave on 24 April 2020.  *See* Order, ECF No. 222.  The Court held oral argument on the government's motion to dismiss on 17 July 2020.  *See* Order, ECF No. 239.  On 6 October 2020, the government filed a motion for leave to file a supplemental brief "regarding the recent decision in *Pacific Wind, LLC v. United States*, Case No. 19-612."  *See* Mot. for Leave to File Supp. Brief, ECF No. 257.  Plaintiffs filed a brief in opposition to the government's motion for supplemental briefing on 7 October 2020.  *See* Pls.' Opp. to Def.'s Mot. for Supp. Briefing, ECF No. 258.  The government filed a reply in support of its motion for leave to file a supplemental brief on 14 October 2020.  *See* Reply in Supp. of Mot. for Leave to File Supp. Brief, ECF No. 259.

## III.   Jurisdiction and Standing Under Article III

"Standing to sue is a threshold requirement in every federal action."  *Sicom Sys., Ltd. v. Agilent Technologies, Inc.*, 427 F.3d 971, 975 (Fed. Cir. 2005).  "The party bringing the action bears the burden of establishing that it has standing."  *Id.*  "In order to bring suit in an Article III court a plaintiff must establish constitutional standing."  *Crow Creek Sioux Tribe*, 900 F.3d 1350, 1354 (Fed. Cir. 2018).  "The Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III."  *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (internal citation omitted).  At issue in this case are elements one and three of Article III standing.[7]  *See* Def.'s Mot. at 11–13.  To satisfy element one of Article III standing, a plaintiff must suffer an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (internal citations and quotations omitted).  Particularized injuries "must affect the plaintiff in a personal and individual way."  *Id.* at n.1.  A plaintiff must show how they "'personal[ly]' suffered a concrete and particularized injury in connection with the conduct about which he complains."  *Crow Creek*,

---

[7] The three elements of Article III standing are:  (1) an injury in fact (*i.e.*, a "concrete and particularized" invasion of a "legally protected interest"); (2) causation (*i.e.*, a "fairly . . . trace[able]" connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is "likely" and not "merely speculative" that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).  *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 273–74 (2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (labeling the three elements the "irreducible constitutional minimum" of standing)).

900 F.3d at 1354 (quoting *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016)).  To satisfy element three of Article III standing, an injury must be redressable, meaning it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citing *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 38, 43 (1976)).

"Although rulings on standing often turn on a plaintiff's stake in initially filing suit, 'Article III demands that an "actual controversy" persist throughout all stages of litigation.'" *Virginia House of Delegates v. Bethune-Hill*, 139 S.Ct. 1945, 1950–51 (2019) (citing *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013)).  "As a jurisdictional requirement, standing to litigate cannot be waived or forfeited.  And when standing is questioned by a court or an opposing party, the litigant invoking the court's jurisdiction must do more than simply allege a nonobvious harm." *Id.* at 1951.  "It is well settled that questions of standing can be raised at any time and are not foreclosed by, or subject to, statutes of limitation." *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc*., 583 F.3d 832, 841 (Fed. Cir. 2009).  "The Art[icle] III judicial power exists only to redress or otherwise protect against injury to the complaining party, even though the court's judgment may benefit others collaterally.  A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).  "When the suit is one challenging the legality of government action or inaction . . . standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury . . . ." *Lujan*, 504 U.S. at 561–62.  The "assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 489 (1982).

## IV.    Parties' Arguments

The government argues plaintiffs lack Article III standing because:  (1) plaintiffs were not personally suffering "a concrete and particularized" injury through any alleged shortfall in § 1603 payments; (2) Terra-Gen is not an insurance company, and because there are no insurance policies or subrogation at issue, plaintiffs cannot bring suit to recover any § 1603 shortfalls; and (3) even if plaintiffs could demonstrate an injury in fact adequate to meet the first element of standing, their injury is not redressable because any benefit plaintiffs receive from the litigation ultimately benefits Terra-Gen.[8]  Def.'s Mot. at 11–14.

---

[8] Plaintiffs purchased the Alta Facilities from Terra-Gen in sale-leaseback transactions, whereby it became the owners of the Alta Facilities.  *Alta Wind I*, 897 F.3d at 1369.  As part of these transactions, following Treasury Department guidance published in a Frequently Asked Questions document, plaintiffs and Terra-Gen negotiated sale-leasebacks as part of the sale, whereby plaintiffs would own the facilities, but would leaseback the properties for Terra-Gen to operate.  *See* Pls.' Contentions of Fact and Proposed Conclusions of Law, ECF No. 111-1 at 583–592.  Plaintiffs applied for § 1603 grants as owners of the facilities, believing they had properly satisfied all prerequisites for § 1603 grants.  *Alta Wind I*, 128 Fed. Cl. at 713.  As plaintiffs are not tax-exempt entities, the government stated it was unaware of any reason plaintiffs would be similarly ineligible for the grants as Terra-Gen.  Tr. 52:9–19.  During oral argument counsel for the government confirmed the government is "not bringing an Anti-Assignment Act [a]rgument" because the motion to dismiss "is about Article III," and the agreements between

In response, plaintiffs argue they have Article III standing because:  (1) plaintiffs hold legal title to windfarms eligible for cash grants under § 1603 and "case law over the past 120-plus years" allows an indemnified party to bring suit against the liable party, even though recovery will be paid to the indemnitor; and (2) a favorable ruling for plaintiffs would redress the injury plaintiffs allegedly suffered from failing to receive full payment under § 1603, as the focus of the redressability inquiry is whether an injury is redressable to the plaintiff; not what will ultimately be done with the recovery.  Pls.' Opp'n to Def.'s Mot. to Dismiss at 9–21.

## V.     Applicable Law

### A.  Supreme Court Precedent

In 2008 the Supreme Court analyzed Article III standing in a case where plaintiffs would ultimately pass litigation proceeds to another party.  The Court found plaintiffs who remit all recovered proceeds to a third party pursuant to a separate contractual agreement with the third party may satisfy Article III's standing requirements.  *See Sprint Communications Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008).  In *Sprint*, payphone operators who sought to collect money owed from long-distance carriers assigned their claims to billing and collection firms. The collection firms pursued collection of the claims through settlement negotiations and claims in court under an agreement remitting all compensation recovered to payphone operators.  *Id.* at 271–72.  Collection firms and payphone operators signed an "Assignment and Power of Attorney Agreement" which "provide[d] that the [collection firm] will litigate 'in the [payphone operator's] interest.'"  *Id.* at 272.  "The [collection firm] and the payphone operator then separately agreed that the [collection firm] would remit all proceeds to the payphone operator and that the payphone operator would pay the [collection firm] for its services (typically via a quarterly charge)."  *Id.*  The collection firms subsequently filed lawsuits against long-distance carriers in federal court, seeking to recover monies owed.  *Id.*  The long-distance carriers "moved to dismiss the claims, arguing that the [collection firms] lack[ed] standing to sue under Article III of the Constitution."  *Id.*

Analyzing whether the *Sprint* collection firms had Article III standing, the Supreme Court reviewed "how courts have historically treated suits by assignors and assignees."  *Id.* at 275.  Throughout its review of "history and precedents" from the 17th century to present, the Court analyzed each element of Article III standing as the Court in *Lujan* articulated it.  *Id.* at 285–86.  Challenging the existence of an injury in fact, the petitioners in *Sprint* argued the collection firms did "not themselves suffer[] any injury in fact and . . . the assignments for collection do not suffice to transfer the payphone operators' injuries."  *Id.* (internal quotation omitted).  In upholding plaintiffs' standing to bring suit, the Court acknowledged the collection firms "did not originally suffer any injury caused by the long-distance carriers; the payphone operators did."  *Id.*  Plaintiffs had standing not because they originally suffered any injury from the defendant, but rather because payphone operators assigned their legal claims to plaintiffs

---

Terra-Gen and plaintiffs "seemed to be designed to somewhat avoid the Anti-Assignment Act."  Tr. 63:22–23, 64:5, 11–12.  The Court therefore explores Article III standing principles independent of any application of the Anti-Assignment Act.

"lock, stock, and barrel." *Id.* As the assignee of legal claims against the defendant, plaintiffs had standing to sue defendant and pass the proceeds of the litigation on to the payphone operators.

In dissent, Chief Justice Roberts characterized *Sprint* as "conclud[ing] that a private litigant may sue in federal court despite having to 'pass back . . . all proceeds of the litigation.'" *Id.* at 298. The dissent argued the majority's opinion is a "broad, generalized reading of the historical tradition of assignments," resulting in a situation where "a plaintiff need no longer demonstrate a personal stake in the outcome of the litigation." *Id.* at 301, 305. Chief Justice Roberts continued, "[b]y severing the right to recover from the right to prosecute a claim, the Court empowers *anyone* to bring suit on any claim, whether it be the first assignee, the second, the third, or so on." *Id.* at 302 (emphasis in original). By allowing the collection firm to bring suit while being contractually obligated to remit all proceeds of the litigation to the payphone operators, "[t]he majority's assertion implies, incorrectly, that [the collection firms] have, or ever had, a choice of what to do with the recovery." *Id.* at 304.

In 2020, the Supreme Court further analyzed element one of Article III standing, holding plaintiffs did not suffer an injury in fact when the outcome of the litigation had no effect on their received benefits. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020). In *Thole*, plaintiffs filed a putative class-action suit against U.S. Bank and others claiming mismanagement of their defined-benefit plan, which allegedly occurred more than a decade before the suit. *Id.* at 1618. Under the plan, plaintiffs received a fixed amount of income per month, regardless of market or plan performance. *Id.* The Supreme Court discussed plaintiffs' "concrete stake" in the litigation sufficient to satisfy element one of Article III standing and determined whether an injury in fact existed by examining how the lawsuit related to and affected the plaintiffs personally. *Id.* at 1619. The Court in *Thole* held plaintiffs lacked a "concrete stake" in the lawsuit necessary for Article III standing, as plaintiffs "have received all of their monthly benefit payments so far, and the outcome of this suit would not affect their future benefit payments." *Id.* Even if plaintiffs "were to lose this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny less. If [plaintiffs] were to win this lawsuit, they would still receive the exact same monthly benefits that they are already slated to receive, not a penny more." *Id.* (emphasis omitted). Although the plan itself may have suffered losses, this would not harm plaintiffs' receipt of monthly benefits, so plaintiffs were not personally affected by any of defendant's actions under the defined-benefit plan plaintiffs sought to sue under. *Id.* Therefore, plaintiffs suffered no injury adequate to confer standing to sue the defendant to remedy. *Id.* The Court noted if plaintiffs "had not received their vested pension benefits they would of course have Article III standing to sue," but because their monthly payment would not change in the face of a positive court ruling finding breaches of the duties of loyalty and prudence by the plan operator, plaintiffs lacked standing. *Id.*

Plaintiffs in *Thole* also sought to claim an injury in fact based on an alleged injury of plan mismanagement. As plaintiffs did not allege mismanagement so egregious as to substantially increase the risk the plan and the employer would fail, plaintiffs suffered no actual injury because they continued to receive their monthly payment and their alleged injury had not yet arisen. *See id.* In an attempt to demonstrate Article III standing, plaintiffs "point[ed] to the Court's decisions upholding Article III standing of assignees—that is, where a party's right to sue has been legally or contractually assigned to another party." *Id.* at 1620. In rejecting this

argument, the Court in *Thole* cited *Sprint*, noting even if the plan itself suffered a cognizable injury from defendant's actions, there had been no assignment of the legal injury to plaintiffs. *Id.*

The dissent in *Thole* disagreed with whether plaintiffs suffered a cognizable harm. Justice Sotomayor specifically argued, "[a]lthough a formal assignment or appointment suffices for standing, it is not necessary" because "Congress expressly and thereby legally assigned pension-plan participants and beneficiaries the right to represent their plan, including in lawsuits where the other would-be representative is the defendant." *Id.* at 1634. More particularly, the dissent believed plaintiffs had standing to sue because "ERISA assigns the right to sue on the plan's unquestionably cognizable harm: here, fiduciary breaches causing wrongful gains and hundreds of millions of dollars in losses." *Id.* Pointing to *Sprint* as undermining the majority's holding, Justice Sotomayor noted "'naked legal title' has long permitted suit and . . . 'federal courts routinely entertain suits which will result in relief for parties that are not themselves directly bringing suit,' such as when '[t]rustees bring suits to benefit their trusts.'" *Id.* at 1634, n.9 (quoting *Sprint*, 554 U.S. at 280, 287). The "critical question" before the dissent was "whether petitioners have an equitable interest in their retirement plan's assets even though their payments are fixed." As the pension plan itself sustained an injury, the dissent believed plaintiffs have a corresponding right to sue. *Id.* at 1625.

## B.  Federal Circuit Precedent

In 2017 the Federal Circuit analyzed element one of Article III standing to ascertain whether the plaintiff "sufficiently alleged [an] injury in fact . . . which the Supreme Court has characterized as a 'hard floor of Article III jurisdiction.'" 900 F.3d at 1355. In *Crow Creek*, a Native American tribe sued the United States for a claimed Fifth Amendment taking and mismanagement of the Tribe's reserved water rights. *Crow Creek Sioux Tribe*, 900 F.3d at 1352. The Tribe specifically "alleged that certain unspecified acts and omissions by the United States," including the building of a dam upstream, took the Tribe's "*Winters* reserved water rights." *Id.* at 1353; *see Winters v. United States*, 207 U.S. 564 (1908) (establishing an implied right to unappropriated water to the extent Native American tribes needed it to accomplish the purpose of the reservation). In granting the government's motion to dismiss pursuant to Rule 12(b)(1), this court "not[ed] that *Winters* only entitles the Tribe to sufficient water to fulfill the Reservation's purpose and explain[ed] that nothing in the complaint suggests that the Tribe is 'experiencing a shortage of water' or that its water supply from the Missouri River is or will be 'insufficient for the Tribe's intended pursuits.'" *Id.* at 1353 (quoting *Crow Creek Sioux Tribe v. United States*, 132 Fed. Cl. 408, 410–11 (2017)). This court "therefore dismissed the suit for lack of subject-matter jurisdiction because it could not 'identify an injury to the Tribe that has yet occurred.'" *Id.* at 1354.

The Federal Circuit affirmed the Court of Federal Claims' dismissal of the case under Rule 12(b)(1). *Id.* at 1352. The court ruled the Tribe failed to allege an injury in fact because "[t]he facts alleged in the complaint, taken as true, suggest the government action, including the operation of the Pick-Sloan dams, generally affects water flows" but the Tribe "does not allege that the amount of water flowing by the Reservation and available for the Tribe's use is insufficient to fulfill the purposes of the Reservation or will be insufficient in the future." *Id.* at

1356.  As long as the government action "does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation," there is no violation of the Tribe's *Winters* right sufficient to create an injury under the doctrine of standing.  *Id* at 1357.  As was the case in *Thole*, plaintiffs in *Crow Creek* failed to allege an actual injury to some legally protected interest the Tribe held; therefore, the Federal Circuit similarly held plaintiffs failed to meet element one of Article III standing.  *Id.*

## C.  Comparable Court of Federal Claims Cases

In *American Maritime Transport* this court addressed a plaintiff's standing to sue the federal government for a claimed shipping subsidy plaintiff would "pass[] through" to a third party per a prior agreement.  *American Maritime Transport, Inc. v. United States*, 18 Cl. Ct. 283, 286 (1989).  Plaintiff in *American Maritime Transport* brought suit against the government "to recover payment of Operating Differential Subsidy (ODS) . . . under an Operating Differential Subsidy Agreement."  *Id*. at 284.  Plaintiff entered into an agreement with the third party whereby a third party would be responsible to plaintiff for total vessel operating costs "regardless of whether [plaintiff] receives any ODS payments."  *Id.* at 286.  Where plaintiff did receive any ODS payments, it would pass those payments through to the third party.  *Id*.  A dispute over ODS payments arose between plaintiff and the government, resulting in plaintiff filing a breach of contract action against the government.  *Id* at 288.

The government in *American Maritime Transport* sought to dismiss the claim, arguing in part plaintiff lacked standing to sue "because it is not in fact injured by the government's refusal to pay" the subsidy at issue.  *Id* at 289–90.  Due to a prior agreement plaintiff had with a third party, "the plaintiff receives the same amount of money regardless of whether the subsidy is paid and is not injured by nonpayment."  *Id*.  Rejecting the government's argument, the court found "[t]he plaintiff is identifiably and discernably injured by the refusal of the government to make the ODS payments."  *Id* at 291.  Despite the fact plaintiff would pass along to a third-party beneficiary any payments it recovered, "plaintiff nonetheless suffers cognizable economic harm and has a sufficient stake in the outcome of this case for its suit to be considered a genuine and justiciable case or controversy."  *Id*.  Additionally, "plaintiff [was] also injured by exposure to liability that may result from a denial of ODS payments."  *Id*.  Therefore, the court found plaintiff satisfied Article III standing requirements.

In the similar case of *Kawa v. United States*, plaintiff was an escrow agent who alleged the government failed to properly pay him for work done by a third party for whom the funds would be held in escrow.  *Kawa v. United States*, 77 Fed. Cl. 294, 297 (2007).  The government moved to dismiss the action in part based on plaintiff's lack of standing, and in support argued the escrow agent did not possess any property interest in an escrow account, the agent was required to forward any payment he received to third parties, and the agent was protected from any liability arising under the lawsuit.  *Id* at 296–300.  Under the government's argument, the escrow agent "suffered no injury, and therefore lack[ed] standing to pursue [the] action."  *Id* at 299.  This court cited *American Maritime Transport*, noting "the plaintiff had standing to sue for a subsidy where the Government had refused to make payment . . . [regardless of] the fact that plaintiff was contractually obligated to forward payment to a party with whom it had

contracted." *Id.* at 300. Therefore, the court held "[i]t follows that in the instant case, plaintiff has standing to sue despite his obligation to forward any recover to [the third parties]." *Id.*

### D. Related Insurance Agreement Cases

Plaintiffs extensively cite *American Tobacco Co. v. United States*, arguing the case supports the proposition this court and its predecessor (the Court of Claims) historically permit indemnified plaintiffs to maintain suit after indemnification by a third party.[9] Pls.' Resp. at 10–12. In *American Tobacco*, the Court of Claims addressed whether a plaintiff seeking monetary relief from the government for the loss of United States internal-revenue stamps had standing to sue for the value of the stamps despite receiving payment in full for the loss from its insurer. 32 Ct. Cl. 207, 217 (1897). Plaintiff sought "to recover the value of such stamps for the use of certain insurance companies named in the petition," which had compensated plaintiff for the loss. *Id.* Plaintiff first "filed with the Treasury Department, in accordance with the rules and regulations of the Department." *Id.* The Treasury Department denied plaintiff's request, as "'satisfactory evidence ha[d] been furnished to [the Treasury Department] that [plaintiff] received reimbursement of the value of said stamps by the recovery of insurance thereon.'" *Id.* Plaintiff then filed suit in the Court of Claims, which held for plaintiff under insurance subrogation principles and noted "[t]he obligations and responsibilities of the original parties are to be determined upon the same basis as if no subrogation had intervened." *Id.* at 226. The Court of Claims therefore awarded plaintiff full compensation from the United States for the stamps at issue. *Id.*[10]

On appeal to the Supreme Court, the government argued plaintiff was not the proper party to bring suit because the insurance company already paid plaintiff's damages in full. According to the government, this resulted in the insurance party "becom[ing] the actual plaintiffs in this suit." *United States v. American Tobacco Co.*, 166 U.S. 468, 473 (1897). Thus, the government asserted the apparent case between the government and the "merely nominal" original plaintiff was instead actually "between the United States and the insurance companies." *Id.* Finding plaintiff was the proper party to bring suit, the Court stated "[w]here the stamps have been destroyed . . . and those who paid for them apply to the government to be reimbursed for their value," there is no "materiality . . . in the fact that the applicant has been paid the value of such stamps by an insurance company under and by virtue of a separate contract . . . ." *Id.* at 477. The Court explained, "[b]ecause an owner of property may be able to reimburse himself, in case of its destruction, from other sources, is no reason for denying to such an owner an insurable interest in the property." *Id.* at 479. The Court further noted unless "the government repaid the value of these stamps so destroyed, or provided other stamps in lieu thereof without

---

[9] At the Court's 17 July oral argument, the Court asked plaintiffs to cite "[o]ne case that's the best case that does find standing that parallels the issues and situation of Plaintiff here." Plaintiffs cited *American Tobacco* as their most parallel case, despite the Court suggesting the Federal Circuit and Court of Federal Claims have never before cited the case in an analysis of Article III standing. Tr. 70:6–13.

[10] The Federal Circuit has adopted "[t]hat body of law represented by the holdings of the Court of Claims" as binding precedent until overturned by the Federal Circuit sitting in banc. *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982).

any further payment, the government would be in the position of one who retained money to which it had no equitable right." *Id*. at 478.[11]

The Supreme Court in *American Tobacco* did not specifically address the issue of standing. The analysis it performed in *American Tobacco*, however, contained similarities to a contemporary Article III analysis. The Court explicitly considered whether plaintiff was still the "proper[]" party to bring suit against the government after a third party reimbursed plaintiff for the full value of the stamps destroyed. *Id* at 474. First, similar to the approach the courts in *Sprint*, *Thole*, and *Crow Creek* adopted, the Supreme Court analyzed whether plaintiff suffered an actual injury. *Id.* at 475. Finding an injury occurred, the Court in *American Tobacco*, as in *Sprint*, looked to the agreement between the parties requiring repayment to a third party. *Id*. In *American Tobacco* the Court's approach found the real parties in the case were plaintiffs and the government, not the insurer and the government, as plaintiff itself suffered the actual injury. *Id.* Second, similar to a redressability analysis, the Court noted although the plaintiff ultimately received payment from its insurer, the government "would be in the position of one who retained money to which it had no equitable right" if it failed to pay plaintiff for the injury. *Id* at 475–78. If the government made the payment, the original injury would be remedied even if the money went to a third party as part of a separate contractual agreement. *Id.* The analysis the Court performed in *American Tobacco*, looking at the actual injury and determining whether the Court could redress the injury through a favorable ruling, bears a strong resemblance to the Supreme Court and Federal Circuit's analyses to determine constitutional standing. Therefore, although *American Tobacco* discusses insurance subrogation, it provides a meaningful guide to cases and controversies federal courts traditionally entertain. *See Sprint*, 554 U.S. at 274–75 (noting "history and tradition," including "how courts have historically treated suits by assignors and assignees," "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider.").

### E.  Related Cases

Plaintiffs in this case argue their injuries provide a stronger claim to Article III standing than the injuries of plaintiffs whose standing to sue the Supreme Court upheld in *Sprint*. Pls.' Resp. at 22. In support of this argument, plaintiffs cite an unpublished Ninth Circuit case, *Development Specialists, Inc. v. Meritage Homes Corp*., for the position an original holder of a

---

[11] Following *American Tobacco*, the Court of Claims and the Court of Federal Claims have continuously upheld the underlying legal conclusions of the case. *See Phillip Morris & Co. to Use of Aetna Ins. Co. v. United States*, 128 Ct. Cl. 153, 154 (1954) (holding "[i]n the *American Tobacco Company* case . . . the Court held that the fact that the plaintiff there had been reimbursed by an insurance company . . . did not nullify the plaintiff's right to demand redemption of the stamps by the Government" and similar to this case "the plaintiffs, because they have been reimbursed by others for the value of the stamps, have not lost their rights to have the stamps redeemed"); *Quarles Petroleum Co., Inc. v. United States*, 213 Ct. Cl. 15, 25 (1977) (permitting plaintiffs to bring suit "for and on behalf of the owner-operators subrogee, seeking recovery of the reasonable amount the owner-operator incurred in the oil spill removal operations"); *S.W. Aircraft Inc. v. United States*, 213 Ct. Cl. 206, 211 (1977) (holding "plaintiff's receipt of insurance proceeds does not bar this suit" in seeking recovery of the value of a crashed helicopter leased to the United States); *North Slope Technical, Ltd. v. United States*, 27 Fed. Cl. 425, 429 (1992) (citing *American Tobacco* to hold "[t]here is, consequently, no general rule prohibiting the contractor from suing for the use and benefit of an insurer which has absorbed the loss. Nor does the Government step into the shoes of the insured and reap the benefit of the insurance coverage, absent an agreement between the parties that it can do so," and permitting "the action [to] proceed" by plaintiff "for the use and benefit" of the insurer).

claim who will remit all recovered proceeds in a litigation has standing to sue. *Id.*; *see* 621 Fed. App'x 434, 435 (9th Cir. 2015). In *Development Specialists*, plaintiff "act[ed] as a sub-agent for various lenders who sold participation interests in their recovery under [a] Repayment Guaranty." *Id.* at 434. Defendants argued "this sale divested the lenders, and therefore [plaintiffs] of standing" because the lenders "receipt of the sale proceeds constituted payment in full, thus mooting this action." *Id.* at 435. In rejecting this argument, the Ninth Circuit cited *Sprint* for the proposition "'[a]n assignee of a legal claim for money owed has standing to pursue that claim in federal court, even when the assignee has promised to remit the proceeds of the litigation to the assignor." *Id.* at 434 (quoting *Sprint*, 554 U.S. at 271). Consequently, the court in *Development Specialists* held plaintiffs had "an even stronger claim to standing than the assignees in *Sprint.*" *Id.* at 435. The Ninth Circuit viewed any payments plaintiffs received from third parties equal to the amount sought in litigation as "more akin to an investment [by the third party] in the outcome of the litigation" than "satisfy[ing] the underlying obligations" defendants had to plaintiffs. *Id.* Therefore, "[e]ven if the lenders sold the participation interests for the full amount" plaintiffs claimed in the lawsuit, plaintiffs "would still be permitted to sue [the defendant] for this amount" in satisfaction of the underlying claim. *Id.*

## F.  Supreme Court, Federal Circuit, and Court of Federal Claims Authority on Article III Standing

To ensure Article III standing, the Supreme Court, Federal Circuit, and Court of Federal Claims analyze the existence of an actual alleged injury suffered by individual plaintiffs. The Court observes three distinct situations arise in its review of applicable precedent. The first, as detailed in *Thole* and *Crow Creek*, occurs when plaintiffs suffer no actual injury or damages because the alleged injury has not yet occurred or is hypothetical in nature. In *Thole*, the Supreme Court held plaintiffs suffered no injury in fact because they continued to receive the same monthly payment despite the defendant's alleged violations and would continue to receive the same amount in the future. *See* 140 S. Ct. at 1622. The Court noted plaintiffs "have received all of their monthly benefit payments so far, and the outcome of th[e] suit would not affect their future benefit payments." *Id.* at 1619. The Supreme Court further reaffirmed if plaintiffs "had not received their vested pension benefits they would of course have Article III standing to sue." *Id.* Similarly, in *Crow Creek*, plaintiffs were unable to allege any government action injuring the Tribe's legally protected *Winters* right of receiving a sufficient amount of water "necessary to fulfill the purpose of the reservation." 900 F.3d at 1356. No actual injury occurred affecting the minimum flow of water guaranteed for the Tribe's use or any other right the Tribe held. *Id.* at 1357. The Federal Circuit thus held the Tribe "simply cannot be injured by government action that does not affect the Tribe's ability to use sufficient water to fulfill the purposes of the Reservation." *Id.* In both *Thole* and *Crow Creek*, the fundamental defect of plaintiff's claim was a lack of pleading cognizable injury in fact; there was no injury present for either plaintiff to sustain standing. *See, e.g. Thole*, 140 S. Ct. at 1622; *Crow Creek* 900 F.3d at 1355.

The second situation, as detailed in *Kawa* and *American Maritime*, arises when plaintiffs suffer an injury from the defendant's actions but do not suffer monetary loss due to prior contractual agreements with third parties; the plaintiff would remit all litigation proceeds to a third party. In *Kawa*, the Court of Federal Claims held, although plaintiff was acting in an escrow capacity and would forward all recovered proceeds to a third party, the failure of the

government to pay funds it owed plaintiff for third-party services was sufficient to create actual injury. 77 Fed. Cl. at 300. Plaintiff therefore had standing to bring suit, even though a contract protected it from liability arising under the lawsuit and required it to forward litigation proceeds to third parties. *Id.* Similar to *Kawa*, in *American Maritime* this court held, although prior agreements with third parties meant plaintiff received full payment for its services and suffered no damages from the alleged underpayment, it still had standing to sue for a subsidy the government refused to pay. 18 Cl. Ct. at 291. This court's Article III analysis focused on the actual injury to plaintiff arising from its contractual agreement with the government, rather than any agreements with third parties or the end destination of recovered proceeds. *Id.*

The final situation, as detailed in *Sprint*, is when plaintiffs hold legal title to an injury originally suffered by a third party and would remit all recovered proceeds to a third party. In *Sprint*, plaintiffs did not originally suffer the injury, but payphone operators assigned them an injury suffered as part of a collection contract allowing the collection firms to "sue [with Article III standing] based on [the] assignor's injuries." 554 U.S. at 286. The Supreme Court's focus was on the original injury, and because "payphone operators assigned their claims to the [collection firms] lock, stock, and barrel," the Court permitted the collection firms to bring suit as the holder of the injury. *Id.* As long as the original legal injury occurs and plaintiff is properly stepping into the shoes of the third party who suffered the legal injury, plaintiff has standing to bring suit. *Id* at 286.

A review of cases encompassing challenges to standing therefore clarifies this Court must inquire as to whether a legal injury actually occurred, whether plaintiff bringing the suit specifically suffered the injury, and whether a third party assigned a valid legal injury to plaintiff. If the legal injury did not occur to either plaintiff or some third party in a legal relationship with plaintiff, there can be no standing. *See Thole*, 140 S. Ct. at 1620–22 (noting correcting the behavior forming the basis of plaintiffs' complaint would have no impact on the money defendants are paying to plaintiffs); *Crow Creek* 900 F.3d at 1356 (finding no standing under Article III where plaintiff's claim is not based on injury to any legally protected right). If, on the other hand, the legal injury did occur but some other factor affects the overall monetary loss suffered by the plaintiff holding title to the legal injury—be it a separate contractual agreement with a third party, or a third party assigning the claim to plaintiff—courts find sufficient injury in fact to establish standing. *See, e.g. Sprint*, 554 U.S. at 286 (finding standing when a third party suffered an injury and assigned it to plaintiffs); *Kawa*, 77 Fed. Cl. at 300 (ruling plaintiff had standing to sue despite not facing any long-term monetary loss stemming from the failure of the government to pay a third party); *American Maritime*, 18 Cl. Ct. at 291 (finding sufficient injury in fact to establish standing despite any proceeds of litigation passing to a third party who previously paid money to plaintiff).

## VI.   Analysis of Plaintiffs' Injury in Fact Under Article III

### A.   Standing Without the Indemnity Agreement Between Plaintiffs and Terra-Gen

The Court initially reviews the alleged factual circumstances contained in plaintiffs' complaint to determine whether an injury in fact would be present without any indemnity agreements between plaintiffs and Terra-Gen. Plaintiffs allege they "engaged in carefully

structured and negotiated transactions, resulting in agreements for the sale-leaseback of specific wind energy assets as to which Section 1603 applications were submitted." Compl. at 15. These agreements "appropriately sought cash grants equal to 30% of the cost basis." *Id*. After fully complying with all requirements under § 1603, plaintiffs allege the government "failed to pay Plaintiffs cash grants in the amounts to which they are entitled under Section 1603" and rejected "Plaintiffs' cash grant applications that were based on the established appraisal methods for [investment tax credits]." Compl. at 3. Based on this alleged failure to receive the full § 1603 payments they believe are due, plaintiffs argue they have "not been paid the cash grants to which they are entitled" and therefore suffered an injury adequate to satisfy Article III standing. *Id*. at 17.

In the absence of indemnity agreements with Terra-Gen, plaintiffs' claims would still be for an amount of money allegedly owed to them under the statute. The Court must analyze whether these claims would allege an injury in fact sufficiently "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560. This court previously found § 1603 to be a money-mandating statute under which plaintiffs may bring suit against the government. *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 21 (2011) (ruling § 1603 does not provide the government with discretion to deny an application for reimbursement grants when the express requirements of the section are met). Here, plaintiffs applied for § 1603 grants to receive a 30% grant under a calculation based on the purchase price of the Alta Facilities. *See* Compl. at 14–15. The anticipated basis calculation was submitted to the Treasury Department for payment, and plaintiffs received an alleged underpayment from their submission request. *Id*. at 16–17. Plaintiffs in this case allege they were paid less money than they were due under a money-mandating statute, so this deficit in the money plaintiffs would otherwise receive creates a concrete and particularized injury. *See Lujan*, 504 U.S. at 560 (defining an "injury in fact" necessary for Article III standing as "an invasion of a legally protected interest which is . . . concrete and particularized [and] . . . actual or imminent."). The Supreme Court noted in *Thole* if plaintiffs "had not received their vested pension benefits" owed to them under the agreement, "they would of course have Article III standing to sue and a cause of action . . . to recover the benefits due to them." *Thole*, 140 S.Ct. at 1619. In the absence of the indemnity agreements, plaintiffs here would similarly fail to receive compensation for a benefit they believe due, and would seek redress from the Court for the deficit.

At oral argument, the government conceded "if [plaintiffs] had not been reimbursed for the shortfall that they seek . . . they would still have an injury-in-fact," and would consequently have standing. Tr. 50:19–23. Even if the provisions of the indemnity agreement between plaintiffs and Terra-Gen provided for "only partial as opposed to full" reimbursement, the government stated plaintiffs "would still arguably have a financial impact" and therefore have standing to bring the suit. Tr. 31:5–32:1.

Plaintiffs allege the government directly owes them a certain amount of money under § 1603, a statute this court has previously found to be money-mandating and sufficient to establish subject matter jurisdiction. *ARRA Energy Co. I*, 97 Fed. Cl. at 21. Therefore, in the absence of indemnity agreements, plaintiffs would have suffered an injury in fact sufficient to meet element one of the test for Article III standing described in *Lujan*. *See Lujan*, 504 U.S. at

560. The question before the Court therefore is whether Terra-Gen's indemnification provisions negate what would otherwise be an existing injury suffered by plaintiffs.

### B.   Whether the Indemnity Agreements Between Plaintiffs and Terra-Gen Eliminate the Existence of an Injury in Fact

The Supreme Court in *Sprint* addressed similar arguments regarding whether an indemnified party lacks the injury required for Article III standing.  554 U.S. at 274.  The defendant in *Sprint* argued collection firms passing along any proceeds of litigation did "not themselves suffer[] any injury in fact and . . . the assignments for collection 'do not suffice to transfer the payphone operators' injuries.'"  *Id.* at 286.  In rejecting this argument, the Court held although the collection firms "did not suffer any injury" themselves, the "payphone operators assigned their claims to the" collection firms.  *Id.*  The Court further noted "an assignee can sue based on his assignor's injuries."  *Id.* (citing *Vermont Agency of Natural Resources*, 529 U.S. at 773–74).  Therefore, the Court found the collection firms met the first element of Article III standing.  *Id.*

The government argues *Sprint* is inapposite here because "plaintiffs are not assignees of a claim."  Tr. 46:9.  The contractual agreements relied upon in *Sprint* related to "ordinary business purposes," which the government argues makes them distinguishable from "plaintiffs' agreements with Terra-Gen [which] were made to circumvent the specific statutory prohibition in § 1603(g)(4) and/or for the purposes of this litigation."  Def.'s Reply at 5.  The government argues Terra-Gen's indemnification of plaintiffs for § 1603 grant underpayments would result in the same amount of money ultimately going to plaintiffs and therefore divests plaintiffs of any actual injury.  Def.'s Mot. at 13–14.

In *Sprint*, the Supreme Court focused on whether the plaintiffs could adequately meet the standing requirements when assigned injuries from a third party with a contractual agreement to remit any proceeds back to the third party.  *See Sprint*, 554 U.S. at 274.  Here, it was plaintiffs themselves who suffered an actual injury in the alleged underpayment of § 1603 grants.  As the Supreme Court stated, at least where assignment is at issue, "courts . . . have always permitted the party with legal title alone to bring suit."  *Id* at 285.  The Court in *Sprint* permitted "an assignee [to] sue based on his assignor's injuries" when such claims were assigned through an agreement.  *Id.* at 286.  Here, plaintiffs will only remit litigation proceeds as part of an indemnity agreement.  *Id.* at 274.

Chief Justice Roberts characterized the majority's opinion in *Sprint* as a "broad generalized reading" of assignments permitting "anyone to bring suit on any claim," regardless of whether they had "a personal stake in the outcome of the litigation."  *Id.* at 302, 305 (emphasis omitted).  Under Chief Justice Roberts' reading of the majority's opinion, it is clear plaintiffs' claims meet the Supreme Court's requirement of showing an injury in fact.  Plaintiffs have established a "right to recover" based on the alleged violations of § 1603, and this right "empowers anyone to bring suit" on the claim.  *Id.* at 302 (emphasis omitted).  The dissent's concerns surrounding assignment of legal claims as denigrating the constitutional requirement of standing, however, are not present here.  *Id.* at 300.  In this case, it is plaintiffs themselves who suffered an injury in fact by receiving an alleged underpayment, and the only way to redress this

injury is through a favorable ruling on the claims.  This is not a case where an assignee "has acquired the bare legal right to prosecute a claim but no right to the substantive recovery."  *Id*. Plaintiffs are the parties who actually suffered the injury and will guarantee "concrete adverseness" as the majority in *Sprint* found sufficient to meet the requirements of Article III. *Id*. at 288–89.

As part of the purchase price of the Alta Facilities, plaintiffs negotiated indemnity agreements with Terra-Gen to reinforce plaintiffs' allegation of grant money the Alta Facilities should receive under § 1603.  *Alta Wind I*, 897 F.3d at 1371.  Courts analyzing standing focus on the existence of the legal injury itself, rather than whether the plaintiff receives money through some contractual arrangement with a third party, or was assigned a valid legal injury from a third party.  *See, e.g. Thole*, 140 S. Ct. at 1622 (finding no injury sufficient to meet the requirements of Article III exists when any benefit plaintiffs would directly receive from the defendant would not be affected by the outcome of the litigation); *Sprint*, 554 U.S. at 292 (ruling plaintiffs who remit all recovered proceeds to a third party pursuant to a separate contractual agreement with the third party have standing so long as plaintiffs were validly assigned a third party's injury in fact); *Crow Creek Sioux Tribe*, 900 F.3d at 1357 (stating no Article III injury exists where the government has not breached its duty to provide a minimum amount of necessary water to a Native American tribe); *Kawa*, 77 Fed. Cl. at 300 (ruling standing was present where an escrow agent was suing to recover for an injury caused by the government to a third party); *American Maritime*, 18 Cl. Ct. at 291 (noting a plaintiff is "identifiably and discernably injured" when government fails to pay money due, even though the money would be passed along to a third party beneficiary who already indemnified plaintiff from government nonpayment).  So long as plaintiffs, or a party in privity with plaintiffs, suffer a legal injury, the claim is sufficient to meet the requirements of Article III standing.  *Sprint*, 554 U.S. at 286 (ruling standing exists because an adequate legal injury suffered by a third party was validly assigned to plaintiffs "lock, stock, and barrel."); *Kawa*, 77 Fed. Cl. at 300 (ruling injury sufficient for standing exists despite third-party agreements requiring plaintiff forward any proceeds of the litigation to a third party and shielding plaintiff of any liability from the suit); *American Maritime*, 18 Cl. Ct. at 291 (ruling government nonpayment created an adequate injury in fact for plaintiff to bring suit, despite plaintiff passing along any proceeds of the litigation to a third party).

The survey of cases addressing requirements of Article III standing squarely places plaintiffs' claims before this Court in the same category as *Kawa* and *American Maritime*, where plaintiffs suffered an injury from the defendant's actions but did not suffer any monetary loss due to prior contractual agreements with third parties.  As the owners of title to the real property, it was plaintiffs—rather than a third party—who suffered the initial legal injury of alleged underpayment.  This court has previously ruled standing was present when the government pays a party less than the amount § 1603 mandates.  *Alta Wind I*, 897 F.3d at 1369–71.  Plaintiffs' indemnity agreements with Terra-Gen create a situation where plaintiffs suffered an actual injury from underpayment but did not suffer any monetary loss due to contractual agreements with third parties whom plaintiffs must remit litigation proceeds.  This is in contrast to situations where no injury occurred to plaintiff or some third party in privity with plaintiff, or where the court found a third party suffered the injury and plaintiffs only had legal title to the injury.

Plaintiffs did not purchase or otherwise become the assignees of Terra-Gen's claims for § 1603 grants, but instead purchased the facilities and directly applied for the grants as owners. Any recovery will be paid to plaintiffs, who will then be obligated to remit the funds to Terra-Gen pursuant to agreement.  Tr. 60: 3–13 (counsel for plaintiffs acknowledging any money recovered "will be paid over to Terra-Gen as indemnitor").  As the Supreme Court in *Sprint* acknowledged, the collection firms "did not originally suffer any injury caused by the long-distance carriers; the payphone operators did."  *Sprint*, 554 U.S. at 586.  The Court instead focused its inquiry on the existence of an original legal injury suffered by the payphone operators, and because the "payphone operators assigned their claims to the [collection firms] lock, stock, and barrel," the Court permitted the collection firms to bring suit.  *Id.*  Here, as the party holding an original claim to the payments under § 1603, plaintiffs are bringing a suit for remedy of an actual legal injury.

Furthermore, this court has found a specific legal injury held by the party who suffered the injury to exist even if the plaintiff previously contracted with a third party to indemnify any potential loss and pass on proceeds obtained in subsequent actions.  *Kawa*, 77 Fed. Cl. at 300.  When a party is "contractually obligated to forward payment to a party with whom it had contracted" and the government refuses to make payment, a "plaintiff has standing to sue despite his obligation to forward any recovery."  *Id*.  *Kawa* is representative of cases in which a plaintiff, pursuant to a contractual agreement, requested payment of funds that would be remitted to a third party.  *Id*.  Here, as owners of the Alta Facilities, plaintiffs are the parties who suffered the initial alleged injury of underpayment, and, as owners and applicants, plaintiffs are "entitled to receive the physical check from the Government."  *Id.*  As the party initially injured, "the fact that plaintiff was contractually obligated to forward payment to a party with whom it had contracted did not strip the plaintiff of standing."  *Id.*  The alleged underpayment under § 1603, the injury in this case, continues to exist even if another party contractually bore the risk of the injury occurring and has a contractual claim on any proceeds recovered from the litigation.  An analysis of standing focuses on the legal injury itself, rather than outside agreements between plaintiff and third parties.  *Id* (noting "the fact that plaintiff was contractually obligated to forward payment to a party with whom it had contracted did not strip the plaintiff of standing . . . [and] plaintiff has standing to sue even though he is not subject to liability under the escrow agreement with [third parties].").

Likewise, plaintiff in *American Maritime Transport* sought recovery of payments from the government it would then remit to a third party as part of a contractual agreement.  18 Cl. Ct. at 288.  This court held plaintiff "suffer[ed a] cognizable economic harm and has a sufficient stake in the outcome of th[e] case," despite the contractual relationship between plaintiff and a third party.  *Id*. at 291.  Plaintiff was "identifiably and discernably injured" by the refusal of the government to make the payments.  *Id.*  As applicants for § 1603 grants, plaintiffs here suffer from "cognizable economic harm" by receiving an alleged underpayment of § 1603 grants, and plaintiffs will, pursuant to a separate contractual agreement, remit any recovered proceeds to Terra-Gen.  *See id.*

Finally, in *Development Specialists* the Ninth Circuit held an original holder of a legal claim who will remit all recovered proceeds of litigation to a third party had standing to sue.  621 Fed. App'x at 435.  The government there sought to dismiss the claim for lack of standing,

- 18 -

arguing plaintiffs' "receipt of the sale proceeds constituted payment in full, thus mooting this action." *Id.* Citing *Sprint*, the court held plaintiffs had standing because "the proceeds from a sale of participation interests [in a lawsuit] d[id] not necessarily satisfy the underlying obligations, rather they were more akin to an investment in the outcome of the litigation." *Id.* at 435. Under the framework expressed in *Development Specialists*, Terra-Gen's payments to plaintiffs do not defeat the existence of an injury, "because the proceeds . . . do not necessarily satisfy the underlying obligations" of the government in paying requested § 1603 grants. *Id.* Although *Development Specialists* is not binding on the Court, it is part of the body of cases that can "offer a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Sprint*, 554 U.S. at 274.

Plaintiffs and Terra-Gen entered into contractual agreements to remit any recovery proceeds to reimburse Terra-Gen for indemnifying plaintiffs. The agreements did not divest plaintiffs of legal title in § 1603 payments or prevent plaintiffs from sufficiently showing an actual injury when alleging underpayment of money due under the statute. Therefore, plaintiffs sufficiently alleged an injury in fact to meet Article III standing requirements. *Sprint*, 554 U.S. at 286.[12]

### C.  Remittance by an Indemnified Party as Further Clarification for Standing

When an indemnified party will remit all litigation proceeds to the insurer, the Supreme Court permits the party to directly bring suits against the government. *See American Tobacco*, 166 U.S. at 478. Although *American Tobacco* does not directly discuss Article III standing, the Court in *American Tobacco* addressed the general principle of indemnification through subrogation, examining whether a plaintiff already paid in full by insurance for the value of goods destroyed is the "proper[]" party to bring suit against the government. *Id* at 474.

The government argues *American Tobacco* is inapposite to this case because it focuses on contractual interpretation, insurance subrogation, statutory interpretation, and Assignment of Claims Act issues, not whether Article III standing was present. Def.'s Reply at 12. While Terra-Gen is not an insurance company, and insurance subrogation is not directly at issue, the contractual agreements entered between plaintiffs and Terra-Gen are analogous to those between an insurer and its insured. At oral argument, the government argued if Terra-Gen was an insurer

---

[12] On 6 October 2020, another judge on this court denied a motion to dismiss in the similar case of *Pacific Wind, LLC v. United States*, Case No. 19-612, ECF No. 19. The government believes "that the decision in *Pacific Wind* is incorrect" because "the Court's opinion [in *Pacific Wind*] does not analyze certain issues that are necessary to a robust consideration of constitutional standing." Mot. for Leave to File Supp. Brief, ECF No. 257. Accordingly, the government filed a motion "for leave to file a supplemental brief" in support of this motion to dismiss to address this issue and other indeterminate "multiple reasons that cannot be adequately discussed in a notice." Reply in Supp. of Mot. for Leave to File Supp. Brief, ECF 259. As plaintiffs highlight in their response to the government's motion for leave to file a supplemental brief, "the [p]arties have already spent over 85 pages briefing constitutional standing, including the [g]overnment's opening brief, [p]laintiffs' opposition, the [g]overnment's reply, [p]laintiffs' surreply, the [g]overnment's response to the surreply, two notices of supplemental authority and responses thereto, and an extensive oral argument." Pls.' Opp. to Def.'s Mot. for Supp. Br., ECF No. 258. The Court has carefully analyzed the question of plaintiffs' standing under Article III of the Constitution in this order and considered the request for supplemental briefing. The Court concludes supplemental briefing related to the recent *Pacific Wind* decision will not be helpful in this case.

and had indemnified plaintiffs for its loss, plaintiffs would still not be able to bring a suit under Article III "because if they were in the same exact position with no financial impact, they would not have standing." Tr. 29:22–24, 31:20–25, 32:1. Under Supreme Court precedent, however, any such suit brought by a plaintiff and filed after the plaintiff received an insurance payment "is properly brought in the name of the insured for the use of the insurers, but the cause of action rests on the rights of the [insured party]." *American Tobacco*, 166 U.S. at 474. This is because "it is the right of the claimant . . . which is to be passed upon," and therefore the holder of the legal claim may be the party who brings suit. *Id.* The legal principle developed in *American Tobacco*, permitting an indemnified party to bring suit against the government even if proceeds of the litigation are passed along to its insurer, allows a plaintiff to reimburse itself for a loss while seeking redress with the government. *Id* at 478. In a manner similar to insurance subrogation, plaintiffs were indemnified for a loss they allegedly suffered, and sought reimbursement through contractual means. If plaintiffs are correct they received an underpayment, but were barred from bringing suit, the government "would be in the position of one who retained money to which it had no equitable right" and would receive a cash windfall. *Id.*

Here, the government's assertion plaintiffs would be unable to recover damages from the government under insurance subrogation principles runs contrary to *American Tobacco* and the line of cases stemming from its holding. Neither this court nor the Federal Circuit has cited *American Tobacco* outside of the context of insurance subrogation. This court has previously found, however, *American Tobacco* directly relates to the relationship between insurance subrogation and the proper party to bring a suit. *North Slope Technical, Ltd. v. United States*, 27 Fed. Cl. 425, 428–29 (1992). In *North Slope*, this court noted under insurance subrogation principles, "[t]here is, consequently, no general rule prohibiting the contractor from suing for the use and benefit of an insurer which has absorbed the loss" pursuant to a separate contractual agreement, "[n]or does the Government step into the shoes of the insured and reap the benefit of the insurance coverage, absent agreement between the parties that it can do so." *Id.* at 429. Likewise, here the government may not "step into the shoes" of plaintiffs to reap the rewards of Terra-Gen's indemnification provision for alleged § 1603 grant shortfalls. *Id.* If plaintiffs are successful in this suit, the government will be required to furnish additional grants to plaintiffs as owners of the Alta Facilities and applicants for § 1603 grants. If plaintiffs choose to remit those funds pursuant to a separate contractual agreement, it is still plaintiffs who will receive and then remit the funds under the agreement. Accordingly, *American Tobacco* offers an alternative line of legal authority instructing this Court plaintiffs' contractual indemnity agreements with Terra-Gen do not serve to block plaintiffs from bringing suit for a recovery of litigation proceeds ultimately benefitting Terra-Gen. *See American Tobacco*, 166 U.S. at 478.

## VII.   Analysis of the Redressability of Plaintiffs' Injury in Fact Under Article III

To satisfy the third element for standing under Article III, an injury must be redressable: it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (citing *Simon*, 426 U.S. at 38, 43 (1976)). In the absence of an indemnity agreement between plaintiffs and Terra-Gen, any compensation plaintiffs receive upon a positive judgment by the Court would go directly to plaintiffs and be in response to the court finding outstanding money owed to plaintiffs under § 1603. Therefore, in

the absence of an indemnity agreement, a favorable decision would be able to redress plaintiffs' alleged injuries and satisfy element three of Article III's standing test.  Government's counsel confirmed, "based on the precedent in the courts," plaintiffs would likely have standing "if, under the indemnification agreements, there was some financial impact that was actually going to Plaintiffs."  Tr. 32:2–11.

The Court next determines whether the indemnity agreements between plaintiffs and Terra-Gen affect whether this injury "is likely to be redressed by a favorable decision."  *Simon*, 426 U.S. at 38.  Even if plaintiffs suffer an injury in fact, the government argues the final element of standing is not satisfied because any money recovered by plaintiffs would be passed along to Terra-Gen and such injury would therefore not be redressed.  Def. Mot. at 13.  Under the government's argument, "there is no history and tradition allowing applicants for Section 1603 payments, who have already been reimbursed for the grant shortfalls, to bring suit in order to pass the proceeds back to an entity that is ineligible for Section 1603 benefits itself."  Tr. at 12:25–13:5.

In determining whether the injury is redressable, the Supreme Court in *Sprint* narrowed its focus to "whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation—not on what the plaintiff ultimately intends to do with the money he recovers." *Sprint*, 554 U.S. at 287 (emphasis in original).  There, the alleged injuries of the payphone operators were "injuries relate[d] to the failure to receive the required dial-around compensation."  *Id*.  In the case of a legal victory by the collection firms, "[t]he injuries would be redressed whether the [collection firms] remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build a new corporate headquarters."  *Id*.  What the collection agency does with the money after recovering it following a positive judgment, including whether the agency even remitted the litigation proceeds to the payphone operators, does not factor into the Court's judgment.  *Id*.  This is because federal courts "routinely" entertain suits "which will result in relief for parties that are not themselves directly bringing suit" without running into a conflict with the "concrete adverseness" necessary for adversarial judicial proceedings.  *Id* at 287–88.

In this case, plaintiffs purchased the Alta Facilities as part of a negotiated business transaction and allege they were not paid the full amount owed by the government under § 1603. As plaintiffs possess a valid legal injury under § 1603, a payment for the sum of any deficit due under the statute would redress the legal injury.  Similar to the agreements in *Sprint*, plaintiffs entered into contractual agreements determining the recipient of any money received at the conclusion of this litigation.  *Alta Wind I*, 897 F.3d at 1371.  These agreements do not affect whether the payment redresses plaintiffs' specific legal injuries, and it does not matter for the purposes of a standing analysis what plaintiffs do with the money recovered in satisfaction of a legal injury as long as the legal injury itself is redressed by payment to plaintiffs.  *Sprint*, 554 U.S. at 287.  If plaintiffs prevail, their injuries will be redressed.  Whatever amount plaintiffs would receive if successful in litigation, and what they choose to do with the money, is not for the Court to decide.  *See id*. at 287 (stating it does not matter "what the [plaintiffs] do with the money afterward . . . [as] [t]he [plaintiffs'] injuries would be redressed whether the [plaintiffs] remit the litigation proceeds to the payphone operators, donate them to charity, or use them to build a new corporate headquarters.").  The focus of Article III standing inquiry is the specific

legal injury suffered and whether a favorable ruling can redress the specific legal injury.  Here the injury to plaintiffs is the alleged underpayment, and a favorable decision can redress this injury.  Therefore, plaintiffs satisfy element three of the Article III standing requirements.  *Lujan*, 504 U.S. at 560–01.

## VIII.   Conclusion

Plaintiffs sufficiently allege an injury in fact and the redressability of an injury in fact to satisfy Article III standing.  Accordingly, the Court **DENIES** the government's motion to dismiss.  As fully addressed in footnote 12 of this opinion, the Court further **DENIES** the government's motion for leave to file a supplemental brief.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge