# In the United States Court of Federal Claims

Nos. 13-402, 13-917, 13-935, 13-972, 14-47, 14-93, 14-174, 14-175, 17-997

(Filed:  20 June 2023)

```
*****************************************
ALTA WIND I OWNER LESSOR C,      *
et al.,                          *
                                 *
                  Plaintiffs,    *
                                 *
v.                               *
                                 *
THE UNITED STATES,               *
                                 *
                  Defendant.     *
                                 *
*****************************************
```

*Steven J. Rosenbaum*, with whom were *Dennis B. Auerbach* and *Thomas R. Brugato*, Covington & Burling LLP, all of Washington, DC, for plaintiffs.

*James E. Weaver*, Trial Attorney, with whom were *Miranda Bureau*, Trial Attorney, *Andi Leuszler*, Trial Attorney, *Arie Rubenstein*, Trial Attorney, *Bart D. Jeffress*, Trial Attorney, *G. Robson Stewart*, Assistant Chief, Court of Federal Claims Section, *David I. Pincus*, Chief, and *David A. Hubbert*, Deputy Assistant Attorney General, Tax Division, Department of Justice, all of Washington, DC, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiffs, owners of six windfarm facilities in southern California, allege the government underpaid them by over $200 million pursuant to Section 1603 of the American Recovery and Reinvestment Act of 2009.  The government filed a counterclaim, asserting it overpaid plaintiffs by over $59 million.  Following a trial on the claims, the previously undersigned judge held for plaintiffs.  The Federal Circuit reversed, ruling the trial court improperly calculated the basis of the windfarms at the time plaintiffs purchased them and improperly excluded testimony by the government's expert; many fact-intensive issues remain on remand.[1]  This case was transferred to the undersigned on 29 July 2019.  Following transfer of the case, the parties engaged in further discovery.  This Opinion and Order addresses a discrete issue raised by plaintiffs in their Motion for Partial Summary Judgment:  Whether the Section 1603 cash grants—and the indemnities associated with them—are separate grant-ineligible assets to which purchase price should be allocated pursuant to Section 1060 of the Internal Revenue Code.  For the following reasons, the

---

[1] "On remand, the Claims Court will have to make a *factual determination* as to the allocation of purchase price." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1377 (Fed. Cir. 2018) (emphasis added).

Court denies plaintiffs' Motion for Partial Summary Judgment.

## I.      Factual and Procedural History[2]

The following factual and procedural history comes from the Court's 18 June 2021 Opinion and Order on the parties' Joint Motion for the resolution of then pending discovery-related issues.  *See* Joint Mot. for Resolution of Pending Disc.-Related Issues, ECF No. 247 ("Joint Disc. Mot.").

Oak Creek Energy Systems ("Oak Creek") partnered with Allco Wind Energy Management Pt. Ltd. ("Allco") in 2006 "to finance, develop, and construct windfarms in the Tehachapi region of California." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1370 (Fed. Cir. 2018).  Oak Creek and Allco entered into a ["]Master Power Purchase and Wind Project Development Agreement["] with Southern California Edison [('SCE')] later that same year, providing "the Oak Creek/Allco subsidiary would develop multiple wind facilities . . . with all of that output to be sold to [Southern California Edison] for a period of roughly 24 years." *Alta Wind I Owner-Lessor C v. United States*, 128 Fed. Cl. 702, 709 (Fed. Cl. 2016).  As part of this arrangement, [SCE] was to enter into separate power purchase agreements ("PPAs") with each . . . windfarm. *Alta Wind I*, 897 F.3d at 1370.

By June 2008, Oak Creek and Allco had completed development work on the facilities ("the Alta Facilities") but had not begun construction.  "Specifically, . . . they had (1) completed environmental studies; (2) secured key transmission and interconnection queue requests in the Tehachapi Renewable Transmission Project . . . (3) secured land rights; (4) begun the permitting process; (5) completed site analysis for turbines and other major equipment; (6) purchased [General Electric] turbines and executed turbine-related contracts; (7) constructed meteorological towers and collected wind data; and (8) secured the Master PPA with SCE." *Alta Wind I*, 128 Fed. Cl. at 709.  Terra-Gen acquired Allco's U.S. wind energy business that same year and proceeded to "complet[e] the development and construction of the Alta Facilities" and execute Oak Creek and Allco's individual windfarm PPA contracts with [SCE]. *Alta Wind I Owner Lessor C*, 150 Fed. Cl. 152, 155 (Fed. Cl. 2020); *Alta Wind I*, 897 F.3d at 1370.

Congress enacted The American Recovery and Reinvestment Act ("ARRA") of 2009, Pub. L. No. 111-5, 123 Stat. 115, 364-66, as part of its efforts to strengthen the economy and invest in the nation's infrastructure.  Section 1603 of the ARRA provides "a cash grant to entities that 'place[] in service' certain renewable energy facilities." *Alta Wind I*, 897 F.3d at 1367–68.  The grant amount was determined "using the basis of the tangible personal property of the facility

---

[2] In May 2016, the previously assigned judge held a nine-day bench trial in this case and ruled in favor of plaintiffs. *See Alta Wind I Owner-Lessor C v. United States*, 128 Fed. Cl. 702, 706–08 (2016) (Wheeler, J.).  The government appealed, and, on 27 July 2018, the Federal Circuit issued an opinion vacating this court's judgment and remanding the case. *See Alta Wind I Owner Lessor C*, 897 F.3d at 1382–83.  A full recitation of the factual history can be found in the aforementioned cases. *See id.*; *Alta Wind I Owner-Lessor C*, 128 Fed. Cl. at 706–08.

(with certain exclusions)." *Id.* at 1368 (citing [ARRA] § 1603(b)(1)). "Terra-Gen itself was not qualified to receive a [S]ection 1603 payment, as [S]ection 1603(g)(4) barred a 'pass-thru entity' from receiving a grant if any 'holder of an equity or profits interest' in the entity was a nonprofit, and Terra-Gen had some nonprofit equity holders." *Alta Wind I*, 897 F.3d at 1370.

Unable to receive the [Section] 1603 grants, Terra-Gen proceeded to sell five of the windfarms (Altas I–V) to plaintiffs over a two-year period from 2010 to 2012. *Id.* at 1371. These sales were sale-leaseback transactions, whereby the windfarms were purchased and then leased back to Terra-Gen by the plaintiffs. *Id.* Terra-Gen sold a sixth facility outright to one of the plaintiffs in 2012. *Id.* [After acquiring the six Alta facilities,] "[p]laintiffs appear to have placed each facility into service within weeks of its acquisition" and proceeded to apply for over $703 million in grants through [Section] 1603 "using the unallocated method to determine basis." *Id.* The Treasury Department required "companies applying for a [S]ection 1603 grant provide an opinion from an independent auditor validating the claimed grant-eligible costs," for which plaintiffs retained KPMG. *Id.* "KPMG certified that plaintiffs' allocations were fairly stated." *Id.* The Treasury Department ultimately awarded plaintiffs cash grants of approximately $495 million based on the costs of the facilities' grant-eligible construction and development, instead of plaintiffs' method of allocation using each facility's unallocated basis. *Alta Wind I*, 150 Fed. Cl. at 156.

"In June 2013, plaintiffs filed separate claims against the government, which were later consolidated, 'seeking over $206 million in additional [S]ection 1603 grants.'" *Id.* (quoting *Alta Wind I*, 897 F.3d at 1371[]). On 31 October 2016, the Court "awarded Plaintiffs damages in the amounts equal to the shortfall between the grant amounts to which Plaintiffs were entitled and the Government awarded." *Id.* at 722. The Federal Circuit vacated and remanded the case on appeal, holding the purchase prices paid for the Alta Facilities should be "allocated using the residual method" under [IRC Section] 1060. *Alta Wind I*, 897 F.3d at 1376.

*Alta Wind I Owner Lessor C v. United States*, 154 Fed. Cl. 204, 207–09 (2021).

On 14 June 2013, plaintiffs filed separate complaints against the government. The complaints, later consolidated, allege the government underpaid plaintiffs pursuant to [Section] 1603 grants. *See* Compl., ECF No. 1; [6 June 2024] Order, ECF No. 27 [(Wheeler, J.)]; [19 Dec. 2018] Order, ECF No. 196 [Hodges, J.)].[3] In December 2015, the government counterclaimed, alleging overpayment to plaintiffs in the amount of $58,884,366. Def.'s Mot. to Amend the Pleadings to Add Countercls. Based on Expert Op. [at 10], ECF No. 75 . . . . Th[is] [c]ourt began a nine-day trial on 9 May 2016, and heard the testimony of eleven witnesses,

---

[3] Two plaintiffs filed their initial complaints on 24 July 2017, and the cases were stayed pending appeal to the Federal Circuit of the lead case. *See Alta Wind I Owner Lessor A v. United States*, Case No. 17-997, ECF No. 1 (Fed. Cl. July 24, 2017). On 19 December 2018, this court consolidated all plaintiffs under case number 13-402. 19 Dec. 2018 Order, ECF No. 196 (Hodges, J.).

including James Pagano, George Revock, Damon Huplosky, Anthony Johnston, Dr. Edward Maydew, and Dr. Colin Blaydon. *Alta Wind I*, 128 Fed. Cl. at 707. Th[is] [c]ourt excluded the government's expert, Dr. Parsons, from testifying during the trial after the previously undersigned judge concluded he "attempted to conceal articles he wrote for Marxist and East German publications" and "thereby provided untruthful testimony under oath to the Court." *Id.* On 24 October 2016, the previously undersigned judge found "the [g]overnment should have used [p]laintiffs' purchase prices, subject to reasonable allocations . . . as basis in calculating [p]laintiffs grants under Section 1603" and awarded plaintiffs $206,833,364. *Id.* at 722–24. The government appealed, and on 27 July 2018, the Federal Circuit [vacated] and remanded the case to this court. *Alta Wind I*, 897 F.3d at 1382–83. In remanding the case, the Federal Circuit stated "reassignment [of the case] is appropriate on remand" to "preserve the appearance of fairness." *Id.* (remanding the case for reassignment pursuant to [Rule] 40.1 [of the Rules of the Court of Federal Claims ('RCFC')]). . . .

On 29 July 2019, this case was reassigned to the undersigned Judge. *See* Order [Reassigning Case], ECF No. 197. The government filed a motion to dismiss for lack of subject matter jurisdiction on 21 January 2020, and the Court held oral argument on the government's [M]otion on 17 July 2020. *See* Def.'s Mot. to Dismiss for Lack of Subject Matter Jurisdiction and Memorandum in Support, ECF No. 208[;] Order [Setting Oral Argument ('Arg.')], ECF No. 234. On 17 July 2020[,] the Court further ordered the parties to "file a joint motion for resolution of pending discovery-related issues" . . . . *See* [17 July 2020] Order, ECF No. 240. . . . The parties filed their "Joint Motion for Resolution of Pending Discovery-Related Issues" on 4 August 2020. *See* [Joint Disc. Mot.].

. . . The Court denied the government's [M]otion to [D]ismiss on 21 October 2020. *See* Opinion and Order, ECF No. 264.

*Id.* at 209–10. The Court granted plaintiffs' discovery requests in its 18 June 2021 Opinion and Order. *Id.* at 226–27.

On 5 November 2021, the government filed a motion for additional discovery, challenging plaintiffs' privilege claims, ECF No. 287. On 10 December 2021, the government filed a second motion for additional discovery, requesting documents and information following the deposition of Mr. James Pagano, a Terra-Gen employee, ECF No. 292. On 12 July 2022, the Court denied in part the government's Motion challenging plaintiffs' privilege claims concerning plaintiffs' litigation-related agreements after *in camera* review of the unredacted documents. 12 July 2022 Order at 1, ECF No. 308. The Court held oral argument on the remaining issues on 18 August 2022. *See* 25 July 2022 Order, ECF No. 311; 18 Aug. 2022 Oral Arg. Tr., ECF No. 313.

On 6 September 2022, plaintiffs filed a motion for partial summary judgment "seek[ing] rulings as a matter of law that: (1) the Section 1603 cash grant is not a separate asset for purposes of applying [Internal Revenue Code ('IRC' or 'Tax Code')] Section 1060 [('Section 1060')]; (2) the value of the cash grant must be included in the basis of the Section 1603-eligible

property; and (3) [p]laintiffs' eligible basis may not be reduced on account of the 'associated indemnities.' [sic] *i.e.*, the indemnity payments that [p]laintiffs received from Terra-Gen Power, LLC when the Government underpaid the cash grants due under Section 1603." Pls.' Mot. Partial Summ. J. ("Pls.' Partial MSJ") at 2, ECF No. 314; *see also* Mem. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' MSJ Mem."), ECF No. 314-1.  The government filed a response on 21 October 2022, *see* Def.'s Resp. Pls.' Mot. Partial Summ. J. ("Gov't's Resp."), ECF No. 317, and plaintiffs filed a reply on 21 November 2022, *see* Reply Mem. Supp. Pls.' Mot. Partial Summ. J. ("Pls.' Reply"), ECF No. 321.

In its 24 January 2023 Order, the Court granted in part and denied in part the government's first Motion for Additional Discovery and found as moot the government's second Motion for Additional Discovery.  24 Jan. 2023 Order at 14, ECF No. 323.  The Court also instructed the parties to file a joint status report ("JSR") stating their positions on whether plaintiffs' Motion for Partial Summary Judgment was moot or required further proceedings.  *Id.* The parties filed a JSR on 7 February 2023, agreeing plaintiffs' Motion was not moot and requesting oral argument.  7 Feb. 2023 JSR at 2, ECF No. 324.  The Court held oral argument on plaintiffs' Motion for Partial Summary Judgment on 16 March 2023.  *See* 8 Feb. 2023 Order, ECF No. 325; 16 Mar. 2023 Oral Arg. Tr. ("Tr."), ECF No. 329. [4]

## II.     Applicable Law

### A.     Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that movant is entitled to judgment as a matter of law."  RCFC 56(a).  A genuine dispute is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor, and a material fact is one that could affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Questions of law are particularly appropriate for summary judgment."  *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed. Cir. 1999) ("Summary judgment was appropriate here because no material facts were disputed, many being stipulated, and the only disputed issues were issues of law.").

### B.     Statutory Framework

Pursuant to ARRA Section 1603, "each person who place[d] in service specified energy property" during a designated period was entitled to receive a cash grant equal to a percentage—here, 30 percent, of the "basis" of the specified energy property.  ARRA § 1603(a), (b)(1).  Specified energy property, also referred to as "eligible property," is defined by references to Sections 45 and 48 of the IRC.  ARRA § 1603(d).  "Eligible property" only includes tangible personal property and other tangible property, used as an integral part of the facility, for which depreciation or amortization is allowable.  I.R.C. § 48(a)(5)(D).  It does not include real estate,

---

[4] On 27 March 2023, the government filed a motion for leave to file a notice of correction, seeking to correct an inadvertent misstatement by government counsel during the 16 March 2023 oral argument.  Def.'s Mot. for Leave to File a Notice of Correction of an Inadvertent Misstatement, ECF No. 330.  Plaintiffs did not respond to the government's Motion.  The Court grants the government's Motion for Leave to File and takes into account what government counsel intended to say in considering plaintiffs' Motion:  "Well, in the case of the low-income housing tax credit, there's no overlap."  *Id.*; *see* Tr. at 39:19–20.

buildings, or transmission equipment.  *Id.* § 48(a)(5)(D)(i)(II).  "Eligible property" also does not include intangibles.  *Id.* § 48(a)(5)(D)(i).  The amount of a Section 1603 grant is determined by the basis of the eligible property.  ARRA § 1603(b)(1).

In 2018, the Federal Circuit determined Section 1060 applied to determine basis allocation between grant-eligible tangible property and grant-ineligible intangibles.  *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376 (Fed. Cir. 2018).  To determine basis, Section 1060 and corresponding Treasury regulations require the residual method be used in the case of "applicable asset acquisition[s]."  I.R.C. § 1060(a); *see* Treas. Reg. §§ 1.1060, 1.338.  These acquisitions involve, in relevant part, any group of assets:  (i) the use of which "would constitute an active trade or business under [IRC Section] 355"; or (ii) to which "goodwill or going concern value could under any circumstances attach[.]"  Treas. Reg. § 1.1060-1(b)(2)(i).  Following the residual method, the overall purchase price is allocated on a waterfall basis among several categories of assets, some grant-eligible and some not, with each category calculated at the fair market value of the assets in that category.  *See* Treas. Reg. §§ 1.338-6(b), 1.1060-1(a)(1).

The Federal Circuit previously outlined the residual method:

Section 1060 requires that, in the case of an applicable asset acquisition, "the consideration received . . . be allocated among such assets acquired . . . in the same manner as amounts are allocated to assets under [IRC Section] 338(b)(5)."  The regulations implementing [IRC Section] 338 set out a method of allocation—the residual method—in which the consideration is distributed among seven asset classes, some classes for tangible assets and others for intangible assets.  [I.R.C. § 338].  Those asset classes include:

> Class I:  Cash and general deposit accounts.
> Class II:  Actively traded personal property, certificates of deposits, U.S. government securities and publicly traded stock.
> Class III:  Debt instruments.
> Class IV:  Inventory and other property held for sale to customers.
> Class V:  Assets that do not fit within any other class, including tangible property.
> Class VI:  [IRC Section] 197 intangibles, including contract rights, but not goodwill and going concern value.
> Class VII:  Goodwill and going concern value.

*See* Treas. Reg. § 1.338-6(b).  The consideration is allocated among these classes in the order they are listed in a "waterfall" fashion, using the fair market value of the assets within each class.  *See id.*  The parties agree that none of the assets at issue in this case fits within Class I, II, III, or IV. . . .  [T]he Alta transactions included both tangible and intangible property . . . .  The purchase price must therefore be allocated to Class V, then to Class VI, and finally to Class VII, if any value remains.

*Alta Wind I*, 897 F.3d at 1376.

## III.    The Parties' Arguments

Plaintiffs argue the value of the anticipated cash grants and associated indemnities are inherently part of the fair market value ("FMV") of the windfarm tangible property, so the value of the grant itself—as well as the incremental consideration paid for the anticipated cash grant and associated indemnities—attaches to the FMV of the windfarm tangible property within the Class V asset category.  *See* Pls.' Reply at 3, 17; *see also Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376 (Fed. Cir. 2018); I.R.C. §§ 1060, 338; Treas. Reg. § 1.338-6(b). "Plaintiffs' position is that consideration they paid due to the existence of a federal benefit like the cash grant is part of the basis of the property to which the grant relates:  here, the electricity-producing, Section 1603-eligible property."  Pls.' MSJ Mem. at 2.  Plaintiffs move for partial summary judgment in favor of finding:  (1) the Section 1603 cash grant is not a separate asset for purposes of applying Section 1060; (2) the value of the cash grant must be included in the basis of the Section 1603 eligible property; and (3) eligible basis may not be reduced on account of the "associated indemnities."  *See id.*[5]

The government argues the value of the grant itself and the incremental consideration paid for the anticipated cash grants and associated indemnities are separate intangible assets, meaning they:  (1) cannot be categorized as Class V tangible property assets; and (2) are not grant-eligible assets.  *See* Gov't's Resp. at 38; *see also Alta Wind I*, 897 F.3d at 1376; I.R.C. §§ 1060, 338; Treas. Reg. § 1.338-6(b).  The government broadly argues:  (1) incremental consideration is its own incremental asset under the Class VII asset category and is therefore a grant-ineligible intangible asset; (2) plaintiffs' reading of Section 48 of the Tax Code, which "does not support a recursive grant-on-grant interpretation," is erroneous as the provision is simply a basis reduction rule—which specifies the basis reduction made with respect to property as a result of the investment tax credit will be treated as a deduction allowed for depreciation; and (3) summary judgment is not appropriate because underlying factual disputes remain.  *See* Gov't's Resp. at 1–6.

### A.    Whether the Section 1603 Cash Grant Is a Separate Asset for Purposes of Applying IRC Section 1060 and Must Be Included in Eligible Basis

According to plaintiffs, Section 48(d)(3)(B) of the IRC demonstrates Congress "did not provide for the grant to be excluded in determining eligible basis, or for the grant to be treated as its own separate asset."  Pls.' MSJ Mem. at 2.  Specifically, plaintiffs argue the statutory phrase "taken into account" means the cash grant is properly included within the basis of the property itself; stated otherwise, plaintiffs' projected amount of the cash grant, which was included in the

---

[5] Plaintiffs list these *three* grounds for partial summary judgment in the title of their Motion.  Pls.' MSJ Mem.  The table of contents of plaintiffs' opening brief lists *six* reasons under the heading of the "Arguments" section.  *Id.* at ii. Plaintiffs' introduction includes only *five* "reasons" plaintiffs "are entitled to partial summary judgment."  *Id.* at 2–4. Plaintiffs' arguments espoused in their opening brief therefore do not fit neatly into their tripartite roadmap from the title of their Motion.  Plaintiffs, at oral argument, stated their arguments are "opposite sides of the same coin":  (1) the premium is not a separate intangible asset; and (2) the premium is not allocated to the Class VII asset category. Tr. at 27:6.  The Court therefore considers the separability of assets and eligibility for basis—the first two grounds for summary judgment from the title of plaintiffs' Motion—together.

windfarm transaction, should be included in the basis used for determining the cash grant amount. *See id.* at 8–9.

According to the government, "[a]ll that the text of Section 48(d)(3)(B) communicates is that a Section 1603 grant reduces the basis of qualified property by 50% and not, as is the general rule, by 100%. Thus, for the grant, 50% 'shall be taken into account' for reducing basis, just as for the energy credit, 50% 'shall be taken into account.'" Gov't's Resp. at 24–25. The government argues Section 1012, "Basis of property—cost," initially determines plaintiffs' basis. *Id.* at 27. The government highlights the Federal Circuit directed basis to be allocated according to Section 1060 in this case. *Id.* at 27, 31–32 ("Remarkably, while [p]laintiffs' memorandum asks this Court to reach a legal conclusion about the allocation of the purchase price to the eligible assets, their argument section barely mentions Section 1060."); *see Alta Wind I* at 1376. The government claims plaintiffs cannot include the cash grant amounts in basis because when plaintiffs bought the windfarms, plaintiffs had not yet applied for—let alone received—a Section 1603 grant. Gov't's Resp. at 27–28. The government continues to explain Sections 48(d)(3)(B) and 50(c) only apply to reduce basis by 50 percent after the grant has been made. *Id.* at 28–29.

Plaintiffs cite various other IRC provisions, caselaw, and Congressional intent to contextualize Section 48(d)(3)(B). Other provisions within the IRC and Federal Circuit precedent, according to plaintiffs, demonstrate "no such exclusion from basis here, but, instead, [Congress] said precisely the opposite [in Section 48(d)(3)(B)]: that the grant 'shall be taken into account in determining the basis' of the Section 1603-eligible property." Pls.' MSJ Mem. at 3 (quoting I.R.C. § 48(d)(3)(B)) (citing I.R.C. §§ 42(d)(5)(A), 32(c), 907(c)(3), 6409, 47, 48, 50(c); *Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063 (Fed. Cir. 1983)). Stated broadly, "to the extent that some of that payment [i.e., the total purchase price] reflected anticipation of the payment of the cash grant," plaintiffs assert "Section 48 clearly says that the cash grant is included in the basis of the eligible property." Tr. at 47:6–10.

Plaintiffs reference a report from the Congressional Joint Committee on Taxation ("JCT")[6] and Internal Revenue Service ("IRS") Notice 2014-39 for the proposition "Congress expressly 'intended that the [Section 1603] grant provision mimic the operation of the credit under [S]ection 48 [of the IRC].'" *See* Pls.' MSJ Mem. at 14–16 (citing Staff of the J. Comm. on Tax'n, 111th Cong., General Explanation of Tax Legislation Enacted in the 111th Congress, pt. 2, 2011 WL 940372 (2011) ("Congress's instruction in Section 48(d)(3)(B) that basis must be reduced by 50% of the grant for purposes of determining the depreciation deductions to which a grant-recipient is entitled does not permit reducing eligible basis for purposes of calculating the grant itself."); Notice 2014-39, 2014-26 I.R.B. 1109 ("The IRS . . . has issued a Notice explicitly instructing that basis is reduced only after the Section 1603 grant has been calculated and paid.")).

The government asserts the IRS guidance supplied as support for plaintiffs' argument

---

[6] The JCT is a congressional Committee established pursuant to IRC Section 8001. The JCT is composed of ten Members, five from the Senate Finance Committee and five from the House Ways and Means Committee, who: (1) investigate the operation, effects, and administration of internal revenue taxes; (2) investigate and propose measures and methods for the simplification of taxes; (3) make reports on the results of their investigations and studies and make recommendations; and (4) review any proposed refund or credit of taxes more than $2,000,000. I.R.C. §§ 8002, 8022, 6405.

actually promotes the government's interpretation of how Section 48 operates.  Gov't Resp. at 26.  The government further argues IRS Advice Memorandum 2011-004, C.A.M. 2011-004 (Sept. 30, 2011), states the function of Section 48 consistent with the government's view.  Gov't Resp. at 30.  IRS Notice 2014-39, cited by plaintiffs, further supports the undisputed operation of Section 48 whereby basis is reduced by 50 percent of the amount of the grant after receipt of the grant, according to the government.  Gov't Resp. at 30.

Plaintiffs highlight "[t]he Court of Claims, sitting *en banc*, rejected the [g]overnment's position in *Pacific Far East*, holding that the [investment tax credit ('ITC')] should be calculated as 7% of the taxpayer's full purchase price for the ships, without reduction based on the taxpayer's utilization of a tax subsidy to pay part of that purchase price."  Pls.' MSJ Mem. at 22 (citing *Pacific Far East Line*, 211 Ct. Cl. at 83).  Plaintiffs equate the tax subsidy in *Pacific Far East* to the cash grant plaintiffs received here and included in the transaction as incremental consideration.  *Id.* (citing *Pacific Far East Line*, 211 Ct. Cl. at 83).  Plaintiffs reiterate that basis cannot be reduced on account of receiving an ITC by stating "[i]n *Oglebay Norton Co.*, the Court of Claims likewise held that the taxpayer plaintiff's ITC-eligible basis in ships should not be reduced on the ground that the taxpayer had used $1,616,537 of non-taxed funds—what the [g]overnment termed a federal tax 'subsidy'—to finance its capital expenditures."  *Id.* at 24 (internal citations omitted).

The government claims *Pacific Far East* and *Oglebay Norton* "have no bearing on the proper allocation of the basis among all of the assets, tangible and intangible, that [p]laintiffs purchased."  Gov't Resp. at 30.  The government states these cases held taxpayers were able to increase the basis of their ships in the amount of a tax credit received.  *See id.* at 29–30.  The government alleges this case does not apply to plaintiffs because Section 48 does not allow plaintiffs to include a yet-to-be-received Section 1603 grant—unlike the tax credit that could be added to the basis of the ships in these cases—in their basis because plaintiffs had not even received the grant yet, whereas the taxpayers in these cases had already received the tax credit in order to increase basis by that amount.  *See id.* at 30.

Plaintiffs further cite Tax Court cases to suggest the phrase "shall be taken into account" means "included" and "shall not be taken into account" means "not included."  Pls.' MSJ Mem. at 11 (citing *Weil v. Comm'r*, 23 T.C. 424, 428 (1954); *Rogers v. Comm'r*, T.C.M. (RIA) 2004-245, at *1 (T.C. 2004)).

The government refutes plaintiffs' discussion of *Weil v. Commissioner*.  The government notes in *Weil*, the taxpayer had deductions in excess of his taxes owed on ordinary income; however, the taxpayer had capital gains and sought to offset those capital gains with the deductions taxpayer had from his ordinary income.  Gov't Resp. at 26 (citing *Weil*, 23 T.C. at 428).  *Weil* rejected the taxpayer's argument the phrase "shall be taken into account" allowed him to include his capital gains in his ordinary income calculations and use the deductions to offset the gains; "shall be taken into account" only meant "'including [capital gains] in the computation of gross income'—not included in net income directly."  *Id.* (citing *Weil*, 23 T.C. at 431).  The government avers *Weil* shows "shall be taken into account" does not always automatically mean "include" as plaintiffs assert.  *Id.*

Plaintiffs argue a later Court of Claims case, *Cameron Iron Works*, clarified the rule—in *Pacific Far East* and *Oglebay Norton Company*—basis is not reduced on account of received ITCs unless Congress expressly provides for a basis to exclude a tax benefit.  Pls.' MSJ Mem. at 24–25 (citing *Cameron Iron Works v. United States*, 621 F.2d 406 (Ct. Cl. 1980)).  Plaintiffs argue Congress did not make an "'express provision' for eligible basis to be reduced by the value of any Section 1603 cash grant" and therefore precedent "mandates that the value of the grant be included in calculating [p]laintiffs' Section 1603-eligible basis." *Id.* at 25.

Plaintiffs also assert bankruptcy caselaw provides an appropriate analogy with which to analyze the Section 1603 cash grants as includible in basis.  Pls.' MSJ Mem. at 25–27 (citing *Alta Wind I*, 897 F.3d at 1376 n.8).[7]  Plaintiffs' cited bankruptcy cases relate to basis in the low-income housing tax credit ("LIHTC") context, where the tax benefit was specifically excluded from basis in the statutory language.  *See* Pls.' MSJ Mem. at 25–28.

The government raises a policy argument against allowing the cash grant to be included into basis by asserting the version of calculations offered by plaintiffs is against the policy of Section 1603 and IRC Section 48 because it would provide a windfall to plaintiffs and would lead to "absurd results."  Gov't's Resp. at 32.  The government argues including the value of the cash grant in the basis would allow plaintiffs to "falsely inflate the value" of the cash grant.  *Id.* The government goes through a hypothetical of how the circular, erroneous math would work. *Id.*  Supposing a 100-million-dollar basis, a 30 percent grant would be 30 million dollars; the 30 million dollars would be added into basis, resulting in a 130-million-dollar basis and a 39-million-dollar grant (30 percent of 130 million dollars)—and the circular math would continue "ad infinitum." *Id.*

Plaintiffs argue "the government's policy argument for excluding the value of the grant from plaintiffs' eligible basis is precluded by the plain words of the [T]ax [C]ode and binding precedent in this circuit."  Pls.' MSJ Mot. at 28.  Plaintiffs characterize the government as "deploy[ing] a naked policy argument:  that including the grant value as part of eligible basis purportedly is inequitable because it increases the amount of the grant to which Plaintiffs are entitled." *Id.*  Plaintiffs present the government's policy argument as expressly opposed to congressional directive:  "[Congress] has instructed that the grant 'shall be taken into account in determining the basis of the property to which such grant relates[,]' and 'even the most formidable policy arguments cannot overcome a clear statutory directive.'" *Id.* (quoting I.R.C. § 48(d)(3)(B); *BP P.L.C. v. Mayor and City Council of Baltimore,* 141 S.Ct. 1532, 1542 (2021) (citation and internal quotation marks omitted)).  Plaintiffs also note "binding precedent in this Circuit establishes that 'the tax statutes and regulations must be applied as written and without any equitable consideration of the desirability of offsetting prior tax benefits.'" *Id.* (quoting *Pacific Far East*, 544 F.2d 485–86).

---

[7] Plaintiffs made a similar argument in 2018, as summarized by the Federal Circuit:

> Plaintiffs argue that the portion of the purchase price attributable to the expected [S]ection 1603 grants and any associated indemnities are not separate from the value of the windfarms' tangible personal property.  Relying on bankruptcy cases that hold that a tax benefit is treated as part of an asset, . . . they argue that the same should be true of the cash grant.

*Alta Wind I*, 897 F.3d at 1376 n.8 (internal citations omitted).

Plaintiffs, in their reply, argue including the grant in eligible basis comports with Section 1060. Pls.' Reply at 16. Plaintiffs contend Section 48(d)(3)(B) instructs "the grant is part of the basis of the property to which such grant relates, *i.e.*, the Class V energy-producing property. Accordingly, the grant value must be included in the FMV of that Class V property for purposes of the Section 1060 allocation." *Id.* at 17. Plaintiffs cite for support the "legal principle that cash flows stemming from ownership of property are components of the property itself." *Id.* at 18. Plaintiffs' language regarding Sections 48(d)(3)(B) and 50(c) in their initial brief is unclear as to whether plaintiffs argue for: (1) *only* the incremental consideration included in the grant-eligible FMV basis of the windfarm's tangible property allocated to the Class V asset category; or (2) the incremental consideration *and the value of the grant received itself* included into basis to then circularly calculate the grant due from that grand-total basis. *See generally* Pls.' MSJ Mem. (arguing "both express statutory language and controlling precedent in this Circuit prohibit the cash grant from being treated as a separate grant-ineligible asset"). Plaintiffs seemed to clarify in their reply brief they were only arguing the first option: "Plaintiffs' basis is what they spent, not that amount plus the later grant payment." Pls.' Reply at 16 ("Section 48(d)(3)(B) mandates that any amount [p]laintiffs paid because the energy-producing property was eligible for a grant be included in the basis of that property. But it does *not* provide for the grant payment ultimately received to be tacked on to eligible basis—either in [p]laintiffs' case or in the [g]overnment's strawman hypothetical."). At oral argument, plaintiffs explained—and confirmed several times—they do argue for the inclusion of the grant in basis and therefore receiving a grant on the value of the grant. *See* Tr. at 13:23–24 ("THE COURT: . . . [D]oes [the grant] go into basis? [PLAINTIFFS]: Yes, Your Honor."), 14:20–23 ("THE COURT: At minimum, do you argue that the value of the cash grant itself should be included in the basis? [PLAINTIFFS]: Yes, Your Honor."), 17:16–17 ("[PLAINTIFFS]: . . . [I]n valuing that tangible eligible property, you include the cash grant."), 50:25 ("[PLAINTIFFS]: . . . [T]he cash grant is included in determining the basis."), 62:2–3 ("[PLAINTIFFS]: The grant itself goes into the basis."), 81:19–22 ("THE COURT: But you're adding the cash grant into the basis for the purposes of calculating the cash grant. [PLAINTIFFS]: As you would.").

In determining "whether the cash grant entitlement . . . [is a] separate intangible[]," the government argues the incremental consideration paid for the anticipated Section 1603 cash grant is properly allocated as basis for a grant-ineligible intangible asset. *See* Gov't's Resp. at 37–38; *Alta Wind I*, 897 F.3d at 1376 n.8.[8] The government disputes plaintiffs' assertion the FMV of the tangible property *includes* the incremental consideration paid for the anticipated Section 1603 cash grant. Gov't's Resp. at 37–38. The government argues the incremental consideration is, instead, properly allocated as basis to the Class VII asset category as residual goodwill because the incremental consideration is a separate intangible asset bargained for in plaintiffs' transaction. *See id.* at 38 ("Plaintiffs paid amounts in excess of the sum of the [FMV] of underlying assets. . . . [T]he excess is residual goodwill."). As a separate intangible asset, the government advances the incremental consideration is ineligible for inclusion in the basis used to calculate the Section 1603 cash grant for the windfarm's tangible property. *Id.* at 37–38.

In arguing the incremental consideration is a separate intangible asset properly

---

[8] In 2018, the Federal Circuit specified "whether the cash grant entitlement or associated indemnities are separate intangibles" was to be decided by this court on remand. *Alta Wind I*, 897 F.3d at 1376 n.8; *see supra* n.7.

categorized under Class VII goodwill, the government highlights relevant Treasury regulations and explanations, which contain temporary regulations relating to particular rules and provide guidance concerning the application of certain sections. *See* Gov't's Resp. at 33 (citing Treas. Reg. § 1.338-6(c); TD 8215, 53 FR 27035-01, 1988 WL 278840 (explaining Temp. Treas. Regs., including § 1.1060-1T)); *see generally* I.R.M. 32.1(1) (2019) (providing an overview of the Treasury regulations process). As the Federal Circuit directed basis allocation pursuant to Section 1060, the government emphasizes corresponding regulations which limit basis allocated to Class V tangible property to the FMV of the property on the day after the transaction. *See Alta Wind I*, 897 F.3d at 1376 ("The Alta transactions['] . . . purchase prices must be allocated using the residual method."); Gov't's Resp. at 33; Treas. Reg. § 1.338-6(c)(1) ("The amount . . . allocated to an asset (other than Class VII assets) cannot exceed the [FMV] of that asset at the beginning of the day after the acquisition date."). The incremental consideration should be allocated as Class VII goodwill, according to the government, because the purchase price reflected an increase above the FMV of the tangible property due to the anticipated tax benefit. *See* Gov't's Resp. at 22–23, 37–38.

## B.   Whether the Associated Indemnities Are Separate Assets for Purposes of Applying IRC Section 1060

Plaintiffs argue "[t]he cash grant indemnities . . . are simply the flip side of the grants themselves . . . because eligible basis may not be reduced on account of the cash grants themselves, neither may it be reduced on account of the 'associated indemnities.'" Pls.' MSJ Mem. at 3–4. "[I]t is a legal mandate under Tax Code Section 48(d)(3)(B) that the grant be included in the basis of the Section 1603-eligible property. It necessarily follows that indemnities that simply ensure [p]laintiff's receipt of those grant payments do not affect [p]laintiffs' Section 1603-eligible basis." *Id.* at 30.

The government alleges the associated indemnities should be allocated similarly to the incremental consideration for the anticipated Section 1603 cash grants: as grant-ineligible intangible assets. *See* Gov't's Resp. at 38–40. The government argues the indemnifications added value to the transaction purchase price in and of themselves. *See id.* at 39 ("Without the indemnities, the transaction likely would either have fallen apart or been consummated at lower price levels. . . . The value allocable to the indemnities is a question for trial. But clearly, they had value."). Plaintiffs paid more than the FMV of the tangible property for the windfarm by paying for "the expected grant award plus the indemnities [which] became the identifiable, dollar-for-dollar sums that [p]laintiffs purchased." *Id.* This portion of the increased purchase price beyond the FMV of the tangible property, the government contends, is not properly allocable as basis to the Class V asset category for tangible property; the increased portion paid for the indemnities is properly treated as a separate intangible asset allocated to the Class VII asset category as residual goodwill in the same manner as the incremental consideration for the anticipated Section 1603 cash grants should be allocated as goodwill. *See id.* at 39–40. The government alternatively argues the incremental consideration attributable to the indemnifications could be allocated under the Class VI asset category as a contract right, which still categorizes the indemnifications as a separate grant-ineligible intangible asset. *See id.* ("But to the extent the Court concludes that the complex web of contractual rights and obligations associated with the anticipated grants, including indemnities, transformed grant expectancies into

contract rights, the Court must allocate some or all of those sum-certain amounts to contract right intangibles, with any leftover accounted for as goodwill.").

### C.     Whether Material Facts Contravene Plaintiffs' Legal Analysis

The government notes it "intends to offer expert rebuttal testimony at trial in support of the proposition that the purchase price for the windfarm businesses in excess of the sum of FMVs of individual assets is accounted for as residual goodwill, even where that excess arises out of the purchase of tax benefits associated with individual assets." Gov't Resp. at 12.  The government presents "fact-based evidence" for "trial." *Id.*  The government's brief extensively details the factual history of the legislative scheme, plaintiffs' windfarm transactions, expert testimony regarding valuation, and accounting practices regarding allocation of tax benefits. *Id.* at 12–23.  At oral argument, however, the government agreed the allocation of a category of assets, such as grants or premiums, pursuant to Treasury regulations is a question of law, and the valuation of those assets is a question of fact, which plaintiffs do not raise in their Motion. *See* Tr. at 24:11–14 ("[THE GOVERNMENT]: . . . [T]he classification of the particular thing . . . is a question of law . . . ."), 25:1–2 ("[THE GOVERNMENT]: . . . [C]onstruing the regulation, . . . 1.338-6, yeah, that's a matter of law.").  Plaintiffs do not address underlying factual disputes in their briefing. *See* Pls.' MSJ Mem.; Pls' Reply.

## IV.     Whether Allocation of Basis Attributable to Grants, Premiums, and Indemnities is a Question of Law or Fact

As summary judgment cannot be granted where questions of material fact exist, the Court begins by analyzing whether basis allocation for premiums and indemnities raises factual issues. *See* RCFC 56(a).  Examining the guidance from the Federal Circuit in 2018, the circuit left for resolution "whether the cash grant entitlement or associated indemnities are separate intangibles." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376 n.8 (Fed. Cir. 2018).  Section 1060 applies to plaintiffs' asset acquisition of various windfarms from Terra-Gen and requires basis allocation in an asset acquisition in the same manner as basis allocation in a stock acquisition, as described in IRC Section 338 and Treasury Regulation Section 1.338–6. *See id.* at 1372–77; I.R.C. §§ 338, 1060; Treas. Reg. § 1.338–6(b), (c).  As the Federal Circuit described, Tax Code Sections 338 and 1060 and Treasury Regulations Section 1.338–6(b)–(c) require basis allocation via the residual method across seven asset classes; in other words, the FMV of each asset "at the beginning of the day after the acquisition date" must be allocated to each asset category with any residual basis allocated to the Class VII asset category.  Treas. Reg. § 1.338–6(c); *see Alta Wind I*, 897 F.3d at 1376.  Section 1603 of the ARRA allows for the grant to be 30 percent of the basis of the "qualified facility" as described in IRC Section 48(a)(5)(D), which in turn describes "qualified property" as "tangible personal property," among other definitional requirements.  ARRA § 1603; I.R.C. § 48(a)(5)(D)(i)(I).  The Federal Circuit elaborated on the differences between tangible and intangible assets because the grant is only allowable for basis attributable to "tangible personal property." *See Alta Wind I*, 897 at 1377; *see also Desert Sunlight 250, LLC v. United States*, 157 Fed. Cl. 209, 239 (2021) ("Because this is a Section 1603 cash grant case, what matters most is the value of the Class V tangible assets in which Section 1603-eligible tangible assets fall, not the value of the Class VI or VII intangible assets.").  Specifically, any "turn-key value is considered part of the tangible assets in a

transaction rather than a separate intangible asset"—such as goodwill or going concern value. *Alta Wind I*, 897 at 1377 (citing *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974). Under the residual method of basis allocation, the FMV of the tangible assets, including any turn-key value, is categorized as Class V assets, while all other intangible assets, including going concern value and goodwill, are categorized as Classes VI and VII. *See Alta Wind I*, 897 at 1376–77 ("[T]urn-key value . . . is the incremental value 'a buyer would pay . . . for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.'" (citing *Miami Valley Broad. Corp.*, 499 F.2d at 680)); Treas. Reg. § 1.338–6. Plaintiffs do not argue for inclusion of the grants because they are part of turn-key value. *See* Pls.' MSJ Mem.; Pls.' Reply; Tr. at 106:9–14 ("THE COURT:  So, do you argue that the turn-key value includes the grants?  [PLAINTIFFS]: Well, the value—I'm not sure I'm—I'm not sure whether . . . you would equate the turn-key value to the value of the grants. They are both things that are part of the value of the property."). The Court therefore considers:  (1) whether allocation of basis attributable to the grants and premiums raises factual issues; and (2) whether allocation of basis attributable to the indemnities raises factual issues.

### A.    Basis Allocation Attributable to Grants and Premiums

Plaintiffs assert the determination of whether "the value of the cash grant is a component of the Alta facilities' eligible tangible property" should be resolved "as a matter of law." Pls.' Reply at 1. For purposes of their Motion, plaintiffs focus on which components are part of the grant-eligible basis as a legal matter, not the valuations or valuation methods. *See id.* At oral argument, the government agreed the application of Treasury Regulation Section 1.338–6 to categories of assets is a question of law separate from any question of fact as to the valuation or exact dollar values that would be attributable to specific categories. *See* Tr. at 24:11–14 ("[THE GOVERNMENT]:  . . . [T]he classification of the particular thing . . . is a question of law . . . ."), 25:1–2 ("[THE GOVERNMENT]:  . . . [C]onstruing the regulation, . . . 1.338–6, yeah, that's a matter of law."). As both parties agree the categorization of the grants and premiums is a question of law, the Court proceeds with analyzing the parties' arguments regarding partial summary judgment on these issues *infra*.

### B.    Basis Allocation Attributable to Indemnities

At oral argument, the parties agreed material issues of fact arose for indemnities, although they identified separate factual issues. Both parties argue separate factual issues exist. The government asserts categorizing the indemnities—either as premium consideration or as a contract right—is a factual issue which will be addressed by the recently granted discovery. *See* Tr. at 114:22–23 ("[THE GOVERNMENT]:  . . . [U]nlike just excess premium consideration, an indemnity is a contract right."), 116:8–13 ("[THE GOVERNMENT]:  To the degree that Your Honor concludes [as a factual matter] the contracts had value on the purchase dates, yes, it goes in a different [allocation class]. . . .  Because contract rights are different than just a premium price.").

Plaintiffs characterize whether the indemnities are common in the industry—and therefore should not have any value allocated to them pursuant to binding precedent—as a

factual issue.[9]  Tr. at 120:20–121:6 ("[PLAINTIFFS]: . . . [T]here's another legal principle which . . . is that if . . . an indemnity . . . is commonly provided in the industry as a matter of course, then it is not given separate value.  Now, that triggers a factual question as to whether . . . these kinds of indemnities are common in [the industry]."); *see* Pls.' MSJ Mem. at n.8 (citing *A.A.B. Joint Venture v. United States*, No. 04-1719, 2008 WL 4415054, at *6 (Fed. Cl. Sept. 24, 2008) ("A warranty amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue."); *Houchins v. Comm'r*, 79 T.C. 570, 594 (1982) (contractual warranties that are offered as the standard practice of an industry are not allocated value because they "add nothing to the established [FMV] of the" object sold); *Grodt & McKay Realty, Inc. v. Comm'r*, 77 T.C. 1221, 1239 (1981) (same)).  As both parties raise different factual issues regarding the allocation of indemnities, the Court denies plaintiffs' Motion for Partial Summary Judgment to the extent they request summary judgment on the allocation of indemnities.  *See* RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The Court accordingly does not decide any factual determinations, including the admissibility of expert reports or testimony, in this Opinion and Order.

## V.    Statutory Interpretation of IRC Section 48(d)(3)(B)

"The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."  Antonin Scalia & Bryan A. Garner, READING LAW:  THE INTERPRETATION OF LEGAL TEXTS, 56 (2012).  The "context includes the purpose of the text," and "the purpose must be derived from the text, not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires."  *Id.*  As a guiding principle, the Court must not go "beyond the borders of the statute."  *United States v. Great N. Ry. Co.*, 287 U.S. 144, 154 (1932).  Plaintiffs argue IRC Section 48 directs the inclusion of the grant in eligible basis.  The government disagrees, asserting Section 48(d)(3)(B) governs depreciation, not calculation of the grant.  The Court accordingly must interpret the statute and begins with the statutory language.  *See BASR P'ship v. United States*, 795 F.3d 1338, 1342 (Fed. Cir. 2015) ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.  Section 48 provides:

> In the case of any property with respect to which the Secretary makes a grant under [S]ection 1603 of [ARRA] . . . Any such grant . . . shall be taken into account in determining the basis of the property to which such grant relates, except that the basis of such property shall be reduced under [S]ection 50(c) in the same manner as a credit allowed under [S]ubsection (a).

---

[9] Plaintiffs present the argument regarding whether the indemnities are common in the industry in the alternative, arguing first the indemnities should not be allocated any value because they are "the flip side of the grants themselves[.]"  Pls.' MSJ Mem. at 29–30, 30 n.8; *see* Tr. at 121:6–12 ("[PLAINTIFFS]: . . . [W]e should win on the indemnification issue for reasons of law without having to reach [the factual question as to whether this is a common industry practice].  But if Your Honor were to, for some reason, rule against us on the arguments we've advanced on the indemnification issue, then I do want to make plain we do have this additional [factual] argument.").  Plaintiffs, however, cite no authority in their briefs regarding allocation to indemnities, relying on the Federal Circuit's use of the phrase "associated indemnities" in connection with the cash grants and caselaw regarding the effect of an indemnity on an affirmative defense.  Pls.' MSJ Mem. at 29–30; Pls.' Reply at 19–20.  The Court was able to find caselaw classifying an indemnity as an intangible.  *See Dyer v. Comm'r*, 211 F.2d 500, 504 (2d Cir. 1954) (identifying "an intangible- such as . . . an indemnity against loss").

I.R.C. § 48(d)(3)(B).  Section 50(c), in turn, provides:

> For purposes of this subtitle, if a credit is determined under this subpart with respect to any property, the basis of such property shall be reduced by the amount of the credit so determined[,]

but

> In the case of any energy credit . . . only 50 percent of such credit shall be taken into account under paragraph (1)[.]

I.R.C. § 50(c)(1), (3)(A).  The Court first addresses the plain meaning of Section 48(d)(3)(B) and plaintiffs' citations to comparable statutory language before analyzing the structure of Section 48.

## A.    Plain Meaning and Comparable Statutory Language

The Court begins with the text of the statute to determine whether it requires including the grant in basis for grant calculation purposes.  The Supreme Court stated in *Flora*, "This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments." *Flora v. United States*, 362 U.S. 145, 150 (1960); *see also* Scalia & Garner, *supra*, at 140 ("Words are to be given the meaning that proper grammar and usage would assign them."). Examining the grammar of plaintiffs' proffered provision, the beginning of Section 48(d)—"In the case of any property with respect to which the Secretary makes a grant under [S]ection 1603"—gives the timeframe Section 48(d) considers:  after calculation of a grant, that is, once "the Secretary makes a grant[.]"  If Section 48(d) applied to calculation, the text could have used future tense ("the Secretary *will* make a grant"), used a modal verb expressing possibility ("the Secretary *could* make a grant"), or focused on the application for rather than the making of the grant ("*the property owner applies for* a grant") to indicate the timeframe was before the grant issues.  The statute instead uses the present tense "makes," demonstrating "a grant"—the object of "makes"—is a present reality rather than a future possibility.  I.R.C. § 48(d).  When Section 48(d)(3) continues with the language "[a]ny such grant[,]" the plain meaning of "such"—"of the type previously mentioned"—shows the "grant" discussed in Subsection (3) is the same grant "mentioned" at the beginning of Section 48(d):  a grant "the Secretary makes"; a present reality. *Such*, Oxford Dictionary of English (3d ed. 2010); *see also Such*, Webster's Third New International Dictionary (2002) ("previously characterized or specified"); *Such*, Black's Law Dictionary (11th ed. 2019) ("That or those; having just been mentioned").  The specific Section plaintiffs cite, Section 48(d)(3), then discusses the same existing grant:  "Any *such* grant . . . shall be taken into account in determining the basis of the property to which *such* grant relates . . . ."  I.R.C. § 48(d)(3)(B) (emphasis added).  "[D]etermining the basis" must then occur after "the Secretary makes a grant" based on the temporal context of the Subsection.  *Id.*  The basis determination therefore cannot be for the purpose of calculating the grant under the plain language of the statute because that plain language contemplates a presently existing grant rather than a future grant in need of calculation.  *Id.*; *see Such*, Oxford Dictionary of English (3d

ed. 2010); *Flora*, 362 U.S. at 150 ("This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant to a construction of those enactments."); Scalia & Garner, *supra*, at 140.

Turning to plaintiffs' statutory comparison arguments, plaintiffs first draw a comparison between "shall be taken into account" in Section 48(d)(3)(B) and "not taken into account" in IRC Section 42(d)(5)(A).  The Court agrees with plaintiffs "taken into account" in both Section 42(d)(5)(A) and Section 48(d)(3)(B) means "included."  The implication of the words "shall be taken into account" in Section 48(d)(3)(B) depends on context, however, and this comparison cannot add a grant calculation context—explaining when the grant must be included—that does not exist in, and is contradicted by, the plain language of Section 48(d)(3)(B).  *See BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); Tr. at 89:18–20 ("[PLAINTIFFS]:  The plain meaning of the text . . . would generally trump everything under normal interpretation.").  Section 42(d)(5)(A) relates to basis determinations for LIHTC and provides "[f]ederal grants not taken into account in determining eligible basis.—The eligible basis of a building shall not include any costs financed with the proceeds of a federally funded grant."  Plaintiffs argue Section 42(d)(5)(A)'s "taken into account" language as an example in the Tax Code where that phrase directs inclusion—or here, exclusion—of an amount in basis.  Pls.' MSJ Mem. at 9.  The LIHTC is "an amount equal to the applicable percentage of the qualified basis."  I.R.C. § 42(a).  The provision plaintiffs cite, Section 42(d)(5)(A), directs eligible basis for purposes of calculating the LIHTC "shall not include any costs financed with the proceeds of a federally funded grant."  The plain language of Section 42(d)(5)(A) contemplates two government benefits, the LIHTC and a separate federal grant—not one benefit.  Section 42(d)(5)(A) directs other government benefits received in connection with the low-income housing (i.e., federally funded grants) "shall not" be included in the eligible basis of the property for purposes of calculating this government benefit, the LIHTC.  I.R.C. § 42(d)(5)(A).  Plaintiffs cite Section 42(d)(5)(A) as support for the argument Section 48(d)(3)(B) directs the inclusion of one government benefit in calculating itself; plaintiffs argue the value of one government benefit (i.e., the Section 1603 cash grant) should be included in the basis of the eligible property to then determine the value of that same government benefit.  Pls.' MSJ Mem. at 9.  While the language of Section 42(d)(5)(A) is similar to that of Section 48(d)(3)(B), the inclusion of two government benefits in the LIHTC provision militates against plaintiffs' proffered interpretation of Section 48(d)(3)(B), which focuses only on one benefit and therefore cannot support a recursive calculation interpretation.  *Compare* I.R.C. § 42(d)(5)(A) ("Federal grants not taken into account in determining eligible basis.—The eligible basis of a building shall not include any costs financed with the proceeds of a federally funded grant."), *with* I.R.C. § 48(d)(3)(B) ("Any such grant—shall be taken into account in determining the basis of the property to which such grant relates, except that the basis of such property shall be reduced . . . .").  Plaintiffs further cite two bankruptcy cases, *In re Lewis & Clark Apartments, LP* and *In re Creekside Senior Apartments, LP*, which required the LIHTC to be included in the valuation of real property during bankruptcy proceedings.  Pls.' MSJ Mem. at 25–27 (citing *In re Lewis & Clark Apartments, LP*, 479 B.R. 47 (8th Cir. BAP 2012); *In re Creekside Senior Apartments, LP*, 477 B.R. 40 (6th Cir. BAP 2012)).  The cases are distinguishable as both *In re Lewis & Clark Apartments, LP* and *In re Creekside Senior Apartments, LP* occur in the context of bankruptcy rather than Section 1060 basis

allocation, and neither discusses including the LIHTC in basis to recursively calculate itself.[10] *See generally In re Lewis & Clark Apts., LP*, 479 B.R. 47; *In re Creekside Senior Apts., LP*, 477 B.R. 40. Plaintiffs do not persuade the Court the phrase "shall not include," while meaning a certain portion of basis is excluded in calculating the LIHTC pursuant to Section 42(d)(5)(A), translates to Section 48(d)(3)(B) requiring the inclusion of the value of the grant in calculating the grant itself. *BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.

Second, plaintiffs raise IRC Section 32(c) for the meaning of "shall be taken into account" and assert the language requires including the grant in basis to calculate itself. The Court agrees with plaintiffs "taken into account" in both Section 32(c) and Section 48(d)(3)(B) means "included." The implication of the words "shall be taken into account" in Section 48(d)(3)(B) depends on context, however, and this comparison cannot add a grant calculation context—explaining when the grant must be included—that does not exist in, and is contradicted by, the plain language of Section 48(d)(3)(B). *See BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); Tr. at 89:18–20 ("[PLAINTIFFS]: The plain meaning of the text . . . would generally trump everything under normal interpretation."). Section 32(c) is the Earned Income Tax Credit ("EITC"), a tax credit for low-income individuals and families calculated from the individual's taxpayer amount of earned income and number of dependents. I.R.C. § 32(c). Section 32(c)(2)(B)(ii)–(v) lists various sources of income that "shall [not] be taken into account"[11] when calculating the individual taxpayer's earned income upon which the EITC will be based. Section 32(c) directs pensions and annuities be excluded from earned income; income earned by "nonresident alien individuals" be excluded from earned income; income earned by an individual as "an inmate at a penal institution" be excluded from earned income; and income earned from "service performed in work activities as defined in" the Social Security Act (describing mandatory work requirements; "work experience" and "community service programs" are specifically referenced by the Tax Code) be excluded from earned income. I.R.C. § 32(c)(2)(B)(ii)–(v). Plaintiffs contend Section 32(c)'s "taken into account" language shows the phrase directs inclusion of an amount in basis. Pls.' MSJ Mem. at 9–10 (citing I.R.C. § 32(c)). The EITC provisions referenced by plaintiffs detail certain forms of income earned by individuals that are excluded from any calculation of the individual's earned income (e.g., wages earned while imprisoned). I.R.C. § 32(c)(2)(B)(ii)–(v). As with the LIHTC, Section 32(c) excludes certain "outside" sources of income for purposes of calculating the government benefit

---

[10] The Sixth Circuit in *In re Creekside Senior Apartments, LP* held the tax benefit was part of the property, running with the land, and must be included in the bankruptcy valuation of the property. 477 B.R. 40, 55–56, 60 (6th Cir. BAP 2012). The court stated if the LIHTC property is sold prior to the end of the compliance period and there are remaining credits, then "the credit allowable . . . to the taxpayer for any period after such acquisition shall be equal to the amount of credit which would have been allowable . . . for such period to the prior owner . . . had such owner not disposed of the building." *Id.* at 55 (quoting I.R.C. § 42 (d)(7)(A)(ii)) (internal quotations and emphasis omitted). The Eighth Circuit in *In re Lewis & Clark Apartments, LP* relied on *In re Creekside Senior Apartments* to reach the same conclusion. 479 B.R. 47, 53 (8th Cir. BAP 2012) (discussing *In re Creekside Senior Apartments*).

[11] While Section 32(c)(2)(B)(ii)–(v)—calculating an individual taxpayer's earned income upon which an EITC will be based—uses the language "shall be taken into account," each subsection begins with the phrase "no amount." For example: "[N]o amount received as a pension or annuity shall be taken into account[.]" I.R.C. § 32(c)(2)(B)(ii). Rearranging the placement of the negative, Section 32(c)(2)(B)(ii) is grammatically equivalent to "an amount received as a pension or annuity shall not be taken into account."

at issue in the provision, the EITC.  *Id.*  Section 32(c) does not direct the inclusion of the value of the EITC in an individual's earned income for purposes of then calculating the EITC.  *Id.*  The EITC therefore does not support plaintiffs' argument Section 48(d)(3)(B) directs the inclusion of the Section 1603 cash grant value for purposes of calculating the value of the grant.  I.R.C. § 32(c); *BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.

Third, plaintiffs raise IRC Section 907(c)(3) for the meaning of "shall be taken into account" and assert the language requires including the grant in basis to calculate itself.  The Court agrees with plaintiffs "taken into account" in both Section 907(c)(3) and Section 48(d)(3)(B) means "included."  The implication of the words "shall be taken into account" in Section 48(d)(3)(B) depends on context, however, and this comparison cannot add a grant calculation context—explaining when the grant must be included—that does not exist in, and is contradicted by, the plain language of Section 48(d)(3)(B).  *See BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); Tr. at 89:18–20 ("[PLAINTIFFS]:  The plain meaning of the text . . . would generally trump everything under normal interpretation.").  Section 907 reduces the allowable credit a corporation would have been able to take when the tax paid to a foreign government was based on oil and gas income.  Plaintiffs cite Section 907(c)(3), which defines "dividends, interest, [and] partnership distribution[s]" for purposes of calculating the "foreign oil and gas extraction income" and "foreign oil related income" this specific version of the foreign tax credit ("FTC") is based on.[12]  Certain kinds of interest payments received are includible in this category of income; however, Section 907(c)(3) describes other kinds of interest which "shall not be taken into account in computing foreign-oil related income."  Plaintiffs contend Section 907(c)(3)'s "shall (not) be taken into account" language shows the phrases direct the exclusion or inclusion of an amount in basis.  Pls.' MSJ Mem. at 10 (citing I.R.C. § 907(c)(3)).  Section 907(c)(3) does not support plaintiffs' argument Section 48(d)(3)(B) directs the inclusion of the grant in the basis to then calculate this same grant because Section 907 does not discuss calculating the FTC based on itself.  Section 907(c)(3) excludes certain kinds of income for purposes of calculating an FTC, a government benefit; Section 907(c)(3) of the Tax Code does not stand for using the FTC received to recursively calculate the appropriate amount of the FTC.  The FTC therefore does not support plaintiffs' argument Section 48(d)(3)(B) directs the inclusion of the Section 1603 cash grant value for purposes of calculating the value of the grant.  I.R.C. § 907(c)(3); *BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.

Fourth, plaintiffs raise IRC Section 6409 for the meaning of "shall not be taken into account" and assert the language requires including the grant in basis to calculate itself.  The Court agrees with plaintiffs "taken into account" in both Section 6409 and Section 48(d)(3)(B) means "included."  The implication of the words "shall be taken into account" in Section 48(d)(3)(B) depends on context, however, and this comparison cannot add a grant calculation

---

[12] Section 907 relates to calculating the allowable FTC, a credit determined upon the amount of taxes paid to foreign governments.  I.R.C. § 907; *see* I.R.C. § 901 (relating to taxes of foreign countries and of possessions of United States).  Section 907 specifically relates to taxes paid to foreign governments based on oil and gas income in that foreign jurisdiction.  I.R.C. § 907.

context—explaining when the grant must be included—that does not exist in, and is contradicted by, the plain language of Section 48(d)(3)(B).  *See BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); Tr. at 89:18–20 ("[PLAINTIFFS:  The plain meaning of the text . . . would generally trump everything under normal interpretation.").  Section 6409 provides federal tax refund amounts received are excludible from an individual's taxable income:  "any refund . . . made to any individual under this title shall not be taken into account as income."  Plaintiffs contend Section 6409's "shall not be taken into account" language shows the phrase directs the exclusion of an amount from basis.  Pls.' MSJ Mem. at 10–11.  The exclusion of a federal tax refund—for these purposes, characterized as a government benefit conferred on the taxpayer—from earned income—which plaintiffs analogize to basis—is still the exclusion of a government benefit for making certain *other* calculations (i.e., amount of taxable income).  Section 6409 does not stand for a government benefit—the tax refund—to be includible in income for purposes of then calculating any tax refunds based on that income.  Likewise, Section 48(d)(3)(B) does not require the inclusion of the value of the grant in basis for purposes of calculating the grant.  Section 6409 therefore does not support plaintiffs' argument Section 48(d)(3)(B) directs the inclusion of the Section 1603 cash grant value for purposes of calculating the value of the grant.  *BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.

Plaintiffs finally raise IRC Section 47 as an example of Congress expressly excluding a benefit in calculating basis, which they argue Congress did not do for Section 1603.  Section 38 of the Tax Code authorizes an ITC described in Section 46.  Section 46 describes various ITCs, such as the rehabilitation credit (IRC Section 47) and the energy credit relevant in this case (IRC Section 48).  The rehabilitation credit described in Section 47 allows a business tax credit for placing qualified rehabilitated buildings in service.  Plaintiffs cite a provision from Section 48 stating "[t]he energy percentage shall not apply to that portion of the basis of any property which is attributable to qualified rehabilitation expenditures."  Pls.' MSJ Mem. at 19 (quoting § 48(a)(2)(B)) (internal quotations omitted).  Even plaintiffs' explanation of Section 47 acknowledges there are two separate benefits involved:  "By this provision, a taxpayer is required to exclude from its eligible basis any expenditure for which a credit is available under [S]ection 47 for purposes of calculating the energy credit due to it under [S]ection 48."  *Id.* (emphasis omitted).  Section 47 does not direct such circular calculations, nor does Section 48.  *BASR P'ship*, 795 F.3d at 1342 ("Statutory interpretation begins with the words of the statute."); Scalia & Garner, *supra*, at 56.

## B.    Statutory Structure

The Court next considers the structure of the statutory scheme.  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012); *see BASR P'ship*, 795 F.3d at 1343 ("[A court] cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").

Section 48 has several subsections covering different topics, which the Court examines to understand whether Section 48(d)(3)(B) relates to calculation.  First, Subsection (a) describes the energy credit—upon which the Section 1603 grant is based—and its calculation, including:

> defining the energy credit, § 48(a)(1) ("the energy credit for any taxable year is the energy percentage of the basis of each energy property placed in service during such taxable year"),
> defining the energy percentage, § 48(a)(2),
> defining energy property, § 48(a)(3), and
>> defining qualified property, § 48(a)(5)(D).

This Subsection does not cross-reference Section 48(d)(3)(B), which plaintiffs contend applies to calculation.  The later Subsection (d) is titled "Coordination with Department of Treasury grants" and covers the interaction between the Section 48 credit and the Section 1603 grant, including:

> prohibiting recipients of the Section 1603 grant from receiving production and investment tax credits, § 48(d)(1),
> recapturing credits already determined for the property on which a Section 1603 grant is received, § 48(d)(2),
>> excluding the Section 1603 grant from gross income, § 48(d)(3)(A), and
>> applying Section 50(c)'s special basis reduction rule for Section 48 credits to Section 1603 grants, § 48(d)(3)(B).[13]

The structure of the statute weighs against plaintiffs' suggested interpretation because plaintiffs attempt to read a calculation rule into a subsection discussing the coordination of energy credits, grants, and further tax treatment while another subsection discusses calculation.  Section 48(a) discusses calculation, and plaintiffs make no convincing argument Section 48(d)(3)(B) alone discusses calculation when the rest of Section 48(d) discusses the interaction between the Section 48 credit and the Section 1603 grant.  *See Roberts*, 566 U.S. at 101 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *BASR P'ship*, 795 F.3d at 1343 ("[A court] cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").

Within Section 48(d)(3), there are two components:  Section 48(d)(3)(A), which describes post-issuance tax treatment of the grant ("Any such grant . . . shall not be includible in

---

[13] An IRS advice memorandum from the Office of Chief Counsel cited by the government accords with the Court's understanding of Section 48(d) *supra*:

> ARRA [S]ection 1104 added §[] 48(d) to the Code.  Section 48(d)(1) denies otherwise allowable tax credits under §§[ ]45 and 48 to [S]ection 1603 payment recipients.  Section 48(d)(2) requires the recapture of credits for progress expenditures for the taxable year in which a [S]ection 1603 payment is made for qualifying property.  Section 48(d)(3)(A) excludes [S]ection 1603 grants from gross income.  Section 48(d)(3)(B) provides that basis in the property is reduced by one-half of the amount of the [S]ection 1603 payment.

C.A.M. 2011-004 at 3 (Sept. 30, 2011); *see* Gov't's Resp. at 26–27.

the gross income or alternative minimum taxable income of the taxpayer"), and Section 48(d)(3)(B)—the provision the parties dispute regarding the basis of the property ("Any such grant . . . shall be taken into account in determining the basis of the property to which such grant relates, except that the basis of such property shall be reduced under [S]ection 50(c) in the same manner as a credit allowed under [S]ubsection (a)").  Section 48(d)(3)(A) connects to Section 48(d)(3)(B) with the conjunction "but," demonstrating the two provisions are topically connected but lead to different conclusions:  the grant is not included for certain tax purposes under (A) but is included for other tax purposes under (B).  "But" would cover a shift not only in inclusion versus exclusion but in purpose if the Court read in plaintiffs' interpretation of Section 48(d)(3)(B):  the grant is not included for certain post-issuance tax purposes under (A) but is included for pre-issuance calculation purposes under (B).  The structure of Subsection (3) therefore weighs against plaintiffs' suggested interpretation because both provisions, connected by the conjunction "but," are most naturally read to relate to post-issuance tax treatment of the grant.  *See Roberts*, 566 U.S. at 101 ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *BASR P'ship*, 795 F.3d at 1343 ("[A court] cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").

Finally, Section 48(d)(3)(B) refers to Section 50(c):  "Any such grant . . . shall be taken into account in determining the basis of the property to which such grant relates, except that the basis of such property shall be reduced under [S]ection 50(c) in the same manner as a credit allowed under [S]ubsection (a)."  Section 50(c) is a basis reduction rule.  *See* I.R.C. § 50(c)(1) ("For purposes of this subtitle, if a credit is determined under this subpart with respect to any property, the basis of such property shall be reduced by the amount of the credit so determined.").  It provides a "[s]pecial rule" for an energy credit:  "In the case of any energy credit or clean electricity investment credit . . . only 50 percent of such credit shall be taken into account under paragraph (1) . . . and . . . paragraph (1) shall not apply for purposes of determining eligible basis under [S]ection 42."  I.R.C. § 50(c)(3).  Plaintiffs then proffer an interpretation of Section 48(d)(3)(B) that is fragmented; the first clause—"shall be taken into account in determining basis of the property to which such grant relates"—relates to pre-issuance calculation, and the second clause—"except that the basis of such property shall be reduced under [S]ection 50(c) in the same manner as a credit allowed under [S]ubsection (a)"—relates to post-issuance tax treatment.  *See* Tr. at 85:14–20 ("[PLAINTIFFS]: . . . [I]f you did a cash grant of $100 million, that's not taxable income.  That's what [Section 48(d)(3)(A)] says.  And then [Section 48(d)(3)(B)]) says, but you do include it in the basis of the property and you're then going to take a 50 percent reduction for depreciation and other purposes just like you would if this . . . were an investment tax credit.").  Referring to a special basis reduction rule further reinforces Section 48(d)(3)(B) covers post-issuance basis reduction for tax purposes, not calculation of the grant.  *See Roberts*, 566 U.S. at 101 ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *BASR P'ship*, 795 F.3d at 1343 ("[A court] cannot determine the meaning of the statutory language without examining that language in light of its place in the statutory scheme.").

The plain language and structure of Section 48 provide an unambiguous interpretation of Section 48(d)(3)(B):  an existing grant is included in basis once it issues, subject to the special

basis reduction rule in Section 50(c)(3). *See BASR P'ship*, 795 F.3d at 1342. The plain meaning of Section 48(d)(3)(B) does not govern the method of calculation of a grant and therefore does not support plaintiffs' Motion for Partial Summary Judgment regarding what assets must be included in grant calculation.

## VI.     Whether the Section 1603 Grant is Includible in Basis

In addition to arguing the grant is includible in basis after the grant issues, plaintiffs further argue the grant was includible for calculation of the grant itself. *See* Pls.' Partial MSJ Mem. at 8 ("Congress has explicitly provided . . . the basis of Section 1603 grant-eligible property must include the Section 1603 grant"). The government characterized the argument as circular with a hypothetical in its response:

> Imagine a developer that incurs $100 in eligible costs in constructing a renewable energy facility. The developer places the facility into service and then claims a grant. As discussed above, the effect of Section 48(d)(3)(B) is straightforward: The developer is entitled to a $30 grant, and then, just as with the energy credit, the developer's depreciable basis in the eligible property is reduced from $100 to $85. The developer is left with $85 in depreciable basis and receives a $30 grant.

> But if Plaintiffs' recursive interpretation were correct, then Section 48(d)(3) would act as a grant inflator, allowing the grant to be included in the tangible property basis for purposes of determining the grant itself. The end result would be very different. The developer's basis for grant purposes would be its $100 cost of construction for tangible property plus its $30 expected grant, and so its grant amount would be 30% of $130, or $39, ad infinitum.

Gov't's Resp. at 32. The Court understood plaintiffs to retreat from this argument in their reply brief: "The Government erects a strawman to argue that including the grant in eligible basis would lead to 'absurd results.' . . . [W]e do not claim that the hypothetical applicant's eligible basis is $130 in this scenario." Pls.' Partial MSJ Reply at 16. Plaintiffs, however, reconfirmed at oral argument the grant itself should be included in basis for purposes of calculating that same grant. Tr. at 13:23–24 ("THE COURT: . . . [D]oes [the grant] go into basis? [PLAINTIFFS]: Yes, Your Honor."), 14:20–23 ("THE COURT: At minimum, do you argue that the value of the cash grant itself should be included in the basis? [PLAINTIFFS]: Yes, Your Honor."), 17:16–17 ("[PLAINTIFFS]: . . . [I]n valuing that tangible eligible property, you include the cash grant."), 50:25 ("[PLAINTIFFS]: . . . [T]he cash grant is included in determining the basis."), 62:2–3 ("[PLAINTIFFS]: The grant itself goes into the basis."), 81:19–22 ("THE COURT: But you're adding the cash grant into the basis for the purposes of calculating the cash grant. [PLAINTIFFS]: As you would."). The Court accordingly addresses whether a Section 1603 grant can be included in basis for the purpose of calculating the grant.

Plaintiffs clarified at oral argument they contend summary judgment is appropriate even without a ruling in their favor on the statutory interpretation of IRC Section 48(d)(3)(B). *See* Tr. at 122:20–21, 123:1–4 ("[PLAINTIFFS]: . . . [*Pacific Far East* and *Cameron Iron Works*] would entitle us to win our motion for partial summary judgment even if Section 48(d)(3)(B) did

not exist."). Specifically, plaintiffs argue the following support a finding the grant is part of the eligible basis: (1) the grant is an economic component of the grant-eligible tangible property; (2) a March 2011 JCT report providing a general explanation of tax legislation enacted in the 111th Congress; (3) IRS Notice 2014-39; and (4) two cases from the United States Court of Claims, *Oglebay Norton* and *Pacific Far East*. The government raises a further argument regarding public policy. The Court addresses each in turn.

At oral argument, plaintiffs asserted the Section 1603 cash grants were tangible property under the Class V asset category. Tr. at 72:9–23 ("[PLAINTIFFS]: . . . [T]ax benefits are . . . a component of the eligible property. THE COURT: But are they tangible? [PLAINTIFFS]: Yes . . . . it's one of the economic components of that property."). The Section 1603 cash grant, however, mimics the operation of a Section 48 tax credit. *See* Pls.' MSJ Mem. at 14. The Section 48 tax credit is allowed for "tangible personal property." I.R.C. § 48(a)(5)(D)(i)(I). The relevant regulations provide a definition of "tangible personal property" which includes "tangible property except land and improvements thereto, such as buildings or other inherently permanent structures," "all property (other than structural components) which is contained in or attached to a building," and "all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure)." Treas. Reg. § 1.48–1(c). *Black's Law Dictionary* defines "cash" as "[m]oney or its equivalent" and "grant" as "[a]n agreement that creates a right or interest in favor of a person or that effects a transfer of a right or interest from one person to another." *Cash*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Grant*, *id.*; *see also Grant-in-aid*, *id.* ("A sum of money given by a governmental agency to a person or institution for a specific purpose; esp., federal funding for a state public program."). The plain meaning of "cash grant" is then "[a]n agreement that creates a right or interest in favor of a person" for "[m]oney or its equivalent." A cash grant cannot fit into the plain meaning of any of these categories of tangible personal property—an agreement creating a right for money is not: a "building[]"; "property . . . contained in or attached to a building"; or "property which is in the nature of machinery[.]" *See* Treas. Reg. § 1.48–1(c)–(f); *Building*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A structure with walls and a roof, esp. a permanent structure."); *Contain*, OXFORD DICTIONARY OF ENGLISH (3d ed. 2010) ("have or hold (someone or something) within"); *Attached*, *id.* ("joined, fastened, or connected to something"); *Machinery*, *id.* ("machines collectively"); *Machine*, *id.* ("an apparatus using mechanical power and having several parts, each with a definite function and together performing a particular task"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (finding the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case[,]" and the inquiry ends if the statutory language is unambiguous). Given this relevant regulatory definition of "tangible personal property,"[14] a cash grant does not qualify as "tangible personal property." "*Only* tangible personal property as defined" in the regulation qualifies as grant-eligible property. *See RP1 Fuel Cell, LLC v. United States*, 120 Fed. Cl. 288, 311 (2015) (emphasis added) (finding Section 1603 grant-eligible "property is only tangible personal property as defined in 1.48–1(c) and (d) of the Income Tax Regulations and is

---

[14] While the regulation provides a specific definition of "tangible personal property," the Court notes the plain meaning of the term also supports an interpretation that does not encompass a cash grant; *Black's Law Dictionary* defines "tangible personal property" as "[c]orporeal personal property of any kind; personal property that can be seen, weighed, measured, felt, touched, or in any other way perceived by the senses, examples being furniture, cooking utensils, and books." *Tangible Personal Property*, BLACK'S LAW DICTIONARY (11th ed. 2019).

an integral part of the facility").  The regulation's plain meaning definition of eligible tangible personal property therefore precludes plaintiffs' argument the grant is an "economic component" of the grant-eligible property.  *See* Tr. at 72:9–23; Treas. Reg. § 1.48–1(c); *Robinson*, 519 U.S. at 340.

Plaintiffs cite to a March 2011 report from the JCT providing a general explanation of tax legislation enacted in the 111th Congress for the proposition Congress enacted the Section 1603 cash grant program to "mimic the operation of the credit under [S]ection 48." Pls.' MSJ Mem. at 14 (quoting Staff of the J. Comm. on Tax'n, 111th Cong., General Explanation of Tax Legislation Enacted in the 111th Congress, pt. 2, 2011 WL 940372, at *12 (2011)) (internal quotations omitted).  At oral argument, the government was "in full agreement with th[is] statement" from the JCT report.  Tr. at 90:17–24 ("[THE GOVERNMENT]: . . . [W]hat [plaintiffs] cite to a Joint Committee report for is the following:  'Congress expressly intended that the Section 1603 grant provision mimic the operation of the credit under Section 48 of the IRC.'  . . .  And we're in full agreement with that statement.").  The government, however, disagreed with the consequences of the statement—namely, with plaintiffs' proffered interpretation of calculating the grant amount per Section 48.  Tr. at 90:24–91:1 ("[THE GOVERNMENT]:  . . . There's no credit-on-credit calculation and there shouldn't be any grant-on-grant calculation either.").  While plaintiffs argue Section 48 directs the inclusion of the grant's value in the eligible basis to then calculate the amount of that same grant, the government disputes that characterization of Section 48's operation.  The government follows the calculation directions set forth in Section 48(a), which describe the energy credit be determined based on 30 percent of the amount of the basis of eligible tangible personal property, as defined further in the statute.  As the Court analyzes *supra* Section V, the government properly characterizes the operation of Section 48(a) and (d)(3)(B):  the plain meaning of the text and the structure of the statute show Section 48(a) describes the calculation of an energy credit, and Section 48(d)(3)(B) describes post-issuance tax treatment of an ARRA Section 1603 grant.  The JCT's description of Section 1603 cash grants mimicking Section 48 therefore does not support plaintiffs' argument regarding including the grant in basis.  Staff of the J. Comm. on Tax'n, 111th Cong., General Explanation of Tax Legislation Enacted in the 111th Congress, pt. 2, 2011 WL 940372, at *12; I.R.C. § 48(a); *see supra* Section V.

Plaintiffs also raise IRS Notice 2014-39 for the proposition "for purposes of calculating the grant due in the first instance, the applicant does not reduce its basis." Pls.' MSJ Mem. at 14–15 (emphasis omitted).  Notice 2014-39 describes the operation of Section 48 under sequestration.  The notice specifically directs "basis is reduced only after the Section 1603 grant has been calculated and paid." Notice 2014-39, 2014-26 I.R.B. 1109.  Section 48(d)(3)(B) relates to the reduction of basis in the property for depreciation purposes after receipt of the grant, as described *supra* Section V.  Notice 2014-39 therefore properly characterizes the operation as:  (1) a grant is paid out by the Treasury Department; (2) the grant is received by the taxpayer grant-applicant; and (3) basis in the property is then reduced by 50 percent of the amount of the grant received.  2014-26 I.R.B. 1109.  While plaintiffs correctly note basis reduction does not occur until after the Section 1603 grant issues, they confuse basis reduction—what Section 48(d)(3)(B) covers and Notice 2014-39 discusses—with allocating basis to the value of an anticipated grant—what plaintiffs argue for and the government opposes.  The parties dispute the scope of eligible basis in step (1) regarding the Treasury Department

paying out the grant. Notice 2014-39 does not go into detail regarding the calculation of the grant in step (1) paid out by the Treasury Department and therefore provides no support for including the grant in basis to calculate itself. *Id.*

Finally turning to plaintiffs' caselaw arguments, plaintiffs argue *Oglebay Norton* and *Pacific Far East* support including the grant in basis. In these two cases, shipbuilders had received certain subsidies—one federal government benefit—and were seeking an ITC—a different federal government benefit. *Oglebay Norton Co. v. United States*, 610 F.2d 715, 716 (Ct. Cl. 1979) ("The 1972 [investment] credit resulted from 'improvements' made to three of plaintiff's bulk ore ships. These improvements were paid for entirely by qualified withdrawals in 1972 from the ordinary income account of its Interim Capital Construction Fund."); *Pac. Far E. Line, Inc. v. United States*, 544 F.2d 478, 482 (Ct. Cl. 1976) ("The issue [is]: . . . Whether the basis for the investment credit is plaintiff's cost or whether from that cost must be deducted [the amount] representing down payments drawn from the reserve funds and allocated to tax deferred earnings . . . ."). The parties in these cases disputed whether improvements to vessels funded by the subsidies from the government were includible in basis for purposes of determining the amount of the ITC on the vessels. *Pac. Far E. Line*, 544 F.2d at 487 ("Defendant's primary position is that to the extent the vessels were acquired with tax-free reserve funds, they were not '[S]ection 38 property' because no depreciation was allowable . . . ."); *Oglebay Norton*, 610 F.2d at 723 (same). The applicable statute provided an ITC was only allowed on "property with respect to which depreciation [. . .] is allowable[.]" *Oglebay Norton*, 610 F.2d at 718 (quoting I.R.C. § 48(a)(1) (1962)) (internal quotations omitted); *accord Pac. Far E. Line*, 544 F.2d at 483. In both cases, the shipbuilders were allowed to include in basis the property acquired with the subsidies to then determine the value of the ITC, despite no depreciation deduction being allowed on those subsidies. *Oglebay Norton*, 610 F.2d at 725 ("Simply because a depreciation deduction was not allowable in this instance does not mean that the improvements were not depreciable property within the meaning of [S]ection 38."); *Pac. Far E. Line*, 544 F.2d at 487 ("[T]he fact that a portion of the cost of the ships is not depreciable because that cost has already been recovered through prior tax deferrals does not remove that portion from the [ITC] provisions."). The court in each case reasoned because Congress did not expressly exclude the subsidy for purposes of calculating basis for the ITC, it is includible. *Pac. Far E. Line*, 544 F.2d at 486 ("[W]here Congress has intended to reduce the basis for the credit because of the source of the moneys invested, it has made express provision."); *accord Oglebay Norton*, 610 F.2d at 727; *cf.* I.R.C. § 42(d)(5)(A) (where federal grants are specifically excluded from basis to determine the amount of the LIHTC). These cases do not address basis allocation in an asset acquisition, and both of these cases predate the enactment of Section 1060. Moreover, these cases are distinguishable, similar to the IRC provisions discussed *supra* Section V: both cases contemplated the inclusion or exclusion of one federal benefit for purposes of calculating another federal benefit—not calculating the same federal benefit recursively as plaintiffs argue. *Oglebay Norton*, 610 F.2d at 716 ("The 1972 [investment] credit resulted from 'improvements' made to three of plaintiff's bulk ore ships. These improvements were paid for entirely by qualified withdrawals in 1972 from the ordinary income account of its Interim Capital Construction Fund."); *Pac. Far E. Line*, 544 F.2d at 482 ("The issue [is]: . . . Whether the basis for the investment credit is plaintiff's cost or whether from that cost must be deducted [the amount] representing down payments drawn from the reserve funds and allocated to tax deferred earnings . . . ."). In these cases, the one federal benefit—a subsidy—was includible in the basis to

determine another federal benefit—the ITC. *Oglebay Norton*, 610 F.2d at 725 ("Simply because a depreciation deduction was not allowable in this instance does not mean that the improvements were not depreciable property within the meaning of [S]ection 38."); *Pac. Far E. Line*, 544 F.2d at 487 ("[T]he fact that a portion of the cost of the ships is not depreciable because that cost has already been recovered through prior tax deferrals does not remove that portion from the [ITC] provisions."). The ITC was never reincorporated into basis to then calculate itself, which is precisely what plaintiffs argue for the ARRA Section 1603 grant. To distill the lengthy discussion *supra* Section V regarding the IRC provisions: an authority discussing the inclusion (or exclusion) of "A"—subsidized government funds—in the calculation of "B"—an ITC—does not help plaintiffs argue for the inclusion of "C"—an ARRA Section 1603 grant—in the calculation of C—the ARRA Section 1603 grant. *Oglebay Norton* and *Pacific Far East* therefore do not support plaintiffs' premise the grant is includible in basis to calculate itself. *Oglebay Norton*, 610 F.2d at 725; *Pac. Far E. Line*, 544 F.2d at 487.

The government further advances a public policy and logic argument, chiefly through the hypothetical stated *supra* Section VI. *See* Gov't's Resp. at 32 ("The developer's basis for grant purposes would be its $100 cost of construction for tangible property plus its $30 expected grant, and so its grant amount would be 30% of $130, or $39, ad infinitum."). As the government's illustration demonstrates, a windfall to plaintiffs would result if the Section 1603 cash grant was somehow reincorporated into basis to then calculate—and inflate the value of—that same cash grant. While the statute temporarily replaced the tax credit incentive in Section 48 with the cash grants in Section 1603—allowing taxpayers who otherwise would not obtain the value of the credit due to not owing taxes to obtain the incentive through a grant—the language of Sections 48 and 1603 does not support this sort of windfall—especially in a manner requiring recursive calculations, the stopping point of which can only be arbitrary. ARRA § 1603(a) ("No grant shall be made under this [S]ection with respect to any property unless such property—(1) is placed in service during 2009 or 2010, or (2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010."); *id.* § 1603(d)(1) (referring to I.R.C. § 48(a)(5)(D) to define "qualified property"); I.R.C. § 48(a)(5)(D) (requiring "qualified property" be either "tangible personal property" or "other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility"); *see supra* Section V. Plaintiffs' argument the grant, after receipt, is then reincorporated into basis to calculate the grant defies logic, mathematics, ARRA Section 1603, IRC Section 48, Treasury Regulation Section 1.48–1(c), and IRS Notice 2014–39. While "a page of history is worth a volume of logic," in this case, plaintiffs do not have history or logic on their side. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 395 (2006) (Roberts, C.J., concurring) (quoting *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).

Plaintiffs fail to address plain statements from statutes, Treasury regulations, and binding precedent which define "tangible property." For example, Section 48(a)(5)(D)(i)(I) directs only "tangible property" is eligible for the tax credit (under Section 1603, the grant), and Treasury Regulation Section 1.48–1(c) defines "tangible personal property." The Court of Claims in *Miami Valley Broadcasting Corporation* also conveyed the meaning of "tangible property": "The tangible assets are the land, improvements, technical installations, equipment and supplies, and other physical items, all of which constituted the well-designed, completed, tested and fully

operational plant and facilities . . . ." *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 679 (Ct. Cl. 1974). More recently, the Federal Circuit gave direction regarding what property qualifies for the Section 1603 grant in its 2018 Opinion in this case: "Section 1603 entitles plaintiffs to a cash grant equal to 30 percent of the basis of their 'specified energy property'—the tangible personal property and other tangible property (not including real estate, buildings, and transmission equipment) integral to plaintiffs' windfarm facilities." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1372 (Fed. Cir. 2018) (citing ARRA § 1603; I.R.C. § 48(a)(5)(D); Treas. Reg. § 1.48-1). None of the authorities raised by plaintiffs allows the Court to consider a grant to be eligible "tangible property" for the purpose of calculating itself. *See* Staff of the J. Comm. on Tax'n, 111th Cong., General Explanation of Tax Legislation Enacted in the 111th Congress, pt. 2, 2011 WL 940372, at *12; Notice 2014-39, 2014-26 I.R.B. 1109; *Oglebay Norton*, 610 F.2d at 725; *Pac. Far E. Line*, 544 F.2d at 487. The Court therefore denies plaintiffs' Motion for Partial Summary Judgment on the issue of requiring the value of the grant to be included in eligible basis. *See* RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## VII.  Whether the Premium for the Section 1603 Grant is Includible in Basis

Separate from the future value of the grant at the time of the transaction is the value—at the time of the transaction—of the anticipated grant; the Alta Wind properties could have increased in value because the buyers had an expectation of receiving a grant, and the buyers could have paid a premium in anticipation of the grant. The Court addresses whether the incremental consideration associated with the premium for the anticipated value of the grant is part of the eligible basis. Plaintiffs were unable to explain at oral argument why they did not explicitly discuss allocation according to the Treasury regulations in briefing. *See* Tr. at 66:16–24 ("THE COURT: . . . [W]hy do plaintiffs not cite [Treasury Regulation] 1.338-6 in the briefing, but only discuss allocation to the different classes in very few pages? [PLAINTIFFS]: Well, the—because we're not—what we're asking the Court to determine is . . . whether the cash grant is part of the eligible property that is part of Class V. And so that's the sole issue if the answer's yes . . ."). Plaintiffs confirmed at oral argument they argue the premium paid for the grant is part of the eligible tangible property. *See* Tr. at 78:16–79:2 ("THE COURT: . . . [Y]our view, as a matter of law, is that the premium paid for the cash grant is Class V eligible. [PLAINTIFFS]: Part of it. . . . [I]t is a component of the eligible property. THE COURT: But all of the premium is in Class V? [PLAINTIFFS]: Yes, but not as a separate asset, . . . as part of the eligible assets themselves.").

When asked by the Court at oral argument why none of the cases plaintiffs cited in their Motion for Partial Summary Judgment briefing directly considered basis allocation pursuant to Section 1060, plaintiffs listed *Estate of Smith*, *Deseret Management*, *Peoples Bancorporation*, *Meredith*, and *IT&S of Iowa* as cases from different forums addressing basis allocation cited in their briefing. Tr. at 99:19–100:24. While some of these cases generally address basis allocation, none of these cases address the specific context of basis allocation of tangible property pursuant to Section 1060 in a corporate asset acquisition. *See Est. of Smith v. Comm'r*, 198 F.3d 515 (5th Cir. 1999), *nonacq.*, IRS Announcement Relating to: Smith, 2000-19 I.R.B. 01 (IRS ACQ 2000); *Deseret Mgmt. Corp. v. United States*, 112 Fed. Cl. 438 (2013); *Peoples Bancorp. & Subsidiaries v. Comm'r*, 63 T.C.M. (CCH) 3028 (T.C. 1992); *Meredith Corp. and*

*Subsidiaries v. Comm'r*, 102 T.C. 406 (1994); *IT&S of Iowa, Inc. v. Comm'r*, 97 T.C. 496 (1991).  The Court addresses each cited case in turn.

Plaintiffs provide the following parenthetical explanation for *Estate of Smith*, a Fifth Circuit case regarding petitions for redetermination contesting notices of estate and income tax deficiencies:  "tax-deduction benefit was part of value of property to which deduction related." Pls.' Reply at 9 (citing *Est. of Smith*, 198 F.3d at 528–29).  Plaintiffs contend the case held:

> [A] "contingent" tax benefit (a potential tax deduction) was part of the value of the property to which the deduction related, even though the benefit (and its amount) might only "ripen" in the future.  The Fifth Circuit explicitly rejected the IRS's claim that, because the tax benefit had not yet vested at the time when the property needed to be valued for tax purposes, the tax benefit should be treated as "a separate, free-standing asset."

*Id.* at 10 (quoting *Est. of Smith*, 198 F.3d at 528–29).  *Estate of Smith* addresses the issue of categorizing a contingent income tax deduction as an asset of an estate.  198 F.3d at 527 ("[T]he contingent right to future income tax relief . . . is a factor that must be taken into account in connection with the Estate . . . .").  The Estate and the IRS disagreed as to whether a future Section 1341 income tax deduction,[15] that is, a contingent right to income tax relief—which did not exist as an available tax deduction to the decedent at time of death—could be retroactively considered as an asset of the Estate.  *See id.* at 527.  The Fifth Circuit held the future tax deduction was an asset of the Estate.  *Id.* at 529.  Plaintiffs' pin cite directs the valuation, not allocation, of a Section 2053(a)(3) deduction to incorporate the future Section 1341 tax benefit. *Id.* at 528–29.  The Section 2053 deduction is "for 'claims against the [E]state . . . as are allowable by the laws of the jurisdiction . . . under which the [E]state is being administered.'" *Id.* at 521.  The decedent, and subsequently the Estate, had been in ongoing litigation with Exxon over royalties at the time of decedent's death; the litigation settled 15 months after the death.  *Id.* at 519–20.  The Sections 2053 and 1341 deductions allowable relate to any deductions the Estate could take due to that litigation and settlement.  Valuation of deductions allowable to an estate have little—if anything—to do with basis allocation pursuant to Section 1060 in the context of a business' acquisition of another business' assets.  Plaintiffs therefore miss the mark in citing *Estate of Smith* as a basis allocation case—it has nothing to do with basis allocation. Plaintiffs do not explain why a ruling which is not precedential for this court and which addresses such a different issue—valuation of deductions rather than basis allocation—should influence the Court here; the Court finds *Estate of Smith* distinguishable and unpersuasive.  *Id.* at 528–29 (discussing valuation).

Plaintiffs also cite *Deseret Management*, a Court of Federal Claims case involving the tax treatment of a sale of radio stations that occurred in the year 2000.  Pls.' Reply at 9–10 (citing *Deseret Mgmt. Corp.*, 112 Fed. Cl. 438).  Plaintiffs do not pin cite the 2013 case, where a corporate taxpayer brought a tax-refund action challenging IRS determinations, but rather cite it as part of two exemplary string cites with two explanatory parentheticals:  "amortization

---

[15] "Section 1341 of the [Tax] Code allows an income tax deduction to a taxpayer who previously received taxable income under a claim of right, but who must later repay some or all of that income."  *Est. of Smith v. Comm'r*, 198 F.3d 515, 526 (5th Cir. 1999).

deductions incorporated into [the] valuation of [a] broadcast license" and "incorporating projected future amortization deductions into [the] valuation of [a] broadcast license." *Id.* In *Deseret Management*, the value of the tangible property was not disputed, and the case only addressed basis allocation in a like-kind exchange pursuant to IRC Section 1030 as between the value of a Federal Communications Commission license and goodwill—two intangible asset values, both categorized specifically as amortizable intangible assets in IRC Section 197. 112 Fed. Cl. at 447–60. This case thus does not assist the Court in addressing the issue of basis allocation pursuant to Section 1060 for tangible property. Even accepting plaintiffs' characterization—the value of future amortization deductions is incorporated into the value of the broadcast license—amortization of intangible assets provides no guidance as to the value of depreciable tangible assets at issue here. The Court therefore finds *Deseret Management* distinguishable and unpersuasive. 112 Fed. Cl. at 447–60 (discussing whether any allocation to goodwill is appropriate).

Plaintiffs also raise *Peoples Bancorporation*, where the Tax Court analyzed North Carolina corporations' entitlement pursuant to IRC Section 167 to depreciate the value of core deposit intangibles relating to two banks acquired by the corporations. Pls.' Reply at 9, 11 (citing *Peoples Bancorp.*, 63 T.C.M. (CCH) 3028). Again, plaintiffs do not expound on the case in their brief but include it in the same two string cites as *Deseret Management* with the following parentheticals: "valuation included 'the value of tax benefits associated with amortization of the deposits'" and "adopting valuation that included 'the value of tax benefits associated with amortization of the deposits,' even though such amortization had not yet occurred." *Id.* This case does not address basis allocation for tangible property. The dispute in *Peoples Bancorporation* was whether certain deposits acquired by a bank were separately amortizable assets or subsumed within goodwill, which was not amortizable at the time. *Peoples Bancorp.*, 63 T.C.M. (CCH) 3028 ("Petitioners contend that the core deposits acquired are amortizable because they are separate from goodwill, petitioners established a reasonable estimate of their value and useful life, and the amortization method used is reasonable."). The deposits are intangibles because IRC Section 197 defines an intangible as "any customer-based intangible," which "in the case of a financial institution, . . . includes deposit base and similar items." I.R.C. § 197(d)(1)(C)(iv), (d)(2)(B). Section 197 specifically lists goodwill as another intangible. I.R.C. § 197(d)(1)(A). Basis allocation between intangible assets—bank deposits and goodwill—does not provide guidance as to proper basis allocation to tangible property pursuant to Section 1060 because it focuses on waterfall Classes VI and VII whereas only the Class V asset category is grant-eligible in the present case. The Court therefore finds *Peoples Bancorporation* distinguishable and unpersuasive. 63 T.C.M. (CCH) 3028 ("[W]e allowed the taxpayers to include as part of the value the full tax benefit of amortization of the core deposits using a reasonable method.").

Plaintiffs further cite *Meredith*, in which an accrual base taxpayer brought suit in the Tax Court after purchasing all of the assets of a consumer magazine business. Pls.' Reply at 10–11 (citing *Meredith*, 102 T.C. at 460–62). In the second string cite, plaintiffs provide the following parenthetical explanation: "asset value included value of future amortization deductions." *Id.* In this case, the anticipated amortization deductions the acquiring company expected were includible in the value of the acquired magazine's subscriber base—an intangible asset. *See* 102 T.C. at 461–62. IRC Section 197 characterizes lists "with respect to current or prospective

customers" and any "value resulting from future provision of goods or services pursuant to relationships (contractual or otherwise) in the ordinary course of business with customers" as intangible assets.  I.R.C. § 197(d)(1)(C)(ii), (d)(2)(A)(iii).  The subscriber base of a magazine is intangible pursuant to Section 197 and was considered an intangible asset in this case.  *See* 102 T.C. at 445 ("[R]espondent has conceded for purposes of this case that the subscriber relationships acquired by petitioner are, collectively, an amortizable intangible asset."), 461–62 (analyzing tax benefits included in the value of subscriber relationships).  The inclusion of anticipated amortization deductions in the basis of an intangible asset—a subscriber base—does not support the allocation of an anticipated grant to a tangible asset during basis allocation as plaintiffs request here.  The Court therefore finds *Meredith* distinguishable and unpersuasive. *See* 102 T.C. at 445 ("[R]espondent has conceded for purposes of this case that the subscriber relationships acquired by petitioner are, collectively, an amortizable intangible asset.").

Finally, plaintiffs cite *IT&S of Iowa*, where the Tax Court held the core deposit intangible asset arising from the purchase of a State Bank by another State Bank is separate and distinct from goodwill and has a limited useful life, the duration of which can be ascertained with reasonable accuracy.  Pls.' Reply at 11 (citing *IT&S of Iowa*, 97 T.C. at 532).  In the second string cite, plaintiffs provide the following parenthetical explanation:  "property value appropriately included value associated with future tax deduction."  *Id.*  Similar to *Peoples Bancorp.*, this case addresses basis allocation between two intangible assets—deposit base and goodwill—in a bank's acquisition of another bank.  Here, the Tax Court allowed the bank to value the deposit base by including the value of future amortization deductions.  97 T.C. at 532–33.  Valuation of an intangible asset via inclusion of future tax benefits does not provide guidance as to the appropriate basis allocation of tangible assets pursuant to Section 1060.  The Court therefore finds *IT&S of Iowa* distinguishable and unpersuasive.  *See* 97 T.C. at 532–33 ("[T]he petitioner may include in its valuation the tax savings generated by the core.").

Plaintiffs do not cite relevant, binding legal authority for the proposition the premium is includible in the value of basis attributable to the grant-eligible tangible personal property of the windfarm.  The Federal Circuit acknowledged, with reference to *Miami Valley*—a suit for refund of alleged overpayments of federal income tax and assessed interest for four taxable years—turn-key value is part and parcel of the value of the grant-eligible tangible personal property and thus properly attributable as part of the basis allocated to the Class V asset category.  *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1377 (Fed. Cir. 2018) (citing *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974)).  Plaintiffs did not argue turn-key value *included* the value of the grants or premiums at oral argument, only the premium paid for the tax benefit should be treated as part of the tangible property, similar to how turn-key value was treated in *Miami Valley*.  Tr. at 106:9–14 ("THE COURT:  So, do you argue that the turn-key value includes the grants?  [PLAINTIFFS]: Well, the value—I'm not sure I'm—I'm not sure whether . . . you would equate the turn-key value to the value of the grants.  They are both things that are part of the value of the property.").  None of the cases cited for plaintiffs' argument the grant should be included in basis, however, support the notion the premium should be included in basis.  *See Est. of Smith*, 198 F.3d at 528–29; *Deseret Mgmt.*, 112 Fed. Cl. at 447–60; *Peoples Bancorp.*, 63 T.C.M. (CCH) 3028; *Meredith*, 102 T.C. at 445; *IT&S of Iowa*, 97 T.C. at 532–33.  Each IRC provision and case cited are irrelevant to the question of proper basis allocation of a grant within basis, *see supra* Section VI, and a premium within basis.

For the same reasons the Court finds plaintiffs' arguments regarding the grants qualifying as eligible tangible property unavailing, *see supra* Section VI, and because plaintiffs' caselaw discussed above is distinguishable, the Court cannot consider a premium associated with the anticipated value of a grant to be eligible "tangible property" for the purpose of calculating the grant. The Court therefore denies plaintiffs' Motion for Partial Summary Judgment to the extent they request the premium associated with the anticipated value of the grant to be included in eligible basis. *See* RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## VIII.   Conclusion

Factual issues prevent the Court from granting summary judgment on the issue of whether the indemnities associated with the Section 1603 cash grants are part of the grant-eligible basis. *See supra* Section IV.B. The incremental consideration paid for the anticipated Section 1603 cash grants is not basis allocable to Class V tangible property. *See supra* Section VII. The portion of the purchase price pertaining to consideration for the anticipated Section 1603 cash grants is grant-ineligible intangible property under Class VI (contract rights) or Class VII (goodwill or going concern value). *See id.* Plaintiffs' argument the anticipated cash grants and premiums are inherently part of the basis of the windfarm as Class V tangible property basis is unavailing. *See supra* Sections V–VII. The Court accordingly **DENIES** plaintiffs' Motion for Partial Summary Judgment, ECF No. 314.[16]

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[16] The Court further **GRANTS** the government's Motion for Leave to File a Notice of Correction of an Inadvertent Misstatement, ECF No. 330. *See supra* n.5.