# In the United States Court of Federal Claims

Nos. 13-402, 13-917, 13-935, 13-972, 14-47, 14-93, 14-174, 14-175, 17-997
(Filed:  8 July 2026)[*]

```
**************************************
ALTA WIND I OWNER LESSOR C, et al.,     *
                                        *
                  Plaintiffs,           *
                                        *
v.                                      *
                                        *
THE UNITED STATES,                      *
                                        *
                  Defendant.            *
                                        *
**************************************
```

    *Steven J. Rosenbaum*, with whom were *Dennis B. Auerbach*, *Thomas R. Brugato*, *Samuel R. Howe*, and *Maura A. Sokol*, Covington & Burling LLP, all of Washington, DC, for plaintiffs.

    *James E. Weaver*, Trial Attorney, with whom were *Richard J. Markel*, Trial Attorney, and *David I. Pincus*, Chief, Court of Federal Claims Section, Tax Division, Department of Justice, all of Washington, DC, for the government.

## **TRIAL ORDER**

**HOLTE, Judge.**

> Just then, they discovered thirty or forty windmills in that plain.  And as soon as Don Quixote saw them, he said to his squire: "Fortune is guiding our affairs better than we could have ever hoped.  Look over there, Sancho Panza, my friend, where there are thirty or more monstrous giants . . . , and with their spoils we'll start to get rich." . . . "Look, your worship," said Sancho; "what we see there are not giants but windmills, and what seem to be their arms are the sails that turned by the wind make the millstone go."[1]

    This retrial narrates plaintiffs' thirteen-year saga tilting at cash grants worth almost $1 billion for their windfarm energy facilities.  While plaintiffs see cash flows substantiating the windfarm valuation, the evidence supports using only the cost of windmills.

---

[*] This Opinion was originally filed under seal on 2 July 2026 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for proprietary, confidential, or other protected information and submit proposed redactions by 8 July 2026 at 12:00 p.m.  On 7 July 2026, the parties confirmed they do not seek redaction of the Opinion.  The Opinion is now reissued for publication with minor edits for typos.

[1] MIQUEL DE CERVANTES, DON QUIXOTE 30–31 (John Ormsby trans. 1885) (1605), http://public-library.uk/ebooks/29/80.pdf.

In February 2009, President Barack Obama signed the American Recovery and Reinvestment Act of 2009, which provided "a cash grant to entities that 'place[] in service' certain renewable energy facilities." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1367–68 (Fed. Cir. 2018). This cash grant was designed to infuse capital into and incentivize development of renewable energy projects amid the 2008 financial crisis. The cash grant amount was calculated as thirty percent of "the basis of the tangible personal property of the facility (with certain exclusions)." *Id.* at 1368 (citing ARRA § 1603(b)(1)).

After applying for and not receiving their desired amount of cash grants, plaintiffs filed suit in this court alleging underpayment of ARRA cash grants. To calculate the basis of the tangible property of their facilities, plaintiffs used the full price for which they purchased the facilities, including the value of their anticipated cash grants, from Terra-Gen (the preceding owner and current operator). After a 2016 trial before a different judge, the court agreed with plaintiffs' valuation, awarding them a cash grant equal to the shortfall between plaintiffs' desired amount and the cash grants they received from Treasury. The government appealed, and the Federal Circuit disagreed with the court, vacating judgment, remanding for retrial, and ordering reassignment to a different judge. *See generally id.* at 1365. Noting "the purchase prices for the Alta facilities were in excess of the development and construction costs of the tangible assets," the Federal Circuit directed the Court "to make a factual determination as to the allocation of purchase price" based on seven asset classes under IRC § 1060, making sure to distinguish between turn-key value (which is grant-eligible) and goodwill and other intangibles (which are not grant-eligible). *See id.* at 1377.

Thus arose the parties' present dispute: what portion of the purchase price, and whether the value of the cash grants, should be attributed to grant-eligible assets under Section 1060. Central to this dispute is the Federal Circuit's mandate to determine the fair market value of the grant-eligible assets, including their turn-key value, under Section 1060. While plaintiffs present a discounted cash flow to calculate the fair market value of the assets, the government offers the cost approach. Plaintiffs' discounted cash flow: (1) projects future cash flows; (2) discounts the cash flows to their present value (while also eliminating intangible asset values by using a "development-stage" discount rate); (3) subtracts operating expenses, taxes, and land value; and (4) uses a ratio of eligible costs to ineligible costs to isolate eligible assets. *See* Section IX.A, *infra*. Of note, plaintiffs include ninety-eight percent of the value of their anticipated cash grant in calculating the grant-eligible assets. While plaintiffs argue this is the most appropriate method for valuing integrated, income-producing assets, the government argues its cost approach is ideal for valuing readily replaceable assets. The cost approach identifies the costs to replace and reproduce grant-eligible assets with exact duplicates of the same assets and then applies a rate of return on capital to account for developer profit. *See* Section IX.B, *infra*. Under plaintiffs' discounted cash flow method, plaintiffs argue they are owed $191,227,748 using a conservative estimate and $205,774,148 using a more realistic estimate, whereas under its cost approach, the government argues the Treasury overpaid plaintiffs by $58,884,366. *See* Section IX, *infra*.

Eleven days of trial and one day of closing arguments later, another chapter in plaintiffs' thirteen-year saga comes to a close. The Court finds the cost approach more suitable to value the grant-eligible assets as the cost approach more appropriately reflects the fair market value of the

eligible assets, avoids the questions raised by plaintiffs' lack of corroborating evidence in their discounted cash flow methodology, and distinguishes assets between the Section 1060 classes. *See* Section IX, *infra*. Specifically, the Court concludes the cost approach (with the inclusion of certain costs the government improperly excluded—namely, Interest During Construction and the Oak Creek Development Fee and a markup for developer profits) best calculates the grant-eligible assets classified under Class V of Section 1060, pursuant to the Federal Circuit's Remand Opinion. *See* Section IX.B.2, *infra*. The Court notes two items in declining to adopt DCF. First, plaintiffs did not adduce sufficient evidence to establish the fair market value of the grant-eligible assets includes ninety-eight percent of the value of the cash grant, as plaintiffs' discounted cash flow implies. Second, discounted cash flow for Section 1060 valuations is not inherently defective—rather, the record evidence here tilts in favor of the cost approach over discounted cash flow.

For the reasons stated below, the Court instructs the parties to apply the cost approach to value the Alta facilities: the parties shall calculate the fair market value of the grant-eligible assets by starting with grant-eligible costs noted in each KPMG cost segregation report, excluding Development Rights (but retaining Interest During Construction and the Oak Creek Development Fee), and applying developer profits of fifteen percent for Alta I, and twenty percent for Alta II–VI. The parties shall file a joint status report with the final amount owed to plaintiffs, if any. *See* Section IX, *infra*.

## I.    Factual Background

In June 2008, Oak Creek Energy Systems ("Oak Creek") and Allco Wind Energy Management Pty. Ltd. ("Allco") completed pre-construction development of multiple wind facilities ("the Alta Facilities") in the Tehachapi region of California. *Alta Wind I Owner Lessor C v. United States*, 128 Fed. Cl. 702, 709 (2016), *vacated and remanded*, 897 F.3d 1365 (Fed. Cir. 2018). Terra-Gen Power LLC ("Terra-Gen") acquired Allco's U.S. wind energy business the same year and proceeded to "complet[e] the development and construction of the Alta Facilities" and execute Oak Creek and Allco's individual windfarm power purchase agreement ("PPA") contracts with Southern California Edison ("SCE"). *Alta Wind I Owner Lessor C v. United States*, 150 Fed. Cl. 152, 155 (2020); *Alta Wind I*, 897 F.3d at 1370.

In February 2009, President Barack Obama signed the American Recovery and Reinvestment Act ("ARRA") of 2009, Pub. L. No. 111-5, 123 Stat. 115, 364-66, which provided "a cash grant to entities that 'place[] in service' certain renewable energy facilities." *Alta Wind I*, 897 F.3d at 1367–68. The grant amount was determined "using the basis of the tangible personal property of the facility (with certain exclusions)." *Id.* at 1368 (citing ARRA § 1603(b)(1)). "Terra-Gen itself was not qualified to receive a [S]ection 1603 payment, as [S]ection 1603(g)(4) barred a 'pass-thru entity' from receiving a grant if any 'holder of an equity or profits interest' in the entity was a nonprofit, and Terra-Gen had some nonprofit equity holders." *Alta Wind I*, 897 F.3d at 1370.

Unable to receive the Section 1603 grants, Terra-Gen sold six of the Alta facilities to plaintiffs between 2010 and 2012. *Id*. at 1371. After acquiring the six Alta facilities, "[p]laintiffs appear to have placed each facility into service within weeks" and proceeded to

apply for over $703 million in grants through Section 1603 "using the unallocated method to determine basis." *Id.* The Treasury Department ultimately awarded plaintiffs cash grants of approximately $495 million based on the costs of the facilities' grant-eligible construction and development, instead of plaintiffs' unallocated method to determine basis. *Alta Wind I*, 150 Fed. Cl. at 156.

## II.    Procedural History

"In June 2013, plaintiffs filed separate claims against the government, which were later consolidated, 'seeking over $206 million in additional [S]ection 1603 grants.'" *Alta Wind I*, 150 Fed. Cl. at 156 (quoting *Alta Wind I*, 897 F.3d at 1371).[2] In December 2015, the government counterclaimed, alleging overpayment to plaintiffs in the amount of $58,884,366. Gov't's Mot. to Am. the Pleadings to Add Countercls. Based on Expert Op. at 10, ECF No. 75. On 31 October 2016, this court "awarded Plaintiffs damages [of $206,833,364,] . . . the amount[] equal to the shortfall between the grant amounts to which [p]laintiffs were entitled and [those] the [g]overnment awarded." *Alta Wind I*, 128 Fed. Cl. at 722. The Federal Circuit vacated and remanded the case on appeal, holding the purchase prices paid for the Alta facilities should be "allocated using the residual method" under Internal Revenue Code Section 1060. *Alta Wind I*, 897 F.3d at 1376.

On 29 July 2019, this case was reassigned to the undersigned. *See* Order Reassigning Case, ECF No. 197. Following discovery, on 6 September 2022, plaintiffs filed a motion for partial summary judgment "seek[ing] rulings as a matter of law that: (1) the Section 1603 cash grant is not a separate asset for purposes of applying IRC Section 1060; (2) the value of the cash grant must be included in the basis of the Section 1603-eligible property; and (3) [p]laintiffs' eligible basis may not be reduced on account of the 'associated indemnities.'" Pls.' Mot. Partial Summ. J. ("Pls.' MPSJ") at 2, ECF No. 314-1.

The Court denied plaintiffs' Motion for Partial Summary Judgment on 20 June 2023. *Alta Wind I Owner Lessor C v. United States*, 166 Fed. Cl. 386, 413 (2023) ("20 June 2023 Order"). The Court held, in relevant part, "[t]he incremental consideration paid for the anticipated Section 1603 cash grants is not basis allocable to Class V tangible property . . . [and t]he portion of the purchase price pertaining to consideration for the anticipated Section 1603 cash grants is grant-ineligible intangible property." *Id.* The Court therefore deemed plaintiffs' "argument the anticipated cash grants and premiums are inherently part of the basis of the windfarm as Class V tangible property" "unavailing." *Id.* The Court observed: "Plaintiffs' argument the grant, after receipt, is then reincorporated into basis to calculate the grant defies logic, mathematics, ARRA Section 1603, IRC Section 48, Treasury Regulation Section 1.48–1(c), and IRS Notice 2014–39." *Id.* at 409 (internal quotations omitted). Ultimately, the Court's 20 June 2023 Order did not rule on the appropriate method for calculating the fair market value of the eligible tangible property, instead denying summary judgment on the basis plaintiffs did not provide any controlling law binding the Court to include cash grant value as a matter of

---

[2] Two plaintiffs filed their initial complaints on 24 July 2017, and the cases were stayed pending an appeal to the Federal Circuit in the lead case. *See Alta Wind I Owner Lessor A v. United States*, Case No. 17-997, ECF No. 1 (Fed. Cl. July 24, 2017). On 19 December 2018, this Court consolidated all plaintiffs under case number 13-402. 19 Dec. 2018 Order, ECF No. 196 (Hodges, J.).

law.  *Id.* at 410 ("None of the authorities raised by plaintiffs allows the Court to consider a grant to be eligible "tangible property" for the purpose of calculating itself."), 413 ("Plaintiffs do not cite relevant, binding legal authority for the proposition the premium is includible in the value of basis attributable to the grant-eligible tangible personal property of the windfarm.").

On 18 July 2023, plaintiffs filed a motion for reconsideration of the Court's 20 June 2023 Order, ECF No. 338.  *See also* Corr. Mot. for Limited Reconsideration at 1, ECF No. 350.  Plaintiffs sought "limited reconsideration of the Court's 20 June 2023 Order insofar as the Order makes a determination that neither party sought that, in all circumstances, the value associated with the Section 1603 cash grants cannot be allocated to Class V tangible property, but must instead be treated as a separate intangible asset." *Id.* at 1 (cleaned up).  Specifically, plaintiffs requested "the Court . . . clarify" the 20 June 2023 Order to make clear plaintiffs can argue at trial "under the income method of valuation, the value of tax benefits like the cash grant" may impact "the value and allocated basis of the property to which such benefits relate." *Id.* at 2.  In finding plaintiffs' Motion for Reconsideration moot, the Court held the 20 June 2023 "Order did not address valuation methods, meaning the parties are free to offer any valuation evidence and argue in favor of any valuation method at trial." *Alta Wind I Owner Lessor C v. United States*, 169 Fed. Cl. 1, 11 (2023).  The Court further held "while plaintiffs are permitted to argue in favor of any valuation method at trial, including one allegedly necessitating treating the cash grant value as one cash inflow that goes into the discounted cash flow analysis of the eligible tangible property, the 20 June 2023 Order prohibits plaintiffs from treating cash grants as Class V tangible property inherently part of the basis of the windfarms." *Id.* (cleaned up).

On 15 July 2024, the parties filed a post-discovery joint status report ("JSR"), noting "the parties agree that the case should proceed to trial as expeditiously as feasible, subject to the resolution of motions in limine . . . and completion of post-discovery proceedings." *See* 15 July 2024 JSR at 2, ECF No. 380.  The Court held a telephonic status conference and shortly thereafter issued a scheduling order on 10 September 2024 outlining the deadlines for exchange of contentions of facts and law, exhibit and witness lists, and motions *in limine. See* 10 Sept. 2024 Order at 1–2, ECF No. 382.

Pursuant to the Court's 10 September 2024 Order, the parties filed five Motions *in limine* on 31 October 2024—plaintiffs filed one, and the government filed four.  *See* Pls.' Mot. *in Limine* to Exclude Substantial Portions of the Gov't's Suppl. Rebuttal Expert Rpts., ECF No. 391; Gov't's Mot. *in Limine* to Exclude Pls.' Expert Dr. Matthew G. Osborn's Testimony, ECF No. 393; Gov't's Mot. *in Limine* to Limit Pls.' Expert Professor Maydew's Testimony, ECF No. 394; Gov't's Mot. *in Limine* to Exclude Testimonies of Messrs. James Pagano, George Revock, Damon Huplosky, and Anthony Johnston, ECF No. 395; Gov't's Mot. *in Limine* to Exclude Pagano Ex., ECF No. 396.

On 23 January 2025, the Court held an in-person oral argument regarding the parties' Motions *in limine.  See* 16 Dec. 2024 Order, ECF No. 403.  During the oral argument, the Court found as moot plaintiffs' Motion *in limine* because the parties agreed to submit supplemental sur-rebuttal and sur-sur-rebuttal expert reports, and if necessary, conduct supplemental expert depositions.  *See* 27 Jan. 2025 Order at 2–3, ECF No. 409.  The parties further agreed to stay the government's four Motions *in limine* [until after trial] given the lack of any prejudice if the Court

- 5 -

were to hear all the evidence.  *See id.* at 3.

The Court commenced an eleven-day retrial on 14 July 2025.  During retrial, the government filed two evidentiary motions.  On 6 October 2025, the parties filed their post-trial Proposed Findings of Fact and Conclusions of Law ("PFFCL").  *See* Pls.' PFFCL, ECF No. 463; Gov't's PFFCL, ECF No. 466.  The Court held closing arguments on 17 February 2026.  23 Dec. 2025 Order, ECF No. 482.

### III.    The Federal Circuit's Remand Instructions for Retrial

In the Federal Circuit's Opinion vacating the first trial decision prior to reassignment, it laid out a clear framework, noting the "Court [of Federal Claims] will have to make a factual determination as to the allocation of purchase price."  *Alta Wind I*, 897 F.3d at 1377.  Specifically, the Federal Circuit ruled plaintiffs' acquisitions of the Alta facilities were "applicable asset acquisitions" under I.R.C. § 1060, so a determination of basis for a cash grant under ARRA § 1603 requires an allocation of purchase price to seven asset classes according to the regulations implementing I.R.C. § 338:

> The regulations implementing I.R.C. § 338 set out a method of allocation—the residual method—in which the consideration is distributed among seven asset classes, some classes for tangible assets and others for intangible assets.  Those asset classes include:
>
> > Class I:  Cash and general deposit accounts.
> > Class II:  Actively traded personal property, certificates of deposits, U.S. government securities and publicly traded stock.
> > Class III:  Debt instruments.
> > Class IV:  Inventory and other property held for sale to customers.
> > Class V:  Assets that do not fit within any other class, including tangible property.
> > Class VI:   I.R.C. § 197 intangibles, including contract rights, but not goodwill and going concern value.
> > Class VII:  Goodwill and going concern value.
>
> *See* Treas. Reg. § 1.338-6(b).  The consideration is allocated among these classes in the order they are listed in a "waterfall" fashion, using the fair market value of the assets within each class.  *See id.*  The parties agree that none of the assets at issue in this case fits within Class I, II, III, or IV.  As noted above, the Alta transactions included both tangible property and intangible property (including PPAs).  The purchase price must therefore be allocated to Class V, then to Class VI, and finally to Class VII, if any value remains.

*See id.* at 1376.  Central to this process is "the issue of turn-key value and its relationship to § 1060."  *Id.* at 1377.  The Federal Circuit held the court's trial decision prior to reassignment improperly attributed all purchase price in excess of the development and construction costs to turn-key value of the tangible assets.  *See id.*  Noting turn-key must be distinguished from

goodwill and going concern value, the Federal Circuit narrowed the issues for this Court at retrial significantly: "In applying the § 1060 residual method, the [Court of Federal Claims] must distinguish between turn-key value and goodwill and other intangibles." *Id.* The Federal Circuit adopted the definition of "turn-key value" from *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974), leaving this Court to determine "the incremental value 'a buyer would pay . . . for such an assurance that the plant and equipment [of the Alta facilities] would all work together without need of costly and time-consuming adjustments and coordination.'" *See Alta Wind I*, 897 F.3d at 1377 (quoting *Miami Valley*, 499 F.2d at 680). At retrial, the process of determining the fair market value of the eligible assets, including a turn-key premium, largely came down to the parties' dispute over valuation methods—plaintiffs advocate a discounted cash flow valuation methodology ("DCF" or "income approach"), while the government advocates a "replacement cost" methodology ("cost approach"). *See* Section IX, *infra*.

## IV.    Fact Witnesses

At retrial, the Court heard testimony from the following fact witnesses: James Pagano, George Revock, Damon Huplosky, and Anthony Johnston. The parties further designated portions of the transcripts from the first trial to be used in the retrial, including testimony from the following fact witnesses from the first trial who did not testify at the retrial: Lance Markowitz, James Spencer, Donald Settle, and Ellen Neubauer.[3] *See* 1 Apr. 2025 Order at 5, ECF No. 423.

### A.    Testimony of Mr. James Pagano

James Pagano, a fact witness for plaintiffs, served as Chief Executive Officer of Terra-Gen, the developer of the Alta facilities, for about 17 years. *See* Tr. at 2547:11–2549:19; Pls.' Suppl. Ex. List, Witness List, Test. Designations, and Expert Rpt. Designation, ECF No. 386. At retrial, Mr. Pagano testified to Terra-Gen's development of the Alta facilities in the Tehachapi Pass, an "attractive" and "productive" region for wind resources due to the "unidirectional" wind that "blows basically one direction from the Pacific to the Mojave." Tr. at 2565:21–2566:13; *see also* PX-0227 (National Renewable Energy Laboratory ("NREL") Wind Power Map). In addition, according to Mr. Pagano, SCE, a utility company servicing the Los Angeles energy market, had made little progress to meet California's renewable energy portfolio standard, which provided another "high mark" making "Alta both unique and valuable." *See* Tr. at 2572:23–2578:6. Further benefitting Terra-Gen, Mr. Pagano stated during rebuttal SCE ratepayers would fund the system upgrades necessary to accommodate the Alta facilities. *See* Tr. at 5128:21–24; *see also* Tr. at 2958:11–2959:11 (Mr. Pagano agreeing with the government's characterization of SCE covering network upgrade costs not normally picked up by a utility company).

Mr. Pagano testified Terra-Gen bought out Allco (the entity with the right to invest in and own the Alta facilities) and Oak Creek (the original developer), thus taking over development of

---

[3] The parties also designated excerpts from the transcript of the first trial in 2016 for each of the testifying fact witnesses at the 2025 retrial. *See* Gov't's Trial Witness List, ECF No. 389; Pls.' Supplemental Exhibit List, Witness List, Testimony Designations, and Expert Report Designation, ECF No. 386.

the project. *See* Tr. at 2589:7–18. According to Mr. Pagano, the Alta facilities cost Terra-Gen about 2.3 billion dollars in total, with the buyout of Allco representing less than ten percent of that cost. *See* Tr. at 2596:14–2597:1. Regarding the subsequent Alta sales to plaintiffs, Mr. Pagano stated Terra-Gen had a "turnkey obligation" "[t]o oversee the construction and make sure it all came together properly and then essentially guarantee that it was going to come together properly based upon our equity at risk." Tr. at 2599:15–20, 2606:13–16. As part of this turn-key contract, Mr. Pagano testified Terra-Gen bore the risk of labor strikes, delays, obtaining Federal Aviation Administration ("FAA") approvals and building permits, the presence of endangered species, and any consequential damages. *See* Tr. at 2609:17–2626:17. Mr. Pagano stated a gas plant he worked on at a previous employer required him to pay "a minimum of 20 percent of the contract price" to secure a turn-key premium for a "full wrap" turn-key facility wherein the contractor assumes all turn-key risks. Tr. at 2600:20–2601:11. While Mr. Pagano conceded "[t]he description for what ultimately needs to be delivered in a BOP contract, balance of plant contract, is similar to what needs to be delivered in a turnkey contract, in that we're contracting for them to build our facility and deliver it to us as a completed facility," he distinguished between the two by noting differences in allocation of risk, responsibilities in coordinating various contractors, and exposure to monetary damages. *See* Tr. at 5123:10–5126:20. Mr. Pagano then discussed Terra-Gen's acquisition of queue positions, *see* Tr. at 2641:19–2678:7, 2960:7–15, lease agreements, *see* Tr. at 3136:25–3148:20, power purchase agreements ("PPAs"), *see* Tr. at 2713:18–2718:15, 2831:19–2875:15, wake impact agreements, *see* Tr. at 2721:19–2724:3, and Balance-of-Plant ("BOP") contracts, *see, e.g.*, Tr. at 3073:10–3086:14.

Terra-Gen did not originally intend to sell the Alta facilities upon their completion, as it planned to operate them to "construct and build an entity that has a substantial asset base." Tr. at 2678:13–16. Mr. Pagano explained Terra-Gen had to sell the Alta facilities for anyone to collect a cash grant, however, because some of Terra-Gen's owners were tax-exempt and, despite lobbying Congress to remove the bar to Section 1603 grants for non-profits, Terra-Gen's efforts were unsuccessful. *See* Tr. at 2680:20–2681:7; *see also* Tr. at 2679:19–23 (explaining Section 1603's prohibition of a recipient having any tax-exempt ownership and Terra-Gen having ten percent tax-exempt ownership), 2682:7–10 ("[W]e were not able to apply for a cash grant."). Mr. Pagano noted, however, Terra-Gen was not under a compulsion to sell, "other than the fact that it couldn't qualify for a cash grant itself." Tr. at 2687:17–20; *see also* Tr. at 2711:21–23. To ensure the Alta facilities could qualify for a cash grant, Terra-Gen "had to sell" to grant-eligible owners before the facilities went into service. *See* Tr. at 2689:7–19. At the time the cash grant applications were filed, Terra-Gen had already sold the Alta facilities. *See* Tr. at 2689:20–23. While Terra-Gen sold Alta VI outright to EverPower, Mr. Pagano testified Terra-Gen entered into a sale-leaseback transaction with General Electric and Union Bank of California for Alta I and with Citibank for Alta II through V. *See* Tr. at 2690:10–13. Under the sale-leaseback transactions, Mr. Pagano explained Terra-Gen sold each Alta facility to its respective buyer, but the buyer would immediately lease the facility back to Terra-Gen for it to operate. *See* Tr. at 2690:22–2691:5; *see also* Tr. at 2691:13–23 (explaining Terra-Gen preferred a sale-leaseback transaction structure on the older Alta facilities to maintain an operating role while still receiving residual cash flows from the project). While Terra-Gen operates the facility, Mr. Pagano continued, the buyers would "own the facility and take the tax benefits, receive rent on [the] lease and own the facility indefinitely." Tr. at 2691:2–4. Relying on Treasury guidance,

Mr. Pagano stated the sale-leaseback transaction "was an appropriate method . . . to [resolve] the tax-exempt ownership issue" preventing Terra-Gen from applying for the cash grant. Tr. at 2691:24–2692:19 (citing JX-0126 (Treasury Guidance on "Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009")). Mr. Pagano later summarized as follows: Terra-Gen "entered into a sale-leaseback transaction and an outright sale on the facilities because the economics associated with the grant were substantial enough that we needed to assure that we could receive that, and to do that required a sale." Tr. at 2766:7–11. To clarify how Terra-Gen could "receive" a cash grant through a sale, Mr. Pagano explained the purchase price Terra-Gen received would include the financial benefit of a cash grant "because we were selling the stream of cash flows . . . [and] one of those cash flows was the grant proceeds"—with the caveat Terra-Gen still had to pay taxes on any gain from the sale of the Alta facilities. *See* Tr. at 2783:24–2784:3.

According to Mr. Pagano, even though Terra-Gen charged a sale price reflecting the value of the cash grants plaintiffs anticipated (and a premium for "derisk[ing]" the assets), Terra-Gen would have been better off financially if it could have applied for the grants itself because the sale of the Alta facilities triggered tax liability. *See* Tr. at 2766:18–2767:4, 2770:14–2771:15, 2782:24–2783:14, 2784:11–15, PX-0900 (Pagano Exhibit). To substantiate this claim, Mr. Pagano presented the so-called "Pagano Exhibit"—comparing cash grants for scenarios in which Terra-Gen retained ownership—and concluded Terra-Gen would have received about 40 million dollars more had it been able to apply for the cash grants itself. *See* Tr. at 2782:13–20; PX-0900 (Pagano Exhibit); *see generally* Tr. at 2771:16–2792:22 (walking through the contents of the Pagano Exhibit). Mr. Pagano testified the Pagano Exhibit demonstrates Terra-Gen did not seek to inflate the cash grants through the sale of the Alta facilities because Terra-Gen ultimately received lower financial benefits from the cash grant after a sale (due to tax liability) compared to if Terra-Gen were allowed to apply for the grant itself with no sale. *See* Tr. at 2784:4–15. Mr. Pagano further emphasized his view the parties to the transaction were shortchanged because the government not only properly taxed Terra-Gen on the proceeds of the sale, but also improperly disregarded purchase prices in determining plaintiffs' eligible basis for the cash grants. *See* Tr. at 2800:3–2806:1 ("We're essentially paying taxes on grant proceeds in the form of the gain on sale, but then that basis is being ignored in determining the grant that we're entitled to.").

Plaintiffs designated portions of Mr. Pagano's testimony from the first trial, including testimony discussing royalty rates under the land leases Terra-Gen conveyed to the purchasers of the Alta facilities, *see* Tr. at 612:13–621:5, Terra-Gen's valuation of a small number of parcels of land Terra-Gen conveyed to plaintiffs at no separate charge, *see* Tr. at 406:13–414:25, and subsequent facts Mr. Pagano learned concerning curtailment and liquidated damages allegedly demonstrating the Alta PPAs were not favorable to Terra-Gen or plaintiffs, *see* Tr. at 245:6–253:23. The government also designated portions of Mr. Pagano's testimony from the first trial, including testimony discussing the DCF valuation model employed by plaintiffs, *see* Tr. at 186:17–204:17, the sale-leaseback structure of the transactions for Alta I–V, *see* Tr. at 184:23–185:19, and comparable land lease royalty rates in August 2010, *see* Tr. at 560:9–562:22.

## B.    Testimony of Mr. George Revock

- 9 -

Mr. George Revock, a fact witness for plaintiffs and the government, is a former Citibank employee who negotiated Citibank's purchase of Alta facilities II–V. *See* Tr. at 3198:4–3199:15; Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation. Mr. Revock testified Citibank, a sophisticated and well-informed buyer, *see* Tr. at 3248:1–7, used a DCF model to determine purchase prices because DCF best reflected "the actuality of the revenues and experiences associated to a particular project,"[4] Tr. at 3223:25–3224:5; *see also* Tr. at 3230:20–25, 3237:23–3238:5. Mr. Revock testified Citibank also employed appraisals from DAI Management Consultants ("DAI") to estimate anticipated cash grant values. *See* Tr. at 3249:1–5, 3250:12–14. DAI's final appraisal identified ninety-three percent of the Alta facilities as grant-eligible. *See* Tr. at 3253:2–4; Tr. at 3207:15–18. Mr. Revock noted DAI based its final appraisal on projected construction costs associated with the eligible property, and Citibank found the eligibility percentage reasonable. *See* Tr. at 3253:5–8, 19–22, 3256:3–5. According to Mr. Revock, DAI's appraisal value also reflected the turn-key value of Alta II through V, as Citibank believed it was "purchasing an operating asset, an integrated facility, [meaning it] is completed for its intended use, placed in service, generating power." Tr. at 3258:14–16. Mr. Revock noted Citibank saw turn-key value as important because property eligible for a cash grant "must be installed, tested, and [] ready and capable of being used for its intended purpose." Tr. at 3259:4–16.

According to Mr. Revock, turn-key value is inherent in the DCF valuation method because revenues begin "coming in from day one." *See* Tr. at 3260:19–23. As such, Mr. Revock testified Citibank did not treat: (1) the wind resource at the Alta site, *see* Tr. at 3275:12–16, (2) locational value, *see* Tr. at 3275:21–3276:5, or (3) tax benefits as a separate intangible or a component of goodwill, *see* Tr. at 3276:22–3277:3, and denied receiving any brand names, patents, or customer lists through the Alta transactions, *see* Tr. at 3278:23–3279:7. Mr. Revock also testified he did not believe a replacement cost valuation would capture turn-key value as completely as a DCF model because replacement cost may not capture all the variables associated with making the asset operational—namely, the associated integration of all the components generating power. *See* Tr. at 3260:24–3261:9. Mr. Revock also noted a replacement cost valuation "does not incorporate the value of any tax credits that were eligible for these projects," nor does it capture the quality of the wind resource because wind drives revenues. *See* Tr. at 3263:1–4, 8–12; *see also* Tr. at 3274:21– 25, 3275:10–15 (indicating Citibank did not separate wind resource from DCF or treat it as an intangible). Conversely, Mr. Revock testified to his belief DCF is the best approach to capture all those variables. *See* Tr. at 3263:13–19. To further support DCF as the proper valuation model, Mr. Revock testified the PPA with SCE made cash flow more predictable because it provided stable revenues for the first twenty-five years of operation, driving eighty to eighty-five percent of the value. *See* Tr. at 3265:8–12, 18–20, 3267:1–7.

---

[4] According to Mr. Revock, in conducting due diligence, Citibank consulted with the consulting firm Garrad Hassan for technical analysis regarding the strength of wind power to support projected cash flow. *See* Tr. at 3243:15–3244:1, 3244:6–20. Mr. Revock later conceded Garrad Hassan's analysis may have been flawed. *See* Tr. at 3288:18–3290:16 (discussing an email Mr. Revock wrote, *see* JX-0623, criticizing Garrad Hassan as having "been wrong more than most").

Mr. Revock recalled Citibank and Terra-Gen agreed to a tax indemnity provision meant to protect Citibank in the event the Treasury's cash grant payments were less than expected. *See* Tr. at 3268:11–14, 3269:20–25. In Mr. Revock's experience, such a provision is common. *See* Tr. at 3268:19–20 ("I am unfamiliar with any transaction that does not have a tax indemnity agreement."). Mr. Revock testified Citibank would not have moved forward with the Alta transactions without a tax indemnity. *See* Tr. at 3317:18–19. Mr. Revock later explained on cross-examination Terra-Gen and Citibank structured the transactions to ensure Citibank always received cash flow, putting the burden of low power output on Terra-Gen. *See* Tr. at 3299:3–8, 3303:9–13, 3304:17–21, 3306:16–20 ("If the project doesn't do well, it's Terra-Gen's problem, as long as you can meet the lease payments."). Mr. Revock stated this cash flow did not include the cash grant because only Citibank is eligible for the cash grant. *See* Tr. at 3336:22–23; Tr. at 3337:4–16.

## C.    Testimony of Mr. Damon Huplosky

Mr. Huplosky is Terra-Gen's tax director and has thirty years of experience in tax and accounting. *See* Pls.' Trial Witness List, ECF No. 110, at 1; Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation at 11; Tr. at 3340:15–18. Mr. Huplosky was the principal drafter of the cost segregation reports separating grant-eligible from grant-ineligible property for the Alta transactions. *See* Tr. at 3340:23–3341:1. In drafting the cost segregation reports, Mr. Huplosky recalled he relied heavily on an appraisal from Duff & Phelps, a valuation firm, dividing the purchase price for the assets purchased from Allco and separating development rights and transition costs. *See* Tr. at 3392:21–3393:6. Mr. Huplosky also stated a Terra-Gen accountant, Joe Krol, performed several significant markups based on certain excluded costs and additional turbine payments. *See* Tr. at 3447:7–3451:19.

When distinguishing grant-eligible from grant-ineligible property, Mr. Huplosky stated he looked for which property produced energy, based on guidance from the Department of the Treasury. *See* Tr. at 3348:1–4. Mr. Huplosky explained grant-eligible property included anything integral to the construction, operation, or maintenance of the windfarm. *See* Tr. at 3348:25–3349:22. Mr. Huplosky distinguished electrical transmission equipment, transmission rights, and buildings as ineligible but identified wind turbines, turbine foundations, met towers,[5] and roadways leading to the turbines as eligible. *See* Tr. at 3349:9–3350:8, 3353:11–17, 3354:6–18. While Mr. Huplosky initially identified grant-eligible and grant-ineligible property, KPMG had the final say. *See* Tr. at 3384:4–6 ("[THE GOVERNMENT:] Did KPMG always have the last word on what was eligible and ineligible? [MR. HUPLOSKY:] Yes.").

Mr. Huplosky further distinguished direct costs from indirect costs. *See* Tr. at 3350:25–3351:4. Direct costs, according to Mr. Huplosky, are "the actual equipment purchased as well as the labor that goes into installing that equipment." Tr. at 3351:6–8. Direct costs could be grant-eligible, like wind turbine or substation equipment, or grant-ineligible, like the actual transmission lines. *See* Tr. at 3351:13–3355:6. Indirect costs are all other costs of construction, such as permitting costs, interest on construction, property taxes, and insurance. *See* Tr. at

---

[5] Met towers "help measure the wind speed at various heights and the wind direction" and are "integral" to placing wind turbines "so that they work optimally." Tr. at 3353:4–10.

- 11 -

3351:16–20.  Mr. Huplosky identified two types of indirect costs:  (1) account-specific, which relate to a particular set of assets, such as a permit for a substation's construction; and (2) project, which relate to the entire facility, such as Interest During Construction.  *See* Tr. at 3355:10–25.  Regardless of the type of indirect cost, according to Mr. Huplosky, 26 U.S.C. § 263A requires capitalization of both.  *See* Tr. at 3356:13–15.  Mr. Huplosky testified capitalization allowed him to allocate indirect costs, which lack value *per se*, to direct costs with value.  *See* Tr. at 3357:13–18.  Mr. Huplosky stated he followed Treasury guidance to allocate indirect costs to different categories of direct costs, *pro rata*, rendering some indirect costs grant-eligible, depending on the eligibility of the direct cost receiving the allocation.  *See* Tr. at 3357:19–3361:6.  Mr. Huplosky identified the Oak Creek Development Fee and Interest During Construction as examples of partially grant-eligible indirect costs after allocation to eligible direct costs.  *See* Tr. at 3377:23–3379:5, 3385:5–20; *see also* Tr. at 3388:4–15 (same treatment for development rights).  Mr. Huplosky stated KPMG and the other big four accounting firms approved the practice, aligning with Mr. Huplosky's previous experience.  *See* Tr. at 3384:7–10 (Interest During Construction), 3389:25–3390:6 (development rights), 3391:23–3392:7 (common practice), 3515:9–15 (big four approval of the *pro rata* method).  Applying this method to Alta I, $399,666,440 of Terra-Gen's $437,710,639 costs were grant-eligible.  *See* Tr. at 3401:4–3402:3.

When discussing the basis calculation for Alta I, Mr. Huplosky testified he began with the amount of purchase price allocated to property, plants, and equipment ("PP&E") in the DAI appraisal.  *See* Tr. at 3408:21–3409:1.  From there, he removed non-construction, selling, and non-capitalizable costs from the PP&E, which left only the grant-eligible construction costs.  *See* Tr. at 3408:2–16, 3409:9–16.  Then, Mr. Huplosky took the grant-eligible construction cost, $399,666,440, and divided it by the total construction cost, which equated to a 93.1% grant-eligible ratio for Alta I.  *See* Tr. at 3409:17–3410:1.  According to Mr. Huplosky, this method is "the gold standard in terms of allocating the price" paid for a "facility amongst the assets of the facility" and is regularly employed by the big four accounting firms.  Tr. at 3411:15–3412:16.  Mr. Huplosky stated he applied the same method to Alta VI to obtain a 96.0489% ratio, which KPMG also approved.  *See* Tr. at 3427:4–6.  For Alta II through V, however, Mr. Huplosky explained he did not need to conduct cost-segregation into grant-eligible and grant-ineligible costs because Citibank only purchased grant-eligible assets.  *See* Tr. at 3427:11–20.

### D.    Testimony of Mr. Anthony Johnston

Mr. Anthony Johnston, a fact witness for plaintiffs and an audit partner at KPMG, oversaw KPMG's accounting and audit work concerning Alta I–VI.  *See* Tr. at 3538:24–3540:11, 3541:21–3542:22, 3544:20–3545:4.  Mr. Johnston testified his team concluded the construction costs Terra-Gen designated eligible for Alta I–VI "were fairly stated in all material respects."  Tr. at 3545:11–12, 3556:19–3559:22.  To reach this conclusion, Mr. Johnston explained KPMG "reviewed all of the key agreements" and supporting documents, including disbursements and banks statements, to confirm alignment with Section 1603.  *See* Tr. at 3545:15–24.  Primarily, Mr. Johnston said his team focused on "vouching that all the costs [] were incurred as part of building out the project," with "vouching" defined as, "a type of audit procedure where you gain supporting documentation [] that supports the books and records, the underlying transactions."  Tr. at 3546:13–23.  Mr. Johnston also testified to KPMG's awareness of Terra-Gen's bias given

the economic incentives for increasing eligible cost values.  *See* Tr. at 3575:22–3576:8. According to Mr. Johnston, KPMG employees spent over one thousand hours preparing the audit of the Alta projects.  *See* Tr. at 3559:25–3560:4.

Mr. Johnston noted the KPMG audit report covered only "management's overall assertion on the total eligible costs," *i.e.*, KPMG's analysis assumed Terra-Gen's numbers were correct and only evaluated whether the numbers were categorized correctly.  *See* Tr. at 3583:12–14; *see also* Tr. at 3569:3–7 ("I'm not auditing percentages, I'm auditing the eligibility of the costs within management's assertion.").  In addition, Mr. Johnston clarified KPMG did not "vouch" ineligible costs, as only eligible costs mattered for calculating the Section 1603 cash grant.  *See* Tr. at 3581:14–18; *see also* Tr. at 3586:6–8 ("[THE GOVERNMENT:]  Do you know whether the KPMG audit team vouched ineligible costs for the Altas other than II?  [MR. JOHNSTON:]  I don't recall.").  Despite audit language referring to "all costs," Mr. Johnston explained such language only "meant to refer to all eligible costs."  Tr. at 3581:19–3582:5. Similarly, Mr. Johnston testified he relied extensively on the expertise of Katherine Breaks and Kevin Turk (both of KPMG), as these individuals were the "experts around determining which costs were eligible and which costs were ineligible."  *See* Tr. at 3563:20–24, 3573:22–23, 3580:22–3581:2.  Accordingly, Mr. Johnston could not testify in detail as to Mr. Turk's work on eligible and ineligible costs.  *See* Tr. at 3573:25–3574:2 ("I don't recall this work paper in a detailed level, no.").

## V.     Expert Witnesses

At retrial, the Court heard testimony from the following expert witnesses from plaintiffs: Dr. Edward Maydew and Dr. Matthew Osborn.  *See* Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation at 12–13.  Dr. Osborn testified in place of plaintiffs' previous expert, Dr. Colin Blaydon, after Dr. Blaydon withdrew due to serious medical issues. *See* 23 Feb. 2024 Order, ECF No. 375.  The Court heard from Dr. John Parsons, Dr. Glenn George, and Dr. Jennifer Blouin for the government.  Gov't's Trial Witness List at 1–2.  The parties further designated some portions of the transcripts from the first trial to be used in the retrial, including testimony from Dr. Blaydon, who did not testify at the retrial.  *See* 1 Apr. 2025 Order at 5, ECF No. 423; Gov't's Trial Witness List at 2–3.

### A.     Testimony of Dr. Edward Maydew

Plaintiffs' first expert witness, Dr. Edward Maydew,[6] is a Distinguished Professor of Accounting and a Senior Executive Director of the Tax Center at the University of North Carolina at Chapel Hill and has published numerous academic works relating to tax and finance. *See* Tr. at 3589:7–3593:25, 3599:12–3601:5.  Dr. Maydew has a Bachelor's degree in accounting from Iowa State University and a Ph.D. in accounting from the University of Iowa.  *See* Tr. at 3597:6–9.  At retrial, Dr. Maydew testified concerning the opinions set forth in his expert reports

---

[6] The Court already recognized Dr. Edward Maydew as an expert witness in tax and financial accounting in the first trial.  *See* Tr. at 3607:19–3608:7; Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation at 19–20 (designating "only testimony from the first trial concerning [Dr. Maydew's] expert credentials, as well as the Court's ruling accepting Dr. Maydew as a tax accounting expert.").

dated October 2015, December 2015, and September 2021. *See* Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation at 12–13.

Dr. Maydew introduced the income approach and how to apply it properly, discussing the mechanisms of DCF and the Section 1060 waterfall approach. *See, e.g.*, Tr. at 3659:3–9, 3703:14–22; *see also* PX-0326.006–007 ¶¶ 1–8 (Maydew Expert Rpt.). Dr. Maydew did not, however, provide an opinion as to whether income or cost approach[7] is best for the Alta transactions. *See* Tr. at 3723:5–9 ("[PLAINTIFFS:] Are you here to testify as to whether the approach should be the income approach or the cost approach? [DR. MAYDEW:] No. That's not my role."). Regarding the Section 1060 waterfall approach, Dr. Maydew explained, "you're going to start to allocate that purchase price across these seven asset classes, in order, according to the fair market value of the assets in each asset class." Tr. at 3703:23–3704:1. Next, Dr. Maydew testified, the remaining purchase price acts "like water and will flow into the next bucket," or asset category, explaining "you only move on to the next bucket if there's remaining purchase price after filling up the buckets before it." Tr. at 3704:4–7, 3706:14–17. If an asset class has an assessed value worth more than the remaining purchase price, Dr. Maydew explained all remaining purchase price goes into that asset class. *See* Tr. at 3707:1–7. Regarding the classification of turn-key value, Dr. Maydew noted, turn-key value is not treated as a separate asset, but rather "as part of the underlying asset." Tr. at 3707:11–17; *see also* Tr. at 3716:19–3717:1 (describing a similar treatment for location value, assuming a buyer paid for it); PX-0326.016–017 ¶ 7 (Maydew Expert Rpt.).

Regarding fair market valuations under the income approach, Dr. Maydew testified the goal of DCF is to estimate net present value. *See* Tr. at 3659:5–14. He described net present value as "expressing future cash flows" in present-day dollars. *Id.* Dr. Maydew noted "calculations of net present value must reflect all cash flows, including any tax costs or tax savings resulting from the transaction." Tr. at 3665:13–18, 3690:6–9; *see also* PX-0995.006 ¶ 1 (Maydew Suppl. Expert Rpt.). In short, according to Dr. Maydew, "[c]ash flows before tax have no relevance." Tr. at 3665:16. Tax benefits, such as a cash grant, *see* Tr. at 3709:3–4, then, according to Dr. Maydew, are treated as cash inflows, *see* Tr. at 3666:19–24. Dr. Maydew stated cash grants are "designed to be like an investment tax credit"[8] ("ITC"), Tr. at 3709:6–8, which increases the value of an asset "because it's increasing your cash flows from the asset," Tr. at 3684:18–3685:8. Dr. Maydew testified a property with tax-favorable treatment will cause buyers to bid higher for the favorable treatment, so the favorable tax treatment is not considered an asset separate from the property itself. *See* Tr. at 3668:17–19, 3670:15–19, 3685:19–24. Thus, Dr. Maydew explained paying more for a tax benefit connected to a property will increase a buyer's

---

[7] During a brief discussion on cost approach, Dr. Maydew noted the costs Terra-Gen incurred to acquire the property from Allco, including intangibles like engineering studies and building permits, remain capitalized into the value of the property. *See* Tr. at 3721:12–3722:7.

[8] Dr. Maydew distinguished between a tax deduction (such as depreciation) and a tax credit (such as those contained in Section 1603). *See* Tr. at 3652:14–21, 3663:7–17 ("A dollar of depreciation expense would save you a dollar multiplied by your tax rate, whereas a dollar of tax credit just saves you a dollar in taxes."). Dr. Maydew explained depreciation for tax purposes converts money from basis "into tax deductions, depreciation expense, and every dollar of tax depreciation expense" multiplied by the "marginal tax rate in that given year" to provide "tax savings for the taxpayer." *See* Tr. at 3636:2–8.

tax basis.[9]  Tr. at 3679:19–3680:10.  When calculating the fair market value of an asset to be categorized in the waterfall approach, Dr. Maydew described a common practice of iteratively calculating tax benefits:  starting with a base cash flow, calculating its expected tax benefits, adding these tax benefits to the base cash flow, and then using the result as the new base cash flow to calculate expected tax benefits—repeating the process until basis[10] converges to the actual fair market value.  *See* Tr. at 3693:18–5697:20.

## B.      Testimony of Dr. Matthew Osborn

Dr. Osborn is a finance and valuation expert, who replaced Dr. Colin Blaydon as plaintiffs' valuation expert,[11] *see* 23 Feb. 2024 Order, and testified as to why a DCF is the most appropriate valuation methodology to determine the fair market value of the Alta facilities, *see* Tr. at 3769:11–19; *see also* PX-0299.008 ¶ 12 (Blaydon Initial Rpt.).  In the first trial, Dr. Osborn collaborated with Dr. Blaydon in preparing Dr. Blaydon's reports, and Dr. Osborn later supported Dr. Blaydon when he testified.  *See* Tr. at 3795:16–20, 3796:3–4.  Accordingly, Dr. Osborn adopts and shares the opinions of Dr. Blaydon, *see* Tr. at 3796:5–10, and testified concerning the opinions set forth in Dr. Blaydon's expert reports dated October 2015 and December 2015, as well as Dr. Blaydon and Dr. Osborn's joint expert report dated September 2021, *see* Pls.' Suppl. Ex. List, Witness List, Test. Designations, & Expert Rpt. Designation at 12.

Dr. Osborn explained a DCF asset valuation applies a discount rate to an asset's future cash flows to estimate the present value of the asset's cash flows.  *See* Tr. at 3814:21–3815:7.  Dr. Osborn opined an appropriate "discount rate [reflects] the riskiness of [the asset's] cash flows."  Tr. at 3805:20–23.  According to Dr. Osborn, "a simple proposition" provides the basis for DCF:  "The value of an asset is not what someone perceives it to be worth, but rather it is a

---

[9] According to Dr. Maydew, identical properties may have different tax bases, depending on whether one is determining basis for a buyer or seller.  *See* Tr. at 3648:17–3649:8.  Dr. Maydew explained a "buyer's basis is determined by what the buyer pays" for the asset, even if the buyer borrows some of the purchase money.  *See* Tr. at 3639:1–7, 3642:17–21.  Dr. Maydew noted other costs, such as the seller's cost of construction or profit margin, are not relevant to the buyer's overall basis, as basis from a buyer's perspective only considers what the buyer paid for the asset.  *See* Tr. at 3637:22–3638:2, 3638:10–25.  While a buyer takes basis in what it pays for an asset, Dr. Maydew testified a developer selling the asset takes basis in "the cost of construction."  Tr. at 3643:13–23.

[10] Dr. Maydew clarified an asset owner's tax basis typically only approximates the asset's fair market value at the time of purchase because asset values may fluctuate with the market post-purchase.  *See* Tr. at 3729:10–16.

[11] Given Dr. Osborn's purpose in replacing Dr. Blaydon as an expert witness, the Court first heard foundation to enable the Court to recognize Dr. Osborn as an expert.  Dr. Osborn testified to his extensive professional and academic experience in financial economics, with an emphasis on asset pricing and corporate finance.  *See* Tr. at 3769:11–3794:6.  He has a Bachelor's degree in economics from the Virginia Commonwealth University, a Master's degree in economics with a concentration in finance from the University of Edinburgh, and a Ph.D. in finance from Boston College.  *See* Tr. at 3769:23–24, 3791:13–18.  In addition, Dr. Osborn has a chartered financial analyst certification, has published on financial issues, and has presented academic research to various audiences.  *See* Tr. at 3775:10–21, 3776:25–3777:8, 3781:12–19.  Currently, Dr. Osborn works at Cornerstone Research, a consulting firm specializing in financial and economic analysis, and has previously applied his financial expertise to energy matters involving power production.  *See* Tr. at 3771:11–19, 3783:2–15.  While declining to rule on the government's objections to Dr. Osborn, consistent with the Court staying the government's motion *in limine* seeking to limit or exclude Dr. Osborn's testimony pending trial, the Court recognized Dr. Osborn as an expert in finance and valuation.  *See* Tr. at 3799:24–3800:14.

function of the expected cash flows on that asset." Tr. at 3815:12–15; *see also* PX-0299.034–035 ¶ 61 (Blaydon Initial Rpt.). Dr. Osborn then described the effect of the proposition: "[A]ssets with high and predictable cash flows should have higher values than assets with low and volatile cash flows." Tr. at 3815:15–17. Dr. Osborn noted many in his field consider DCF "the gold standard valuation method" because it reflects the economic benefits of owning an asset. *See* Tr. at 3808:10–17. Dr. Osborn testified DCF works best if "you have an income-generating asset that's unique, it's not readily replaceable, and it generates income." Tr. at 3824:18–19; *see also* Tr. at 3822:3–17 (explaining an asset must generate income for DCF to apply, so items such as artwork or items purchased for sentimental value fall outside the best application of DCF). Thus, according to Dr. Osborn, DCF works best for businesses and income-producing assets, regardless of whether the asset is tangible. *See* Tr. at 3817:2–6, 16–17. Using the valuation of an office building as an example, Dr. Osborn opined "[y]ou would look to . . . the economic benefits of owning that asset" rather than component costs because an office building produces income, is difficult to replace, and is a complex and highly-integrated asset. *See* Tr. at 3828:15–3829:5. Thus, Dr. Osborn stated, "you wouldn't value [an office building] by computing what the cost of the cement and the rebar or . . . what type of tile they use or light fixtures." Tr. at 3829:1–3. Accordingly, Dr. Osborn testified DCF captures the turn-key value of the Alta facilities best by measuring the future cash flows it produces as an integrated facility. *See* Tr. at 3857:7–20; *see also* PX-0910.025 ¶ 67 (Blaydon/Osborn Corr. Suppl. Rpt.).

Dr. Osborn defined the cost approach as valuing "what it would cost to . . . recreate" an asset. Tr. at 3807:9–10; *see also* PX-0299.081 ¶ 152 (Blaydon Initial Rpt.). Thus, according to Dr. Osborn, the cost approach works well for readily replaceable assets. *See* Tr. at 3807:10–12, 3831:3–7. Dr. Osborn explained when DCF can be more informative than the cost approach with reference to two identically built hotels, one with an ocean view and one without. *See* Tr. at 3846:17–3847:7. Dr. Osborn proposed DCF would be more appropriate to value these properties than cost approach because a buyer would pay more for the hotel with the ocean view if potential tenants would pay more for the view, regardless of the cost to construct the hotel. *See* Tr. at 3847:23–3848:7. Dr. Osborn similarly explained a buyer would pay more for an oil refinery in Texas than in Maine because the Texas refinery would generate more revenue due to better access to oil. *See* Tr. at 3848:21–3850:6. Dr. Osborn applied the same reasoning to tax-advantaged and non-tax-advantaged assets, opining a buyer would pay more for an asset with the tax benefit, regardless of the cost of construction. *See* Tr. at 3851:2–10; *see also* PX-0910.027–028 ¶ 74 (Blaydon/Osborn Corr. Suppl. Rpt.).

Before explaining how he valued the Alta facilities with DCF, Dr. Osborn explained why DCF is best for calculating the fair market value of the Class V assets under the Section 1060 residual method. Dr. Osborn proposed DCF is more appropriate because the Alta facilities: (1) are unique; (2) are "complex and integrated assets;" (3) are not readily replaceable; and (4) have good data to forecast cash flows. *See* Tr. at 3810:5–19, 3852:12–17. To substantiate these propositions, Dr. Osborn testified the Alta facilities "are located in California, which is an economic environment that's highly favorable to renewal energy facilities, and also they come with valuable tax benefits associated with owning these assets." Tr. at 3840:9–21. Dr. Osborn explained the Alta facilities sit roughly one hundred miles away from Los Angeles, a population center with a consistent demand for electricity, all in the state of California, which requires utilities to procure a portion of their electricity from renewable resources. *See* Tr. at 3843:10–22.

Dr. Osborn testified the Tehachapi wind resource in which the Alta facilities are located "is unique in that you have a desert next to a mountain pass where the desert gets hot during the day, basically draws wind through the mountains," and keeps wind blowing in one direction to reduce strain on the turbines. Tr. at 3842:18–3843:9. Dr. Osborn observed the Alta facilities can be distinguished from simple wind turbines because they reflect a "configuration of those turbines expertly engineered to capture wind from this prime wind resource." Tr. at 3841:8–10. Further, while discussing the turn-key value and replaceability of the Alta facilities, Dr. Osborn testified the Alta facilities include all the foundations, "the service roads, the meteorological towers, the substations, [and] the various other components of the integrated facility that are all together in working order as an integrated asset that's producing income." Tr. at 3841:10–15. Dr. Osborn also noted "the Alta facilities are income-generating assets with cash flows that can be reliably projected." Tr. at 3852:10–12. Dr. Osborn asserted DCF best captures all these value drivers because they are all "reflected in the projections of the expected future cash flows associated with essentially owning this facility." Tr. at 3845:19–3846:4. Moreover, Dr. Osborn recalled the NREL Report, PX-1093 (NREL Renewable Energy Cost Modeling), indicates DCF is the preferred methodology for calculating after-tax cash flows and can take into account federal tax incentives. *See* Tr. at 3883:1–3884:2. According to Dr. Osborn, unlike DCF, the cost approach "does not reflect the fact that the Alta facilities are unique integrated assets that are designed to generate electricity from a prime wind resource." Tr. at 3852:20–23; *see also* PX-0910.027–028 ¶¶ 74–76 (Blaydon/Osborn Corr. Suppl. Rpt.).

Next, Dr. Osborn discussed how he applied DCF to the Alta facilities to determine the value of the Class V tangible property. The process consists of three steps. First, Dr. Osborn looked at cash inflows associated with owning the assets, also known as revenue from operations, which includes the grant value. *See* Tr. at 3860:8–22 ("It's cash in the door."), 3878:20–23 (including a reduction in tax as cash inflow), 3879:1–21 (equating the cash grant to a tax benefit), 3880:4–7 ("To the extent that government subsidy is a cash flow from owning an asset, you would need to include that for appropriately valuing an asset."). Second, Dr. Osborn accounted for cash expenditures leaving the Alta facilities, such as maintenance and operating expenses, expenses to forecast electricity demand, and taxes. *See* Tr. at 3861:6–21. Third, Dr. Osborn discounted the future stream of net cash flows to ascertain the present value using a discount rate. *See* Tr. at 3861:25–3862:15. Dr. Osborn emphasized he looked "at the value of tangible property directly by looking at . . . cash flows . . . discounted by a discount rate that reflects the riskiness of those tangible assets separate from the risk-reducing intangibles." Tr. at 3966:24–3967:6; *see also* PX-0910.015 ¶ 35 (Blaydon/Osborn Corr. Suppl. Rpt.).

Dr. Osborn testified extensively on the discount rate as reflecting the time value of money and the riskiness of the net cash flows. *See* Tr. at 3862:9–15. A riskier cash flow, Dr. Osborn explained, translates to a higher discount rate, which reduces the net present value of an asset. *See* Tr. at 3862:25–3863:10, 3915:6–8; *see also* PX-0910.015 ¶ 36 (Blaydon/Osborn Corr. Suppl. Rpt.). In choosing an appropriate discount rate, Dr. Osborn stressed he sought to "valu[e] the integrated turnkey facility as the tangible . . . Class V property." Tr. at 3887:19–24; *see also* Tr. at 3888:3–5, 3907:11–14 ("[T]he Section 1603 cash grant is for the basis in the eligible property only, which is the electricity-producing assets of the assets we're valuing here."). For example, to discount cash flows in isolation of intangible PPA value in accordance with the Federal Circuit's definition of turn-key, Dr. Osborn used a discount rate reflecting a

development-stage facility not yet in turn-key condition with reduced risk from energy prices locked-in through the PPAs. *See* Tr. at 3918:7–13, 3919:4–7, 3920:9–15, 3925:7–13. According to Dr. Osborn, his approach directly valued the tangible property separate from risk-reducing intangibles excluded from turn-key by the Federal Circuit—*i.e.*, Dr. Osborn valued only "cash flows associated with the sale of electricity and the tax benefits that come with ownership of the tangible property."[12] *See* Tr. at 3919:19–22, 3923:19–3924:3, 3960:14–19 ("[B]y using a development stage discount rate, I have effectively filtered out anything that would contribute to risk for a development stage project or an operational stage project."). Dr. Osborn noted he adjusted the discount rate upward from DCF models in the first trial to account for higher risk from the exclusion of risk-reducing intangibles, thus lowering the present value of the cash flow. *See* Tr. at 3918:20–22, 3921:15–17, 3922:16–19. Dr. Osborn ultimately used a 9.05% discount rate—a "conservative" rate. Tr. at 3923:1, 3930:18–3931:21, 3937:6–10; *see also* PX-0910.017–020 ¶¶ 46–53 (Blaydon/Osborn Corr. Suppl. Rpt.). Using this approach, Dr. Osborn's DCF values fell within ten percent of the respective purchase prices. *See* Tr. at 3969:3–5. On cross-examination, however, Dr. Osborn testified the DCF valuations in the first trial, which used discount rates more appropriate for the actual developmental stage of the facilities, implied total facility values exceeding Alta purchase prices for all six Alta facilities. *See* Tr. at 4055:18–4056:1 (Alta I DCF value of $633 million; purchase price of $560 million), 4056:2–8 (noting smaller differences for Alta II–V), 4056:11–15 (noting a difference exceeding $100 million for Alta VI).

Finally, Dr. Osborn testified he allocated DCF values to eligible tangible property *pro rata* using the KPMG cost segregation reports. *See* Tr. at 3992:10–18, 3998:21–25; *see also* PX-0910.023 ¶ 61 (Blaydon/Osborn Corr. Suppl. Rpt.). To calculate cash grant values, Dr. Osborn multiplied the resulting Class V tangible eligible asset values by thirty percent. *See* Tr. at 4000:9–19. Ultimately, Dr. Osborn determined plaintiffs should have received an additional $205,774,148 in cash grants—roughly half the damages plaintiffs sought in the first trial. *See* Tr. at 4002:2–6; *see also* PX-0299.094 ¶ 184 (Blaydon Initial Rpt.).

C.    **Testimony of Dr. John Parsons**

The government's first expert witness, Dr. John Parsons, has a bachelor of arts in economics from Princeton University, a master's in economics from Northwestern University, and a Ph.D. in economics from Northwestern University. *See* Tr. at 4110:4–7. Throughout his career, Dr. Parsons has worked as a business consultant, including experience with valuations in the energy industry. *See* Tr. at 4120:10–19, 4121:10–17, 4123:10–4125:13, 4126:17–21, 4131:20–4134:21. Previously, Dr. Parsons taught at The City University of New York and Columbia University. *See* Tr. at 4119:19–4120:5, 4121:1–9. Currently, Dr. Parsons is the deputy director of research at the Center for Energy and Environmental Policy Research at the Massachusetts Institute of Technology, and, since starting there in 1984, Dr. Parsons has taught finance, published articles in peer-reviewed journals, and conducted applied work in energy. *See* Tr. at 4109:4–7, 4110:22–25, 4115:15–4117:6. The Court recognized Dr. Parsons "as an expert witness qualified to testify about economics, finance, and valuation, with a particular expertise in the energy industry as to the matters discussed in his opening report, rebuttal report,

---

[12] Dr. Osborn did not calculate a dollar value for the intangibles. *See* Tr. at 3967:7–9.

supplemental report and sur-surrebuttal report."[13]  Tr. at 4139:8–16.  Dr. Parsons testified in support of using the cost approach over the income approach to value the Alta facilities and discussed his initial, rebuttal, and supplemental rebuttal reports.  *See* Gov't's Trial Witness List at 1.

Dr. Parsons applied the cost approach to value the eligible assets.  *See* Tr. at 4141:16–18; *see also* DX-0783.018 ¶ 34 (Parsons Initial Rpt.).  When applying the cost approach, Dr. Parsons explained he looks only for the cost to build the Alta facilities.  *See* Tr. at 4191:18–20; *see also* Tr. at 4145:16–4146:4 (explaining the market decides the price of various elements of the cost used to value a property), Tr. at 4549:8–17 (noting the cost approach does not include costs to tear down the original asset).  The cost approach includes tangible assets, according to Dr. Parsons, but properly excludes intangible assets under Section 1060.  *See* Tr. at 4191:20–4192:9 (using the profit Terra-Gen paid Allco in the acquisition price as an example of an intangible not relevant to the cost approach).  In support, Dr. Parsons distinguished Dr. Maydew's inclusion of intangibles from Dr. Parson's exclusion of intangibles when "trying to figure out the cost of building a windfarm," arguing "the cost clearly does not change even if the basis goes up."  *See* Tr. at 4192:17–4194:6.  Contrary to Dr. Osborn's claim the Alta tangible assets are not readily replaceable, Dr. Parsons stated, "all of the tangible assets I am concerned with valuing are reproducible assets, and that matters because the cost of reproducing them is an important ingredient in valuation."  Tr. at 4205:14–17; *see also* Tr. at 4173:17–4174:10, 4218:22–23.  Specifically, Dr. Parsons noted wind turbines, which account for sixty percent of project costs, have a global market with a price index measured by Bloomberg, indicating these assets are readily replaceable.  *See* Tr. at 4205:24–25, 4207:5–21; *see also* Tr. at 4218:24–4219:2.

Dr. Parsons applied the cost approach in two steps:  (1) itemizing costs by creating a schedule of expenditures; and (2) calculating developer profit.[14]  *See* Tr. at 4232:19–4233:17; *see also* DX-0783.018–019 ¶¶ 34–36 (Parsons Initial Rpt.).  According to Dr. Parsons, the sum of these values is the fair market value of the tangible eligible property for each of the Alta facilities under the cost approach.  *See* Tr. at 4233:3–6.  For example, implementing step 1 for Alta I, Dr. Parsons used the KPMG cost segregation report and isolated construction costs by removing intangibles, Interest During Construction, and the Oak Creek Development Fee to obtain the costs before profit of roughly $338 million.  *See* Tr. at 4233:23–4248:18, 4251:18–4254:1, 4260:20–4260:25.  For step 2, Dr. Parsons calculated developer profit using a capital

---

[13] Dr. Parsons testified for the government during the first trial, but the previous court excluded his testimony under Rule 702 for non-disclosure of past scholarship—a decision the Federal Circuit later reversed.  *See* Tr. at 4109:2–3, 4138:4–11; *Alta Wind I*, 897 F.3d at 1379–82.  Dr. Parsons briefly discussed articles he published during the 1980s but did not include on his CV because he keeps "a separation between [his] professional activities and [his] personal interests," and the undisclosed articles fell in the latter.  Tr. at 4119:5–9.  During cross-examination, plaintiffs' counsel impeached Dr. Parsons for not disclosing all journals with which he was affiliated during the 2016 trial.  *See* Tr. at 4387:6–4389:1.  Dr. Parsons conceded he did not disclose past articles "about what was going on in a Marxist economy" despite telling plaintiffs' counsel his CV, aside from a few unrelated articles, amounted to a complete listing of his publications.  *See* Tr. at 4365:12–4369:10; *see also* Tr. at 4369:11–4373:20.  On re-direct examination, Dr. Parsons testified he had no intent to violate the Federal Rules of Civil Procedure or to deceive plaintiffs' counsel.  *See* Tr. at 4545:17–4546:8.

[14] According to Dr. Parsons, developer profit "is the combination of the profit paid to interest for creditors and the profit that the equity owner gets."  Tr. at 4249:9–11; *see also* Tr. at 4232:24–4233:3 ("I'm going to have to calculate what would be the right rate of return to earn on an investment in the tangible assets.").

- 19 -

asset pricing model to calculate a rate of return owed to "whoever provided the capital to build these things." *See* Tr. at 4254:13–15, 4255:1–7. Dr. Parsons continued, "the capital asset pricing model has a measure of risk, which we call beta, and then it has a risk premium, which is the premium that the market [pays] in returns over and above the Treasury rate." Tr. at 4255:20–24. Applying the capital asset pricing model, Dr. Parsons started with a 2.58% base Treasury rate, then added the base rate to the multiplication of: (1) a heavy construction industry beta of 1.29,[15] times (2) a market risk premium of five percent—ultimately arriving at a 9.03% rate of return. *See* Tr. at 4255:13–17, 4256:3–4258:9. Rather than applying the 9.03% rate to the full capital invested all at once, Dr. Parsons applied the 9.03% rate over time, specific to when construction costs were incurred throughout Alta I's construction, obtaining a developer profit of roughly $41 million for Alta I. *See* Tr. at 4260:3–4261:8. Finally, bringing steps 1 and 2 together, Dr. Parsons added $338 million in construction costs to $41 million in developer profits, estimating the fair market value of Alta I's tangible eligible property under the cost approach to be $379 million. *See* Tr. at 4261:9–17. Repeating this process, Dr. Parsons calculated the value of the eligible assets for all six Alta facilities to be $1,643,428,450—below the basis Treasury used to calculate Section 1603 grants for plaintiffs. *See* Tr. at 4264:12–25; *see also* DX-0783.019 ¶ 37 (Parsons Initial Rpt.).

Dr. Parsons then explained how the cost approach captures turn-key value, noting "[t]he cost method in this case supplies you a completely assembled, installed, integrated, tested, coordinated, and in operating order windfarm." Tr. at 4282:19–24; *see also* Tr. at 4285:13–22, 4463:12–17. Dr. Parsons stated his use of the KPMG cost segregation reports ensured the cost approach included the turbine supply agreement, balance of plant agreement, and other contracts providing for the complete assembly, installation, and testing of the turbines. *See* Tr. at 4271:4–10, 4271:18–4276:22, 4279:13–16, 4281:9–12; *see also* Tr. at 4230:22–4231:8, 4238:13–16. Dr. Parsons also asserted his cost approach adheres to the Federal Circuit's decision regarding turn-key value because it "includes what Terra-Gen agreed to pay the turbine supplier and the balance of plant contractor for assurances that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination." Tr. at 4286:25–4287:6; *see also* Tr. at 4287:22–4288:4.

Dr. Parsons criticized Dr. Osborn's income approach, first explaining broadly why the income approach does not best determine the fair market value of the eligible assets for Section 1603 purposes: "I decided that the income approach, while it's a useful estimate of the business as a whole, is not that useful for the task at hand, which is to understand the value of the eligible assets alone." Tr. at 4141:13–16; *see also* Tr. at 4331:17–19 ("None of the[] textbooks [cited by Dr. Osborn] give exclusive supremacy to the income method. They all use all methods under different circumstances."). According to Dr. Parsons, the income approach fails to account for instances when a project's value increases, but the value of the tangible assets decreases. *See* Tr. at 4210:20–4211:21. Dr. Parsons testified the Alta facilities fit such an instance because the value of some tangible assets, such as turbines, decreased, while the value of the Alta facilities continued to rise. *See* Tr. at 4217:7–9; *see also* DX-0784.006 ¶ 8 (Parsons Rebuttal Rpt.). Dr. Parsons explained the income approach values income generated as "a result

---

[15] According to Dr. Parsons, "1.29 is the beta I received from th[e] Ibottson company . . . That's the beta of the heavy construction industry." Tr. at 4256:4–6.

of the whole combination of assets," but valuing the eligible assets separately under such an approach would further require tearing "different income into pieces," which Dr. Parsons asserts is not possible for the Alta facilities eligible assets.  Tr. at 4211:21–24, 4212:4–6.

Dr. Parsons criticized Dr. Osborn's income approach more specifically with reference to tax incidence, explaining tax costs and benefits should not be attributed fully to the buyer and the eligible assets.  *See* Tr. at 4295:20–4296:1, 4304:10–14, 4307:3–8; *see also* DX-0784.039–040 ¶¶ 71–72 (Parsons Rebuttal Rpt.).  Dr. Parsons stated a tax incidence analysis should ask:  (1) how did the cash grant impact the price of the windfarm business; and (2) what portion of this windfarm business price fluctuation can be attributed to the impact of the cash grant on just the price of eligible assets.  *See* Tr. at 4296:8–25.  For example, regarding the first question, Dr. Parsons views discrepancies between plaintiffs' DCF valuations and transaction prices for the Alta facilities as evidence the buyer and seller each captured portions of the cash grant value indirectly through transaction prices—and thus the cash grant cannot be assumed to have accrued to the buyer in full.  *See* Tr. at 4302:3–15 ("[I]f the buyer captured a part of it, you would see the transaction price be less than the DCF value when the DCF value puts 100 percent of the cash grant into the DCF value.").  Regarding the second question, Dr. Osborn noted the market price of wind turbines went down "at the time the cash grant program was instituted . . . even though the value of the windfarm businesses was going up."  Tr. at 4308:4–6.  According to Dr. Parsons, these price fluctuations indicate the cash grant should not be treated as a pure increase to the value of tangible eligible assets, because some of these assets were decreasing in value.  *See* Tr. at 4308:7–13.  For these reasons, Dr. Parsons stated Dr. Osborn's analysis lacked supporting evidence to conclude the entire cash grant should be attributed to eligible assets—Dr. Parsons characterized Dr. Osborn's valuation as "an attempt to sort of carefully circumscribe and minimize what could possibly be intangibles and goodwill," to greatly increase DCF valuations of basis.  *See* Tr. at 4319:17–4320:18.

Next, Dr. Parsons critiqued Dr. Osborn's iterative calculation of cash grants, which, according to Dr. Parsons, inflated the value of the cash grants and is "one very significant reason why his estimated value of the eligible tangible assets is so much higher than the cost tangible [] value for the eligible tangible assets."  Tr. at 4321:3–9; *see also* Tr. at 4325:4–5.  To illustrate, Dr. Parsons compared Dr. Osborn's DCF valuation with and without the cash grant as a cash flow.  *See* Tr. at 4323:21–24; *see also* DX-0833, Ex. 1 (Parsons Suppl. Rebuttal Rpt.) (spreadsheet comparing Dr. Osborn's DCF model with and without the cash grant to Dr. Parsons's cost approach model).  Before removing the cash grant, Dr. Osborn's income approach exceeded Dr. Parson's cost approach valuation by just over $1 billion.  *See* Tr. at 4323:15–18.  After removing the cash grant, Dr. Osborn's DCF valuation dropped by over nine hundred million dollars to about ninety-four million above Dr. Parsons's cost approach valuation.  *See* Tr. at 4324:15–19.  Dr. Parsons again expressed doubt the entire value of the cash grants can be assumed to accrue to the fair market value of the tangible eligible assets, noting wind turbines make up sixty-nine percent of eligible costs for Alta II, but sixty-nine percent of the DCF value exceeds the cost of the wind turbines by $79 million.  *See* Tr. at 4330:7–20 ("And so if you use this methodology to value those turbines, you are going to claim that the value is much higher than what the fair market price is."); *see also* Tr. at 4329:2–4 (asserting plaintiffs' experts "always act[] as if the market price goes up to whatever that one buyer is willing to pay.  And that's just not how markets work.").  Relatedly, Dr. Parsons disputed Dr. Osborn's attribution of

- 21 -

locational value to tangible assets, arguing equipment commands the same market price regardless of how much more profitable the location of the plant. *See* Tr. at 4334:18–4335:15 (asserting a hydrocracker sold to an oil refinery in Maine has the same market price as one sold to a refinery in Texas); *see also* DX-0784.024–025 ¶¶ 44–45 (Parsons Rebuttal Rpt.).

Dr. Parsons leveled similar critiques to Dr. Maydew's office building example. Mainly, Dr. Parsons argued Dr. Maydew assumed away intangibles, goodwill, and going concern value, while also not considering market price in his example. *See* Tr. at 4338:1–17; *see also* DX-0784.034 ¶¶ 62–63 (Parsons Rebuttal Rpt.). Market price, for Dr. Parsons, serves as the more standard approach when a buyer purchases property, plants, or equipment. *See* Tr. at 4342:11–13. Rather than conducting iterative calculations to determine fair market value, as Dr. Maydew did, Dr. Parsons stated, "you stop [at the market price] and you don't increase your tax benefits by doing iteration." Tr. at 4342:15–4343:2. The value of the business may go up because of the tax benefit, Dr. Parsons testified, but "that doesn't mean the value of the property, plant, and equipment goes up" because the tax benefit would flow down to goodwill. Tr. at 4343:4–14 ("I assumed that the property, plant, and equipment stayed at the same price after the tax benefit passed.").

Dr. Parsons also asserts Dr. Osborn's DCF valuation skirts the requirements of the Section 1060 waterfall method in two ways. First, according to Dr. Parsons, Dr. Osborn's inflated values minimize the residual value of ineligible assets because, in some cases, the DCF model values tangible eligible assets above the purchase price, leaving nothing from purchase price to allocate to intangible assets. *See* Tr. at 4352:6–4353:16. Second, Dr. Parsons asserts Dr. Osborn's valuation approaches the waterfall analysis "upside-down" because Dr. Osborn uses a discount rate to remove intangibles from cash flow rather than estimating the value of tangibles in isolation. *See* Tr. at 4344:1–4345:1. Specifically, Dr. Parsons disagreed with Dr. Osborn removing goodwill from revenue streams via a discount rate because goodwill is always calculated as a residual value. *See* Tr. at 4345:14–21; *see also* Tr. at 4346:12–14 ("[Dr. Osborn] tries to claim that there's no goodwill in his cash flow, but that's just an impossible proposition."). When Dr. Parsons showed his waterfall analysis, using Alta I as an example, he indicated he did not "have a methodology [to value intangibles] like Dr. Osborn's." *See* Tr. at 4354:13–4356:18. Ultimately, Dr. Parsons leveled two critiques of the plaintiffs' experts: (1) "minimizing the existence of intangibles;" and (2) "turning a blind eye to market prices." Tr. at 4356:23–25; *see also* DX-0784.039 ¶ 71, 58 ¶ 107 (Parsons Rebuttal Rpt.).

### D.    Testimony of Dr. Glenn George

The government's second expert witness, Dr. Glenn George, earned his Bachelor's degree in engineering as well as his Master of Business Administration from Cornell University. *See* Tr. at 4565:4–8. After serving as a Navy ensign at the Office of Naval Reactors, Dr. George earned his Ph.D. in public policy with a focus on regulatory economics from Harvard University. *See* Tr. at 4565:8–10. Dr. George has since worked in a variety of consulting roles at consulting firms and investment banks. *See* Tr. at 4566:4–13. Throughout his professional career, Dr. George has advised clients on potential investments in energy projects and has taught courses on financing energy projects and damages. *See* Tr. at 4570:20–4571:1, 4573:17–4574:7. Previously, Dr. George served as an expert for the government in other Section 1603 cases and

worked with DCF models and methods, power purchase agreements, and renewable energy projects. *See* Tr. at 4566:24–4569:24, 4574:13–23. The Court recognized "Dr. George as an expert witness qualified to testify about energy economics." Tr. at 4575:18–23. Dr. George testified regarding his rebuttal supplemental expert report and his deposition and responded to opinions articulated in Dr. Osborn's supplemental expert report. *See* Gov't's Trial Witness List at 2. Dr. George did not provide a valuation opinion. *See* Tr. at 4578:14–23.

Dr. George opened his testimony by explaining his critique of Dr. Osborn's report: "[I]t's my opinion that Dr. Osborn's framework for evaluating the Alta assets separated from their intangible assets -- aspects, in particular the PPA and transmission rights, is unreliable and, in fact, incorrect." Tr. at 4579:14–18; *see also* Tr. at 4610:3–11, 4611:4–13, 4754:3–4; DX-0873.003 ¶ 10 (George Corr. Rebuttal Rpt.). Given these shortfalls, Dr. George concluded Dr. Osborn's modeling fails to isolate the cash flow attributable to tangible property. *See* Tr. at 4600:1–4. Dr. George testified first about his critique of Dr. Osborn's treatment of the PPA executed between Terra-Gen and SCE as risk reduction instead of incremental cash flow. *See* Tr. at 4599:6–20; *see also* Tr. at 4595:13–15 ("[M]y issue with PPA price is one of the dollar value. It's the quantity of cash flow that's really my critique of Dr. Osborn's model."). If Dr. Osborn incorrectly handled the PPAs, Dr. George asserted, then his entire analysis would become unreliable. *See* Tr. at 4588:7–8. According to Dr. George, Dr. Osborn erred when he plugged in the existing PPA prices into his model because at least a year-and-a-half had passed between the execution of the PPA and the closing transaction dates for all six Alta facilities, with PPA prices declining significantly in the interim. *See* Tr. at 4589:20–4590:1, 4588:25–4589:6. The declining PPA prices made the Alta PPAs more valuable as they rose above market PPA prices, Dr. George explained. *See* Tr. at 4592:21–25; *see also* Tr. at 4633:5–8 ("[T]he Alta Wind PPAs acquired this value through time as the wind market price and the price for replacement PPAs persistently declined."); DX-0873.008–010 ¶¶ 16–18 (George Corr. Rebuttal Rpt.). He further asserted this new market information may have affected the purchase prices for the Alta facilities, which is why Dr. George asserts it is incorrect to conduct a valuation exercise based on "some time arbitrarily in advance of a transaction date." Tr. at 4622:10–4623:3; *see also* Tr. at 4623:4–14. On cross-examination, however, Dr. George conceded the PPA price for Alta I and II fell below the average PPA price from the Padilla Report analyzing PPA prices from 2010 and 2011. *See* Tr. at 4779:15–4780:21; *see also* Tr. at 4780:22–4781:5 (indicating Alta VI's PPA price fell within the average range of PPA prices from the Padilla Report), Tr. at 4798:15–25. Dr. George also "readily concede[d]" the Alta Wind PPAs, when executed, were not above market. Tr. at 4799:1–6. Yet, on re-direct, Dr. George stated the pricing trend for PPAs in California throughout 2011 and 2012 indicated a clear and persistent downward trend. *See* Tr. at 4874:4–8.

Dr. George also explained a "lag time" between the PPA execution and the commercial operating date caused the significant PPA price differences. *See* Tr. at 4636:11–22. According to Dr. George, even assuming similar commercial operating dates, if two wind farms executed their respective PPAs years apart, then the PPA prices would likely reflect significant differences, making commercial operating dates less reliable than PPA lag times when determining a reliable indicator of a market PPA price. *See* Tr. at 4636:16–4637:15; *see also* Tr. at 4645:13–22 (asserting Dr. Osborn's analysis is "not reliable" because it relies on commercial operation date instead of the date on which a PPA is executed). On cross-examination, however,

Dr. George conceded PPA lag times are typical. *See* Tr. at 4765:18–4766:16, 4768:8–10. Dr. George also conceded a PPA executed in May 2012 for delivery in December 2013 would have different economic features than a PPA executed in July 2010 for delivery in May 2012. *See* Tr. at 4774:23–4775:7.

Dr. George illustrated the effect of a high-value PPA (due to a subsequent decline in market prices) on valuing tangible property by entering different PPA prices into Dr. Osborn's DCF model. *See* Tr. at 4593:23–25. He found a "high degree of sensitivity between the PPA price input into the model and the asset value," where each one-dollar decrement in market PPA price decreased the value of tangible assets by around five million dollars. Tr. at 4594:6–12; *see also* Tr. at 4594:13–24 (using the Alta VI PPA as an example). A discount rate, Dr. George stated, would not necessarily exclude a PPA because a PPA "does much more than just reduce risk" because it "sets the price at which power is purchased from the facility" and "creates the revenue that more than any other single aspect drives the entire value of the business." Tr. at 4611:17–21; *see also* Tr. at 4601:8–13. After offering extensive testimony about characteristics of the PPA market and price declines shortly after the Alta PPA execution dates, *see* Tr. at 4644:23–4645:4, 4748:11–4751:20, Dr. George concluded Dr. Osborn's model is unreliable because it undervalues intangible asset values flowing from PPAs and consequently overvalues tangible assets. *See* Tr. at 4752:16–4753:4; *see also* DX-0873.004–005 ¶ 12 (George Corr. Rebuttal Rpt.).

Dr. George then moved to his second critique of Dr. Osborn's DCF model, arguing Dr. Osborn's "methodology doesn't take into account the . . . potential timing of revenue or cash flow due to a possible delay in obtaining those transmission rights." *See* Tr. at 4595:17–20; *see also* Tr. at 4599:6–25, 4601:16–4602:6, DX-0873.007 ¶ 15 (Corr. George Rebuttal Rpt.). Even if the Alta facilities could obtain readily available transmission rights, Dr. George noted "it would still take [roughly fifty months] to perform the requisite process." Tr. at 4754:5–12, 4756:9–13. According to Dr. George, the timing of the transmission rights introduces uncertainty as to the in-service dates for the Alta facilities, risking eligibility for the cash grant if the in-service date were to move past 2012. *See* Tr. at 4758:4–11. Yet, on cross-examination, Dr. George recognized half of the energy projects going online in California throughout 2011 took fewer than three years to go online from the beginning of the interconnection process. *See* Tr. at 4848:1–5; *see also* Tr. at 4847:1–8 (noting twenty-five percent of energy projects going online nationwide in 2011 did so within twenty months of beginning the interconnection process). Dr. George nonetheless concluded the "interconnection process and the overall process for securing transmission rights is strongly suggestive that it may have been impossible beginning at the time of those Alta transactions to secure those rights and to interconnect in time to secure the Section 1603 cash grant." Tr. at 4875:16–21. Dr. George ultimately viewed Dr. Osborn's analysis as "trying to have it both ways" by claiming to exclude intangible asset values from the valuation of the tangible assets while assuming intangible assets, such as PPAs and transmission rights, existed on the transaction dates to make possible the revenue streams attributed only to tangible assets. Tr. at 4608:24–4609:7; *see also* DX-0873.003–006 ¶¶ 10–13 (George Corr. Rebuttal Rpt.).

**E.    Testimony of Dr. Jennifer Blouin**

Dr. Jennifer Blouin is a professor of accounting at the Wharton School of the University of Pennsylvania with a Bachelor's degree in accounting from Indiana University and a Ph.D. in accounting from the University of North Carolina. *See* Tr. at 4878:7–4883:14, 4885:8–12. In addition to her work as a professor, Dr. Blouin serves as an editor for the *Review of Accounting Studies*, an associate editor for the *Journal of Accounting Research*, and a member of the *Journal of Accounting and Economics* editorial board. *See* Tr. at 4882:21–4883:4. She recently finished a term as the president of the National Tax Association. *See* Tr. at 4883:4–7. Prior to working as an academic, Dr. Blouin worked as a tax manager and consultant at Arthur Andersen. *See* Tr. at 4883:14–25. The Court recognized Dr. Blouin as an expert in "tax accounting, taxation of business entities and transactions, and the effect of taxes on corporate behavior." Tr. at 4887:1–7. Dr. Blouin testified for the government to rebut the opinions of Dr. Maydew and Dr. Osborn. *See* Gov't's Trial Witness List.

Dr. Blouin first distinguished between the terms "tax basis," "fair market value," and "willingness to pay." *See* Tr. at 4892:10–4896:13. Dr. Blouin explained the fair market value of an asset and the purchaser's tax basis for that asset could be the same at the time of purchase, but then separate after. *See* Tr. at 4893:25–4894:1. For example, according to Dr. Blouin, a share of stock could increase in fair market value over time according to the market for the stock, while the purchaser's tax basis in that share of stock would remain set at the original price paid. *See* Tr. at 4893:1–25. Dr. Blouin explained "willingness to pay" is distinct from tax basis and fair market value and can deviate significantly from these values depending on the idiosyncrasies of a given buyer's preferences. *See* Tr. at 4895:2–16. For example, Dr. Blouin posed a hypothetical in which she inherits her grandmother's flatware set but subsequently misplaces the gravy ladle—Dr. Blouin states her "willingness to pay" for a replacement ladle on eBay could be far above "fair market value" because the "collection has sentimental value" and the ladle "completes the collection." *See* Tr. at 4895:8–4896:18. Dr. Blouin further explained, while her idiosyncratic willingness to pay for the gravy ladle could impact its fair market value, fair market value does not necessarily equal her willingness to pay—*i.e.*, if her willingness to pay for the ladle is $150, but the next highest bid on the market is $14, she could win an eBay auction at $15. *See* Tr. at 4895:17–4896:18. Expressing this principle again through a homebuyer who receives a tax credit for which no other potential buyers are eligible, Dr. Blouin asserted the fair market value of a home would not increase "dollar for dollar" with the tax credit despite the singular eligible homebuyer being willing to pay more. *See* Tr. at 4908:5–4909:20. Extending this concept, Dr. Blouin testified it is not appropriate to include a tax benefit like a cash grant in a DCF valuation if the benefit is not generally available and thus would not be expected to impact the market price of the asset. Tr. at 4911:3–4912:7, 4997:18–4998:20. To illustrate her point, Dr. Blouin described "a tax credit that is applicable only to certain buyers, such as first-time homebuyers who are left-handed surgeons" as an example of a tax credit available to such a limited pool of buyers that its effects would not be incorporated into a market price. Tr. at 4998:2–12; DX-0879.003 n.7 (Blouin Rebuttal Rpt.). Dr. Blouin noted, however, she "had made no effort to determine how many entities were actually eligible to participate in the cash grant program." Tr. at 5002:9–16.

Regarding Dr. Maydew's 2021 supplemental report, Dr. Blouin agreed "the calculations of the net present value of an investment property must reflect all cash flows from the property, including the effects of tax costs and tax benefits," but described Dr. Maydew's report as

"incomplete" for addressing only the case of a "singular asset," as opposed to "a group of assets constituting a trade or business." Tr. at 4938:23–4939:10; *see also* DX-0879.002–003 ¶¶ 5–8 (Blouin Rebuttal Rpt.). Dr. Blouin explained, in the context of a Section 1060 allocation of a tax benefit for the Alta transactions, "there would be no overt or specific allocation of a tax benefit, because what's required under 1060 . . . is th[e] requirement that there's a waterfall [allocation of] fair market value . . . as you move down the schedule from Class I to Class VI." Tr. at 4939:11–25. According to Dr. Blouin, "if we're evaluating the fair market value through those buckets, and at the end of Class VI, if you add that total up, and it's less than the purchase price, then that residual will fall to goodwill or the Class VII assets." Tr. at 4939:19–23. Dr. Blouin analogized the Alta transactions to I.R.C. § 338(h)(10) qualified stock purchase transactions, which are deemed applicable asset acquisitions subject to the Section 1060 residual method. *See* Tr. at 4939:11–4963:9. Section 338(h)(10) transactions treat the sale of a target corporation as an asset sale and allow a buyer to "step up" the basis in the target's assets, yielding "valuable future depreciation [and] amortization deductions for the acquirer that would not exist if the transaction were treated as a stock sale for tax purposes." DX-0879.007–009 ¶¶ 15–17 (Blouin Rebuttal Rpt.); *see also* Tr. at 4944:6-4948:25. In a Section 338(h)(10) transaction, the buyer of the target pays a premium to the seller to incentivize the seller to elect Section 338(h)(10), allowing the buyer to receive these tax benefits—the premium paid is allocated to Class VII goodwill. *See* Tr. at 4949:15-4953:14. To the extent plaintiffs here similarly paid additional consideration for a cash grant "to effect some sort of tax benefit," Tr. at 4960:15–24, Dr. Blouin argues those incremental payments must be allocated to Class VII goodwill, *see* Tr. at 4956:25–4957:24; *see also* DX-0879.003 ¶¶ 7–8, 8 n.9 (Blouin Rebuttal Rpt.).

During her testimony, Dr. Blouin further opined Dr. Osborn's DCF model "does not actually follow a 1060 waterfall," Tr. at 4889:2–17, but instead "flips the waterfall" and leaves "no opportunity to even have goodwill in this transaction," Tr. at 4970:4–13; *see also* DX-879.004 ¶¶ 11–12 (Blouin Rebuttal Rpt.). Dr. Blouin characterized Dr. Osborn's approach as "identify[ing] three specific intangibles [not including goodwill] and then adjust[ing] the discount rate used to value the tangible assets and sa[ying], well, there's the value of the intangibles." Tr. at 4970:14–4971:1. According to Dr. Blouin, Dr. Osborn's approach incorrectly values the intangibles prior to the tangibles and attaches all other value—including the cash grant—to the tangible assets. *See* Tr. at 4970:8–13, 4971:8–13, 4973:1–4. Dr. Blouin proposes a correct implementation of Section 1060 would allocate any amount paid in excess of the fair market value of the tangible assets to Class VII goodwill, which she defined as "anything above and beyond the fair market value of the things that we can identify [in a transaction]." Tr. at 4906:23–25; *see also* Tr. at 4971:2–13, 4889:2–17. Finally, Dr. Blouin critiqued Dr. Osborn's DCF approach using a fax machine analogy, which, as Dr. Blouin characterized it, implies "assets in different owners' hands would be worth a lot more," based on the idea "a fax machine in the hands of a company that does copying should be worth more than the fax machine in the hands of my local mom-and-pop store." Tr. at 4971:19–4972:7; *see also* DX-0879.005 n.16 (Blouin Rebuttal Rpt.). In her view, a "trade or business might have value associated with it," but the tangible assets themselves would not have more value "in the hands of [a] copy company than [a] mom-and-pop store." Tr. at 4972:8–12. In the same way, Dr. Blouin argued, a turbine "sitting in a warehouse" possesses the same fair market value as a turbine "placed in the most favorable location for production of electricity." Tr. at 5053:21–5054:8; *see also* Tr. at 4994:17–4995:13, 5052:16–21. Dr. Blouin acknowledged "the connectedness" of the turbine

placed in a windfarm would necessarily create some value, though she noted she did not "know where to delineate the difference between the value associated with the trade or business versus the value associated with the fair market value of the turbine component." *See* Tr. at 5055:9–20.

## VI.    Rebuttal Witnesses

After the Court heard testimony from the expert witnesses, the Court heard rebuttal testimony from two witnesses testifying for the plaintiffs:  Mr. James Pagano and Dr. Matthew Osborn.  In addition, to resolve a dispute over whether Mr. Pagano could provide rebuttal testimony as a fact witness when the government denies drawing new facts from its expert witnesses, the Court permitted the government to provide sur-rebuttal testimony from Dr. Glenn George and Dr. John Parsons. *See* Tr. at 5095:12–21.  After the close of rebuttal testimony, the government indicated the sur-rebuttal testimony supplied an adequate remedy to allowing Mr. Pagano to testify on rebuttal and expressly waived any objection. *See* Tr. at 5397:11–21 ("[GOVERNMENT:]  I believe that our ability to do a sur-rebuttal was sufficient remedy and we won't be filing a motion.").

### A.    Rebuttal Testimony of Mr. James Pagano

Plaintiffs opened their rebuttal testimony with Mr. James Pagano, who responded to several factual contentions made by the government's experts.  First, Mr. Pagano discussed the difficulty of "repowering," or replacing, a wind power facility at the end of the asset's useful life. *See* Tr. at 5102:12–22, 5103:7–5104:22 (explaining the cost of replacing a turbine by deconstructing the current one and building a new one is worthwhile once the asset reaches the end of its useful life and cannot produce a revenue stream), 5107:25–5108:23 (describing the various challenges of deconstructing a wind facility); *see also* Tr. at 5107:23–24 ("It's a very onerous process to tear out even one turbine.").  According to Mr. Pagano, given the high costs of replacing a wind asset, Terra-Gen continues to operate several assets built thirty to forty years ago because they continue to produce a revenue stream. *See* Tr. at 5104:23–5105:6.  Regarding transmission rights, Mr. Pagano elaborated on the time needed to secure serial queue rights, an eighteen-month process, and cluster rights, a two-year process. *See* Tr. at 5109:8–5111:13.  Mr. Pagano also testified about the dramatic increase in renewable energy demand triggered by the California renewable portfolio standard increasing renewable energy requirements to thirty-three percent, which greatly benefitted Terra-Gen. *See* Tr. at 5115:1–5115:25.  Next, Mr. Pagano explained Terra-Gen received a return larger than $370,000 on the letters of credit used to finance the construction of the Alta facilities. *See* Tr. at 5116:1–5118:10.  Mr. Pagano then noted the difference between a balance of plant contract and a turn-key contract, which largely revolves around the allocation of risk. *See* Tr. at 5123:13–5126:15.  Lastly, Mr. Pagano defended using iterative calculations to calculate the ITC based on his experience working on dozens of ITC transactions. *See* Tr. at 5137:10–12; *see also* Tr. at 5137:14–15 (indicating Mr. Pagano expected the cash grant to mimic the ITC).

### B.    Rebuttal Testimony of Dr. Matthew Osborn

Plaintiffs called Dr. Matthew Osborn as their second rebuttal witness to critique Dr. Parsons's application of the cost approach and respond to the criticisms of plaintiffs' valuation

leveled by Dr. Parsons and Dr. George.  Dr. Osborn began his rebuttal by explaining "the way Dr. Parsons has implemented that cost approach is, in my opinion, fatally flawed."  Tr. at 5162:17–18.  Dr. Osborn first noted "the central premise of the cost approach is that the property that you're valuing is very easily replaced."  Tr. at 5157:3–19.  According to Dr. Osborn, for the cost approach to work best, the substituting asset "needs to provide a similar utility or economic benefit, or in the case of income-producing assets, equivalent future cash flows."  Tr. at 5158:21–5159:2.  Dr. Osborn claimed Dr. Parsons skipped this analysis in his cost approach because Dr. Parsons "did not look at all at the economic value of the asset," instead looking only at the cost before applying "a limited mark-up over those costs."  Tr. at 5159:5–10; *see also* Tr. at 5165:18–5166:11 (Dr. Osborn explaining Dr. Parsons took "the middle road" regarding expected return between a successful and unsuccessful project, which does not reflect actual economic benefits and caps the return at the average value).  Continuing his critique, Dr. Osborn explained Dr. Parsons, in selecting a rate of return on capital, took a discount rate typically used to discount future economic benefits, ignored those benefits, then used the discount rate "as essentially a rate of return on cost that's constrained to a single number."  Tr. at 5163:11–15.  Dr. Osborn then testified, "it's not appropriate to take essentially what's an average return or an expected return and constrain the return on development of a particular asset based on a fixed return over cost."  Tr. at 5163:25–5164:3; *see also* PX-0910.019 n.63 (Blaydon/Osborn Corr. Suppl. Rpt.).

Dr. Osborn continued his criticisms of Dr. Parsons's calculation of developer profits beyond flaws with the rate of return, arguing Dr. Parsons "ignore[d] actual information about economic costs" Terra-Gen paid to other providers of capital into the project.  Tr. at 5169:19–23.  Specifically, Dr. Osborn thought Dr. Parsons mistakenly removed $48.1 million in Interest During Construction and the $100 million Oak Creek Development Fee from his cost approach analysis.  *See* Tr. at 5169:23–5170:5.  According to Dr. Osborn, by removing Interest During Construction and the Oak Creek Development Fee, Dr. Parsons implies Terra-Gen lost fifty million dollars on the Alta facilities "by paying out more capital than they receive in essentially equity return."  Tr. at 5170:17–22; *see* Tr. at 5170:6–12.  Dr. Osborn argues such a result is contrary to the goal of an effective valuation under the cost approach, because, while "the cost approach depends on the substitute asset providing a sufficient return for somebody to come in and replace that asset," Dr. Parsons's approach implies Terra-Gen would have lost money and lacked any incentive to develop the eligible property.  Tr. at 5170:13–17; *see also* Tr. at 5159:19–5160:1.  Dr. Osborn characterized Dr. Parsons's removal of Interest During Construction and the Oak Creek Development Fee as "sweeping it essentially into the bucket of ineligible property."  Tr. at 5171:2–15.  More generally, Dr. Osborn believed Dr. Parsons wrongfully assumed in his model the value of an asset "can't be anything different than its cost," which does not treat the Alta assets "as an integrated turnkey facility that is together, ready to generate electricity and start generating income."  Tr. at 5175:25–5176:13.  According to Dr. Osborn, this incorrect premise results in a disproportionate markup to other assets as opposed to electricity-producing tangible assets.  *See* Tr. at 5177:13–16; *see also* Tr. at 5174:12–5175:2 (Dr. Osborn showing a developer markup of 194% over the ineligible costs but a 6.4% markup on eligible property).

Next, Dr. Osborn characterized Dr. Parsons zeroing out the cash grant to show the DCF analysis produces a number close to the value of Dr. Parsons's cost approach as "completely

irrelevant for purposes of valuation." Tr. at 5182:1–19. Dr. Osborn took issue with Dr. Parsons zeroing out the cash grant because valuing an asset requires including all economic benefits of owning the asset. *See* Tr. at 5182:22–5183:5. In addition, while Dr. Parsons removed the cash grant, a tax benefit, Dr. Osborn noted Dr. Parsons did not remove any tax detriments, such as property and income taxes, which amount to over a billion dollars in tax outflows. *See* Tr. at 5183:6–24. By removing the cash grant and keeping tax detriments in the calculation, Dr. Osborn argues Dr. Parsons produced a "biased" value "not meaningful with respect to the economic value of the assets." Tr. at 5184:18–5185:5. Even if no cash grant exists, Dr. Osborn noted other tax benefits exist to fill the cash grant's place, which "speaks to one of the reasons why simply just stripping out entirely the cash grant value just makes no sense." Tr. at 5185:19–23. Dr. Osborn also defended his inclusion of the cash grant in his DCF valuation because the cash grant "is a cash flow that the owner of the tangible eligible property is entitled to by owning that asset." Tr. at 5189:17–23; *see also* Tr. at 5187:12–5189:8 (observing turbine prices are irrelevant for DCF valuation for a similar reason: they constitute a cost as opposed to cash flow).

Lastly, Dr. Osborn clarified how he implemented DCF and responded to Dr. George's analysis by questioning several assumptions Dr. George made. *See* Tr. at 5220:25–5224:1, 5224:19–5225:18. Specifically, Dr. Osborn testified his decision to employ a higher discount rate associated with a development-stage windfarm "reflects the incremental risks that are associated with those intangibles," which filters out the contribution of value from those intangible assets. Tr. at 5224:6–12. Regarding the comparison of wind PPA prices to determine whether the Alta PPAs qualified as above-market, Dr. Osborn testified the best PPA comparators would have similar delivery dates of the Alta PPAs, as opposed to Dr. George's preferred approach of looking only at PPA execution dates similar to the Alta facilities' in-service dates. *See* Tr. at 5226:14–5232:8. In addition, Dr. Osborn took issue with Dr. George's PPA price regression analysis for its lack of data and for excluding certain PPA data on arbitrary timing grounds—PPA data which would have otherwise contributed to a significantly higher PPA price in the analysis. *See* Tr. at 5235:11–5246:25.

### C.    Sur-Rebuttal Testimony of Dr. Glenn George

The government called Dr. Glenn George as its first sur-rebuttal witness. He testified in response to Dr. Osborn's rebuttal testimony, primarily regarding PPA pricing and the ability of Dr. Osborn's DCF analysis to separate the intangibles from eligible assets. *See* Tr. at 5314:25–5321:21 (Dr. George's discussion defending his regression analysis of market PPA prices). First, Dr. George defended his view of looking at PPA prices at the time of the Alta facilities' in-service dates because the best approach to valuation requires considering all information available on the in-service date. *See* Tr. at 5300:16–5301:12. Dr. George also noted PPAs with significant delivery overlap but different execution dates should have "very little difference in the valuation of the two contracts." Tr. at 5306:21–5307:1.

Second, Dr. George spoke about the ability of Dr. Osborn's DCF analysis to separate the intangibles, namely the PPAs and transmission rights, from the eligible assets. According to Dr. George, Dr. Osborn changing the discount rate to separate the intangibles does not remove the value of the PPAs and transmission rights in their entirety because the two intangibles "do much

- 29 -

more than merely reduce risk." Tr. at 5311:17–25; *see also* Tr. at 5314:13–17. Dr. George continued, "there's a price embedded in the PPA and there are timing issues embedded in the transmission rights. Price affects the quantity of cash flows in [Dr. Osborn's] model [while] the transmission rights . . . reflect the timing of those cash flows." Tr. at 5311:25–5312:5. Dr. George testified, although Dr. Osborn says he separated the intangibles from the eligible assets, Dr. Osborn's exercise still has the PPA price and transmission rights embedded in it. *See* Tr. at 5312:6–13, 20–23. Dr. George asserts Dr. Osborn's assumption the PPA and transmission rights are absent when present, is "a circular form of reasoning," which an increased discount rate cannot break. Tr. at 5313:8–5314:12.

### D.    Sur-Rebuttal Testimony of Dr. John Parsons

The government called Dr. John Parsons as its second and final sur-rebuttal witness. During his rebuttal testimony, Dr. Parsons responded to several points made by Dr. Osborn during plaintiffs' rebuttal and reinforced his criticisms of Dr. Osborn's DCF model. First, Dr. Parsons defended his cost approach model by denying he capped any return, as the full value of the purchase prices appears throughout the various asset classes of the waterfall approach. *See* Tr. at 5343:25–5344:25. Dr. Parsons then stated he believed Dr. Osborn was the one who pre-determined a return rate in his valuation because "he's identifying how much of the value goes to intangible assets, which are all the assets being developed in those early stages of the project." Tr. at 5346:6–10. According to Dr. Parsons, Dr. Osborn chose 1.3% as the one fixed rate across the six Alta facilities to identify the value of the intangible assets, even though the projects used to develop the return rate have varying success. *See* Tr. at 5346:17–5347:16 ("He calculates this differential in the discount rate for an operational versus development-stage project. It's about 1.3 percent."); *see also* Tr. at 5347:12–19 ("The critique here is a critique that most definitely in larger amount applies to the decision by Dr. Osborn to apply one fixed rate of return to the intangible assets and to ignore whether it's especially successful, as it was in the Alta cases, or less successful."). Dr. Parsons testified Dr. Osborn's fixed differential likely could not capture the value of intangibles, which poses a problem for the Alta facilities because their business value increases while the tangible value does not change. *See* Tr. at 5350:9–11, 5352:8–20, 5353:16–20. Dr. Parsons further explained the purchase price contains items other than tangible property and, if the tangibles take on the full value of the cash grant, "nothing gets dropped down to Class VII" because too much of the purchase price gets allocated to Class V. *See* Tr. at 5375:7–19.

Second, Dr. Parsons defended his decision to exclude the Oak Creek Development Fee and Interest During Construction from his cost approach. Dr. Parsons characterized the Oak Creek Development Fee as having "nothing to do with the eligible property" because it is "a success fee for development of the intangible assets." Tr. at 5355:20–24; *see also* Tr. at 5356:16–18 (referring to the Oak Creek Development Fee as a "profit"). As for Interest During Construction, Dr. Parsons observed "the total amount of funding of debt was more than the construction expenses for the tangible property," which indicated the debt funded more than just tangible property. Tr. at 5357:11–15; *see also* Tr. at 5357:20–5358:1 (using the grant bridge loan as an example). Dr. Parsons stated he did not believe Dr. Osborn accounted for interest costs not attributable to eligible assets. *See* Tr. at 5358:2–5.

Lastly, Dr. Parsons responded to Dr. Osborn's assertion the cost approach can only be used to value readily replaceable assets. Dr. Parsons retorted, "most tangible assets are readily replaceable," while intangible assets "are usually not readily reproducible." Tr. at 5360:20–5361:10. Dr. Parsons testified any uniqueness attributable to the Alta facilities "is the uniqueness that is added onto the tangible assets to maximize the income value from the windfarm business." Tr. at 5363:23–5364:5. According to Dr. Parsons, while the windfarm business at the heart of the transaction is unique, "[t]he tangible assets are standard manufactured products sold with model numbers associated with them, as well as the cost of assembling and installing them." Tr. at 5364:14–19; *see also* Tr. at 5364:6–13 ("[T]he tangible assets here produce electricity, they don't produce income.").

## VII.    Pending Trial Motions

Prior to trial, the parties filed five Motions *in limine*: one from plaintiffs and four from the government, and each party responded to the opposing party's motions. *See* 27 Jan. 2025 Order at 2, ECF No. 409. At a status conference, "the parties agreed the caselaw and circumstances in this case favor the Court staying the government's motions *in limine* and tentatively allowing the evidence" while finding moot plaintiffs' Motion *in limine*. *Id.* at 2–3. While the Court stayed the government's pending Motions *in limine*, the Court noted the parties can "object to inappropriate testimony during trial." *Id.* at 3. After the Court's 27 January 2025 Order, the government filed two more evidentiary Motions, one the day before trial commenced and another during trial: the first Motion sought to treat the statements of Mr. James Pagano and Terra-Gen as opposing party admissions under FRE 801(d)(2), *see* Gov't's Mot. to Treat Statements of Mr. Pagano and Terra-Gen as Opposing Party Statements Under FRE 801(d)(2) ("Gov't's FRE 801(d)(2) Mot."), ECF No. 437; and the second moved to admit into evidence DX-0375, a marked-up draft appraisal report introduced during Mr. Damon Huplosky's testimony, *see* Gov't's Mot. to Admit into Evidence Ex. DX-0375 ("Gov't's Mot. to Admit DX-0375"), ECF No. 441. The Court stayed both Motions until after closing arguments.[16] *See* 29 July 2025 Order at 1–2, ECF No. 443. Considering trial has now concluded, the Court addresses each motion below.

### A.    The Government's Motion *in Limine* to Limit or Exclude Dr. Osborn's Testimony

The government's first motion *in limine* seeks to limit or exclude Dr. Osborn's testimony and DCF model for two reasons: (1) Dr. Osborn fails to comport with legal requirements—namely Section 1060, the Federal Circuit's 2018 Remand Opinion mandating use

---

[16] In bench trials, given the low risk of prejudice from the Court hearing all the evidence, the Court has the discretion to stay motions *in limine* until, during, or after trial. *See Sci. Applications Int'l. Corp. v. United States*, 175 Fed. Cl. 389, 395–96 (2025) ("Courts 'enjoy broad discretion' when ruling on motions *in limine*. Such discretion is even greater for this Court as bench trials limit the concern for juror confusion or potential prejudice. Because of the lack of concern for prejudice, 'the Court would ordinarily allow the parties to proceed with presenting their case and withhold judgment on the admissibility of evidence until after trial.'" (citations omitted)); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (noting "concerns [about Federal Rule of Evidence 403] are of lesser import in a bench trial"); *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

of the residual method, and the Court's prior legal determination excluding cash grants as Class V tangible property; and (2) Dr. Osborn's revised report violates disclosure requirements in Rule 26(a) of the Rules of the Court of Federal Claims ("RCFC").  *See* Gov't's Mot. to Limit or Exclude Test. of Dr. Matthew Osborn at 3, 24, 27–28 ("Gov't's Mot. to Exclude Dr. Osborn"). In response, plaintiffs argue the government's motion "reads like a rebuttal expert report" in its critiques of Dr. Osborn's valuation methodologies, which the government "is entitled to argue at trial."  Pls.' Opp'n to Gov't's Mot. to Exclude Dr. Osborn at 1, 3, ECF No. 401.  Recognizing "[a]dmission of expert testimony is within the discretion of the trial court," *see Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. United States Lines Co.,* 370 U.S. 31, 35 (1962)), and the Court reviews each argument in turn.

First, the government contends Dr. Osborn's model fails to comport with Section 1060, the Federal Circuit Remand Opinion, and the Court's June 2023 summary judgment opinion. Specifically, the government claims Dr. Osborn's model "backs into his value for windfarm tangible property" while performing an "upside down allocation . . . inconsistent with the residual method dictated by IRC Section 1060 and the Federal Circuit."  Gov't's Mot. to Exclude Dr. Osborn at 12.  Relatedly, the government asserts Dr. Osborn "assumes that Section 1603 cash grants are 'components' of windfarm tangible property" without an empirical basis, contravening the Court's previous summary judgment decision from 2023.  *Id.* at 15–17; *see also id.* at 25–27.  Plaintiffs dispute the government's contention Dr. Osborn applies an "upside-down waterfall" approach, arguing Dr. Osborn directly valued the Class V tangible property and applied a development-stage discount rate to eliminate any value contributed by risk-reducing intangibles, consistent with the Section 1060 residual method.  *See* Pls.' Opp'n to Gov't's Mot. to Exclude Dr. Osborn at 10–13.  Plaintiffs further contend Dr. Osborn's DCF model and testimony comport with the Court's previous orders because they are "based on valuation principles," not legal assumptions.  *See id.* at 15–22.  Plaintiffs then note the government did not provide an evidentiary basis for excluding Dr. Osborn's DCF model or his testimony.  *See id.* at 13–15.  "Motions *in limine* are meant to deal with discrete evidentiary issues related to trial, and are not another excuse to file dispositive motions disguised as motions *in limine*."  *City of Wilmington v. United States*, 152 Fed. Cl. 373, 380 (2021) (citations omitted).  Here, the government's arguments to limit or exclude Dr. Osborn's DCF model and testimony lack merit because they mirror Drs. Parsons' and Blouin's critiques of Dr. Osborn's DCF model—which means cross examination of the experts is best suited to resolve this dispute, not a motion *in limine*.  *Compare* Gov't's Mot. to Exclude Dr. Osborn at 12–13 *with* Tr. at 4344:11–4345:1 (Parsons) *and* Tr. at 4889:11–17 (Blouin) (citing DBX-0002 (two bullet points summarizing Dr. Blouin's conclusions from her report with respect to Dr. Osborn)).  Moreover, the government's argument regarding Dr. Osborn's inclusion of the cash grant also lacks merit as the Court explicitly stated its "20 June [2023] Order did not address valuation methods, meaning the parties are free to offer any valuation evidence and argue in favor of any valuation method at trial, . . . including one allegedly necessitating treating the cash grant value as one cash inflow that goes into the discounted cash flow analysis of the eligible tangible property."  *Alta Wind I Owner Lessor C v. United States*, 169 Fed. Cl. 1, 11 (2023) (cleaned up).  Given the Court is tasked to factually determine which valuation method is better suited for this case and because the Court allowed plaintiffs to proffer evidence in favor of its valuation, whether plaintiffs appropriately factored the cash grant into their valuations is an issue for trial, not a motion *in limine*.  *See City of Wilmington*, 152 Fed. Cl. at 380; *Alta Wind I Owner Lessor C v. United*

*States*, 897 F.3d 1365, 1376 n.8 (Fed. Cir. 2018) ("We need not decide that issue in this appeal or decide whether the cash grant entitlement or associated indemnities are separate intangibles. *We leave these issues to the [Court of Federal Claims] on remand.*" (emphasis added)). Accordingly, considering the Court held a bench trial on the very issues the government argues warrant the exclusion of Dr. Osborn's testimony, the Court is well-suited to adjudicate the merits of whether Dr. Osborn's DCF model adheres to the requirements of Section 1060 and the Court's previous orders based on the testimony adduced at trial from all experts. *See Acoustical Design*, 932 F.2d at 942 (Fed. Cir. 1991) ("Admission of expert testimony is within the discretion of the trial court."). Also, the government's Motion fails because the Court's June 2023 opinion expressly allowed plaintiffs to elicit testimony about Dr. Osborn's inclusion of cash grants. *Id.*

Second, the government argues the Court should limit Dr. Osborn's testimony and evidence to the opinions he articulated in his 24 September 2021 Supplemental Expert Report and ignore his 14 October 2024 Revised Supplemental Expert Report because plaintiffs failed to timely disclose the 2024 revised report. Gov't's Mot. to Exclude Dr. Osborn at 27. Specifically, the government asserts plaintiffs' disclosure was untimely—"more than three months after the close of expert discovery, six months after Dr. Osborn's deposition, and three years after disclosure of the original report"—and improperly "excises" a paragraph articulating an assumption underlying Dr. Osborn's DCF model in "an attempt to circumnavigate around the Court's order of December 23, 2023." *Id.* at 28; *see also* Reply to Pls.' Opp'n to Gov't's Mot. to Exclude Osborn at 15–16, ECF No. 405 ("It would be prejudicial and unfair to permit plaintiffs to belatedly erase original paragraph 71 from Dr. Osborn's supplemental report."). Plaintiffs deny Dr. Osborn's revised report violates RCFC 26(a)'s disclosure requirements because Dr. Osborn's revisions simply clarify his supplemental expert report, as opposed to offering new opinions. *See* Pls.' Resp. to Gov't's Mot. to Exclude Dr. Osborn at 22. Notably, RCFC 26(a)(2)(B)(i) requires "a complete statement of all opinions [an expert] witness will express and the basis and reasons for them" ahead of trial and RCFC 37(c)(1) precludes the use of untimely disclosed information "unless the failure was substantially justified or is harmless." Plaintiffs' revision of its expert report removes one paragraph, the contents[17] of which are immaterial to the Court's findings below. *See* Section IX, *infra*. Moreover, "given . . . this Court only conducts bench trials, we have even greater discretion to deny a motion *in limine* because there is no concern for juror confusion or potential prejudice." *City of Wilmington*, 152 Fed. Cl. at 377. Accordingly, given the Court is well-equipped to consider and appropriately weigh the implications of Dr. Osborn's supplemental report with and without the paragraph at issue, plaintiffs' untimely revision to its supplemental report is harmless under RCFC 37(c)(1), and the Court denies the government's Motion. *See id.*; *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002); *Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1352 (Fed. Cir. 1991) ("When balancing probative value against possible prejudice, the trial court has broad discretion." (citation omitted)).

## B.    The Government's Motion *in Limine* to Limit Dr. Maydew's Testimony

---

[17] In full, the original paragraph states: "I understand that the locational value and tax benefits associated with the tangible assets, like the turnkey value, are components of the tangible assets themselves, and are not separate intangible assets. By applying the DCF approach to value the tangible assets, I am able to capture these important drivers of value." *See* Pls.' 24 Sept. 2021 Blaydon/Osborn Suppl. Rpt., ECF No. 294-3 ¶ 71.

The government's second Motion *in limine* argues RCFC 26(a) and 37(c) prohibit Dr. Maydew from testifying regarding "whether the value of the Alta facilities' grant-eligible tangible assets" includes the value of the cash grant because Dr. Maydew does not specifically address this issue in his supplemental expert report. Gov't's Mot. to Limit Edward L. Maydew's Test. ("Gov't's Mot. to Limit Dr. Maydew Test.") at 1, 6, ECF No. 394. For this reason, the government seeks to limit Dr. Maydew's testimony to only "the generalities listed in his reports and deposition testimony." Gov't's Reply in Supp. of its Mot. to Limit Dr. Maydew's Test. at 4, ECF No. 406. Plaintiffs argue Dr. Maydew's trial testimony should not be limited because he addressed whether the eligible assets should include the cash grant in his initial report, with a "modest supplement" in his supplemental report. *See* Pls.' Opp'n to Gov't's Mot. to Limit Dr. Maydew Test. at 1, ECF No. 400.

While the government cites potential prejudice if Dr. Maydew were to testify to specifics without notice to the government, *see* Gov't's Mot. to Limit Dr. Maydew's Test. at 1, the Court is well-equipped to consider the government's concerns of prejudice and assign Dr. Maydew's testimony its due weight. *See Sci. Applications Int'l. Corp. v. United States*, 175 Fed. Cl. 389, 395–96 (2025); *Seaboard Lumber*, 308 F.3d at 1302. Moreover, the government's concerns are moot here considering the Court (1) is unaware of testimony exceeding Dr. Maydew's report, and (2) did not rely on Dr. Maydew's testimony about the value of cash grants in its findings below. *See* Section IX.A, *infra*. Accordingly, the Court denies as moot the government's Motion to Limit Dr. Maydew's testimony because the Court is unaware of any such testimony at issue, and, in any event, such testimony was immaterial to the Court's decision below. *See Acoustical Design*, 932 F.2d at 942 (Fed. Cir. 1991) ("Admission of expert testimony is within the discretion of the trial court.").

## C.    The Government's Motion *in Limine* to Limit Fact Witness Testimony

The government's third Motion *in limine* seeks to limit testimony from plaintiffs' four fact witnesses to: (1) testimony presented at the 2016 trial; and (2) non-expert testimony under FRE 702. *See* Gov't's Mot. to Limit Pls.' Fact Witnesses at 1, ECF No. 395. To support its argument, the government cites the Court's 18 June 2021 Opinion and Order where the Court stated "the government may object to any testimony it believes is inappropriate for a fact witness or was not presented at the first trial during the second trial." *Id.* at 1 (citing *Alta Wind I Owner Lessor C*, 154 Fed. Cl. at 223). In response, plaintiffs argue the Court's 18 June 2021 Order does not prohibit them from eliciting testimony from the fact witnesses on "the same subjects" as the first trial. Pls.' Opp'n to Gov't's Mot. to Limit Pls.' Fact Witness Test. at 1, ECF No. 399. The Court already decided this dispute in its 18 June 2021 Order allowing plaintiffs "to recall the same or similar testimony as they did in the first trial." *Alta Wind*, 154 Fed. Cl. at 227. Moreover, to the extent plaintiffs attempted to elicit expert testimony from a fact witness at trial, the government could, and did, object to inappropriate expert testimony during trial. *See, e.g.*, Tr. at 2808:10–25 (government's counsel objecting, and the Court striking, testimony from Mr. Pagano testifying about industry markups during a discussion of the Pagano Exhibit), 5130:7–5136:15 (government's counsel objecting to Mr. Pagano commenting on Dr. Parsons' report and successfully limiting Mr. Pagano's testimony to the factual background of the case). In any event, at a bench trial, the Court is well-positioned in its role as fact-finder to afford the testimony of the fact witnesses "only the weight justified by [their] credibility and relevancy."

- 34 -

*Price v. United States*, 175 Fed. Cl. 1, 20 (2025) (citing *Sarif Biomedical LLC v. Brainlab, Inc.*, 725 F. App'x 996, 1000 (Fed. Cir. 2018)).  Accordingly, the Court denies as moot the government's Motion to Limit Fact Witness Testimony, considering:  (1) the government levied robust objections on these very concerns at trial; (2) the Court already decided the relevant scope of fact witness testimony in a prior opinion; and (3) the Court is well-positioned to assign any concerned testimony its due weight in view of the government's concerns.  *See Walter Kidde Portable Equip, Inc. v. Universal Sec. Instruments, Inc.*, 479 F.3d 1330, 1338 (Fed. Cir. 2007) (motions *in limine* "are preliminary in character because they determine the admissibility of evidence before the context of trial has actually been developed"); *Alta Wind*, 154 Fed. Cl. at 227; *Price*, 175 Fed. Cl. at 20.

### D.    The Government's Motion *in Limine* to Exclude the Pagano Exhibit

The government's fourth Motion *in limine* seeks to exclude the so-called "Pagano Exhibit," PX-0900, and related testimony from fact witnesses.  Gov't's Mot. to Exclude Pagano Ex., ECF No. 396.  The Pagano Exhibit is a collection of excel spreadsheets Mr. Pagano created to illustrate "the financial implications of Terra-Gen having continued to own the facility and itself applied for a cash grant had it been eligible to do so, versus the economics of selling the property."  Tr. at 2771:17–23 (Pagano) (citing PX-0900).  The government argues the Pagano Exhibit "is a hypothetical exercise" designed to advance plaintiffs' arguments to include the cash grant, which the Court already decided against in its 2023 summary judgment opinion.  *See* Gov't's Mot. to Exclude Pagano Ex. at 1–3.  The government additionally argues fact witnesses "have no business in testifying at trial to anything other than their personal knowledge," as opposed to the hypothetical exercise posed by the Pagano Exhibit.  *Id.* at 3.  In response, plaintiffs argue the Court already decided the issue in its 18 June 2021 Order.  Pls.' Opp'n to Gov't's Mot. to Exclude Pagano Ex. at 1, 3–4, ECF No. 398 (citing *Alta Wind I Owner Lessor C*, 154 Fed. Cl. at 224–25).  Further, plaintiffs argue there is no basis for excluding the Pagano Exhibit because the exhibit will help Mr. Pagano respond in his testimony to the government's argument Terra-Gen and plaintiffs sold the Alta facilities "in an 'abusive' effort to engineer 'inflated' cash grants 'by design.'"  *Id.* at 1–2, 5–9 (citing Gov't's Memo. of Contentions of Fact and L. at 1, 3, 91, ECF No. 390).  According to plaintiffs, the Pagano Exhibit constitutes "legitimate fact testimony" because it "elucidat[es] Mr. Pagano's contemporaneous thought process when Terra-Gen was deciding whether to hold or sell the Alta facilities."  *Id.* at 2, 6.  Of note, the government also objected to the admission of the Pagano Exhibit during the direct examination of Mr. Pagano, and the Court took note of the government's objections before admitting the Pagano Exhibit subject to the pending Motion *in limine*.  *See* Tr. at 2772:11–2773:9, 3049:4–16.

While the government's concerns as to the limits of fact witnesses' personal knowledge are well-taken, ultimately the Pagano Exhibit was immaterial to the Court's findings below.  *See* Section IX, *infra*.  Moreover, considering the government objected to the Pagano Exhibit and related testimony extensively at trial, the Court is well-equipped to consider the government's concerns and afford the Pagano Exhibit and related testimony their due weight accordingly. *Price v. United States*, 175 Fed. Cl. 1, 20 (2025) (citing *Sarif Biomedical LLC v. Brainlab, Inc.*, 725 F. App'x 996, 1000 (Fed. Cir. 2018)).  Accordingly, the Court denies as moot the government's Motion to Exclude the Pagano Exhibit because the Court finds the Exhibit and

related testimony immaterial to its findings below and afforded the Exhibit and related testimony their due weight in its factual determinations.  *See Sci. Applications Int'l. Corp. v. United States*, 175 Fed. Cl. 389, 395–96 (2025) ("Courts 'enjoy broad discretion' when ruling on motions *in limine*.  Such discretion is even greater for this Court as bench trials limit the concern for juror confusion or potential prejudice.").

### E.    The Government's Motion *in Limine* to Treat Statements of Mr. James Pagano and Terra-Gen as Opposing Party Admissions

The government's fifth Motion *in limine* asks the Court to treat the statements of James Pagano (CEO of Terra-Gen) and Terra-Gen, who are not plaintiffs, as admissible "non-hearsay party admissions" under FRE 801(d)(2) because they "are for all practical purposes, parties in this litigation."  Gov't's FRE 801(d)(2) Mot. at 3; *see also* 11 July 2025 Pretrial Conference Tr. at 38:12–39:3, ECF No. 440.  In other words, the government argues the Court should treat statements by Mr. Pagano and Terra-Gen as admissible, non-hearsay opposing party statements for three reasons:  (1) Mr. Pagano's presence in the courtroom throughout both trials; (2) plaintiffs' statement Mr. Pagano was their "designated representative;" and (3) the fact "Terra-Gen is driving this litigation."  Gov't's FRE 801(d)(2) Mot. at 1–2.  Plaintiffs argue "Terra-Gen engaged in arms-length transactions with the Plaintiff buyers," so it "makes no sense for the statements of the *seller* to be attributed to an unrelated *buyer*."  Pls.' Opp'n to Gov't's FRE 801(d)(2) Mot. at 3.  Plaintiffs then argue no caselaw supports "the proposition that the designation of a non-party individual as a party's representative *at trial* under FRE 615(a)(2) renders that individual—or his employer—a party-opponent for purposes of FRE 801."  *Id.*

While the parties briefed FRE 801(d)(2) extensively ahead of trial, the lack of a dispute at trial related to FRE 801(d)(2) moots this dispute.  The government's Motion was preliminary because the government argues all statements by Mr. Pagano and Terra-Gen—before retrial even commenced—should fall under FRE 801(d)(2) without citing specific statements or documents the government seeks to admit.[18]  *See Walter Kidde Portable Equip, Inc. v. Universal Sec.*

---

[18] The interpretive stretch to FRE 801 which the government advocates further emphasizes it would be inappropriate for the Court to decide this Motion in the absence of specific testimony in dispute.  *See Walter Kidde*, 479 F.3d at 1338.  Under FRE 801(d)(2), statements "offered against an opposing party" and made by "the party in an individual or representative capacity" or "the party's agent or employee on a matter within the scope of that relationship and while it existed" are not hearsay.  FRE 801(d)(2)(A), (D).  The government relies heavily on the committee notes to a 2024 amendment to the rule to assert the statements of Mr. Pagano and Terra-Gen are not hearsay.  *See* Gov't's FRE 801(d)(2) Mot. at 4–5.  The 2024 amendment to FRE 801 added the following language:  "If a party's claim, defense, or potential liability is directly derived from a declarant or the declarant's principal, a statement that would be admissible against the declarant or the principal under this rule is also admissible against the party."  The government argues this new language "make[s] clear that 'when a party stands in the shoes of a declarant or the declarant's principal, hearsay statements made by the declarant or principal are admissible against the party.'"  *Id.* at 5 (quoting Advisory Committee's Note to 2024 Amendment to FRE 801).  According to the Advisory Committee's note to the 2024 amendment, however, the amendment covers relationships such as an estate bringing a claim for a decedent or a trustee pursuing a debtor's claim—unambiguous instances where a party's claim is directly derived from a declarant or a declarant's principal.  *See* Advisory Committee's Note to 2024 Amendment.  Here, even if Terra-Gen and plaintiffs' interest may be aligned in litigation, it is less clear whether their interests were aligned when Terra-Gen and Mr. Pagano made statements prior to litigation, especially considering Terra-Gen and plaintiffs were on opposite sides of a transaction.  For this reason, unless the government seeks to admit evidence in response

*Instruments, Inc.*, 479 F.3d 1330, 1338 (Fed. Cir. 2007) (motions *in limine* "are preliminary in character because they determine the admissibility of evidence before the context of trial has actually been developed").  Plaintiffs also do not cite specific statements or documents they seek to exclude as non-admissible hearsay in response to the government's Motion.  *See generally* Pls.' Opp'n to Gov't's FRE 801(d)(2) Mot.  On the contrary, both parties proceeded at trial as if Mr. Pagano and Terra-Gen were opposing parties to the government for hearsay purposes.  *See, e.g.*, Tr. at 2884:22–24 (Cross-Examination of Mr. Pagano) ("[PLAINTIFFS:]  This [DX-1308 Black and Veatch independent engineering report] is a hearsay document.  It's not to or from Terra-Gen."), 2886:2–5 ("[PLAINTIFFS:]  This is a classic hearsay document, Your Honor.  It's not authored by Terra-Gen or any Terra-Gen individual.  It doesn't even appear to come from Terra-Gen's files."), Tr. at 3447:7–21 (Cross Examination of Mr. Huplosky) (plaintiffs stating, "no objection," to DX-0106-1, an email from Terra-Gen employee Joe Krol, "[b]ased on the testimony that Mr. Krol is a Terra-Gen employee"), Tr. at 3448:22–24 ("[GOVERNMENT:] I'm seeking to illustrate [with DX-0106-2] what Mr. Krol of Terra-Gen has handwritten into the document, which would not be hearsay if it's Terra-Gen.").  The government's Motion did not play a role in any of the cited hearsay objections, as the only reference to the Motion occurred at the end of Mr. Pagano's examinations, where the government admitted Mr. Pagano's "testimony here today has been plain old evidence, but I'm looking to maybe prior statements he's made." *See* Tr. at 3194:23–3195:23.  At no point in trial did plaintiffs object to the admission of prior statements made by Mr. Pagano or Terra-Gen, with the exception of DX-0375 (a draft DAI appraisal report with marked-up comments from Mr. Huplosky), discussed in Section V.F, *infra*.  Even then, the government did not reference its Motion to treat Mr. Huplosky, a Terra-Gen employee, as an opposing party under FRE 801(d)(2) to admit his handwritten comments in its Motion seeking to admit DX-0375.  *See* Section V.F, *infra*.  Accordingly, considering the government's Motion was not specifically tethered to any evidentiary disputes at trial, the Court denies as moot the government's Motion to Treat Statements of James Pagano and Terra-Gen as Opposing Party Admissions Under FRE 801(d)(2).  *See Sci. Applications*, 175 Fed. Cl. at 395–96; *Walter Kidde*, 479 F.3d at 1338.

## F.    The Government's Motion *in Limine* to Admit into Evidence DX-0375

The government's final Motion *in limine* requested the Court to admit DX-0375, a marked-up draft of DAI's appraisal from an email attachment dated 27 December 2010. *See* Gov't's Mot. to Admit DX-0375 at 1.  The government moved to enter DX-0375 into evidence during Mr. Huplosky's cross-examination but drew objections for hearsay and lack of foundation.  *See id.*; Tr. at 3483:21–3492:24, 3621:20–3624:10 (Huplosky).  The marked-up report relates directly to the already-admitted DX-0372, a cover email Mr. Huplosky sent on 28 December 2010, addressing attorney comments from Dewey & LeBoeuf.  *See* Tr. at 3481:12–3482:11.

The government offers two arguments in support of admitting DX-0375.  First, the government argues sufficient foundation exists to prove DX-0375 is the marked-up draft appraisal report attached to the cover email, DX-0372.  Gov't's Mot. to Admit DX-0375 at 1–2.

---

to a specific objection from plaintiffs, it is improper to designate every pre-litigation statement of Terra-Gen and Mr. Pagano as a non-hearsay party admission without a specific dispute to decide.

The government notes Mr. Huplosky confirmed he sent the cover email, DX-0372, *see* Tr. at 3481:12–3482:9 (Huplosky), and showed familiarity with the markup comments in DX-0375 when asked about his state of mind regarding them, *see* Tr. at 3534:9–12 (Huplosky).  Second, the government argues Mr. Huplosky's comments are non-hearsay under FRE 801(c) because they "go to Mr. Huplosky's state of mind" rather than to prove the truth of the matter asserted.  Gov't's Mot. to Admit DX-0375 at 2–3.  The government argues the comments from Dewey & LeBouef are admissible for this same reason—they provide the context for Mr. Huplosky's comments, such as his display of frustration with the Dewey & LeBoeuf attorney, his reaction to whether to include the Oak Creek Development Fee in balance of plant costs, and his reaction to limiting the developer fee to twenty or thirty percent.  *Id.* at 4 (citing DX-0375.001, 008, 010).

In response, plaintiffs reinforce their argument from trial:  DX-0375 "is classic hearsay," and the government failed to provide evidence showing the comments from the appraisal report affected Mr. Huplosky's state of mind.  Pls.' Opp'n to Gov't's Mot. to Admit DX-0375 at 1, ECF No. 442; *see also* Tr. at 3489:11–23.  Plaintiffs additionally deny the government provided sufficient evidence to prove Mr. Huplosky, when writing about the Oak Creek Development Fee and balance of plant costs, was directly responding to the associated Dewey & LeBouef comment on DX-0375.010.  *Id.* at 1–2.

The government's Motion fails for three reasons.  First, while the government seeks to admit DX-0375 to prove Mr. Huplosky's state of mind, its Motion is moot because Mr. Huplosky's state of mind—such as his "frustration with the Dewey & LeBoeuf attorney"—is immaterial to the Court's determination of the only issue at retrial:  the allocation of purchase prices under Section 1060.  *See* Section IX, *infra*.  Second, the Court does not discuss nor rely on Mr. Huplosky's comments on DX-0375 in its analysis, *see generally infra*, rendering moot plaintiffs' opposition to the government's Motion.  Third, as there are numerous comments throughout DX-0375, the government bears the burden to show every comment is not hearsay and affected Mr. Huplosky's state of mind.  Given each comment independently constitutes hearsay without such a showing, and because the government did not show each comment affects Mr. Huplosky's state of mind, the Court cannot admit the entire exhibit into evidence.  *Cf. Columbia First Bank, FSB v. United States*, 58 Fed. Cl. 333, 338 (2003) (explaining courts are able to admit admissible parts of a document containing hearsay and exclude others).  Accordingly, given the Court does not rely on DX-0375 in its analysis below, the Court denies as moot the government's Motion to Admit into Evidence Exhibit DX-0375 because the Court finds Mr. Huplosky's state of mind immaterial to its findings and DX-0375 would otherwise constitute non-admissible hearsay.  *See id.*

## VIII.  Legal Standard—How to Calculate the Turn-key Value of the Tangible Eligible Assets for Alta I-VI to Determine Plaintiffs' Basis for ARRA § 1603 Cash Grants

In the first trial, prior to the Federal Circuit's reversal and reassignment to the undersigned, the court determined plaintiffs' basis for the ARRA § 1603 cash grants was the full purchase price of the Alta facilities (with allocations to account for grant-ineligible property for Alta I and VI), less the price of land conveyed in fee simple.  *See Alta Wind I*, 128 Fed. Cl. at 722.  Integral to this determination was the court's finding "neither goodwill nor going concern value could have attached to Altas I-VI at the time of the transactions, [so] the transactions were

not 'applicable asset acquisitions' . . . [and I.R.C. §] 1060 and its accompanying residual method do not apply to the transactions." *Id.* at 716.  The Federal Circuit, however, reversed the first trial decision because, "[t]here is no need to show that a transaction had actual, accrued goodwill or going concern value at the time of the transaction" for Section 1060 to apply.  *See Alta Wind I*, 897 F.3d at 1373.  Rather, because the presence of three Treasury regulation factors—(1) intangible assets; (2) an excess of the total consideration over the aggregate book value of assets purchased; and (3) related transactions, including lease agreements, licenses, or other similar agreements in connection with the transfer—indicated "goodwill or going concern value *could* attach, . . . [t]he Alta transactions therefore count as "applicable asset acquisitions" for purposes of Section 1060, and their purchase prices must be allocated using the residual method." *Id.* at 1373–76 (citing Treas. Reg. § 1.1060-1(b)(2)(i)) (emphasis added).  Accordingly, on remand and for purposes of retrial, the Federal Circuit directed the Court "to make a factual determination as to the allocation of purchase price" and, "[i]n applying the § 1060 residual method, . . . [to] distinguish between turn-key value and goodwill and other intangibles." *Id.* at 1377.

## A.    Determination of Basis Under ARRA § 1603

The principal issue at retrial "is how to calculate plaintiffs' *basis* in eligible property for purposes of the section 1603 grants." *Alta Wind I*, 897 F.3d at 1369 (emphasis added).  ARRA § 1603 "provide[s] a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property." ARRA § 1603(a).  Basis is naturally at issue because it drives the value of the cash grant—to calculate the grant, section 1603 provides the "amount of the grant with respect to any specified energy property [is] the applicable percentage," "30 percent," "of the *basis* of such property." ARRA §§ 1603(b)(1), (b)(2)(A) (emphasis added).  Moreover, the only type of property eligible to be included as basis is "tangible personal property and other tangible property, used as an integral part of the facility, for which depreciation or amortization is allowable." *Alta Wind I*, 897 F.3d at 1369 (citing I.R.C. §§ 45(d), 48(a)(5)(D); ARRA § 1603(d)(1)).  While the parties agree on this legal framework, plaintiffs advocate valuation methodologies resulting in a higher basis than determined by Treasury, while the government advocates a valuation methodology resulting in a lower basis than determined by Treasury.  *See* PX-0910.026 ¶ 65 (Blaydon/Osborn Corr. Suppl. Rpt.); DX-0783.019 ¶ 37 (Parsons Initial Rpt.).

### 1.    The Residual Method Under I.R.C. § 1060

IRC § 1060 provides a specific methodology for determining basis in the case of "applicable asset acquisition[s]." *See* I.R.C. § 1060.  The Federal Circuit already determined Section 1060 applies for the calculation of basis for the Alta facilities.  *See Alta Wind I*, 897 F.3d at 1375.  Section 1060 entails divvying up the purchase price of the Alta facilities by valuing each of seven classes of assets sequentially.  *See id.* at 1376 (citing I.R.C. § 1060).  Purchase price is allocated to each asset class according to the fair market value of assets until no remaining purchase price is left to allocate.  *See id.*  If, after allocation to Class VI ("I.R.C. § 197 intangibles, including contract rights"), some value remains, all remaining purchase price is allocated to Class VII ("Goodwill and going concern value").  *See id.*  Key to the dispute at retrial is what portion of the purchase price should be allocated to asset Class V ("Assets that do not fit within any other class, including tangible property," I.R.C. § 1060) because eligible basis

can only be found in Class V.  *See id.* at 1377.  The parties agree none of the Alta facilities contain any assets in Classes I ("Cash and general deposit accounts"), II ("Actively traded personal property, certificates of deposits, U.S. government securities and publicly traded stock"), III ("Debt instruments"), or IV ("Inventory and other property held for sale to customers"),[19] *see Alta Wind I*, 897 F.3d at 1376, but disagree as to how to allocate the purchase prices to Classes V, VI, and VII, *see* PX-0910.002, 005 ¶¶ 05, 16–17 (Blaydon/Osborn Corr. Suppl. Rpt.); DX-0833.010–013, 016–017 ¶¶ 16–25, 34 (Parsons Suppl. Rebuttal Rpt.).  Thus, for purposes of retrial, the Federal Circuit tasked the Court with "a factual determination as to the allocation of purchase price" to asset Classes V, VI, and VII.  *Alta Wind I*, 897 F.3d at 1377; *see also id.* at 1376 ("The purchase price must therefore be allocated to Class V, then to Class VI, and finally to Class VII, if any value remains.").

### 2.　　Distinguishing Turn-key Value from Goodwill and Other Intangibles to Allocate Purchase Price to Asset Classes V, VI, and VII

The allocation of Alta purchase prices to Classes V, VI, and VII after a fair market valuation of development and construction costs turns on a distinction between "turn-key value" and "goodwill and other intangibles."  *See Alta Wind I*, 897 F.3d at 1377.  Because "the purchase prices for the Alta facilities were in excess of the development and construction costs of the tangible assets making up the facilities," determining what portion of this excess is part of eligible basis for the cash grants requires allocation under the residual method.  *See id.*  "Unlike goodwill and going concern value, turn-key value is considered part of the tangible assets in a transaction rather than a separate intangible asset, so it is a Class V asset for purposes of the residual method."  *Alta Wind I*, 897 F.3d at 1377 (citing *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677 680 (Ct. Cl. 1974) (precedential *per curiam* appeal)).  Thus, to "apply[] the § 1060 residual method," the Federal Circuit directed the Court "must distinguish between turn-key value and goodwill and other intangibles."  *Id.*  This task entails:  (1) determining the fair market value of tangible eligible assets found in Class V, including any turn-key value; and (2) ensuring the value determined in (1) does not include ineligible goodwill and other intangibles found in Classes VI and VII.  *See id.*

Turn-key value is "the incremental value 'a buyer would pay for such an assurance the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.'"  *Alta Wind I,* 897 F.3d at 1377 (quoting *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974) (cleaned up)); *see also Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063, 1065 n.4 (Fed. Cir. 1983) ("A turn-key job is defined as a job or contract in which the contractor agrees to complete the work of building and installation to the point of readiness for operation or occupancy.  Up to that point, the contractor assumes all risks." (citations omitted)).  Moreover, "turn-key value, 'the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order,' is separate from the value that comes from having secured a customer contract, regulatory approvals, transmission rights, and various other arrangements that ensured the immediate operation of the Alta windfarms."  *Alta Wind I*, 897 F.3d at 1377 (cleaned up)

---

[19] Except for $4.99 million allocated to Class I for Alta VI—$2 million in cash and $2.99 million in deferred financing costs.  *See* PX-0910.023 ¶ 55 (Blaydon/Osborn Corr. Suppl. Rpt.).

(quoting and citing *Miami Valley*, 499 F.2d at 680, 682).  Accordingly, in determining the eligible basis of the Alta facilities for ARRA § 1603 grants, the Federal Circuit tasked the Court with a factual determination of "turn-key value," as defined by the court in *Miami Valley*.[20]  *See id.* (defining turn-key with reference to *Miami Valley*) (concluding:  "In applying the § 1060 residual method, the Claims Court must distinguish between turn-key value and goodwill and other intangibles.  On remand, the Claims Court will have to make a factual determination as to the allocation of purchase price.").

### 3.    Binding Caselaw Regarding a Factual Determination of Turn-key Value

To further inform the Court's determination of turn-key value, a review of the analysis in *Miami Valley* is informative.  *See id.*  In *Miami Valley*, plaintiffs brought suit in the Court of Claims seeking refund of "alleged overpayments of federal income tax and assessed interest" for taxable years 1959–1962.  499 F.2d at 678.  In establishing the basis for depreciation of the tangible assets at issue during the taxable years, the government argued the basis should reflect only the "reproduction cost of each of the separate tangible assets" and should not take into account the fact that "such assets were parts of an assembled and operating plant."  *Id.* at 679.  The Court of Claims disagreed, finding "[t]he 'turnkey' product was worth more than the sum of the untested and uncoordinated parts, even though they were all constructed and installed in place," and therefore "a buyer would pay an increment for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination."  *Id.* at 680.  In concluding the "cost of the [the assets] would in all probability have included the total of the reproduction costs of the individual assets ($2,178,072), plus increments covering construction interest, and the contractor's contingencies, overhead and profit for the 'turnkey' aspect," the Court of Claims ultimately approved plaintiffs' proffered turn-key premium as part of basis.  *Id.* at 680–81.  In making this determination, the Court of Claims found the valuation of plaintiffs' appraiser's turn-key calculation was "on this record . . . reasonable."  *See id.* at 681 n.2.  While the *Miami Valley* court did not endorse a particular range of turn-key premiums, the court accepted as turn-key value $518,892 where the total reproduction cost of the individual assets was $2,178,072 (for a total turn-key premium of approximately 23.8% of reproduction costs).  *See id.* at 680–81.

---

[20] Of persuasive value, Treasury guidance (of unknown publication date) on Section 1603 cash grants also notes Treasury will accept a "markup" of reproduction costs in determining basis, noting in full:

> The Section 1603 review team will accept a cost approach that includes only eligible property and a markup that is consistent with industry standards and with the scope of work for which the markup is received.  While appropriate markups are case-specific and can depend on the ultimate transaction price, the 1603 review team has found that appropriate markups typically fall in the range of 10 to 20 percent.  A cost approach that includes a markup should explicitly address the appropriateness of the selected markup in light of the activity, capital investment, and risk for which that markup is compensating.

*Evaluating Cost Basis for Solar Photovoltaic Properties* at 4, TREASURY, https://home.treasury.gov/system/files/216 /N-Evaluating_Cost_Basis_for_Solar_PV_Properties-final.pdf.  This guidance further notes, despite the title of the publication, cost approach guidance is not limited to solar photovoltaic properties.  *See id.* at 1. n.1.

The court in *Miami Valley* also made several helpful distinctions for determining what is not included turn-key.  For example, "going concern value"—"the special value inherent in a functioning established plant continuing to operate, to do business, and to earn money, with its staff and personnel"—is not "turnkey" and "cannot be used . . . as part of the basis of the depreciable tangible assets." *Miami Valley*, 499 F.2d at 681–82.  Likewise, while the court did not define "goodwill," the court noted goodwill "is of course not depreciable or amortizable" and cannot be included in basis. *See id.* at 681 (citations omitted).

In *Forward Comm's Corp. v. United States*, the Court of Claims further expounded the *Miami Valley* definition of turn-key. *See* 608 F.2d 485, 513–16 (Ct. Cl. 1979) (precedential *per curiam* decision).  In that case, following plaintiff's purchase and liquidation of a newspaper company, the court was tasked with determining "the fair market values of the machinery and equipment and the goodwill" of the liquidated company. *Id.* at 509.  Plaintiff calculated the value of the machinery and equipment by subtracting the balance sheet figures ("book value") for "land and buildings, and other nondepreciables" from the purchase price, to arrive at a residual value of remaining assets which plaintiff then adjusted downward based on "what a newspaper of the size [of the liquidated company] should have in machinery and equipment assets." *Id.* at 511–12.  The government, however, valued the machinery and equipment based on "original cost figures" adjusted upward by industry-specific indices and back down to account for depreciation, arriving at a "full replacement cost less depreciation." *See id.* at 512.  The government then added "a further 5 percent increase to the total value because all of the items were part of a total working operation" to arrive at "fair market value." *See id.*  The court found the government's expert "made the most credible estimate" because "[h]e was the only one to actually inspect the machinery and equipment, [] the only one to break the property down on an item-by-item basis[, and h]e employed standard appraisal techniques in considering inflation, depreciation, obsolescence, and the 'turnkey' factor." *Id.* at 513.

With specific regard to turn-key value, the plaintiff in *Forward Communications* disputed the government's five percent premium, arguing it should be increased to at least twenty percent based on:  (1) expert testimony "in general 50 percent should be added;" and (2) the use of "about 24 percent over reproduction cost" in *Miami Valley*. *See* 608 F.2d at 513.  The court rejected plaintiff's arguments in part because the expert's fifty percent value included installation costs and was applied to catalog cost of the assets without installation, whereas the government's calculation was more precise—it applied the five percent premium to the company's book costs which already included costs for installation and integration. *See id.*  The court noted the "50 percent [figure was] a mere generalization unsupported by other evidence." *Id.*  With regard to the *Miami Valley* turn-key premium, the court rejected an argument based merely on a twenty-four percent figure in another case because:  (1) the specific twenty-four percent value was not a legal standard but a factual determination specific to that case, (2) the twenty-four percent value was also applied to catalog costs, and not actual installed costs reflected in the books; and (3) no evidence indicated a turn-key premium for a medium-size television broadcasting company in *Miami Valley* would be comparable to turn-key for a small newspaper company. *See id.*  The court also noted plaintiff failed to produce evidence their costs "did not reflect fully the costs of transporting and installing its equipment, . . . teaching employees how to use it, [paying nonproductive employees during installation], adjustments and hookups of the machines, and other elements [of turn-key]." *Id.*  Accordingly, the court reasoned it did not have

any evidentiary basis to find the book value of the machinery and equipment did not already include turn-key value.  *See id.* at 514.  The court ultimately adopted the government's valuation of machinery and equipment, using the five percent turn-key premium.  *See id.*  Although the court did not apply the IRC § 1060 residual method in *Forward Communications*, the court attributed the rest of the purchase price not allocated to any of the other liquidated assets to goodwill.  *See* 608 F.2d at 516.

## B.    Standard of Review

"It is well-settled that a tax refund suit in the Court of Federal Claims is a *de novo* proceeding, in which the plaintiff bears the burden of proof with respect to each and every element of its claim.  *Int'l Paper Co. v. United States,* 36 Fed. Cl. 313, 322 (1996) (quoting *Sara Lee Corp. v. United States,* 29 Fed. Cl. 330, 334 (1993)).  It is not an appellate review of the administrative decision that was made by the IRS; instead, the Court must make an independent decision as to whether the taxpayer is due a refund.  *Id.*  When making this determination, the Court is to give no weight to subsidiary factual findings made by the IRS in its internal administrative proceedings.  *Cook v. United States,* 46 Fed. Cl. 110, 113 (2000).  *D'Avanzo v. United States*, 54 Fed. Cl. 183, 186 (2002) (cleaned up); *see also W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015), *aff'd*, 636 F. App'x 796 (Fed. Cir. 2016) (applying *D'Avanzo*, 54 Fed. Cl. at 186, for the standard of review in the context of ARRA).

In a *de novo* tax case, plaintiffs bear the burden to prove, by a preponderance of the evidence:  (1) they are entitled to the amount at issue; and (2) the amount due.  *See Washington Mut., Inc. v. United States*, 130 Fed. Cl. 653, 686–87 (2017), *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018) (citing *United States v. Janis*, 428 U.S. 433, 440 (1976); *Charron v. United States*, 200 F.3d 785, 792 (Fed. Cir. 1999); *Danville Plywood Corp. v. United States*, 899 F.2d 3, 7–8 (Fed. Cir. 1990); *Cook v. United States*, 46 Fed. Cl. 110, 114–117 (2000)).  Because a tax assessment is presumptively correct, plaintiffs will not recover in a tax refund case just through a showing they were underpaid—plaintiffs must also prove the amount of the refund due.  *See Washington Mut.*, 130 Fed. Cl. at 687 (citing *Arrington v. United States*, 1997 WL 101091, at *4 (Fed. Cir. Mar. 7, 1997); *Janis*, 428 U.S. at 440; *Taylor v. Comm'r*, 70 F.2d 619, 620 (2d Cir. 1934), *aff'd*, 293 U.S. 507 (1935) (in a refund suit, if taxpayer fails to prove the amount due, taxpayer may not recover everything owed to him "even though we know that the tax is too high")) (other citations omitted).  Further, while "plaintiff bears the burden of proof for each [of its] claim[s]," *W.E. Partners II*, 119 Fed. Cl. at 690 (citations omitted), given the government filed counterclaims, both parties bear the burden of proving they are entitled to recovery of their respective claims, *see id.*; *Trans Ocean Van Serv. v. United States*, 192 Ct. Cl. 75, 123 (1970); *Int'l Harvester Co. v. United States*, 169 Ct. Cl. 821, 846 (1965); *Daum v. United States*, 120 Ct. Cl. 192, 221 (Ct. Cl. 1951); *G.M. Shupe, Inc. v. United States*, 5 Cl. Ct. 662, 740 (1984).

To establish the amount due, the parties must establish basis to a reasonable degree of certainty.  *See Washington Mut.*, 130 Fed.Cl. at 686 (citing *Washington Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1104 (W.D. Wa. 2014)).  "To do so, [the parties] must put forward sufficient evidence for the Court to make a 'reasonable or rational approximation' of the value of these assets.  *Id.* (quoting *Union Pac. R.R. v. United States*, 524 F.2d 1343, 1383 (Ct. Cl. 1975) (precedential *per curiam* decision)) (citing *Meredith Broadcasting Co. v. United States*, 405 F.2d

1214, 1231 (Ct. Cl. 1968) (precedential *per curiam* decision); *Kraft, Inc. v. United States*, 30 Fed. Cl. 739, 795 (1994)).  "While the [Court of Federal Claims] has discretion in choosing a method of evaluation and some leeway in determining the amount of fair market value, the court . . . has no discretion to make a finding of the value of an asset where there is *no* evidence to support it." *Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992) (emphasis in original).

## IX.    The Parties' Valuation Methodologies and Whether They Satisfy the Burden of Proof and the Federal Circuit's Remand Instructions

The Court's present task is to determine whether the parties carried their burden of proving entitlement to an over- or under-payment of Section 1603 cash grants.  According to the Federal Circuit's remand instructions, the Court must "make a factual determination as to the allocation of purchase price" and, "[i]n applying the § 1060 residual method," determine the value of the individual tangible assets, and, to the extent purchase price exceeds this value, "distinguish between turn-key value and goodwill and other intangibles." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1377 (Fed. Cir. 2018).  Given the parties proffered two disparate approaches to allocate the purchase price, the Court's central inquiry is to determine which of the parties' approaches—plaintiffs' income approach or the government's cost approach—properly determines the fair market value of the tangible assets and properly distinguishes between turn-key, goodwill, and other intangibles with reliability, reasonability, and precision. *See id.*; *Washington Mut., Inc. v. United States*, 130 Fed. Cl. 653, 686 (2017), *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018) (citing *Washington Mut., Inc. v. United States*, 996 F. Supp. 2d 1095, 1104 (W.D. Wash. 2014)).  While precedent requires the Court to assess whether the parties' approaches are reasonable approximations, the parties did not identify precedent requiring the Court to apply a specific methodology or calculate values in a certain manner to calculate the value of Section 1603 cash grants—indeed, the Federal Circuit's remand instructions recognize this assessment is *factual* in nature. *Alta Wind I*, 897 F.3d at 1377; *see also* Tr. at 5528:18–5529:12 (Closing Arguments) ("THE COURT:  So back to the Federal Circuit.  What does it mean to make a factual determination as to the allocation of purchase price?"  [PLAINTIFFS:]  [Y]ou have to make a factual determination as to what the fair market value is of the Class V eligible property . . . [and] make sure that the methodology utilized by the party in their presentation comes up with a number, a dollar value for the Class V tangible eligible property, that that dollar value includes turnkey value and excludes goodwill or going concern value . . . . THE COURT: And that's a factual determination? PLAINTIFFS: Yes . . . ."), 5529:23–5530:18 (Closing Arguments) ("[GOVERNMENT:]  [I]t's a question of law up front, and then if they pass that test, then you have to look at it and see if factually they proved it up.  THE COURT:  The question of law being Daubert issues?  [GOVERNMENT:] Yes.").  Given no binding precedent requires the Court to apply a specific methodology and the Federal Circuit noted the Court is to make factual determinations, the Court is entrusted with selecting a valuation methodology based on the reliability of the parties' expert opinions, the reasonability of applying the experts' methodologies to the case at hand, the level of precision in calculating the damages values, the text of the statute and the identified purpose of the statute in the text, factual guideposts from prior Court of Claims and Federal Circuit cases, and certainly the Federal Circuit's remand instructions. *See Alta Wind I*, 897 F.3d at 1377; *Washington Mut.*, 130 Fed. Cl. at 686, *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018); *Miami Valley*, 499 F.2d at 681–82.

- 44 -

Each relevant entity—Treasury, plaintiffs, and the government—used different methodologies to calculate plaintiffs' cost basis. Treasury's methodology is the most straightforward: Treasury calculated cost basis by using grant-eligible construction costs itemized in the KPMG cost segregation reports submitted with the Alta I–V facilities' grant applications. *See Alta Wind I*, 897 F.3d at 1371. Alta VI's calculations were slightly different—that facility took a bridge-to-grant loan from Treasury in the amount of a certain percentage of the eligible costs for Alta VI. *See* JX-0196.057 (Alta I–VI Cash Grant Award Letters). Instead of using the values plaintiffs provided for the cost basis in their grant application for Alta VI, Treasury backed into eligible cost basis from the amount of the loan divided by that percentage of eligible costs. *See id.*;[21] *see also* Tr. at 5575:9–5576:4 (Closing Arguments).

After the Federal Circuit reversed the first trial decision which found the entire Alta purchase prices constituted plaintiffs' cost basis, plaintiffs modified their initial DCF model (used in the first trial to corroborate the purchase prices) to instead calculate fair market value of only the tangible assets of the Alta facilities. *See* PX-0910.004 ¶ 5 (Blaydon/Osborn Corr. Suppl. Rpt.). This adjusted DCF valuation projects the anticipated cash flows forward and applies a development stage discount rate to calculate present value of the cash flows after relevant deductions for operating expenses, tax, etc. *See* PX-0910.005 ¶ 8 (Blaydon/Osborn Corr. Suppl. Rpt.). This development stage discount rate, according to plaintiffs, eliminates value from the cash flows attributable to intangibles. *See* PX-0910.015 ¶¶ 34–35 (Blaydon/Osborn Corr. Suppl. Rpt.) ("By using a higher development stage discount rate, I am

---

[21] As Treasury explained, "[t]he amount requested was reduced because the presented cost basis was higher than open market expectations for eligible property of this size, in this location, installed contemporaneously. The cost basis has been adjusted to reflect the basis presented as eligible basis to support the 'Bridge to Cash Grant' loan. This adjusted eligible basis may itself include value that should be allocated to more than the eligible property alone. However, the adjusted basis is more consistent with market expectations than the eligible cost basis claimed in the Section 1603 application." JX-0196.057 (Alta I–VI Cash Grant Award Letters).

Any reference in this opinion to the KPMG cost segregation report for Alta VI should be read to refer to the "Asset Detail" sheet of JX-0192 (Mustang Hills Grant Study FMV Rpt.). Treasury's reduced cost basis amounts to around $290 million, *see* JX-0196.057 (Alta I–VI Cash Grant Award Letter), but there is no breakdown of this lower $290 million cost basis in the KPMG cost segregation report for Alta VI. *See generally* JX-0189 (Alta VI KPMG Cost Segregation Rpt.). A KPMG cost segregation memo with the same cost breakdown as the KPMG cost segregation report does, however, reference a Mustang Hills Grant Study FMV Report to determine eligible cost basis. *See* JX-0184.002 (Alta VI KPMG Cost Segregation Memo.) ("KPMG reviewed the cost document 'Mustang Hills Grant Study FMV Report-revised 6-17-12(PPA Non Eligible)' as part of this analysis."), 013–016 (breakdown of costs). The Mustang Hills Grant Study FMV Report breaks down the lower $290,865,852 cost basis number by line item for Alta VI. *See* JX-0192 (Mustang Hills Grant Study FMV Report, Sheet [Asset Detail], Row [243], Column [J]); *see also See* JX-0192 (Mustang Hills Grant Study FMV Report, Sheet [Everpower Eligible Calc]) (breaking down the larger $413.6 million cost basis in a separate tab showing the larger number steps up all cost line-items pro-rata to account for the difference between purchase price and total costs). Dr. Parsons adopted this exact same number ($290,865,862) in his cost approach, citing plaintiffs' interrogatory answers for support. *See* DX-0783.068, Ex. 11, Row [1], Column [F] (Parsons Initial Rpt.). At closing arguments, plaintiffs confirmed this is the correct number to use. *See* Tr. at 5575:9–15 ("[PLAINTIFFS:] The cost to Terra-Gen out of pocket for Alta VI grant-eligible property is $290,866,000"). Accordingly, the correct point of reference for determining the eligible cost breakdown of Alta VI is the "Asset Detail" sheet in the Mustang Hills Grant Study FMV Report, which breaks down $290,865,862 of eligible costs into their constituent parts. *See* JX-0192 (Mustang Hills Grant Study FMV Rpt., Sheet [Asset Detail]).

able to value the tangible assets, separate from the intangibles."). Then, after removing land value from the cash flows as required by Section 1603, PX-0910.024 ¶ 59 (Blaydon/Osborn Corr. Suppl. Rpt.), plaintiffs apply a ratio of eligible costs to ineligible costs to isolate eligible tangible assets to serve as cost basis. *See* PX-0299.045–046 ¶ 81 (Blaydon Initial Rpt.). Plaintiffs posit the result of these operations includes the value of the eligible assets, plus a turn-key increment. *See* PX-0910.027 ¶ 66–67 (Blaydon/Osborn Corr. Suppl. Rpt.). The government argues plaintiffs' DCF valuation suffers several defects, namely: (1) the inclusion of at least a portion of the anticipated cash grant as eligible basis; (2) the failure to consider and eliminate potential going concern or goodwill premiums; and (3) the failure to fully eliminate ineligible asset values through use of the development stage discount rate. *See* DX-0879.006–009 ¶¶ 13–17 (Blouin Suppl. Rebuttal Rpt.); Gov't's PFFCL ¶¶ 425–30, 446–50, ECF No. 484.

Finally, the government proposes a cost method to value the Alta facilities, arguing a cost approach is more appropriate than valuing based on income because the assets to be valued are readily replaceable and differ from unique architecture which is not readily replaceable. Tr. at 4173:17–4174:10, 4205:8–4206:11, 5360:7–5361:16 (Parsons); DX-0783.018 ¶¶ 33–34 (Parsons Initial Rpt.) (arguing the cost approach is a more reliable and appropriate methodology to value readily replaceable assets such as the Alta property eligible for Section 1603 grants). To calculate plaintiffs' basis using the cost approach, the government's expert, Dr. Parsons, employs three steps: (1) start with the cost numbers from the KPMG's cost segregation reports submitted to Treasury; (2) subtract out certain "acquisition costs;" and (3) apply a rate of return to account for developer profits at the time of capital expenditures. *See* Tr. at 4233:23–4261:17 (Parsons); DX-0783.018–019 ¶ 35 (Parsons Initial Rpt.). First, Dr. Parsons states the KPMG reports categorize various cost items as "grant-eligible," and these items can serve as a starting point for determining cost basis. *See* Tr. at 4232:19–4242:19 (Parsons). Next, Dr. Parsons removed certain acquisition costs because he stated these costs either do not reflect actual development costs, relate to intangible assets, or relate to other entities' profits. *See* Tr. at 4245:24–4246:11, 4252:11–4254:1 (Parsons); DX-0783.068, Ex. 11 (Parsons Initial Rpt.) (Summary of Total Eligible Cost, Inclusive of Developer Profit); DX-0783.018–019 ¶ 35 (Parsons Initial Rpt.). Dr. Parsons finally applied a nine percent rate of return on all capital using a modified Capital Asset Pricing Model, calculated at the time of the capital expenditure. *See* Tr. at 4259:16–4261:17 (Parsons); DX-0783.018, 024–025, 042–043 ¶¶ 32–35, 50–55, Ex. 9 (Parsons Initial Rpt.). Plaintiffs argue, to construct a proper cost approach calculation, Dr. Parsons should have used the full eligible costs listed in the KPMG cost segregation reports (without removing the acquisition costs), in addition to adding an approximately thirty-seven percent premium to account for turn-key and developer fees. *See* Tr. at 5169:19–5170:12 (Osborn), 5603:23–5604:10 (Closing Arguments) ("[PLAINTIFFS:] You can derive a combined, you know, mathematically, you can derive a combined percentage, which comes to I think 37 percent, because first you add the 15 percent turnkey fee and then you apply the 20 percent to the combined out-of-pocket expenses and turnkey fee.").

Having briefly summarized each entity's valuation methodology, the Court now evaluates each methodology by determining whether it comports with the Federal Circuit's remand instructions and whether the parties presenting each methodology satisfied their burden of proof. Specifically, the Court first assesses whether plaintiffs' DCF approach distinguishes

- 46 -

between turn-key, goodwill, and other intangibles and whether plaintiffs adduced sufficient evidence at trial to support its methodology.  Then, the Court determines whether the government's cost approach distinguishes between turn-key, goodwill, and other intangibles and whether the government adduced sufficient evidence at trial to support its methodology.  The Court also compares the government's cost approach against Treasury's calculations with respect to turn-key value and evaluates plaintiffs' critiques of the government's approach.  Finally, the Court determines whether either party bore its burden in proving an over- or under-payment of cash grants.

### A.    Whether Plaintiffs Adequately Distinguish Eligible Basis from Ineligible Asset Values Through a Discounted Cash Flow Valuation

Plaintiffs value eligible basis using a discounted cash flow methodology.  *See* PX-0910.008 ¶¶ 16–17 (Blaydon/Osborn Corr. Suppl. Rpt.).  Section 1060 requires allocation of purchase price to each of seven asset classes according to the fair market value of the assets, *see Alta Wind I*, 897 F.3d at 1376, and the parties agree fair market value is the price at which an asset would change hands between a willing buyer and willing seller.  *See* PX-0910.002 ¶ 5 (Blaydon/Osborn Corr. Suppl. Rpt.); DX-0783.032 ¶ 75 (Parsons Initial Rpt.) (seeking to establish fair market value based on indications of an "arms-length transaction").  The parties also agree fair market value is typically determined through one of three valuation approaches: (1) the cost approach, (2) the market approach, or (3) the income approach.  PX-0299.008–009 ¶¶ 12(c)–(e) (Blaydon Initial Rpt.); DX-0783.020 ¶¶ 38–39 (Parsons Initial Rpt.).  To determine the fair market value of the tangible eligible assets in this case, plaintiffs argue the income approach is the most appropriate method because the assets to be valued are integrated, income-producing assets.  *See* PX-0910.006–007 ¶ 13 (Blaydon/Osborn Corr. Suppl. Rpt.).  Plaintiffs present their income approach in the form of a discounted cash flow model, arguing discounted cash flow is the most appropriate valuation method because it determines value through projected income, and "the value of the tangible assets is most appropriately measured based on the amount of cash that those assets are expected to generate, discounted to present value through application of an appropriate discount rate."  *See* PX-0910.003, 004–005 ¶¶ 8, 13–14 (Blaydon/Osborn Corr. Suppl. Rpt.).  Plaintiffs value the assets from future income streams falling into two categories:  (1) the generation and sale of electricity, and (2) tax benefits.  *See* PX-0299.036 ¶ 64 (Blaydon Initial Rpt.).  In support of their income approach, plaintiffs present caselaw, finance treatises, and expert testimony, and note the parties to the Alta transactions themselves used discounted cash flow valuations to reach a sale price.  *See* PX-0910.003, 004–005 ¶¶ 8, 13 (Blaydon/Osborn Corr. Suppl. Rpt.); Tr. at 834:6–19 (Spencer),[22] 971:12–972:25 (Markowitz),[23] 3223:20–3224:9 (Revock); Pls.' PFFCL ¶ 117.

---

[22] As of 2016, Mr. James Spencer was the founder, president, and chief executive officer of EverPower Wind Holdings, Inc., which is a developer and owner of seven wind power facilities.  Tr. at 824:24–826:4, 827:18–22 (Spencer).  Mr. Spencer testified at the first trial about, *inter alia*, overseeing the purchase of the Alta VI (Mustang Hills) facility.  *Id.*

[23] As of 2016, Mr. Lance Markowitz was the Los Angeles president of Bankers Commercial Corporation and the Managing Director of MUFG Union Bank.  Tr. at 918:14–919:23, 925:8–16, 950:2–3, 983:12–17 (Markowitz).  Mr. Markowitz testified at the first trial about, *inter alia*, overseeing the acquisition of the Alta I facility.  *Id.*

In an attempt to distinguish between eligible and ineligible assets in accordance with the Federal Circuit's Remand Opinion, plaintiffs modified their discount rate. In the first trial, plaintiffs' DCF valuation was offered simply "to confirm that the prices reflected the fair market value of the assets Plaintiffs acquired." Pls.' Suppl. Brief at 6, ECF No. 267; PX-0299.034 ¶ 60 (Blaydon Initial Rpt.). At retrial, to conform with the Federal Circuit's direction to extract from purchase price the value of the eligible assets under the Section 1060 residual method, plaintiffs' expert adjusted one variable from the initial DCF analysis—the discount rate. *See* Pls.' Suppl. Brief at 8; PX-0910.006, 012–013 ¶¶ 17, 34–35 (Blaydon/Osborn Corr. Suppl. Rpt.). According to plaintiffs, after applying the new discount rate, all that remains is the fair market value of the Class V assets, because the discount rate effectively discounts away the value of Class VI and VII assets. *See* PX-0910.012–013 ¶¶ 34–35 (Blaydon/Osborn Corr. Suppl. Rpt.). Stated differently, plaintiffs' DCF model first projects net revenues[24] forward for the Alta facilities as a whole, before using the adjusted discount rate to simultaneously: (1) discount projected revenues to present value; and (2) remove value contributed by ineligible intangible assets from the revenue streams. *See* PX-0910.019–020 ¶¶ 51–52 (Blaydon/Osborn Corr. Suppl. Rpt.). Plaintiffs then perform two additional operations to remove the value of any ineligible Class V tangible assets. First, plaintiffs subtract the value of land. *See* PX-0910.022 ¶ 59 (Blaydon/Osborn Corr. Suppl. Rpt.). Second, plaintiffs multiply the DCF valuation (less land)

---

[24] Plaintiffs forecasted electricity generation based on wind-study projections and an independent engineer's review of design specifications for the Alta facilities. *See* PX-0299.039–041 ¶¶ 70–73 (Blaydon Initial Rpt.); *see also* PX-0910.019–020 ¶ 52 (Blaydon/Osborn Corr. Suppl. Rpt.) (referring to the initial expert report for revenue and expense projections). To project revenues from this electricity generation forecast, plaintiffs multiplied forecasted generation by electricity prices over the useful life of the generation assets—prices already locked in for roughly twenty-five years through PPAs and, for periods after the twenty-five year PPAs, price estimates from the Energy Information Administration. *See* PX-0299.037–038 ¶¶ 67–68 (Blaydon Initial Rpt.). Plaintiffs then determined pre-tax net income by subtracting the projected operating and maintenance expenses from the revenue projections. *See* PX-0299.046 ¶ 82 (Blaydon Initial Rpt.).

Throughout this process, plaintiffs' expert leveraged the financial models the parties to the transactions used in negotiations, including: (1) revenues the Alta facilities were projected to generate related to electricity during the useful life of the tangible assets; and (2) operating and maintenance expenses. *See* PX-0299.036, 037–046 ¶¶ 64, 66–82 (Blaydon Initial Rpt.). These figures were reviewed and corroborated by independent engineers at the time of the transaction, *see* PX-0299.036, 037–046 ¶¶ 64, 66–82 (Blaydon Initial Rpt.), and the government's expert agreed, if DCF were the appropriate methodology, the figures plaintiffs used would be the appropriate inputs, *see* Tr. at 4464:3–4465:17 (Parsons).

After projecting future pre-tax net income, plaintiffs then determined the further impact of taxes, considering both tax costs and tax benefits. *See* PX-0299.041–045 ¶¶ 74–80 (Blaydon Initial Rpt.); PX-0910.028 ¶ 70 (Blaydon/Osborn Corr. Suppl. Rpt.). Projected tax benefits included depreciation deductions and the anticipated cash grant. *See* PX-0910.026 ¶ 70 (Blaydon/Osborn Corr. Suppl. Rpt.). For depreciation, plaintiffs' expert took a conservative approach by assuming plaintiffs would only be able to take advantage of half the "bonus" or "accelerated" depreciation deductions available. *See* PX-0299.063–064 ¶ 117 (Blaydon Initial Rpt.). In other words, while the tax code allows accelerated depreciation deductions, plaintiffs' expert conservatively assumed plaintiffs would only take advantage of half of the bonus depreciation deductions they anticipated, because the ability to claim bonus depreciation depends on having sufficient taxable income in a given tax year and is not otherwise a guaranteed tax benefit. *See* PX-0299.063–064 ¶ 117 (Blaydon Initial Rpt.). For the cash grant, plaintiffs calculated a grant of thirty percent the fair market value of the electricity-producing Class V property, assumed to accrue 60 days after the valuation date. *See* PX-0299.044 ¶ 79 (Blaydon Initial Rpt.); PX-0910.035–036 ¶ 62 (Blaydon/Osborn Corr. Suppl. Rpt.). Of note, however, because plaintiffs consider the cash grant as, itself, contributing to the fair market value of the electricity-producing Class V property, this calculation required a circular mathematical operation, further discussed in note 25, *infra*.

by an eligibility ratio. *See* PX-0910.021–022 ¶¶ 56–58 (Blaydon/Osborn Corr. Suppl. Rpt.). Plaintiffs leverage the KPMG cost segregation reports to calculate the eligibility ratio, summing the value of eligible costs only and dividing this eligible cost total by all costs (eligible and ineligible). *See* PX-0910.021–022 ¶¶ 56–58 (Blaydon/Osborn Corr. Suppl. Rpt.). According to plaintiffs, after multiplying this ratio by the DCF valuation (less land), the result is the fair market value of only the eligible assets. *See* PX-0910.024 ¶ 63 (Blaydon/Osborn Corr. Suppl. Rpt.).

1.      **Whether to Include the Value of an Anticipated ARRA § 1603 Cash in the Fair Market Value of Assets Serving as Basis for the ARRA § 1603 Cash Grant**

The parties dispute whether plaintiffs should treat the anticipated cash grant as a future cash flow largely attributable to the eligible assets. Plaintiffs argue the anticipated cash grant is a cash flow stemming from the eligible assets, so it should be used to determine the value of the eligible assets. *See* PX-0910.026–027 ¶¶ 70–71 (Blaydon/Osborn Corr. Suppl. Rpt.). The government argues using the value of a cash grant to calculate the basis for that cash grant is circular and inappropriate. *See* DX-0833.002–004 ¶¶ 3–6 (Parsons Suppl. Rebuttal Rpt.). Prior to retrial, plaintiffs moved for summary judgment on this issue, arguing the value of an anticipated cash grant should be included in basis for that cash grant as a matter of law. *See* Pls.' MPSJ at 2–4. The Court denied plaintiffs' Motion because neither the ARRA statute, binding precedent, nor any other cited authority established ARRA cash grants were Class V assets or otherwise must be included in the basis used to determine its own value. *See Alta Wind I Owner Lessor C v. United States*, 166 Fed. Cl. 386, 409 (2023). Plaintiffs moved for reconsideration, asking the Court not to "go so far as to hold that, even under the income method of valuation, the value of tax benefits like the cash grant is excluded." *See* Pls.' Mot. for Reconsideration at 2. The Court found the Motion moot, noting while no legal authority establishes cash grants were part of basis for cash grants, plaintiffs are free to adduce factual and expert testimony to determine whether the anticipated value of cash grants reflected in the purchase prices should be allocated to Class V assets. *See Alta Wind I Owner Lessor C v. United States*, 169 Fed. Cl. 1, 11 (2023). Specifically, the Court held, "while plaintiffs are permitted to argue in favor of any valuation method at trial, including one allegedly necessitating treating 'the cash grant value as one cash inflow that goes into the discounted cash flow analysis' of the eligible tangible property, the 20 June Order prohibits plaintiffs from treating cash grants as 'Class V tangible property' inherently 'part of the basis of the windfarms.'" *Id.* (quoting *Alta Wind I*, 166 Fed. Cl. at 413 (cleaned up)). Now, at trial, because plaintiffs purchased the Alta facilities in part to place eligible assets in service and collect an ARRA cash grant, plaintiffs argue the cash grant is a future revenue stream fundamental to the fair market value of the eligible assets.[25] *See* Pls.' PFFCL ¶ 225.

---

[25] The government notes including the anticipated value of the cash grant in calculating the basis for that very same cash grant involves a circular mathematical operation. *See* DX-0833.002–004 ¶¶ 3–6 (Parsons Suppl. Rebuttal Rpt.). In other words, to determine basis for the cash grant, plaintiffs' expert conducted a discounted cash flow, but to conduct the discounted cash flow, plaintiffs' expert needed to first determine basis for the cash grant. *See* DX-0833.002–004 ¶¶ 3–6 (Parsons Suppl. Rebuttal Rpt.). Plaintiffs' experts noted such circular mathematical operations are commonplace in valuations and achievable with a standard excel function. *See* PX-1110 ¶ 15 (Osborn Corr. Sur-Rebuttal Rpt.); PX-1120.002 ¶ 1 (Maydew Sur-Rebuttal Rpt.). The government argues on policy

The relevant inquiry for a Section 1060 allocation of purchase price is the "fair market value" of each asset class. *See Alta Wind I*, 897 F.3d at 1376 (citing Treas. Rep. § 1.338-6(b)). After the Court held in 2023 cash grants are not tangible assets, the remaining factual issue is whether the fair market value of the eligible assets should reflect the value of the anticipated cash grant, or if the value of the anticipated cash grant is instead more appropriately allocated to the fair market value of a different asset class. *Id.* at 1377. Indeed, the Federal Circuit left this exact issue to the Court on remand. *Id.* at 1376 n.8 ("Plaintiffs argue that the portion of the purchase price attributable to the expected section 1603 grants [is] not separate from the value of the windfarms' tangible personal property. . . . We need not decide that issue in this appeal or decide whether the cash grant entitlement or associated indemnities are separate intangibles. We leave these issues to the Claims Court on remand."). While the Court agrees with plaintiffs the discounted cash flow methodology is an excellent and oft-used method for determining fair market value generally, *see* PX-0299.034–035 ¶ 61 (Blaydon Initial Rpt.) (first citing Tim Koller, et al., *Valuation: Measuring and Managing the Value of Companies* 303 (5th ed. 2010), and then citing Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance* 10 (2d ed. 2006)), for the Court to adopt plaintiffs' specific approach to a discounted cash flow, plaintiffs must establish their DCF model adequately separates the fair market value of eligible assets from the fair market value of ineligible assets, *See Alta Wind I*, 897 F.3d at 1376–77. For plaintiffs to establish the fair market value of the eligible assets should include not only their anticipated net revenue stream before a cash grant, but also the cash grant itself, plaintiffs must persuade the Court a willing buyer and willing seller would normally view the value of the eligible assets in the same way. *See* Section IX, *supra* (describing the willing seller-willing buyer framework); *see also* Section VIII.B, *supra* (burden of proof and persuasion).

> ### a.    Whether Including the Value of the Anticipated ARRA § 1603 Cash Grant in the Value of the Eligible Assets Reflects Idiosyncratic Preferences

To establish the fair market value of the eligible assets, plaintiffs' DCF model must determine the price at which the eligible assets (and only the eligible assets) would change hands between a willing buyer and willing seller. *See* PX-0910.002 ¶ 5 (Blaydon/Osborn Corr. Suppl. Rpt.); DX-0783.032 ¶ 75 (Parsons Initial Rpt.). Dr. Blouin explained, while one buyer's willingness to pay may *impact* fair market value, that buyer's willingness to pay does not *equal* fair market value unless it reflects the broader market's preferences as well. *See* DX-0879.005 n.7 (Blouin Rebuttal Rpt.); *see also* Tr. at 4895:2–4896:18, 4908:5–4909:20 (Blouin). Dr. Blouin illustrates this concept with a flatware collection (which includes a gravy ladle) she

---

grounds such an approach risks inflating cash grants *ad infinitum* to the extent plaintiffs inflate the value of the anticipated cash grant. *See* DX-0833.002–004 ¶¶ 3–6 (Parsons Suppl. Rebuttal Rpt.). The government's expert quantified the inflationary impact, arguing the recursive calculation "inflates what is supposed to be a 30% cash grant into an almost 45% claim." DX-0833.004 ¶ 3 (Parsons Suppl. Rebuttal Rpt.). Considering basis, and therefore the cash grant, is constrained by fair market value of the assets, *see Alta Wind I*, 897 F.3d at 1377, the Court need not address the government's policy concerns. Rather, the central inquiry, analyzed *infra*, is whether plaintiffs have adduced evidence to support the notion a fair market valuation of the eligible assets should include the anticipated value of the cash grant. *See generally* Section VIII, *supra*.

inherited from her grandmother.  *See* Section III.E (Testimony Summaries, Testimony of Dr. Jennifer Blouin), *supra*.  Suppose Dr. Blouin misplaced the inherited gravy ladle:  her "willingness to pay" for a replacement ladle on eBay could be far above "fair market value" because the "collection has sentimental value" and the ladle "completes the collection."  *See* Tr. at 4895:8–4896:18 (Blouin).  If her willingness to pay for the ladle were $150, but the next highest bid on the market is $14, she could purchase a replacement ladle for a mere $15.  *See id.* While Dr. Blouin's idiosyncratic willingness to pay $150 instead of $15 could impact the ladle's fair market value, the fair market value does not necessarily equal her willingness to pay.  *See* Tr. at 4895:17–4896:18 (Blouin); *see also* DX-0879.005 n.7 (Blouin Rebuttal Rpt.).  As the Court finds Dr. Blouin's testimony of fair market value and her gravy ladle analogy persuasive, the relevant question is whether plaintiffs' eligible asset valuation, which includes the value of the anticipated cash grant, is idiosyncratic or commonplace in the market for the eligible assets.  *See id.*

Normally, the income method insulates fair market value from idiosyncratic preferences because its focus is on the expectation of income rather than buyer-specific preferences.  *See* Brief for American Council on Renewable Energy as Amicus Curiae at 4, ECF No. 486 ("Present-valuing the stream of economic benefits to be generated by an asset is in a sense the purest form of valuation that exists.  It assumes the points of view of a hypothetical buyer and seller unsullied by the opinions of others." (quoting J. Bogdanski, *Federal Tax Valuation* ¶ 3.05(1)(b) (2025)).  Plaintiffs' application of the income method here, however, presumes the fair market value of Class V tangible assets would necessarily include the full present value of the anticipated cash grants, *see* Tr. at 5555:4–11 (Closing Arguments), with little-to-no consideration for whether the value of the anticipated cash grants may be attributable to the fair market value of a different asset class in the purchase, such as intangibles.  Specifically, plaintiffs' DCF model attributes, through use of the discount rate, only 1.414% of the cash grant value to intangibles.[26]  For these reasons, while even the government concedes consideration of tax benefits such as a cash grant is not idiosyncratic when valuing a *firm* under the income approach, *see* Gov't's Resp. to Pls.' MPSJ at 34, ECF No. 317, because Section 1060 requires a narrower valuation of *specific assets*, the Court must determine whether attributing the value of an anticipated cash grant to the eligible assets is idiosyncratic, *see Alta Wind I*, 897 F.3d at 1376–77; DX-0879.004 ¶ 6 (Blouin Rebuttal Rpt.).  In view of Dr. Blouin's testimony, even if plaintiffs' valuation of the Alta facilities broadly is not idiosyncratic because a cash grant is a tax benefit which "should increase the value of the firm,"  PX-0299.044 ¶ 79 (Blaydon Initial Rpt.), the attribution of the cash grant almost entirely to the value of the eligible assets may be

---

[26] Plaintiffs' DCF model assumes, through use of the discount rate, only 1.414% of the cash grant value is attributable to intangibles.  *See* note 29, *infra*.  Plaintiffs' discount rate (leveraged by plaintiffs' expert to subtract out any value from goodwill, going concern value, and intangibles) barely impacts cash grant value because the cash grant is treated as an income stream accruing sixty days after the valuation date, while the discount rate's impact increases the farther into the future a revenue stream is forecasted.  *See* PX-0910.014–015 ¶ 34 (Blaydon/Osborn Corr. Suppl. Rpt.); *id*. at .036, Ex. 3-B (Blaydon/Osborn Corr. Suppl. Rpt.); PX-0299.044 ¶ 79 (Blaydon Initial Rpt.).  After determining the present value of the anticipated cash grant, plaintiffs do not apply any other mathematical operation which accounts for potential intangible asset value flowing from the anticipated cash grant. *See, e.g.*, PX-0913 (Alta I DCF Sheet Rows 47–52 Column B) (showing no mathematical operation accounting for potential intangibles after calculating the present value of the anticipated cash grant); PX-0914 (Alta II DCF Sheet Rows 48–53 Column B) (showing no mathematical operation accounting for potential intangibles after calculating the present value of the anticipated cash grant).

idiosyncratic if it would normally be viewed as income from a different asset. *See* DX-0879.005 ¶ 7 (Blouin Rebuttal Rpt.) ("[W]hile I agree that tax incentives can alter the [FMV] of assets that give rise to those tax incentives, any tax attributes that are separately identifiable from, or above and beyond, the FMV of the asset giving rise to the tax incentive (e.g., the cash grant), are themselves separate assets.").[27]

Except for analogies to tax benefits in other circumstances, plaintiffs did not provide evidence the market conventionally includes the value of anticipated cash grants when valuing the eligible assets at issue. Plaintiffs instead rest on an assumption implicit in their discounted cash flow model that the anticipated cash grant is core to the value of the eligible assets. *See* PX-0299.036 ¶ 64 (Blaydon Initial Rpt.). For example, plaintiffs did not adduce evidence the seller Terra-Gen's component and assembly costs reflected a premium due to the introduction of the ARRA cash grant even though Terra-Gen constructed the facilities in the hope of attaining a cash grant. Plaintiffs' expert, on the contrary, decries a valuation based on Terra-Gen's costs for its failure to consider the cash grant. *See* PX-0299.083 ¶ 158 (Blaydon Initial Rpt.). For the Court to find the fair market value of eligible assets should include the value of a cash grant when determining the value of construction, development, and a turn-key increment, plaintiffs

---

[27] Dr. Osborn argues an asset valuation based on costs is wrong because it fails to account for a purchaser's non-idiosyncratic preference for high-revenue assets over low-revenue assets. Dr. Osborn provided two examples to illustrate his opinion: "Under the replacement cost approach, a hotel with a pristine ocean view would supposedly have the same value as a physically identical hotel with an inland view, even though the hotel with the ocean view can charge higher rates and produce more income[, and] an oil refinery in Texas would supposedly have the same value as a physically identical refinery in Maine, even though the Texas refinery would produce more income from having greater access to substantial oil resources and be subject to lower corporate state taxes. Even though the replacement cost of the physical assets may be comparable, all else equal, a buyer would clearly be willing to pay more for the ocean-view hotel and the Texas oil refinery because they produce more income than an inland-view hotel and a Maine oil refinery." PX-0910.0029 ¶ 74 (Blaydon/Osborn Supp. Corr. Rpt.).

Dr. Blouin critiqued Dr. Osborn's opinion regarding "assets in different owners' hands [being] worth a lot more" simply based on who owns the asset and what purpose the asset serves. *See* Tr. at 4971:19–4972:12 (Blouin). Specifically, Dr. Blouin argues Dr. Osborn's reasoning suggests "a fax machine in the hands of a company that does copying [is] worth more than the fax machines in the hands of [a] local mom-and-pop store that is just using it to receive faxes to run their business." Tr. at 4971:17–4972:1 (Blouin). Instead of assessing what the value of an asset is to the owner of the asset—which "to [Dr. Blouin], violates the whole premise of what fair market value is"—Dr. Blouin instead opines "fair market value is this supply and demand effect about how things work" in the market." Tr. at 4972:2–5 (Blouin).

In the context of determining reproduction costs for the Alta facilities, the Court agrees with Dr. Blouin one purchaser's valuation of an asset may have little-to-no impact on fair market value—especially when market participants can simply acquire or reproduce the asset at cost without paying premiums for projected income streams. *See* Tr. at 5053:21–5054:8 (Blouin). While Dr. Osborn's examples are helpful for explaining different asset values despite identical costs in the abstract, Dr. Osborn's examples do not clarify whether such differences apply when valuing the eligible assets in this case. In the absence of evidence showing market participants would not just acquire eligible assets at cost and would instead value the eligible assets based on income streams, Dr. Osborn's valuation is unpersuasive, considering: (1) Dr. Osborn did not provide any empirical analysis to show market participants paid more for grant-eligible assets after ARRA § 1603 became effective; (2) even if a fair market valuation of future income streams for the Alta facilities exceeds reproduction costs, it is unclear whether the excess should be assigned to Class V assets or instead to the firm more broadly, *see Alta Wind I*, 897 F.3d at 1376–77; and (3) the only eligible asset pricing data in the record (*i.e.*, turbine pricing data) indicates at least some eligible asset prices *decreased* after the introduction of the cash grants. *See infra* Section IX.A.1.b–2.

must present at least some evidence suggesting economic or market factors reflect such valuation trends. *See Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992) ("While the [Court of Federal Claims] has discretion in choosing a method of evaluation and some leeway in determining the amount of fair market value, the court . . . has no discretion to make a finding of the value of an asset where there is *no* evidence to support it." (emphasis in original)). This is especially true when Terra-Gen purchased the assets in the expectation of collecting a cash grant, but was "forced to sell" due to its partial non-profit entity status. *See* PX-0299.015 ¶¶ 21–22 (Blaydon Initial Rpt.). Such circumstances indicate Terra-Gen was in fact a "taxpayer will[ing to] bid for the right to hold the tax-favored asset" such that eligible assets would have "increase[d] relative to the price of [a] tax-disfavored asset." *See* PX-0326.024 ¶ X.1 (Maydew Initial Rpt.). As plaintiffs' expert stated, "when two assets give rise to identical pretax cash flows, but the cash flows from one asset are taxed more favorably than those from the other asset, taxpayers will bid for the right to hold the tax-favored asset. As a result, the price of the tax-favored asset will increase relative to the price of the tax-disfavored asset." *Id.* (quoting Myron S. Scholes et al., *Taxes and Business Strategy: A Planning Approach* 90 (2015)). Instead of attributing a premium to eligible assets to reflect the cash grant, however, plaintiffs argue Terra-Gen's costs did *not* include the value of a cash grant. *See* Pls.' PFFCL ¶ 358; PX-0299.009 ¶ 12.e (Blaydon Initial Rpt.). Here, given the eligible assets gave rise to more favorable tax incentives (*i.e.*, the cash grant), the eligible assets would be considered tax-favored assets in the market. *See id.* As Dr. Maydew testified, the fair market value of tax-favored assets would consequently "increase relative to the price" of similarly-situated assets which would not receive the favorable tax incentives—theoretically driving up the fair market value of the eligible assets included with the Alta facilities. Despite the expected theoretical increase in fair market value due to cash grants, however, the government introduced evidence showing turbine prices, for example, actually *decreased* over the lifetime of the cash grants during eligible construction periods from roughly mid-2009 to late 2011:



DX-873 at App'x C, Fig. 6 (George Suppl. Rebuttal Rpt.) (Plotting data from "2020 Sustainable Energy in America Factbook," Bloomberg NEF, 2020).



DX-0784 at Ex. 2 (Parsons Rebuttal Rpt.) (Plotting data from "Wind Turbine Price Index Price Chart, June 2008-June 2015, Bloomberg Database"). In other words, all things equal, a taxpayer's ability to take advantage of a tax incentive (like the cash grant) would, in theory, increase demand for (and the fair market value of) the eligible asset. *See* PX-0326.024 ¶ X.1 (Maydew Initial Rpt.) (quoting Myron S. Scholes et al., *Taxes and Business Strategy: A Planning Approach* 90 (2015)). The decline in the cost of turbines, however, undermines plaintiffs' theory increased demand from the cash grant correspondingly increased the fair market value of the turbines. The decrease in turbine prices displayed above contradicts the notion the fair market value of the grant-eligible assets—such as the turbines purchased with the Alta facilities—increased with the introduction of the cash grants.

Despite these cost trends, plaintiffs nonetheless contend their transaction prices and valuations, paired with broadly applicable valuation principles, should be enough to establish the fair market value of the eligible assets should include the cash grants. *See* PX-1110.003–004 ¶¶ 2–4 (Osborn Sur-Rebuttal Rpt.). Yet, Dr. Parsons explained why, despite tax benefits, the fair market value of the eligible assets may not reflect a markup corresponding to those tax benefits: "If the increased demand for an asset induced by the tax benefit is small relative to the global supply of the asset, then any market price change is likely to be small. If the asset's supply can easily respond to increased demand . . . the market price may not increase much, if at all." *See* DX-0833.006–007 ¶ 7 (Parsons Suppl. Rebuttal Rpt.) (citing Austan Goolsbee, *Investment Tax Incentives, Prices, and the Supply of Capital Goods*, Q.J. Econ. (Aug. 1997)). As Dr. Parsons further noted, "[Dr.] Osborn never investigates the empirical facts [of supply and demand for eligible assets] relevant to determining how much of the tax benefit flows to the tangible assets." *Id.* (citing 28 Mar. 2024 Osborn Dep. at 149, 155–66). Because the Court is persuaded the mere presence of a tax benefit does not automatically increase the fair market value of an asset precipitating the tax benefit (unless the introduction of the tax benefit impacts supply and demand for the asset to such an extent prices rise, *see id.*), plaintiffs' contention the fair market

value of eligible assets necessarily reflects the full value of the cash grant is unpersuasive absent corresponding evidence of changes in price, supply, demand, or some related phenomenon. *Accord Krapf*, 977 F.2d at 1463. Moreover, the absence of evidence the seller of the eligible energy facilities, Terra-Gen, paid price premiums for cash grants when purchasing eligible property in the expectation of obtaining a cash grant further suggests plaintiffs' attribution of cash grant value to eligible assets in a subsequent purchase is idiosyncratic.[28] *See supra*.

Beyond the lack of economic evidence the eligible asset value should reflect a cash grant, plaintiffs have not identified any other circumstance in which the government issues a cash grant to reimburse a portion of the expense of eligible property, *see* ARRA § 1603(a), where the reimbursed expense also includes the expected reimbursement. *See generally Alta Wind I*, 169 Fed. Cl. at 11 (citing *Alta Wind I*, 166 Fed. Cl. at 410) ("None of the authorities raised by plaintiffs allow the Court to consider a grant to be eligible 'tangible property' for the purpose of calculating itself."). The circularity of this approach, paired with the absence of caselaw or evidence showing such a practice is commonplace, preclude the Court from definitively finding such a valuation is not idiosyncratic. *See Krapf*, 977 F.2d at 1463 ("the [Court of Federal Claims] . . . has no discretion to make a finding of the value of an asset where there is *no* evidence to support it." (emphasis in original)). Indeed, as the Court noted in its 2023 opinion, the plain meaning of "cash grant" itself suggests cash grant value operates as an intangible asset reliant on the value of the assets, not a step up in basis for the very assets serving as basis for the cash grant entitlement:

> The relevant regulations provide a definition of "tangible personal property" which includes "tangible property except land and improvements thereto, such as buildings or other inherently permanent structures," "all property (other than structural components) which is contained in or attached to a building," and "all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure)." Treas. Reg. § 1.48–1(c). *Black's Law Dictionary* defines "cash" as "[m]oney or its equivalent" and "grant" as "[a]n agreement that creates a right or interest in favor of a person or that effects a transfer of a right or interest from one person to another." *Cash*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Grant*, *id.*; *see also Grant-in-aid*, *id.* ("A sum of money given by a governmental agency to a person or institution for a specific purpose; esp., federal funding for a state public program."). The plain meaning of "cash grant" is then "[a]n agreement that creates a right or interest in favor of a person" for "[m]oney or its equivalent." A cash grant cannot fit into the plain meaning of any of these categories of tangible personal property—an agreement creating a right for money is not: a "building[]"; "property . . . contained in or

---

[28] Even if plaintiffs could establish Terra-Gen did pay a cash grant premium when purchasing and constructing the turn-key eligible assets (to support an argument the fair market value should include the cash grant) plaintiffs would be faced with an additional factual issue: If, as Dr. Maydew posits, "taxpayers will bid for the right to hold the tax-favored asset" and if Terra-Gen correspondingly paid cash grant premiums to acquire, construct, and assemble the tax-favored assets, it would not be economically logical for plaintiffs to then pay an additional premium for a cash grant already priced into Terra-Gen's development and construction costs. *See, e.g.*, PX-0995.004 ¶ 5 (Maydew Suppl. Rpt.).

attached to a building"; or "property which is in the nature of machinery[.]"  *See* Treas. Reg. § 1.48–1(c)–(f).

*Alta Wind I*, 166 Fed. Cl. at 406 (some citations omitted).  Moreover, 26 U.S.C. § 197(d)(1)(D) defines "intangible" to include "any license, permit, *or other right* granted by a governmental unit."  (emphasis added).  Taken together, the plain meaning of a cash grant as a "right" and Section 197's definition of intangibles as including a "right granted by a governmental unit" suggest the anticipated cash grant value is not strictly attributable to tax benefits flowing from the eligible assets, but instead akin to a Class VI intangible.  *See id*; *see also, e.g.*, *Alta Wind I*, 897 F.3d at 1373–74 (noting value from a contract right may reflect both tangible asset value and intangible asset value) ("PPAs, or at least some portion thereof, may be characterized as customer-based intangible assets under I.R.C. § 197.").

While the "classification [of an intangible asset, which may contribute value to tangible assets,] is a highly factual inquiry requiring an examination of the full context of the transactions," *see Silver State Solar Power S., LLC v. United States*, 150 Fed. Cl. 428, 440 (2020), plaintiffs' expert summarily attributes only 1.414%[29] of the purchased right to collect a cash grant to Class VI intangibles through use of a development-stage discount rate.  *See* DX-0879.006 ¶ 12 (Blouin Rebuttal Rpt.) (citing PX-0910.005–006 ¶¶ 15–16 (Blaydon/Osborn Corr. Suppl. Rpt.)); PX-1110.014–015 ¶¶ 42–47 (Osborn Corr. Sur-Rebuttal Rpt.); DX-0833.008–009, 016–017 ¶¶ 12–15, 34, (Parsons Suppl. Rebuttal Rpt.).  In reaching this small percentage, Dr. Osborn argues the Federal Circuit only identified three intangible assets to be distinguished from tangibles, namely, PPAs, regulatory approvals, and transmission rights. *See* PX-0910.007 ¶ 15 (Blaydon/Osborn Corr. Suppl. Rpt.).  Dr. Osborn further asserts these intangibles can be viewed as simply reflecting risk to cash flows and can therefore be completely accounted for through a higher discount rate to reduce the net present value of cash flows.  *See* PX-0910.008, 014–015 ¶¶ 16–18, 34 (Blaydon/Osborn Corr. Suppl. Rpt.).  Thus, according to Dr. Osborn, the only operation needed for consideration of intangibles in the cash grant is the application of the adjusted discount rate.  *See id.*  A significant flaw in this reasoning, however, is the Federal Circuit did not limit the intangibles to be excluded to only the three listed in Dr. Osborn's report—crucially, the Federal Circuit declined to "decide whether the cash grant entitlement or associated indemnities are separate intangibles."  *Alta Wind I*, 897 F.3d 1376 n.8. Instead, the Federal Circuit opted to "leave these issues to the [Court of Federal Claims] on remand."  *Id.*  It is therefore not enough for Dr. Osborn to account only for PPAs, regulatory approvals, and transmission rights in the value of the cash grant without first determining whether the cash grant entitlement itself is an intangible asset.  *See id.*; *see also* DX-0879.006 ¶ 12 (Blouin Rebuttal Rpt.) ("Under Dr. Osborn's methodology, there would *never* be any value attributable to goodwill, because his analysis in effect *first* determines the type and value of the intangible assets, and *second*, uses this amount to impute the values of the tangible assets.  Dr.

---

[29] 1.414% comes from plaintiffs' expert's discounted cash flow methodology—plaintiffs' expert observes the cash grant will accrue sixty days into the DCF model.  *See* PX-0299.044 ¶ 79 (Blaydon Initial Rpt.).  At a discount rate of 9.05%, this means 1.414% of the cash grant will be shaved off to bring the cash grant from its projected value at sixty days to its discounted present value (mathematically, this amounts to: $1 - (\frac{1}{(1+.0905)^{\frac{60}{365}}}) \approx 0.014141$.  *See, e.g.*, PX-0913 (Alta I DCF Sheet Row 48 Column B) (formula used to calculate cash grant); PX-0914 (Alta II DCF Sheet Row 49 Column B) (formula used to calculate cash grant).  As plaintiffs argue, the discount rate is responsible for accounting for any intangible asset value.  *See* Pls.' PFFCL at 12.

Osborn's approach therefore *necessitates that there can be no other intangibles with FMV* (including goodwill) beyond the three initially specified." (emphasis in original)).

Plaintiffs conclude the anticipated cash grant value should not be allocated to a separate intangible asset because: (1) income-producing eligible assets should be valued through expected income streams; and (2) tax benefits such as a cash grant are an inseparable component of eligible asset income streams because "calculations of net present value must reflect all cash flows . . . [and] cash flows before taxes have no relevance." *See* PX-0995.003 ¶ II.3 (Maydew Suppl. Rpt.) (quoting Sally M. Jones et al., *Principles of Taxation for Business and Investment Planning* 3–7 (2019)). Thus, in plaintiffs' view, because the cash grant is a tax benefit which cannot be separated from the eligible assets, it is part of the assets' cash flow, and the full net present value of the cash grant should be attributed to tangible assets. *See* Pls.' PFFCL at 9–11. All the tax benefits plaintiffs' experts analogize to the cash grant (*e.g.*, exemptions, lower rates, credits, and deductions), however, differ in form and function from the cash grant. *See id.* at 133 ¶ 190 (citing PX-1120.003–004 ¶ 6 (Maydew Sur-Rebuttal Rpt.)). Whereas tax benefits such as exemptions, credits, deductions, or lower tax rates reduce tax liability associated with the income generated by an asset, *see, e.g.*, 26 U.S.C. §§ 501(a), (c), (d) (describing categories of corporations free of otherwise applicable tax liabilities), 38(a) (describing the "general business credit" as applied against a tax liability), 63(a) (defining a "deduction" as an amount subtracted from gross income to produce taxable income), the Section 1603 cash grant is a lump sum the government pays to reimburse the expense of the asset—regardless of income tax liability generated by the asset after it is purchased, *see* ARRA § 1603(a). The cash grant is awarded regardless of revenue streams, *see id.*, while the other tax benefits can only be collected in the presence of revenue-triggering tax liability, *see* 26 U.S.C. §§ 501(a), (c), (d), 38(a), 63(a) (all requiring the existence of a tax liability to apply). This unique characteristic of the cash grant not only reinforces the notion an as-yet uncollected cash grant entitlement is an intangible "right granted by a governmental unit" separate from the eligible assets, 26 U.S.C. § 197(d)(1)(D), but also raises a key question identified by Dr. Blouin: whether the cash grant is "separately identifiable from, or above and beyond the FMV of the asset giving rise to the tax incentive." DX-0879.005 ¶ 7 (Blouin Rebuttal Rpt.).

Plaintiffs' own change-in-ownership forms filed in California reveal plaintiffs viewed cash grant value as separately identifiable from the value of the eligible assets, despite their argument the cash grant is inseparable from the eligible assets. *See* DX-1305.005 (Alta I Change-in-Ownership form); DX-1303.005 (Alta II Change-in-Ownership form); DX-0570-2.002 (Alta V Change-in-Ownership form). For example, in the Alta V Change-in-Ownership form, plaintiffs noted "[t]he amount shown above that was paid for the Cash Grant represents a discre[te] sum paid for revenue unrelated to the operations of the Alta Wind V Project." DX-0570-2.002 (Alta V Change-in-Ownership form). This belies plaintiffs' argument the anticipated value of the cash grant cannot be separated from the value of the eligible assets. DX-0570-2.002 (Alta V Change-in-Ownership form).

In summary, considering: (1) plaintiffs did not present evidence on changes in price, supply, demand, or some related phenomenon related to the eligible assets after the introduction of the cash grant; (2) the cash grant entitlement is a lump sum of cash the government grants to reimburse the expense of the eligible assets; and (3) plaintiffs themselves described the cash

grant as revenue separable and unrelated to the operations of the Alta facilities, the evidence before the Court does not support a conclusion the anticipated value of the cash grant should be allocated to the value of eligible assets in a Section 1060 allocation.  Accordingly, because plaintiffs' discounted cash flow allocates more than ninety-eight percent of the anticipated value of the cash grant to the value of Class V assets, without evidence such value does not instead belong in Class VI or VII, the Court finds plaintiffs' allocation of purchase price to Class V assets lacks sufficient evidentiary support for such a fair market valuation.  *See Alta Wind I*, 897 F.3d at 1377; *Alta Wind I*, 169 Fed. Cl. at 11 (citing *Alta Wind I*, 166 Fed. Cl. at 386).

> **b.      Whether the Premium Paid for the Value of Anticipated Cash Grants Should Be Allocated to the Fair Market Value of the Eligible Assets as Part of a Turn-key Premium**

While the Court finds the record evidence does not support a fair market valuation of the Class V assets inclusive of ninety-eight percent of the anticipated cash grant value, the Federal Circuit noted consideration paid in excess of the development and construction costs of the eligible assets may constitute turn-key, which must be included in fair market value of the assets. *See Alta Wind I*, 897 F.3d at 1377.  Given the Alta facilities purchase prices exceeded development and construction costs, an important question therefore persists:  whether any of the excess purchase price paid for the cash grant should be included in fair market value as part of turn-key.  *See id.*  In its 2023 summary judgment opinion, the Court summarized plaintiffs' position regarding the cash grant's relation to turn-key:  "Plaintiffs did not argue turn-key value *included* the value of the grants or premiums at oral argument, only the premium paid for the tax benefit should be treated as part of the tangible property, similar to how turn-key value was treated in *Miami Valley*."  *Alta Wind I*, 166 Fed. Cl. at 413.  Moreover, at closing arguments, plaintiffs reiterated "turn-key value is built into . . . income stream[s]" used to value the Alta facilities via the income approach.  *See* Tr. at 5527:23–5528:7.  Thus, to assess whether the anticipated value of the cash grant may be included in the value of turn-key, the Court determines whether plaintiffs' showing of turn-key as "built into . . . income stream[s]" provides a sufficient evidentiary basis to include the anticipated value of the cash grant.

To find the anticipated value of the cash grant constitutes turn-key value, the Court must have some evidentiary basis to determine the anticipated value of the cash grant reflects "the incremental value 'a buyer would pay for such an assurance the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.'"  *Alta Wind I*, 897 F.3d at 1377 (quoting *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974) (cleaned up)); *accord Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992) ("[T]he court . . . has no discretion to make a finding of the value of an asset where there is *no* evidence to support it.")  (emphasis in original).  Plaintiffs confirmed at closing arguments, however, their expert did not value turn-key individually, noting "it is not required that we set . . . a dollar amount on [turn-key value] separate and apart from anything else."  Tr. at 5528:11–14 (Closing Arguments); *see also* Tr. at 5577:14–5578:18 (Closing Arguments) (plaintiffs explaining the development stage discount rate is the mechanism separating turn-key from going concern value and goodwill).  In other words, plaintiffs did not present any evidence to show the anticipated value of a cash grant is, as *Miami Valley* defined turn-key, "the incremental value 'a buyer would pay for such an assurance the plant and equipment would all

work together without need of costly and time-consuming adjustments and coordination.'" *Alta Wind I*, 897 F.3d at 1377 (quoting *Miami Valley*, 499 F.2d at 680 (cleaned up)); *see also* PX-0910.015, 024 ¶¶ 35, 64 (Blaydon/Osborn Corr. Suppl. Rpt.); *id.* at Ex. 6 (listing cash grant shortfalls for plaintiffs based on the 9.05% development-stage discount rate). For this reason alone, the Court lacks any evidentiary basis to assess whether the anticipated value of the cash grants fits into the *Miami Valley* definition of turn-key. *See Krapf*, 977 F.2d at 1463.

Beyond the lack of record evidence, however, the Court also notes several statements by plaintiffs indicating they themselves do not view the value of the anticipated cash grants as part of turn-key value. At closing arguments, plaintiffs agreed, "turn-key value would be the same" before and after a transaction, differing only in how it is recognized. Tr. at 5590:09–11 (Closing Arguments); *see also* Tr. at 5589:3–5590:11 ("[PLAINTIFFS:] If you're valuing the asset in the hands of the seller solely based upon their out-of-pocket costs, then there's no turn-key value in that number and you have to add it on top," but for a buyer "the turn-key value has been transferred to the buyer, created for the buyer, and that has to be part of their basis."). Plaintiffs' statement an intervening transaction would not change turn-key value, paired with plaintiffs' approach to calculating turn-key value for Terra-Gen, pre-transaction, confirms plaintiffs do not view turn-key as comprising the anticipated value of the cash grant. Specifically, under the government's cost approach, which plaintiffs view as the appropriate basis calculation for Terra-Gen, plaintiffs argue the turn-key premium would simply be fifteen percent of Terra-Gen's costs. *See* Tr. at 5459:5–5460:8. Further, plaintiffs argue Terra-Gen's costs do not reflect the value of an anticipated cash grant. *See* PX-0299.083 ¶ 158 (Blaydon Initial Rpt.) ("Second, the cost approach does not reflect the expected cash flows of the facilities, including available tax benefits and incentives . . . (e.g., accelerated depreciation and the Cash Grant)"). Considering: (1) plaintiffs concede turn-key value is the same before and after the purchase of a turn-key facility, (2) plaintiffs argue Terra-Gen's costs do not reflect the cash grant, and (3) plaintiffs calculate the appropriate turn-key increment before the transaction as fifteen percent of Terra-Gen's costs, it follows plaintiffs do not view the anticipated value of the cash grants as a component of the turn-key increment. *See* Tr. at 5590:9–11 (Closing Arguments); PX-0299.083 ¶ 158 (Blaydon Initial Rpt.); *see also Alta Wind I*, 897 F.3d at 1377 (turn-key value is "the incremental value 'a buyer would pay for such an assurance the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination,'" (cleaned up)).

Accordingly, the Court lacks an evidentiary basis to conclude turn-key value includes the value of anticipated cash grants for two reasons: (1) plaintiffs did not present evidence to substantiate such a conclusion because they did not separately value a turn-key increment; and (2) plaintiffs note "turn-key value would be the same" before and after a transaction, suggesting cash grants available only post-transaction are not included in turn-key value. Based on its review of the evidence, the Court finds the anticipated value of the cash grants is not a turn-key increment. *See Krapf*, 977 F.2d at 1463 ("the [Court of Federal Claims] . . . has no discretion to make a finding of the value of an asset where there is *no* evidence to support it." (emphasis in original)).

### 2. Whether Plaintiffs' Development Stage Discount Rate Adequately Accounts for Intangibles Identified by the Federal Circuit

In addition to disputing plaintiffs' inclusion of the anticipated cash grant in the value of Class V assets, the government also disputes plaintiffs' assertion their DCF discount rate properly excludes Class VI and VII asset values from Class V asset values. Gov't's PFFCL ¶¶ 307, 403, 425–430. According to plaintiffs, "[a]pplication of th[eir] 9.05% discount rate to discount the Alta cash flows to present value ensures [] the risk-reducing value of the PPAs, transmission rights, regulatory approvals (and any other risk-reducing intangibles that Terra-Gen may have conveyed) is entirely excluded from the Class V asset values that Dr. Osborn calculates." *See* Pls.' PFFCL at 13; *see also* PX-0910.014 ¶ 34 (Blaydon/Osborn Corr. Suppl. Rpt.) ("[C]onsistent with standard valuation theory, the most appropriate way to value the tangible assets at the Alta facilities in isolation from risk-reducing intangibles is by applying a higher discount rate—that is, a discount rate appropriate for a development stage wind power project that has not yet secured such intangibles."). The government takes issue with plaintiffs' use of the discount rate in two respects. First, the government argues plaintiffs' use of a discount rate to remove Class VI and VII asset values sidesteps Section 1060 sequential valuation requirements. *See* Govt's PFFCL ¶¶ 425, 429–30; *see also* Tr. at 4344:11–4345:1 (Parsons), 4889:11–17 (Blouin); DX-0833.006 ¶ 12 (Parsons Suppl. Rebuttal Rpt.); DX-0879.006 ¶¶ 11–12 (Blouin Rebuttal Rpt.). Second, the government argues plaintiffs' discount rate does not account for all possible intangible asset values—*i.e.*, even if using a discount rate to remove Class VI and VII asset values is permissible under Section 1060, the government argues plaintiffs do not definitively show they have removed all Class VI and VII asset values through use of the discount rate. *See* Govt's PFFCL at 123–49 ¶¶ 446–544; *see also* DX-0833.009–010 ¶¶ 13–15 (Parsons Suppl. Rebuttal Rpt.).

First, the government argues plaintiffs' methodology violates Section 1060 by removing Class VI and Class VII asset values from the purchase prices of the Alta facilities and valuing those asset classes before Class V in violation of Section 1060. *See* Govt's PFFCL at 118–19 ¶¶ 425, 429–30; *see also* Tr. at 4344:11–4345:1 (Parsons), 4889:11–17 (Blouin); DX-0833.006 ¶ 12 (Parsons Suppl. Rebuttal Rpt.); DX-0879.006 ¶¶ 11–12 (Blouin Rebuttal Rpt.). According to Dr. Parsons, "Dr. Osborn inverts the order [of Section 1060], purporting to identify the contribution of the intangible assets to the wind farms' DCF value in order to remove it and thereby arrive at a value for the tangible assets." DX-0833.006 ¶ 12 (Parsons Suppl. Rebuttal Rpt.). In so doing, plaintiffs' methodology, according to Dr. Parsons, "introduces significant room for error in the resulting estimate of the value of the tangible assets." *Id.* The Federal Circuit confirmed the Section 1060 residual method requires a sequential valuation of each class of assets to which the purchase price of the Alta facilities must be allocated. *See Alta Wind I*, 897 F.3d at 1376 ("The consideration is allocated among these classes in the order they are listed."). Relevant here are the final three asset classes: "Class V: Assets that do not fit within any other class, including tangible property. Class VI: I.R.C. § 197 intangibles, including contract rights, but not goodwill and going concern value. Class VII: Goodwill and going concern value." *Id.* (citing Treas. Reg. § 1.338-6(b)).

The question before the Court is whether a discount rate designed to value Class V assets by discounting away the asset values in Classes VI and VII conforms with the Section 1060 residual method's sequential valuation requirements. Importantly, the Federal Circuit notes allocations under Section 1060 are "factual determination[s]" conducted "using the fair market value of the assets within each class." *Id.* at 1376–77. Thus, to the extent a valuation method

establishes the fair market value of the correct asset class, an incidentally simultaneous valuation of a later asset class may still conform with the Section 1060 sequence of asset class valuations. *See id.* at 1377.  This is especially the case considering *any* valuation of Class V assets necessarily implies the value of Classes VI and VII assets which comprise the residual value of the purchase price.  *See id.* at 1376 ("[C]onsideration is allocated among these classes in the order they are listed in a '*waterfall*' fashion. . . . The purchase price must therefore be allocated to Class V, then to Class VI, and finally to Class VII, *if any value remains*.") (emphasis added).  On the other hand, a valuation method which simply values Class VI and Class VII assets first to subtract these values from purchase price to determine a residual Class V value would violate Section 1060's requirement allocations be conducted "among these classes in the order they are listed."  *Id.*  The relevant question, therefore, is whether Dr. Osborn's discount rate properly focuses on a fair market valuation of Class V assets or instead improperly seeks to value Class VI and VII assets first to arrive at a residual Class V value.

Dr. Osborn's discount rate of 9.05% (which estimates expected returns for "a development stage wind power project that has not yet secured . . . intangibles") contemporaneously—not invertedly—calculates assets in Classes V through VII.  *See* PX-0910.014 ¶ 34 (Blaydon/Osborn Corr. Suppl. Rpt.).  Dr. Osborn's derivation of a development stage discount rate does not focus on how to value assets in Classes VI and VII and then subtract them from the purchase price to arrive at Class V asset values—rather Dr. Osborn derives a discount rate from a Department of Energy NREL study to isolate Class V asset values based on expected returns for a development-stage facility.  *See* PX-0910.016 ¶¶ 39–40 (Blaydon/Osborn Corr. Suppl. Rpt.).  Using a 13% cost of equity, a 7.125% cost of debt, and a 45% debt ratio—all values from a NREL study[30]—Dr. Osborn derives a 9.05% cost of capital, which he argues can be used to discount away value in the revenue streams attributable to intangible assets to leave the present value of revenues attributable only to tangible assets.  *See* PX-0910.017 ¶ 41 (Blaydon/Osborn Corr. Suppl. Rpt.).  Dr. Osborn's discount rate certainly

---

[30] The NREL study, PX-0387 (M. Martin-Tretton et al., *Data Collection for Current U.S. Wind Energy Projects: Component Costs, Financing, Operations, and Maintenance* NREL (Jan. 2012)), took financing data from fifteen wind projects developed in 2010 and 2011, the same time period as the Alta transactions, and concluded the cost of equity for a development-stage wind project ranged from 8% to 13%.  *See* PX-0387.029 (NREL Study Jan. to Sep. 2011).  Dr. Osborn used the higher end of the range, 13%, to capture the risks of development-stage wind projects, as a conservative approach indicating higher risk because the 13% cost of equity exceeds the 10.75% cost of equity applicable to the general stock market.  PX-0910.016–017 ¶¶ 39–40 (Blaydon/Osborn Corr. Suppl. Rpt.).  The NREL study also established a baseline cost of debt of 7.125% and a baseline debt ratio of 45%, *see* PX-0387.023 (NREL Study Jan. to Sep. 2011), both of which Dr. Osborn adopted, *see* PX-0910.016–017 ¶¶ 40–41 (Blaydon/Osborn Corr. Suppl. Rpt.)

The weighted average cost of capital (WACC), which Dr. Osborn used to estimate the discount rate, *see* Tr. at 3938:3–6 (Osborn), is:

> based on the cost of equity, i.e., the return demanded by an equity investor based on the riskiness of the projected based on the riskiness of the projected cash flows; the cost of debt, i.e., the return demanded by a debt investor based on the risk that the cash flows will not actually be sufficient to repay the debt (which gets first claim on cash flows, before equity) less the tax benefits associated with debt; and the ratio of debt to equity.

PX-0910.005–006 ¶ 09 (Blaydon/Osborn Corr. Suppl. Rpt.); *see also* Tr. at 3911:14–16 (Osborn) ("So you need to balance your mix of debt and equity, and that is what determines essentially what's called your weighted average cost of capital.").

implies Class VI and VII values, but does not do so with the primary goal to subtract them from purchase price to arrive at a residual Class V value—rather the discount rate is used to determine the fair market value of Class V assets based on well-supported market assumptions provided by NREL. *See id.* The government argues the discount rate used to value Class V assets by excluding Class VI and VII assets cannot be selected without also implying the value of Class VI and VII assets in violation of the Section 1060 sequence. *See* Gov't's PFFCL ¶¶ 430–32. Under a discounted cash flow methodology, however, there is no way to establish the fair market value of any asset class without implying the value of other asset classes. *See* PX-0299.034–035 ¶¶ 60–65 (Blaydon Initial Rpt.) (explaining the process of applying DCF); PX-1110.014–015 ¶¶ 43–45 (Osborn Corr. Sur-Rebuttal Rpt.) (explaining how the next step after calculating the fair market value of Class V tangible eligible property is to apply the Section 1060 residual method, meaning DCF already implies the values of Class VI and Class VII assets). A discounted cash flow first establishes value based on expected revenue streams—if these revenues can be attributed to both tangible and intangible asset values, then isolating tangible values will require some assumptions about the value of intangible asset values. *See* PX-0299.034–035 ¶¶ 61–62 (Blaydon Initial Rpt.); PX-0910.007 ¶ 14 (Blaydon/Osborn Corr. Suppl. Rpt.). For this reason, even if Dr. Osborn did not use a discount rate to remove Class VI and VII asset values, he would have to choose some other method which implied Class VI and VII asset values to isolate the revenue streams attributable only to Class V assets. *See* PX-0299.034–035 ¶¶ 61–62 (Blaydon Initial Rpt.); PX-0910.007 ¶ 14 (Blaydon/Osborn Corr. Suppl. Rpt.). Thus, in levying their critiques of Dr. Osborn's valuation, the government essentially asks the Court to prohibit discounted cash flow valuations under Section 1060 when revenue streams flow from multiple asset classes. *See* Gov't's PFFCL ¶¶ 423–544. The government has not identified—and the Court is unaware of—any authority prohibiting the use of a discounted cash flow valuation to establish the fair market value of Class V assets under Section 1060 in these circumstances. Moreover, while the government asserts the functional effect of Dr. Osborn's discount rate is to pre-determine and remove asset Classes VI and VII before a Class V valuation in violation of Section 1060, *see* DX-0833.008 ¶ 12 (Parsons Suppl. Rebuttal Rpt.); PX-0910.013–016 ¶¶ 30–38 (Blaydon/Osborn Corr. Suppl. Rpt.), the implicit valuations of Class VI and VII are merely incidental to the focus of Dr. Osborn's selection of a development stage discount rate: to establish the fair market value of Class V. *See* PX-0910.021 ¶ 51 (Blaydon/Osborn Corr. Suppl. Rpt.). Because Dr. Osborn did not seek to establish the fair market value of Class VI and VII assets when he consulted NREL studies to determine an appropriate discount rate but instead sought to establish the fair market value of Class V assets, such an approach does not amount to a premature valuation of Class VI and VII assets to arrive at a residual value for Class V assets. *See id.* Accordingly, Dr. Osborn's discount rate contemporaneously implying Class VI and Class VII asset values while valuing Class V does not necessarily frustrate Section 1060, considering the focus of Dr. Osborn's discount rate is to factually establish the fair market value of the Class V assets. *See* PX-1110.014–015 ¶¶ 42–47 (Osborn Corr. Sur-Rebuttal Rpt.).

While the use of a discount rate in plaintiffs' DCF to isolate Class V asset values does not necessarily violate sequential valuation requirements under Section 1060, the core question for the Court is whether plaintiffs showed the discount rate effectively determines the fair market value of Class V assets by removing all possible intangible asset values. This inquiry concerns the government's second critique of plaintiffs' discount rates—specifically, the discount rates do

- 62 -

not account for and eliminate all possible intangible asset values.  *See* Gov't's PFFCL ¶¶ 446–544; *see also* DX-0833.009–010 ¶¶ 13–15 (Parsons Suppl. Rebuttal Rpt.).  Each of the government's experts extensively dispute plaintiffs' discount rate isolates Class V asset values.  First, Dr. Blouin argues Dr. Osborn's list of intangibles removed by the discount rate is incomplete because it assumes the anticipated value of the cash grant is part of Class V asset value without considering whether such value is instead part of Class VII goodwill.  *See* DX-0879.006–007 ¶¶ 12–14 (Blouin Rebuttal Rpt.).  Likewise, Dr. George argues Dr. Osborn improperly attributes above-market PPA prices and some value from transmission rights to tangible property cash flows.  *See* DX-0873.007–008 ¶ 11 (George Suppl. Rebuttal Rpt.).  Dr. George disputes Dr. Osborn's manipulation of the discount rate, arguing "[a]djusting the discount rate to account for the value of intangible assets is imprecise and does not properly account for the effect of both the PPA and transmission rights."[31]  *Id.* at DX-0873.010–011 ¶ 14 (George Suppl. Rebuttal Rpt.).  Similar to Dr. George's timeline-related arguments, Dr. Parsons argues plaintiffs' discount rate "fails to capture how . . . intangibles contribute value," because the "intangibles ensured the immediate operation of the Alta wind farms."  DX-0833.009 ¶ 14 (Parsons Suppl. Rebuttal Rpt.).  According to Dr. Parsons, absent transmission rights, the in-service dates for the Alta facilities would have been delayed five years, reducing plaintiffs' estimated present value of revenues by fifty-two percent and rendering plaintiffs ineligible for the cash grants.  DX-0833.009–010 ¶¶ 14–15 (Parsons Suppl. Rebuttal Rpt.) (citing Duff & Phelps, *Estimation of Fair Value of Certain Tangible and Intangible Assets and Liabilities of California High Wind Power LLC as of July 15, 2008* 459 (Jan. 19, 2010)).  Thus, Dr. Parsons argues plaintiffs' discount rate "overlook[s] an important part of the value that flows from Transmission Rights" by virtue of their integral nature to the immediate operation of the Alta facilities.  *Id.*

Except for Dr. Blouin's mention of the cash grant, the government's critiques of plaintiffs' discount rate largely amount to concerns the discount rate fails to remove value from favorable PPA prices and the rapid connection guaranteed by transmission rights.  That is, although the government concedes 9.05% is a reasonable discount rate for a development-stage wind facility, *see* PX-1110.007 ¶ 17 (Osborn Corr. Sur-Rebuttal Rpt.) (quoting Parsons 2024 Dep. at 123), the government argues plaintiffs bought wind facilities realizing especially high revenues compared to the market at the time of the transactions and these revenues were being realized sooner than if the intangibles been acquired later.  *See* Gov't's PFFCL ¶¶ 93–96.  According to the government, these favorable prices and timelines are attributable to intangible asset values and remain unaccounted for by plaintiffs' discount rate.  *See id.*  As Dr. Osborn points out, however, the task is to value "what actually existed on the transaction dates:  fully constructed . . . turnkey facilities, with PPAs, transmission rights, and regulatory approvals in place . . . separat[ing] . . . intangibles from the value of the tangible property."  PX-1110.008 ¶ 20 (Osborn Corr. Sur-Rebuttal Rpt.).  Analogizing such a task to the valuation of a commercial

---

[31] Specifically, Dr. George argues these intangible assets ensured the projects could start sooner, accelerating the timeline for revenues and ensuring the facilities were eligible for a cash grant before the window for eligibility expired.  DX-0873.011 ¶ 15 (George Suppl. Rebuttal Rpt.).  Dr. George further argues the PPA prices plaintiffs locked in ahead of the Alta transaction dates were more favorable than market rates at the time of the Alta transactions—meaning the PPAs contributed above-market value to the revenue streams plaintiffs used to value the eligible assets.  DX-0873.012–014 ¶¶ 16–18 (George Suppl. Rebuttal Rpt.).  Dr. George argues plaintiffs did not properly consider this additional above-market value as intangible asset value when calculating the revenues to be discounted to present value.  DX-0873.016–017 ¶ 22 (George Suppl. Rebuttal Rpt.).

building, Dr. Osborn posits "[i]f a permit is obtained [to construct a building] and the building is constructed, one would not assign a substantial value to the permit because the building would not have been possible without it." *Id.* ¶ 22.  Likewise, here, while Terra-Gen may have managed to secure favorable revenues sooner by virtue of intangible assets, the government fails to show why the Alta facilities should be valued as if intangible assets were secured later under different market conditions.  *See* Gov't's PFFCL ¶¶ 93–96, 104–45.  Plaintiffs acquired—and the Court is tasked with valuing—immediately serviceable wind facilities.  *See Alta Wind I*, 897 F.3d at 1370–71, 1377.  The government instead asks the Court to reject plaintiffs' valuation based on a but-for valuation of the intangible assets—that is, because the tangible assets would not enjoy higher revenues on an accelerated timeline but for the intangible assets, the government argues substantial portions of the tangible asset revenue streams should instead be attributed to the intangible assets.  *See* Gov't's PFFCL ¶¶ 424, 446–544.

While the government makes a compelling case these intangible assets contribute significant value, one of Dr. Parsons's exhibits comparing plaintiffs' DCF approach to Dr. Parson's cost approach undermines just how substantial these contributions are.  *See* DX-0833.018, Ex. 1 (Parsons Suppl. Rebuttal Rpt.).  In the first exhibit to Dr. Parsons's Supplemental Rebuttal Report, Dr. Parsons compares the result of plaintiffs' DCF approach when excluding the cash grant to the results of his cost approach.  *See id.*  When comparing Dr. Parsons's cost approach valuation of "Tangible Assets" to the non-cash grant DCF valuations of "Tangible Assets Acquired," Dr. Parsons's cost valuations exceed the DCF valuations for all but two of the Alta facilities:

**Exhibit 1**
**Comparison of Osborn's DCF Valuations and Parsons' Cost Approach Valuations for Tangible Assets**
*All amounts in US$ thousands*

|  |  | Alta I [A] | Alta II [B] | Alta III [C] | Alta IV [D] | Alta V [E] | Alta VI [F] | Total [G] |
|---|---|---|---|---|---|---|---|---|
|  | Osborn Supplemental Report DCF Valuations and Cash Grant Amounts |  |  |  |  |  |  |  |
| [1] | Tangible Assets | 558,809 | 461,495 | 474,367 | 307,379 | 499,463 | 477,315 | 2,778,828 |
| [2] | Tangible Assets Acquired | 558,809 | 414,043 | 421,675 | 273,876 | 450,324 | 434,398 | 2,553,125 |
| [3] | Eligible Assets | 510,082 | 413,966 | 421,115 | 273,316 | 449,764 | 418,770 | 2,487,013 |
| [4] | Cash Grant | 153,025 | 124,190 | 126,335 | 81,995 | 134,929 | 125,631 | 746,104 |
|  | Parsons Cost Approach Valuations and Cash Grant Amounts |  |  |  |  |  |  |  |
| [5] | Eligible Assets | 379,911 | 258,492 | 258,033 | 176,682 | 295,003 | 275,307 | 1,643,428 |
| [6] | Ineligible Assets | 19,369 | 17,516 | 19,307 | 13,810 | 19,488 | 8,165 | 97,654 |
| [7] | Tangible Assets | 399,280 | 276,009 | 277,339 | 190,492 | 314,491 | 283,472 | 1,741,083 |
| [8] | Cash Grant | 113,973 | 77,548 | 77,410 | 53,005 | 88,501 | 82,592 | 493,029 |
|  | Counterfactual DCF Valuations (Absent the Cash Grant) and Cash Grant Amounts |  |  |  |  |  |  |  |
| [9] | Tangible Assets | 368,290 | 306,168 | 318,654 | 205,585 | 331,626 | 304,835 | 1,835,158 |
| [10] | Tangible Assets Acquired | 368,290 | 274,687 | 283,258 | 183,178 | 298,999 | 299,845 | 1,708,257 |
| [11] | Eligible Assets | 336,122 | 274,610 | 282,698 | 182,618 | 298,439 | 288,407 | 1,662,894 |
| [12] | Cash Grant | 100,837 | 82,383 | 84,809 | 54,785 | 89,532 | 86,522 | 498,868 |

DX-0833.018, Ex. 1 (Parsons Suppl. Rebuttal Rpt.) (emphasis in red added).  Summing the estimates across all the Alta facilities shows Dr. Parsons's cost approach calculation of "Tangible Assets" exceeds a non-cash grant DCF valuation of "Tangible Assets Acquired" by almost $33

million.[32]  *See id.*  What this comparison shows, in short, is the primary reason plaintiffs' DCF valuations exceed the government's cost valuations is the inclusion of the anticipated cash grant in revenue streams—*not* plaintiffs' discount rate.  *See id.*  In other words, the government's counterfactual DCF valuation reveals the cash grant—not plaintiffs' discount rate—is driving overvaluations of Class V assets relative to their cost because removing the cash grant results in a value for the tangible assets *lower* than their initial costs.  *See id.*

Considering the Court determined the cash grant should be largely excluded from the value of Class V assets as it exhibits a Class VI § 197 intangible "right granted by a governmental unit," *see* Section IX.A.1, *supra*, plaintiffs' discount rate may in fact *reduce* the expected value of Class V assets to below their original cost, *see* DX-0833.018 (Parsons Suppl. Rebuttal Report, Ex. 1).  This result undermines the government's contention plaintiffs' discount rate fails to properly account for the contribution of intangible asset values.  *See* Gov't's PFFCL ¶ 425.  Accordingly, if plaintiffs factually supported the inclusion of the anticipated value of the cash grant as a Class V asset or if plaintiffs substantially excluded the anticipated value of the cash grant from Class V assets, plaintiffs' DCF valuation may have otherwise been a viable valuation methodology.  Plaintiffs insist their DCF valuation is unusable without including the anticipated value of the cash grant as a Class V revenue stream.  Accordingly, based on the foregoing, the Court need not further engage this alternative DCF valuation approach.  *See* Pls.' PFFCL at 151 ¶ 225 (citing PX-0910.028–029 ¶¶ 70–71 (Blaydon/Osborn Corr. Suppl. Rpt.)).

### B.    Whether the Government's Cost Approach Adequately Establishes the Fair Market Value of Eligible Assets and an Appropriate Turn-Key Premium

As discussed in Section VIII, *supra*, the Court's task on remand is to "make a factual determination as to the allocation of purchase price" and, "[i]n applying the § 1060 residual

---

[32] In referencing Exhibit 1 of his Supplemental Rebuttal Report, Dr. Parsons compares his cost approach to the results of the counterfactual DCF excluding the cash grant and focuses on Row [9], "Tangible Assets," which shows the counterfactual DCF calculates a lower value of tangible assets than the cost approach for Alta I, but results in higher values than cost approach for Alta II–VI.  *See* DX-0833.003 ¶ 2 (Parsons Suppl. Rebuttal Rpt.); *id.* at .018–19, Ex. 1 (Parsons Suppl. Rebuttal Rpt.).  Dr. Parsons' preference for Row [9], "Tangible Assets"—rather than Row [10], "Tangible Assets Acquired"—does not change the Court's analysis for three reasons.  *First*, the correct point of comparison between cost approach and the counterfactual DCF is "Tangible Assets Acquired."  While Dr. Parsons compares his cost approach Row [7] valuation of "Tangible Assets" to the counterfactual DCF Row [9] valuation of "Tangible Assets," Dr. Parsons' cost approach only valued the tangible assets plaintiffs acquired.  *See, e.g.*, DX-0783.003–004 ¶ 3 (Parsons Initial Rpt.) ("Specifically, my assignment was to determine the fair market value of the eligible wind energy property that formed the basis of the Section 1603 applications at issue in this litigation as of the date that plaintiffs *acquired* it."), 018 ¶ 32 (same).  It is therefore incorrect to compare the cost approach valuation of tangible assets acquired (Row [7], "Tangible Assets") to the counterfactual DCF valuation of tangible assets (Row [9], "Tangible Assets")—the correct point of comparison is Row [10], "Tangible Assets Acquired."  *Second*, even if the correct point of comparison were Row [9], "Tangible Assets," Dr. Parsons himself deems inconsequential the small amount by which the counterfactual DCF estimate exceeds the cost approach estimate, noting:  "[f]or the remaining Altas, the counterfactual DCF estimate is greater than the cost estimate, but the aggregate difference for Altas I-VI is only $94 million, less than 6% over my cost estimate," and, overall, "the valuations are strikingly similar."  DX-0833.003 ¶ 2 (Parsons Suppl. Rebuttal Rpt.).  *Third*, the most relevant point of comparison for calculation of the cash grants is eligible assets (*i.e.*, the basis for the cash grants)—Row [11], "Eligible Assets" for the counterfactual DCF valuation come within 1.2% of the Row [5], "Eligible Assets" for the cost approach valuation.  *Compare* DX-0833.018, Ex. 1, Row [5] Column [G] (Parsons Suppl. Rebuttal Rpt.) *with* DX-0833.018, Ex. 1, Row [11] Column [G] (Parsons Suppl. Rebuttal Rpt.).  $\frac{(1,662,894 - 1,643,428)}{1,643,428} \approx 0.01181$.

method," determine the value of the eligible Class V tangible assets, and, to the extent purchase price exceeds this value, "distinguish between turn-key value and goodwill and other intangibles." *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1377 (Fed. Cir. 2018). In conducting this factual determination, the Court must determine the fair market value of Class V assets. *See id.* at 1376. The parties agree: "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551 (1973) (citations omitted); *see also* 26 C.F.R. § 1.430(g)–1(c)(ii) ("The fair market value of an asset is determined as the price at which the asset would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."); Tr. at 3658:9–15 (Maydew), 3802:17–25 (Osborn), 4141:7–18 (Parsons), 4622:13–4263:3 (George), 4985:8–21 (Blouin). Although Section 1060 does not prescribe a method for the willing-buyer-willing-seller framework, the parties agree three valuation methodologies are widely used to do so: income approach; cost approach; and market approach. *See, e.g.*, PX-0299.008–009 ¶¶ 12(c)–(e) (Blaydon Initial Rpt.); DX-0783.020 ¶¶ 38–39 (Parsons Initial Rpt.). Both parties agree the market approach is not an informative valuation methodology for this case. *See, e.g.*, PX-0299.069–081 ¶¶ 130–51 (Blaydon Initial Rpt.); DX-0783.018 ¶ 33 (Parsons Initial Rpt.). Thus, the Court must decide, as a factual matter, which approach more appropriately estimates the fair market value of the tangible assets: plaintiffs' proposed income approach or the government's proposed cost approach. *See* Sections VIII, IX, IX.A *supra*.

Having considered plaintiffs' income approach in Section IX.A, *supra*, the Court next assesses whether the government's cost approach properly determines the fair market value of the eligible assets while distinguishing between turn-key, goodwill, and other intangibles, as required by the Federal Circuit. *See Alta Wind I*, 897 F.3d at 1377. The cost approach estimates fair market value of an asset by determining reproduction costs. *See* DX-0783.018 ¶ 34 (Parsons Initial Rpt.) ("I believe [the cost] approach should appropriately be based on the cost to construct the eligible property plus reasonable return associated with the eligible property."). Reproduction costs are the costs to reproduce an exact duplicate of the asset to be valued. *See generally* PX-1109.013 (Mark L. Zyla, *Fair Value Measurement Practical Guidance and Implementation* 171 (2d ed. 2012)); PX-1030.020 (Shannon P. Pratt, *Valuing a Business The Analysis and Appraisal of Closely Held Companies* 358 (5th ed. 2008) ("The cost approach is based on the economic principle of substitution. That is, no one would pay more for an asset than the price required to obtain (by purchase or by construction) a substitute asset of comparable utility.")).

As a preliminary matter, the Court notes plaintiffs "would support a cost approach that was properly calculated" if the Court disallowed plaintiffs' treatment of the cash grants in their income approach. Tr. at 5569:18–5570:22 (Counsel for plaintiffs) (Closing Arguments); *see also* Tr. at 5429:1–5 (Closing Arguments) ("[PLAINTIFFS:] If you exclude the value of the cash grant, that would produce a grossly distorted DCF valuation. It would not produce an accurate or appropriate value of what the economic benefits are . . . ."), 5561:21–24 (Closing Arguments) ("[PLAINTIFFS:] If the cash grant were excluded, but you included all income taxes and all property taxes, that would be the number you would get to. It would destroy the entire

analysis.").[33]  Considering the Court determined in Section IX.A, *supra*, plaintiffs' treatment of the cash grants in their income approach is unsupported by the evidence presented, the Court now evaluates whether the government adduced sufficient evidence to support its cost approach (and, correspondingly, whether plaintiffs adduced sufficient evidence to support plaintiffs' critiques to the government's cost approach).  The government's cost approach comprises three steps:  (1) start with KPMG's cost segregation reports for each of the Alta facilities; (2) subtract acquisition costs (Development Rights, Interest During Construction, and the Oak Creek Development Fee); and (3) apply a nine percent rate of return to capital expenditures (at the time the expenditure was incurred) to calculate developer profits.  The Court accordingly evaluates the viability of using the cost approach for the allocation of purchase price under Section 1060.

**1.    Step (1):  Whether Dr. Parsons Properly Used KPMG Cost Segregation Reports to Ascertain Reproduction Costs of the Alta Facilities**

The government's cost approach uses the KPMG cost segregation reports to ascertain the reproduction costs of the Alta facilities.  *See, e.g.*, Tr. at 4536:20–4537:2, 4548:23–4549:17 (Parsons); DX-0783.023 ¶ 49 (Parsons Initial Rpt.).  The KPMG cost segregation reports are attestations of the costs Terra-Gen incurred for each Alta facility with percentages allocated based on what proportion of the cost is attributed to grant-eligible or grant-ineligible property. *See* Tr. at 3542:3–3545:12 (Johnston) (explaining KPMG's process for certifying plaintiffs' cost segregation reports), 3341:2–11 (Huplosky) ("[For a cost segregation report,] basically you take a detailed listing of all of your construction costs, both direct costs and indirect costs, and you put them into various buckets."); DX-0783.023 ¶ 49 (Parsons Initial Rpt.) ("Plaintiffs provided an accounting of costs incurred by Terra-Gen to develop each of the Projects including an accounting of its allocation of those costs to the eligible and ineligible assets.").  In the cost approach, the reproduction costs related to the development and construction of the Class V assets in the Alta facilities are used to represent a fair market value of the Class V assets.  *See* DX-0783.020 ¶ 38 (Parsons Initial Rpt.).  Although the Alta facilities transferred ownership from Terra-Gen to plaintiffs, meaning the KPMG cost segregation reports ultimately reflect Terra-Gen's costs, Dr. Parsons persuasively notes "[t]he cost of building the windfarm is the same regardless of whether there is an intermediate transaction transferring the windfarm from party A to B."  Tr. at 4193:2–5 (Parsons).

---

[33] Plaintiffs' acceptance of cost approach in this circumstance moots an extensive dispute concerning whether the eligible assets are "readily replaceable."  Dr. Parsons argues the cost approach is more appropriate than income approach because, in his view, the eligible assets are readily replaceable.  *See* DX-0783.018, 021 ¶¶ 33, 44 (Parsons Initial Rpt.).  Plaintiffs dispute the government's cost approach, in part, because plaintiffs argue the eligible assets are not readily replaceable.  *See* PX-1110.003–004 ¶ 4 (Osborn Corr. Sur-Rebuttal Rpt.).  Considering:  (1) the Court is entrusted with choosing a valuation methodology based on the evidence presented (and is not bound by a specific valuation methodology as a matter of law), *see* Section VIII, *supra*; and (2) plaintiffs present their own modified version of a cost approach in the event the Court disallows their income approach, *see* Pls.' PFFCL at 283 ¶ 485–490, PX-1110.016 ¶ 51 (Osborn Corr. Sur-Rebuttal Rpt.), the Court finds it unnecessary to decide this dispute and instead focuses on the evidence presented at trial to determine whether cost approach properly calculates the fair market value of the tangible assets.

While plaintiffs dispute the government's exclusion of three acquisition costs found in the KPMG cost segregation reports, plaintiffs do not dispute using the reports as the starting point for determining the costs of tangible-eligible property. Indeed, plaintiffs propose a modified version of the government's cost approach in the event the Court rejects their income approach valuation—in the modified version of the cost approach, plaintiffs adopt the KPMG cost segregation reports *in toto*, adding a markup for turn-key and developer profit. *See* Pls.' PFFCL ¶¶ 486–89, 489 n.50. At trial, Mr. Huplosky testified about his methodology when he drafted the cost segregation reports: he relied on an appraisal from Duff & Phelps and, based on guidance from the Department of the Treasury, distinguished grant-eligible property from grant-ineligible property and direct costs from indirect costs. *See* Tr. at 3348:1–4, 3381:10–3383:10, 3392:19–3393:11, 3414:16–3415:15 (Huplosky). Mr. Huplosky noted KPMG had the last word on what was eligible and ineligible, and KPMG and the other big four accounting firms approved Mr. Huplosky's practice of allocating direct costs. *See* Tr. at 3384:4–6, 3415:12–15 (Huplosky). Mr. Johnston (an audit partner at KPMG) testified KPMG spent at least 1,000 hours on Alta facilities I–V, reviewed all key agreements (including the turbine supply agreement, the balance of plant agreement, and the interconnection agreement), looked at disbursements from bank statements, performed site visits, and understood the rules under the Section 1603 program and the DAI valuation report, and ultimately concluded Terra-Gen's assertion of eligible costs for the Alta facilities were reasonably stated. *See* Tr. at 3545:15–24, 3554:10–21, 3556:19–3557:1, 3558:13–3560:4, 3576:9–13 (Johnston). Accordingly, based on the evidence presented at trial, the Court finds the KPMG cost segregation reports are the appropriate starting point for establishing Terra-Gen's costs under the cost approach.

### 2.     Step (2):  Whether Dr. Parsons' Exclusion of Three Acquisition Costs Was Persuasive

As the parties dispute which items in the KPMG reports should be included in the fair market value of the Class V tangible assets, the Court next determines which of the KPMG cost segregation line items should be included as reproduction costs. While some of the line items are direct costs (*i.e.*, directly related to the development and construction of the facilities), some line items are indirect costs (*i.e.*, indirectly related to the same). The government contends three indirect costs from the KPMG reports—Development Rights, Interest During Construction, and the Oak Creek Development Fee—should be excluded from the Class V tangible assets because they "reflected step-ups in value over original out of pocket development costs, based on anticipated future cash flows of the business" and "were explicitly labeled intangible assets in the Duff and Phelps allocation." Gov't's PFFCL ¶ 361. Plaintiffs contend: (1) "[t]hese are all costs associated, in whole or in part, with Terra-Gen's development and construction of electricity-producing property;" (2) these costs "must be capitalized into the property pursuant to IRC 263A;" and (3) these costs should be included when calculating the reproduction costs. Pls.' PFFCL ¶ 433. Before weighing the evidence, the Court addresses the preliminary matter of whether, as plaintiffs suggest, 26 U.S.C. § 263A ("IRC 263A") mandates the inclusion of all indirect costs in eligible basis as a matter of law. *See id.* ¶¶ 433–440.

Plaintiffs contend IRC 263A is binding on the Court, whereas the government asserts IRC 263A does not apply after a sale.[34]  *See id.* ¶¶ 433–35, 438; Gov't's Resp. to Pls.' PFFCL at 120.  Plaintiffs note Section 1603 Treasury Guidance required the Treasury Department to assess "[t]he basis of property . . . in accordance with the general rules for determining the basis of property for federal income tax purposes," which "includes all items properly included by the taxpayer in the depreciable basis of the property" under IRC 263A.  Pls.' PFFCL ¶ 437 (quoting JX-0126.016 (Treasury Guidance)).  In invoking IRC 263A, plaintiffs cite Dr. Maydew's expert report and Mr. Huplosky's testimony to argue IRC 263A requires capitalization of direct and indirect costs.  *See* PFFCL ¶ 434 (quoting PX-0326.029–030 ¶ 3 (Maydew Initial Rpt.); Tr. at 3356:8–15 (Huplosky)).  According to plaintiffs, *all* indirect costs related to the construction of the eligible assets must be included in basis for the eligible assets as a matter of law.  *See* Pls.' PFFCL ¶¶ 433–35; Pls.' Resp. to Gov't's PFFCL at 49.

The government contends IRC 263A does not apply here because it "governs the capitalization of direct and indirect costs into the tax basis [of a] taxpayer who 'produced' the property in question or acquired the property for 'resale,'" and "[p]laintiffs did neither" because "*Terra-Gen* produced the eligible property."  Gov't's Resp. to Pls.' PFFCL at 120 (citing IRC 263A) (emphasis in original).  According to the government, the fact "*Terra-Gen* produced the eligible property or acquired it for resale" means "IRC 263A is [only] relevant to the determination of *Terra-Gen's* tax basis."  *Id.*  Moreover, the government argues, "while IRC Section 263A governs capitalizing costs in certain situations, it ceases to apply following a sale." *Id.* at 121.  The government concedes IRC 263A may be material to the cost of reproducing tangible assets to the extent Terra-Gen capitalized costs under IRC 263A, but insists "these costs would be reflected in Dr. Parsons' valuation, as a matter of financial analysis, but not as a matter of law."  *Id.* at 120.  The government clarified, "Dr. Parsons has included such costs in his valuations, except where those 'costs' do not belong, for good reason." *Id.*  The government instead asserts plaintiffs' tax basis should be calculated as a matter of fact pursuant to the Section 1060 waterfall approach, with each asset capped at the asset's fair market value, so Section 1060 supplants any legal requirement to include indirect costs pursuant to IRC 263A.  *Id.*

At the outset of the dispute over Section 263A, the Court notes the peculiar framing of this issue as one of law versus one of fact.  The Court is tasked with making a factual determination as to the fair market value of Class V assets under Section 1060.  *See Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376–77 (Fed. Cir. 2018).  Part of this factual determination involves weighing the evidence to choose between the proper methodology to estimate fair market value—the cost approach or the income approach.  *See* Section IX.B, *supra*.

---

[34] Of note, in *Desert Sunlight 250, LLC v. United States* (another Section 1603 cash grant case allocating purchase price according to Section 1060) Judge Meyers held, "as a matter of law, the cost categories of sales tax, interest during construction, and early completion bonuses are capitalized to the costs included in the basis of the Section 1603-eligible assets" under IRC 263A.  157 Fed. Cl. 209, 241 (2021).  In that case, however, plaintiffs (unlike plaintiffs in this case) held ownership in the facilities throughout construction, meaning IRC 263A applied to plaintiffs as taxpayers who "produced" the eligible assets.  *See id.* at 219–20; *see also* IRC 263A(b)(1)–(2).  Moreover, the government did not dispute the applicability of IRC 263A, and Section 1060 applied to two transactions well before the construction of the assets (unlike the sale of the Alta facilities), namely:  (1) "contracts to engineer, procure, and construct the Facility;" and (2) a sale of the developer's interest to plaintiffs and others *before* construction of the facility.  *See id.* at 214–20, 240.  Plaintiffs here, however, seek to apply IRC 263A despite not having constructed the Alta facilities nor acquiring them for resale.  *See infra*.

If the Court were to choose the cost approach to value Class V assets as a factual matter, plaintiffs argue the Court is then *legally* bound to apply IRC 263A to capitalize (and include in the value of eligible assets) those "[i]ndirect costs [which are] properly allocable to [eligible assets because they] directly benefit or are incurred by reason of the performance of production" of the Class V assets.  Pls.' PFFCL ¶ 435 (quoting I.R.C. Reg. § 1.263A-1(e)(3)(i)).

While the plain text of IRC 263A indicates the provision does not apply to plaintiffs, IRC 263A is still relevant to a factual inquiry into Terra-Gen's costs under the cost approach.  IRC 263A applies to "[r]eal or tangible personal property *produced by the taxpayer*" or "acquired by the taxpayer *for resale*," IRC 263A(b)(1)–(2) (emphasis added), and, as the government correctly notes, plaintiffs neither produced the Alta facilities nor acquired them for resale, *see* Gov't's Resp. to Pls.' PFFCL at 120.  Plaintiffs instead acquired the Alta facilities to place them in service and collect a cash grant because Terra-Gen itself was unable to collect the cash grant due to its partial non-profit ownership.  *See* Tr. at 2679:19–23, 2680:20–2681:07, 2682:7–10 (Pagano).  The inquiry in the government's cost approach, however, is to determine Terra-Gen's costs, to the extent those costs reflect the fair market value of the eligible assets.  *See* Section IX.B, *supra*; *see also* Gov't's Resp. to Pls.' PFFCL at 120 (conceding IRC 263A would be relevant to capitalization of Terra-Gen's indirect costs).  Thus, IRC 263A is relevant to determining Terra-Gen's costs under the cost approach, especially considering the cost approach seeks to determine basis from Terra-Gen's perspective under Section 1603, *see* Sections VIII, IX.B, *supra*, and Treasury Guidance on Section 1603 counsels a determination of basis "is determined in accordance with the general rules for determining the basis of property for federal income tax purposes," JX-0126.016 (Treasury Guidance).

Although IRC 263A informs which of Terra-Gen's indirect costs related to producing the eligible assets should be capitalized, IRC 263A cannot supplant the Court's task on remand to allocate the purchase price of the Alta facilities to the relevant asset classes under Section 1060. *See Alta Wind I*, 897 F.3d at 1375–76.  Section 1060 *requires* separating tangible Class V assets from intangible Class VI and VII assets to determine basis.  *See id.* at 1376–77.  IRC 263A merely establishes when certain expenses must be capitalized instead of deducted.  *See* IRC 263A (titled "Capitalization and inclusion of inventory costs of certain expenses); IRC 263A(a) (titled "Nondeductibility of certain direct and indirect costs").  Thus, to succeed on a claim an otherwise ineligible indirect cost should be capitalized into cost of eligible assets, plaintiffs must do more than simply cite IRC 263A—rather, plaintiffs must adduce sufficient evidence for the Court to conclude such an indirect cost is properly capitalizable and allocable to tangible eligible assets.  *See Alta Wind I*, 897 F.3d at 1377 (requiring a factual determination of purchase price allocation under Section 1060); IRC 263A(a)(2)(B) (requiring a determination of the "proper share of those indirect costs (including taxes) *allocable* to such property" (emphasis added)). The Court considers each of the disputed costs in turn.

### a.    Exclusion Category (1):  Development Rights

Dr. Parsons first excluded "Development Rights"—amounting to $157 million across Alta I–VI—when calculating the reproduction costs of the Alta facilities.  *See, e.g.*, Tr. at 4245:24–4246:11 (Parsons); *see also* DX-0783.068, Ex. 11, Row [2] (Parsons Initial Rpt.).  "He did this because those costs did not reflect actual development costs, but rather reflected step-ups

in value over original out of pocket development costs, based on anticipated future cash flows of the businesses." Gov't's Resp. to Pls.' PFFCL at 125 (citing Tr. at 4245:24–4246:11 (Parsons); *see also* DX-0783.068, Ex. 11, Row [2] (Parsons Initial Rpt.); *id.* at .024 ¶ 50; Tr. at 4180:21–4183:7 (Parsons) (describing Duff & Phelps' valuation of "development rights" as a "conjectural valuation of future income")). Plaintiffs argue Development Rights "were ultimately necessary to bring the projects from a conceptual stage to operation," and, "[e]xcept for a portion of the Development-Rights cost attributed to the Master PPA, Terra-Gen capitalized the remainder of the Development Rights cost into the tangible property comprising the Alta Lawsuit Facilities" using a pro-rata method "in proportion to the relative cost to construct the eligible and ineligible property." Pls.' PFFCL ¶¶ 441–42 (citing Tr. at 3387:2–20 (Huplosky)).

Before assessing the strength and reliability of the parties' arguments and witness testimony, the Court investigates what Development Rights include. According to Mr. Huplosky, Development Rights involve (1) "permitting work that had been completed or brought far along[; (2)] wind data that had been collected at the site from the met tower that they had put up[;] and [(3)] there were some other contracts, I believe." Tr. at 3387:21–3388:1 (Huplosky). Mr. Huplosky testified, after "[Terra-Gen] paid a purchase price, [they] hired an appraiser to allocate that purchase price amongst the specific assets [they] acquired, and [the development rights cost] is a portion of the purchase price that got allocated to the development rights." Tr. at 3387:2–15 (Huplosky). Terra-Gen instructed the appraiser—Duff & Phelps—to allocate the purchase price and classify the subject assets into five categories: (1) Land, (2) The Alite Wind Generation Facility; (3) Construction Work in Progress and Development Costs; (4) Development Rights; and (5) Transmissions Rights. *See* JX-0032.004 (Duff & Phelps Appraisal) ("The Subject Assets, as identified by you [*i.e.*, Terra-Gen], are . . . ."). The Duff & Phelps Appraisal describes "Development Rights [as] the collection of permits, wind data, agreements, and other development milestone achievements which are necessary to bring a development project from conceptual stage to operation." *See* JX-0032.040 (Duff & Phelps Appraisal). Duff & Phelps recognized the Development Rights "are a significant part of the value of a development stage wind generation project such as the Tehachapi Project," and "provide the Tehachapi Project with a significantly reduced development risk relative to conceptual stage wind development projects." *Id.* In view of the Duff & Phelps Appraisal and Mr. Huplosky's testimony, the Court assesses whether Development Rights should be capitalized and whether plaintiffs adduced sufficient testimony and evidence at trial to apportion Development Rights into grant-eligible and grant-ineligible costs.

The Duff & Phelps Appraisal declares Development Rights are intangible assets—plaintiffs do not dispute this.[35] *See* JX-0032.046 (Duff & Phelps Appraisal); Pls.' PFFCL ¶ 447 ("The *Development Rights certainly were, as Dr. Parsons claims, 'intangible'* at

---

[35] Of note, plaintiffs preferred Duff & Phelps over other appraisers. In 2010, Mr. Huplosky emailed Mr. Revock regarding the DAI and Duff & Phelps Appraisals, stating "[i]t is anticipated that these appraisals will support the FMV for both the sale/leaseback as well as the cash grant certification that will be performed by KPMG," and "while it is our belief that both firms would do an excellent job, we would prefer Duff & Phelps as they have worked very well in the past with KPMG not only on other engagements but on valuing the acquisition cost surrounding this exact project." JX-0038.001 (7 Apr. 2010 Email from D. Huplosky to G. Revock). This corroborates the veracity and reliability of the Duff & Phelps Appraisal from plaintiffs' perspective. Relatedly, in their PFFCL, plaintiffs emphasized the Duff & Phelps Appraisals were reliable given its argument "[t]he Government presented no evidence at trial to controvert Duff & Phelps' valuation of the Development Rights." Pls.' PFFCL ¶ 441.

- 71 -

the times AllCo procured the wind data and undertook the permitting work, in the sense that no constructed Alta facilities yet existed at those times." (emphasis added)); PX-0910.014 ¶ 38 (Blaydon/Osborn Corr. Supp. Rpt.) ("[T]he valuation firm Duff & Phelps used different discount rates to calculate the value of the Alta facilities with and without 'development rights,' which rights *resemble in some respects the intangibles identified by the Federal Circuit*." (emphasis added)); Tr. at 4180:21–4183:7 (Parsons).  In its Allocation of Purchase Price, Duff & Phelps explicitly listed development *costs* (such as "Alite Development / Organizational Costs" and "CWIP – Phase 1 Development") under Tangible Assets, which totaled $116,208,781, but included "Transmission Queue Rights" and "Development *Rights*" under Intangible Assets, which totaled $272,000,000.  *See* JX-0032.046 (Duff & Phelps Appraisal).  Further, Duff & Phelps—on Terra-Gen's instruction—separated "Construction Work in Progress and Development Costs" from "Development Rights."  *See* JX-0032.004 (Duff & Phelps Appraisal).  As Duff & Phelps noted, Development Rights contribute to "significantly reduced development risk relative to conceptual stage wind development project," which further indicates the Rights were intangible assets.  *See* JX-0032.040 (Duff & Phelps Appraisal); *accord* PX-1110.007 ¶ 19 (Osborn Corr. Sur-Rebuttal Rpt.) (in using a "development stage" discount rate for his DCF calculations, Dr. Osborn "determine[d] the fair market value of tangible property only, separate from the risk-reducing value contributed by intangibles"); Tr. at 3917:24–3918:6 (Osborn) ("[W]hat a PPA essentially does is reduce risk . . . ."); PX-0910.008–009 ¶ 19 (Blaydon/Osborn Corr. Supp. Rpt.).

Notably, a draft KPMG memorandum plaintiffs rely on, *see* Pls.' PFFCL ¶ 442, Gov't's Resp. to Pls.' PFFCL at 125, preliminarily enumerates[36] what comprises Development Rights,

---

[36] The rights enumerated in the KPMG Development Rights include:

- Preparation of a detailed permitting plan through completion of construction
- Preparation of aeronautical obstruction studies to determine feasibility of receiving FAA Determination of No Hazard to Air Navigation
- Preparation of a Radio Spectrum Transmission Analysis for the National Telecommunications and Information Administration (NTIA)
- Preparation of a jurisdictional wetlands analysis for the US Army Corps of Engineers (USACOE)
- Preparation [sic] an Environmental Assessment application which was submitted to BLM ROW
- Receipt of an Environmental Assessment from BLM ROW [what does ROW stand for?] [interrogatory comment in original]
- Preparation of an endangered species/avian impact analysis for the US Fish and Wildlife Service (USFWS) in connection with the desert tortoise and Mohave ground squirrel
- Preparation of Environmental Site Assessments (ESAs) for all properties
- Receipt of US Military approval of the increase in height limit from 400 to 500 feet in certain project areas
- Preparation [sic] an Environmental Impact Report (EIR) application under the Environment Quality Review (CEQA) program . . .
- Preparation of biological surveys, endangered species impact assessments and migratory bird impact assessments including impacts on general biota, Mohave ground squirrel, brown bat, barrowing owl, soils and vegetation, and the desert tortoise
- Preparation of cultural resources surveys
- Submission of a Wind Energy (WE) zone overlay application (zoning change approval)
- Submission of a Conditional Use Permit (CUP) application for concrete batch plants

JX-0153.003–004 (KPMG Memo.)

but only describes permitting works—without listing wind data or other development milestone achievements. *See* JX-0153.003–004 (KPMG Memo.); *see also* Tr. at 3550:7–3552:1 (Johnston) (testifying about the credibility of the drafter of this KPMG memorandum). Not only is the list of rights confined to permitting works or similar work for government approvals (with no mention of wind data or development milestone achievements) but the list is also preliminary in nature, with drafting comments, typos, and a "DRAFT" watermark throughout—calling into question the finality and comprehensiveness of the draft memo's description. *See* JX-0153.003–004 (KPMG Memo.); note 36, *supra*.

Although plaintiffs do not dispute the classification of Development Rights as intangible assets, plaintiffs instead assert, relying on Dr. Maydew and Mr. Huplosky's testimonies, costs that were intangible when incurred "get rolled into the cost basis of the property under [IRC] 263A" once the tangible property is constructed. Tr. at 3719:2–15 (Maydew); *see also* Tr. at 3722:1–19 (Maydew) (similar), 3356:1–3357:18 (Huplosky) (explaining "indirect costs" like permits are "capitalized into the things that you are constructing and that you're using the permit to build"). Dr. Maydew testified the costs are intangibles in the hands of Terra-Gen when Terra-Gen purchased the assets pre-construction, but further testified if the Court were to apply IRC 263A, then the intangible costs are capitalized into a tangible asset. *See* Tr. at 3722:8–19 (Maydew) ("Q. [O]nce construction is completed, would these expenditures still be intangibles, or would they be considered part of the tangible assets? A. Well, if they're capitalized, they're going to be part of whatever you're building, in this case a tangible asset. Q. And to the extent that these are activities covered by Section 263A, are you required to capitalize them into the asset? A. Yeah, if you're following 263A, then you capitalize those. I mean, it would be fine to capitalize intangible assets, yes.").

While Development Rights are indisputably intangible assets and although IRC 263A does not apply to plaintiffs, plaintiffs correctly contend the relevant question for a cost approach is whether IRC 263A would have required *Terra-Gen* to capitalize Development Rights into the cost to build the tangible assets. *See* Section IX.B.2, *supra*. While the government insists the Court look past IRC 263A and simply exclude Development Rights under Section 1060 because they are intangible, *see* Gov't's Resp. to Pls.' PFFCL at 120–21, such an exercise ignores the core inquiry under the cost approach: the cost to reproduce the tangible assets, *see* Sections VIII, IX.B, IX.B.2, *supra*. While an allocation of the intangible assets plaintiffs acquired would warrant the exclusion of intangibles under Section 1060, under a cost approach valuation of *Class V assets plaintiffs acquired*, the correct analysis is which of Terra-Gen's indirect costs would properly be capitalized into *Terra-Gen's costs to produce the Class V assets. See id.* Thus, plaintiffs must adduce sufficient evidence to conclude every constituent part of "Development Rights" is an indirect cost related to Terra-Gen's development and construction of tangible assets, and therefore capitalizable under IRC 263A. *See id.*

At first glance, plaintiffs' description of Development Rights as "wind data, permitting works, [and] other development milestone achievements," Pls.' PFFCL ¶ 441, generally comports with the type of indirect costs tax courts deem capitalizable into construction. *See, e.g.*, *Von-Lusk v. Commissioner*, 104 T.C. 207, 216 (1995) ("While the pursuit of building permits and zoning variances, negotiating permit fees, and similar activities may not readily spring to mind as examples of production activity, we think that upon reflection they are properly

classifiable as such."); I.R.C. § 263A(a)(2)(B).  Several key circumstances, however, call into question whether Development Rights are properly deemed indirect costs of constructing the tangible assets, as opposed to the development of some other grant-ineligible asset.

First, plaintiffs do not provide sufficient evidence for the Court to conclude every asset included in the $157 million Development Rights category is capitalizable under IRC 263A.  The Duff & Phelps Appraisals included the value of the Master PPA—which the parties agree is not eligible to be capitalized—in their description of Development Rights.  *See* JX-0032.040 (Duff & Phelps Appraisal) ("These developmental milestones, including but not limited to its contractual framework with SCE that will allow for future power purchase agreements for approximately 1,550 MW of capacity . . . ."); *see also* Pls.' PFFCL ¶ 442 (citing Tr. at 3387:2–20 (Huplosky) ("Except for a portion of the Development-Rights cost attributed to the Master PPA, Terra-Gen capitalized the remainder of the Development Rights . . . .")).  KPMG, however, later bifurcated Development Rights in the cost segregation reports into two categories—the Master PPA;[37] and everything else.  *See, e.g.*, JX-0098.007 (Alta I KPMG Rpt.).  This implies Development Rights, as a category, was not originally intended to comprise only capitalizable costs under IRC 263A—thus, including assets in Development Rights does not automatically mean all those assets are properly capitalizable under 263A.

Second, aside from "wind data,"[38] the remaining two categories of Development Rights as articulated by plaintiffs ("permitting works" and "other development milestone achievements") are too vague for the Court to determine what these costs relate to and whether they should be deemed capitalizable under IRC 263A.  For example, beyond a rough draft of a

---

[37] The Court also questions the credibility of KPMG's removal of the Master PPA from Development Rights—KPMG was correct to remove Master PPA value but, in doing so, assumed it was correct for Terra-Gen to assign only a nominal dollar value to the Master PPA.  While plaintiffs say all non-capitalizable Master PPA value was removed from the Development Rights number, the KPMG memo plaintiffs cite stated "based on the information in" a "Confidential Information Memorandum (CIM) prepared in connection with the sale of the Tehachapi project," "*Terra-Gen* believes it was reasonable for Terra-Gen to assign a relatively small amount of value to the PPA," and as a result, KPMG "*assumed* that it is proper to ascribe only nominal value to the Master PPA."  JX-0153.004, 007–008 (KPMG Memo.) (emphasis added).  In other words, KPMG did not independently assess the value of the Master PPA—instead, *Terra-Gen* ascribed the nominal value to the Master PPA.  This undermines plaintiffs' contention the portion of the Development Rights removed as attributable to the Master PPA was appropriate.

Intriguingly, a draft valuation two weeks before Duff & Phelps' final valuation attributed significant value to the Master PPA:  the draft showed the Master PPA and transmission rights amounted to $170 million of the Allco acquisition price.  *See* DX-0148-2.002 (Draft Duff & Phelps Purchase Price Allocation for Acquisition of California Highwind Power, LLC).  In the final valuation, however, transmission queue rights were a standalone asset worth $77 million, with the Master PPA relegated to the Development Rights classification amounting to $195 million.  *Compare* JX-0032.046 (Duff & Phelps Appraisal) *with* DX-0148-2.002 (Draft Duff & Phelps Purchase Price Allocation for Acquisition of California Highwind Power, LLC).  This means, the draft valuation may have attributed around $93 million for the value of the Master PPA.  Given the draft valuation is not final and executed, the Court does not assign great weight to this back-of-the-napkin calculation, but it is notable Duff & Phelps did not ascribe merely nominal value to the Master PPA prior to finalizing its valuation.

[38] Plaintiffs contend "wind data [Terra-Gen acquired] from AllCo [was] the most important Development Right Terra-Gen acquired," Pls.' Resp. to Gov't's PFFCL at 43 (footnote omitted), arguing "the wind data (which dated back to 2001) was necessary to determine that constructing wind facilities at the Alta site was feasible and it allowed Terra-Gen to place the wind turbines and associated equipment in spots and at orientations that would maximize their electricity-producing capacities," Pls.' PFFCL ¶ 445 (footnote omitted).

memo from KPMG describing some permitting works, plaintiffs provide no further guidance on what these categories comprise or how they relate to the construction of tangible assets. Instead, plaintiffs, relying on Mr. Huplosky's testimony, simply state "[e]xcept for a portion of the Development Rights cost attributed to the Master PPA, Terra-Gen capitalized the remainder of the Development Rights cost into the tangible property . . . ." Pls.' PFFCL ¶ 442 (citing Tr. at 3387:2–20 (Huplosky)). Plaintiffs argue "KPMG determined that capitalizing the Development Rights cost into the tangible property in this manner was appropriate under IRC 263A," *id.* (citing Tr. at 3389:25–3390:6 (Huplosky); JX-0153.008–013 (KPMG Memo.)), but the KPMG memo plaintiffs reference is only a draft, and its description of Development Rights does not even list "other development milestone achievements" or "wind data," the latter of which is, according to plaintiffs, "the most important Development Right Terra-Gen acquired," *see* note 38, *supra*. *See* JX-0153.003–004 (KPMG Memo.); *see also id.* at 008 ("For purposes of this memo we have assumed that the Duff & Phelps valuation of the Development Rights for Alta Wind I is an appropriate valuation that is sufficiently supported by a methodology that is accepted by the IRS."). Without knowing the constituent parts of the Development Rights—apart from the vague descriptions plaintiffs supplied—the Court lacks an evidentiary basis to determine whether each of those constituent parts should be capitalizable into tangible costs under IRC 263A.

Third, beyond lack of specificity as to what Development Rights comprise, plaintiffs also fail to quantify the value of any individual category of rights falling into Development Rights—this failure further inhibits the Court's ability to conduct an individualized IRC 263A analysis to include or exclude certain Development Rights. In other words, even assuming one or all of "wind data, permitting works, [or] other development milestone achievements" should be capitalized into direct costs, plaintiffs adduced no testimony or evidence quantifying what portion of the $157 million of Development Rights are attributable to each. Given the dearth of testimony or evidence quantifying the constituent parts of Development Rights, the Court risks the improper inclusion of intangible asset costs in the value of tangible assets if it were to wholly adopt the Development Rights as capitalizable costs—such an inclusion would violate not only IRC 263A, but also Section 1060 and the Federal Circuit's Remand instructions. *See* Section IX.B.2, *supra*.

To persuade the Court Development Rights should be capitalized into intangibles, plaintiffs must provide some factual basis to establish each constituent part comprising Development Rights is properly allocable to tangible asset costs under IRC 263A. *Accord Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992). Considering the broad naming conventions for the three Development Rights categories (wind data, permitting works, and other development milestone achievements) initially suggest Development Rights may be capitalizable under IRC 263A, this dispute is close. *See supra*; *accord Von-Lusk*, 104 T.C. 207, 216 (1995). As plaintiffs failed to provide preponderant evidence as to why each component of Development Rights is capitalizable and in what amount, the Court lacks sufficient evidentiary basis to conclude Development Rights are properly deemed costs to reproduce the eligible assets on the record. *See Washington Mut., Inc. v. United States*, 130 Fed. Cl. 653, 686–87 (2017) (collecting cases) ("In this *de novo* tax refund case, plaintiffs bear the burden to prove, by a preponderance of the evidence, that they are entitled to the tax deductions at issue in this case and the correct

- 75 -

amount of the tax refund due."), *aff'd*, 891 F.3d 1016 (Fed. Cir. 2018) (citations omitted); *Krapf*, 977 F.2d at 1463.

### b.  Exclusion Category (2):  Interest During Construction

Dr. Parsons next excluded Interest During Construction ("IDC") from the calculation of reproduction costs because Dr. Parsons claimed IDC—amounting to $48.1 million—is a form of developer return.  *See* Tr. at 4419:10–20 (Parsons); DX-0783.018, 024 ¶¶ 35, 51 (Parsons Initial Rpt.).  Specifically, Dr. Parsons argues plaintiffs took on loans more expensive than typical for constructing the eligible assets and incurred IDC to finance more than just the eligible assets—Dr. Parsons argues both of these defects justify excluding IDC and substituting his own rate of return to estimate developer profits.  *See* Tr. at 4554:2–4557:18 (Parsons); *see also* Tr. at 4423:17–4424:7 (Parsons) (noting "[Terra-Gen] would finance the construction almost exclusively with lending because they had so much return to come from the other intangibles that they had achieved and accomplished in producing").  Given Dr. Parsons characterized IDC as profit accounted for in his rate of return for developer profits, Dr. Parsons opined "[i]t's easier and more reliable to subtract the interest and calculate the total profit on its own" instead of applying one rate of return for the costs funded by financing and another for the costs borne by Terra-Gen without financing.  Tr. at 4247:19–4252:1 (Parsons); *see also* Tr. at 4249:7 (Parsons) ("Interest is a profit to the bank.").  Dr. Parsons states debt (which accrued IDC) exceeded Terra-Gen's construction costs for Alta II and Alta III, meaning IDC was used to finance more than just the construction of tangible property.  *See, e.g.*, Tr. at 5357:10–15 (Parsons) ("[T]he total amount of funding of debt was more than the construction expenses for the tangible property.  So that means they're funding more than the tangible property.").  Dr. Parsons also takes issue with IDC on cash-grant bridge loans because "the grant bridge proceeds are a loan for the cash grant, not for the tangible assets."  Tr. at 4556:9–16 (Parsons).  Similarly, the government argues "Terra-Gen's claimed interest during construction also reflected a *choice* to finance much of the Alta II-V projects' costs using higher-interest long-term debt that would not be paid off until decades after the projects began operation."  Gov't's PFFCL ¶ 418 (citing Tr. at 4557:19–4559:15 (Parsons)) (emphasis added).

Plaintiffs dispute the government's characterization of, and Dr. Parsons' exclusion of, IDC.  *See* PX-0910.031 ¶ 77 n.82 (Blaydon/Osborn Corr. Supp. Rpt.).  In plaintiffs' view, IDC is "interest that Terra-Gen paid on the debt financing it obtained to construct the Alta Lawsuit Facilities" and is therefore an indirect cost required to be included pursuant to IRC 263A.  *See* Pls.' PFFCL ¶¶ 449, 453; *see also* Tr. at 3351:15–20 (Huplosky) (describing "interest on construction" as an indirect cost).  Mr. Huplosky testified KPMG—who had "the last word" on what was eligible and ineligible for the cash grant—determined IDC needed to be capitalized under IRC 263A because "it pass[ed] both prongs [of IRC 263A] that required the capitalization."  Tr. at 3378:8–15 (Huplosky); *see also* Tr. at 3377:23–3378:7, 3383:7–10, 3384:4–10 (Huplosky).  According to Mr. Huplosky, KPMG spread out IDC among both eligible and ineligible assets "[b]ecause the construction loans pertained to the building out of the entire project" and, to determine the portion of IDC attributable only to eligible assets, used a "pro rata [method] based off of the . . . direct asset over the total of the direct assets."  Tr. at 3378:24–3379:11 (Huplosky).  For example, "if an item cost $5 and the total cost was $15, it would get a one-third allocation of the interest expense or the . . . project indirect we were

allocating"—Mr. Huplosky and KPMG used this process to conduct the IDC allocation. Tr. at 3379:12–19 (Huplosky). Also, in opposition to Dr. Parsons' statement his developer profits calculation accounts for IDC, plaintiffs state "IDC and the Oak Creek Fee [discussed *infra*] far outstrip the meager developer profit that Dr. Parsons allows in his valuation." Pls.' PFFCL ¶ 453.

In reviewing whether IDC should be included in the cost valuation, the Court reviews: (1) the reliability of Dr. Parsons' exclusion of IDC in view of the record evidence in this case; (2) plaintiffs' invocation of IRC § 263A(f); and (3) caselaw from the Court of Claims and the Tax Court about IDC being included in cost basis.

Dr. Parsons' exclusion of IDC rests on his characterization of IDC as a form of developer profits, *see* Tr. at 4419:10–20 (Parsons), so the Court first determines the validity of this characterization. To be clear, Dr. Parsons acknowledged he did "not subtract[] [IDC and the Oak Creek Development Fee] because they don't belong there, [rather he] subtract[ed] them because [his capital rate of return is] a [more] convenient way to calculate the total profit." Tr. at 4248:4–8 (Parsons). Similarly, in his initial report, Dr. Parsons characterized IDC as a "return to the lender that is paid out of the total profit of the Project." DX-0783.024 ¶ 51 (Parsons Initial Rpt.). Dr. Parsons further testified, however, "[i]nterest is a profit to the *bank*"—not Terra-Gen, plaintiffs, or any entity developing and constructing the facilities. Tr. at 4249:7 (Parsons). As developer profits are essentially the profit margin a developer expects to receive when developing a facility, *see Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *7, the correct factual inquiry is whether a developer of the eligible assets—for example, Terra-Gen—would expect profits in the form of IDC, not whether a developer paid a lender interest which the *lender* views as profit. Indeed, Dr. Parsons' own estimate of developer profits seeks to establish a reasonable return for the developer after placing the assets in service—it does not estimate the cost of debt (*i.e.*, interest) which the developer must pay to a lender financing the project. *Compare* DX-0783.023 ¶ 46 (Parsons Initial Rpt.) (calculating developer profits as capital return to a *developer* over and above any costs incurred during the development of the profits) *with id.* at ¶ 51 (defining IDC as return to the *lender*). The government offers no record evidence to establish Terra-Gen, plaintiffs, or any *developer* of the Alta facilities received (or expected to receive) profit in the form of IDC. Further, Dr. Parsons concedes Terra-Gen is the party responsible for paying IDC, meaning IDC was a cost borne by Terra-Gen, not a profit to Terra-Gen. *See* Tr. at 4426:19–23 (Parsons) ("Q. And Terra-Gen, likewise, is the party that needs to pay out the IDC amounts, correct? A. Yes. Q. Okay. A. Terra-Gen entities pay that."). Moreover, *Utilicorp* defines "developer's profit [as] the risk inherent in constructing a facility that cannot be sold for the price asked by the developer." *Utilicorp v. Commissioner*, 1997 WL 28654, at *7. At trial, Dr. Parsons testified expenses excluding developer profits comprise "the raw work that was done by the parties who are not capital investors," while the developer profit is "the capital return owed to whoever provided the capital to build these things." Tr. at 4254:10–15 (Parsons). This testimony directly contradicts the definition of developer profit: "the risk inherent in constructing a facility" estimates the capital returned to whoever *built* the facilities, *see Utilicorp v. Commissioner*, 1997 WL 28654,

- 77 -

at *7, not to "whoever *provided the capital* to build these things."[39]  *See id.* (emphasis added).  Dr. Parsons himself opined in his initial report:  "In addition to its out-of-pocket costs incurred over the course of a project, a *developer* requires capital return as compensation for its up front development efforts and the risk involved.  In this dispute, this compensation is known as the developer profit and turnkey fee or turnkey premium."  DX-0783.023 ¶ 46 (Parsons Initial Rpt.) (emphasis added).  The record shows—and Dr. Parsons does not dispute—IDC is an out-of-pocket cost Terra-Gen incurred in order to construct the Alta facilities.  *See* Tr. at 3351:15–20 (Huplosky), 4426:19–23 (Parsons).  Additionally, while debt financing may minimize the risk inherent in constructing a facility by delaying the amount a developer pays out of its cash reserves, interest paid on this debt does not capture the risk constituting developer profit.  Rather, IDC is a *cost* of using debt financing which Terra-Gen paid but did not receive profit from—Terra-Gen paid IDC as a cost of constructing and developer facilities; the IDC did not compensate Terra-Gen "for its up front development efforts and the risk involved."  *See* DX-0783.023–024 ¶¶ 46, 51 (Parsons Initial Rpt.) ("This is a return to the *lender* that is *paid out of the total profit* of the Project) (emphasis added); Tr. at 3351:15–20 (Huplosky).

Dr. Parsons' attempt to account for IDC (and the Oak Creek Development Fee) in his nine percent rate of return when calculating developer profits further supports IDC is not a developer profit.  While Dr. Parsons states developer profits are "compensation for . . . development efforts and . . . risk" "[i]n addition to . . . out-of-pocket costs," *see* DX-0783.023 ¶ 46 (Parsons Initial Rpt.), Dr. Parsons' developer profits calculations result in a $50 million dollar *loss* for Terra-Gen to develop the facilities.  *See* Tr. at 5170:6–12 (Osborn).  By equating IDC to developer profits but defining IDC as "a return to the lender that is *paid out of the total profit*," Dr. Parsons implies IDC is properly viewed as profit which the developer elects to pay as a cost of financing the project—but a cost which reduces profit is not profit; it is a cost.  *See* DX-0783.024 ¶ 51 (Parsons Initial Rpt.).  Even if IDC (and the Oak Creek Development Fee) were developer profits, as Dr. Parson suggests, Dr. Parsons's estimate of developer profits should then encompass the portion of such profits *in addition* to any other risks "inherent in constructing a facility that cannot be sold for the price asked by the developer."  *Utilicorp v. Commissioner*, 1997 WL 28654, at *7.  Instead, by claiming IDC and the Oak Creek Development Fee are developer profits better left out and replaced with his rate of return, Dr. Parsons calculates developer profit which:  (1) implies Terra-Gen would operate at a loss and (2) ignores Terra-Gen's actual cost figures which KPMG categorized as eligible.  *Compare Forward Comm's. Corp. v. United States*, 608 F.2d 485, 513 (Ct. Cl. 1979) (noting true book values of assets with a lower turnkey premium is a more reliable approach to valuation than theoretical estimates of asset values with a higher turnkey premium) *with* DX-0783.018–019, 024  ¶¶ 35, 51 (Parsons Initial Rpt.) (recreating reproduction costs by removing actual costs and replacing them with a rate of return to estimate the fair market value of such costs).  Hypothetical estimates of costs to build are less persuasive where, as here, the actual costs borne are quantifiable with record evidence.  *See, e.g.*, *Forward Comm's.*, 608 F.2d at 513.

Despite Mr. Huplosky's testimony KPMG separated eligible IDC from ineligible IDC *pro rata* according to the costs of the eligible and ineligible assets, *see* Tr. at 3378:24–3379:19

---

[39] Dr. Parsons' broad characterization of developer profits would also encapsulate any entity receiving profit from any line item expense on the cost segregation reports—*e.g.*, GE's profit related to its wind turbines, profit related to a contractor developing the SCADA overlays for the facilities, *etc*.

(Huplosky), the government claims "Terra-Gen's claimed interest was not indicative of interest on only the construction of only eligible property," and "[t]he comparison of Dr. Parsons' total return to the interest that Terra-Gen claimed to attribute to the eligible property's construction is therefore grossly uninformative," *see* Gov't's PFFCL ¶ 419. The government, however, attaches no citation to support this claim. *See* Gov't's PFFCL ¶ 419. Just a few paragraphs prior to this claim, the government acknowledges Terra-Gen allocated 97.12% of its IDC to eligible property for the Alta III facility, *see* Gov't's PFFCL ¶ 417, corroborating Mr. Huplosky's testimony as to the separation of eligible IDC from ineligible IDC. *See also* JX-0124.016, Rows 182–84 (Alta III KPMG Rpt.) (noting "% Grant Eligible" allocations for "Bond IDC," "Accrued Bond IDC," and "Grant Bridge IDC"). Looking at cost segregation reports for the other Alta facilities, KPMG found—as it did for each line item—the percent of IDC allocable to the eligible property. *See, e.g.*, JX-0098.018 (Alta I KPMG Rpt.) (noting 96.2% allocation for "Bond IDC" and "Grant Bridge IDC); JX-0093.020 (Alta II KPMG Rpt.) (noting 96.7% allocation for "Bond IDC" and "Grant Bridge IDC"); JX-0124.016 (Alta III KPMG Rpt.) (noting 97.12% allocations for "Bond IDC," "Accrued Bond IDC," and "Grant Bridge IDC"); JX-0139.018 (Alta IV KPMG Rpt.) (noting 95.8% allocations for "Bond IDC", "Bond IDC - Accrued", and "Grant Bridge IDC"); JX-0151.017 (Alta V KPMG Rpt.) (noting 96.54% allocations for "Bond IDC," "Bond IDC – Accrued," and "Grant Bridge IDC"); JX-0185.016 (Alta VI KPMG Rpt.) (noting 96.9% allocation for "IDC / Commitment Fee"). Critically, the government does not contend the allocations for each of the IDC line items were improperly calculated, nor did the government adduce any testimony undermining the reliability of KPMG's allocations for each IDC line item. Although the government contends, without support, IDC was not properly divided into IDC attributable to eligible assets versus ineligible assets, the cost segregation reports and Mr. Huplosky's testimony indicate the opposite. The Court finds unpersuasive the government's argument Terra-Gen's interest was not appropriately allocated to eligible property.

Dr. Parsons' argument IDC on cash-grant bridge loans should be excluded because "the grant bridge proceeds are a loan for the cash grant, not for the tangible assets" is similarly unpersuasive. Tr. at 4556:9–16 (Parsons). Plaintiffs employed several types of loans during the construction and development of the Alta facilities, one of which is the "cash-grant bridge loan:" Terra-Gen was obligated to repay the cash-grant bridge loan using the proceeds from the cash grants. *See* Tr. at 3035:15–21 (Pagano). The IDC incurred on the bridge loan, according to Mr. Huplosky, was "the interest incurred on the construction that we had to borrow to construct the facility" and was incurred "only during construction." Tr. at 3377:4–19 (Huplosky). While obtaining the bridge loan was tied to the future prospect of a cash grant, Citigroup's Credit Approval Memorandum demonstrates Dr. Parsons is incorrect—the bridge loan was not a "loan *for* the cash grant." Tr. at 4556:9–16 (Parsons) (emphasis added). According to the Memorandum, "[t]he $599.2 million Lease Bonds, $510.1 million of ITC Cash Grant Bridge Loan and $101.3 million of Working Capital/Letters of Credit Facility will be used to fund the construction and satisfy the LC requirements for 4 separate phases of Terra-Gen's CHiPs wind projects," JX-0068.002 (Citigroup Credit Approval Memo.), and the "$510.1 million 18-month Senior Secured ITC Cash Grant Bridge Loan . . . will be used entirely to fund Project Costs," JX-0068.003 (Citigroup Credit Approval Memo.). *See also* JX-0068.007–008 (Citigroup Credit Approval Memo.). Thus, the cash grant is properly viewed as a future guarantee of loan repayment which enabled a loan to build the Alta facilities—the cash grant itself is not the project which the loan actually finances. *Id.* In view of record evidence confirming the

- 79 -

cash-grant bridge loan was not, as Dr. Parsons suggested, "a loan for the cash grant" but rather a loan "to fund Project Costs," the Court finds Dr. Parsons' exclusion of IDC based on the cash-grant bridge loan improper and unsupported by the evidence.

Finally, the government argues Dr. Parsons' exclusion of IDC was proper because plaintiffs opted for longer-term debt. *See* Gov't's PFFCL ¶¶ 418–20. The government insists the IDC "reflected a choice to finance much of the Alta II-V projects' costs using higher-interest long-term debt that would not be paid off until decades after the projects began operation." Gov't's PFFCL ¶ 418 (citations omitted); *see also id.* ("Mr. Pagano acknowledged 'construction type loan[s]' that were 'shorter in term' had far lower rates than decades-long loans that Terra-Gen chose to use to finance much of Altas II-V." (citing Tr. at 3124:20–3126:1 (Pagano))). If plaintiffs opted for short-term debt financing closer to the construction period, Dr. Parsons argues the interest rates would be 3.16 to 3.72%—instead of the 7% plaintiffs paid for their long-term debt financing. *See id.* (citing Tr. at 4557:19–4559:15 (Parsons), 3124:20–3126:1 (Pagano)). Dr. Parsons and the government, however, provide no basis to conclude the structure and duration of a loan is relevant to the allocation of interest to reproduction costs. Instead, the government contends, given Dr. Parsons' nine percent return on capital eclipses interest rates on short-term debt, "as a matter of simple math, if one backed out interest on debt that was truly only for construction of eligible property, that would leave a substantial return for any investor in the equity-funded part of that property's cost." Gov't's PFFCL ¶ 420. Comparing lower interest rates plaintiffs may have been able to secure with Dr. Parsons' return on capital has no bearing on whether the interest plaintiffs actually paid is part of reproduction costs. Dr. Parsons's argues the long-term rates further demonstrate the loans were financing something more than just eligible assets because the long-term rates "are more than the interest charges appropriate," *see* Tr. at 4557:9–14, but as already discussed, *supra*, the KPMG cost segregation reports eliminated this potential issue by allocating the interest between eligible and ineligible assets. Just because the government suspects plaintiffs' IDC may have been expensive does not mean the portion of that IDC attributable to the eligible assets should be excluded from cost basis. Regardless of loan terms, IDC was a cost Terra-Gen paid in furtherance of constructing the Alta facilities. A mere suspicion of more favorable loan terms in the debt market—without factually supporting the feasibility of Terra-Gen securing such terms—is insufficient to establish IDC should be excluded from reproduction costs. *Accord Krapf v. United States*, 977 F.2d 1454, 1463 (Fed. Cir. 1992).

In addition to the record evidence in this case, Treasury Guidance counsels the use of standard relevant taxation procedures to determine basis for Section 1603 cash grants. *See* JX-0126.016 (Treasury Guidance). IRC 263A is informative and corroborates the Court's factual findings. IRC 263A(f) describes indirect costs—such as IDC—are normally capitalized when directly attributable to the relevant property. Specifically, IRC 263A allows IDC to be included in cost basis when "paid or incurred during the production period," and either: (1) the property has "a long useful life," (2) the property has "an estimated production period exceeding 2 years," or (3) the property has "an estimated production period exceeding 1 year and a cost exceeding $1,000,000." 26 U.S.C. § 263A(f)(1). "[I]nterest on any indebtedness directly attributable to production expenditures with respect to such property shall be assigned to such property." 26 U.S.C. § 263A(f)(2)(A)(i); *see also* 26 C.F.R. § 1.263A-1(e)(3)(ii)(V) ("Interest includes interest on debt incurred or continued during the production period to finance the

production of real property or tangible personal property to which section 263A(f) applies."). Critically, IRC 263A does not assess the reasoning for why an entity elected debt financing or the type of loan the entity chose. *Cf.* Gov't's PFFCL ¶ 418 ("Mr. Pagano acknowledged 'construction type loan[s]' that were 'shorter in term' had far lower rates than decades-long loans that Terra-Gen chose to use to finance much of Altas II-V." (citing Tr. at 3124:20–3126:1 (Pagano))).

Prior cases from the Court of Claims, Federal Circuit, and the Tax Court hold it is proper to include Interest During Construction when calculating plaintiffs' cost basis. In *Miami Valley*, the Court of Claims found "cost of [the assets] would in all probability have included the total of the reproduction costs of the individual assets ($2,178,072), *plus increments covering construction interest . . . .*" *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974) (emphasis added). In *Utilicorp*, the Tax Court found the petitioner's valuation expert properly included "construction interest" as a cost related to developing the facility.[40] *Utilicorp v. Commissioner*, 1997 WL 28654, at *3 n.1, *6–8. While the government disputes the applicability of *Utilicorp*, the government provides no basis to dispute *Miami Valley*'s inclusion of construction interest in calculating reproduction costs. Plaintiffs also identify two other persuasive cases supporting the inclusion of construction interest in cost basis: (1) *Kennedy v. Washington Cnty. Assessor*, 2007 WL 4463493, at *6 (Or. T.C. Dec. 14, 2007), which states: "In addition to direct costs and entrepreneurial profit, a cost estimate for a structure must include indirect costs such as architectural and engineering fees, appraisal, consulting, accounting and legal fees, and other carrying costs including insurance, property taxes, and *interest on construction loans*" (emphasis added); and (2) *Am. Express Fin. Advisors, Inc. v. Cnty. of Carver*, 573 N.W.2d 651, 660 (Minn. 1998), which states: "Reproduction cost requires the consideration of all costs, including capital expenditures for direct costs such as labor and materials, and indirect costs such as *financing* and marketing costs. Construction contingencies and *construction period interest* are indirect costs of construction which would be encountered in the construction of a new building and must be accounted for in the reproduction cost" (internal citation omitted) (emphasis added). In both cases, reproduction costs included indirect costs such as construction interest. *See id*.

In summary, Dr. Parsons' cost approach hinges on reproducing the cost of the tangible assets. His process centers on, as the government describes, exercising his judgment on whether a line item should be included in the cost basis. Dr. Parsons' judgment, however, contradicts the record evidence which shows: (1) IDC is not a developer profit; (2) KPMG determined the IDC allocable to the eligible property for each Alta facility; (3) the bridge-to-grant loan was used for constructing the tangible property, rather than to finance the cash grant; and (4) financing terms are not a basis to exclude IDC. IRC 263A and caselaw further support including IDC in the reproduction costs when calculating fair market value of the assets. Accordingly, after weighing

---

[40] The government asserts plaintiffs' description of the valuation expert using construction interest in *Utilicorp* is based on "inferences from a cryptic footnote in *Utilicorp* that merely suggests that the developer may have financed its acquisition." Gov't's Resp. to Pls.' PFFCL at 130. *Utilicorp* does not introduce any crypticity: there, the Tax Court provides a footnote clarifying the expert's estimate of "Other costs" includes "Construction interest, financing, and legal costs, administrative and general costs, and contingency costs." *Utilicorp v. Commissioner*, 1997 WL 28654, at *3 n.1. A plain reading of *Utilicorp* indicates petitioner's expert accounted for construction interest as part of "Other costs" when determining the reproduction costs of the assets. *Id.*

the evidence, the Court finds Dr. Parsons improperly excluded Interest During Construction when calculating the reproduction costs of the Alta facilities and finds Interest During Construction related to the tangible assets—amounting to $48.1 million—should be included in the cost basis when calculating the Section 1603 cash grant.

### c.    Exclusion Category (3):  Oak Creek Development Fee

Dr. Parsons' third (and final) exclusion from reproduction costs is the Oak Creek Development Fee—amounting to $100.5 million. *See* DX-0783.018 ¶ 35 (Parsons Initial Rpt.). Similar to his reasoning for excluding IDC, Dr. Parsons characterizes the Oak Creek Development Fee as "the share of the development profit that will go to Oak Creek." DX-0783.024 ¶ 51 (Parsons Initial Rpt.); *see also* Gov't's PFFCL ¶¶ 374–77.  As described *supra*, "a developer requires capital return as compensation for its up front development efforts and the risk involved," DX-0783.023 ¶ 46 (Parsons Initial Rpt.), and "developer's profit [is] the risk inherent in constructing a facility that cannot be sold for the price asked by the developer," *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *7.  Plaintiffs argue the Oak Creek Development Fee was "one of the costs Terra-Gen incurred in connection with acquiring the AllCo assets."  Pls.' PFFCL ¶ 456 (citations omitted).  As a result, the Court investigates whether the Oak Creek Development Fee constitutes developer profit, as Dr. Parsons opines, or whether the Fee should be included as a reproduction cost in calculating the fair market value of the Class V assets.

Before analyzing the Oak Creek Development Fee, the Court briefly explains the history of the development and construction of the Alta facilities and the origins of the Oak Creek Development Fee.  "In 2006, Oak Creek partnered with Allco Wind Energy Management Pty. Ltd. ('Allco') to continue development of wind power projects in the Tehachapi region, including what would become the Alta Wind Energy Center.  The joint effort between Allco and Oak Creek was managed through a limited liability company named the Alta Innovative Power Company ('AIPC'), which was jointly owned by Allco and Oak Creek, each of which (through subsidiaries) owned 50% of AIPC."  Stip. of Facts ¶ 5, ECF No. 115.  In effect, Oak Creek transferred its development rights to AIPC, of which it owned half, and AIPC transferred a portion of the development rights to an Allco entity, which owned the remaining half of AIPC. *See* Tr. at 2936:22–2937:2 (Pagano).  "[E]ach Project Company [was obligated] to pay either a lump sum development fee or royalty to AIPC" under the agreement.  JX-0036.001 (Termination, Modification, Exclusivity, Non-interference and Mutual Release Agreement). "The amount of the Development Fee payable to each AIPC Member for each Phase [was] equal to two and one-half percent (2.5%) of the Revenues calculated [using a discount rate of 10%] as the present value of the projected Revenues for such Phase following Commercial Operation." JX-0036.031 (Termination, Modification, Exclusivity, Non-interference and Mutual Release Agreement) (Schedule G, Calculation of Development Fee, Termination, Modification, Exclusivity, Non-interference and Mutual Release Agreement); *see also* Tr. at 2939:9–25 (Pagano).  Allco and Mr. Revock both understood the Fee as a success-based fee for the development of each phase of the Tehachapi Project. *See* JX-0012.014 (Allco Info. Memo.) ("Under the terms of the [Joint Development Agreement], AIPC is entitled to a success based development fee for the development of each phase of the Tehachapi Project."); JX-0078.001 (18 Nov. 2010 Email from J. Cast to G. Revock) ("Not a royalty payment - it was supposed to

have been a success fee for their development of the project. The agreement was originally b/w Oak Creek and Allco when Allco had the no development capabilities. In reality, we chose to take over development from them but were left with their fee still as that does not go away."); Tr. at 3327:4–16 (Revock) (agreeing his understanding aligned with the email description in JX-0078.001 (18 Nov. 2010 Email from J. Cast to G. Revock)).

During their partnership, Oak Creek and Allco made "significant progress" in the development of the Alta facilities, *see* JX-0012.011 (Allco Info. Memo.), notably by entering into turbine supply agreements with turbine suppliers, starting permitting work, applying for wind energy zoning with the county, acquiring transmission queue rights to connect the facilities to the electricity grid, purchasing rights to land in excess of 32,000 acres for the Project, and securing a Master PPA. *See* JX-0012.007 (Allco Info. Memo.); Tr. at 2589:22–2592:18 (Pagano). Then, "[o]n July 15, 2008, Terra-Gen acquired Allco's United States wind energy business, including its interests in what would become the Alta Wind Energy Center . . . [and] Allco's 50 percent interest in AIPC." Stip. of Facts ¶¶ 6–7. This acquisition of Allco's interest in AIPC also meant Terra-Gen inherited the rights and responsibilities concerning the Development Fee. *See, e.g.*, DX-0918 Attachment 1.001 (15 Feb. 2011 Letter from T. Curley to P. Madsen & R. Hoyle) ("Alta Wind III, LLC shall make a Development Fee payment of $20,993,000, 50% of which, $10,496,500, shall be paid to Tehachapi Holdings, LLC [an Oak Creek entity] and the other 50% paid to AllCapital Wind Energy Management, LLC [a Terra-Gen entity]."). In acquiring Allco's interest, Mr. Pagano testified "[i]nitially Oak Creek was going to continue developing the project," but because Terra-Gen "wanted to control [its] destiny" and develop the facilities itself, Oak Creek no longer participated in the development of the facilities. Tr. at 2597:2–19 (Pagano); *see also* Tr. at 2589:1–18 (Pagano) (noting Terra-Gen bought out Oak Creek so Terra-Gen could develop the facilities themselves). Nonetheless, Terra-Gen paid Oak Creek because "[i]t was just part of the transaction costs," which Terra-Gen "viewed . . . as another element of the purchase price essentially." Tr. at 2597:20–2598:2 (Pagano).

This historical context and Mr. Revock's testimony support plaintiffs' characterization of the Oak Creek Development Fee as a fee related to the development and construction of the Alta facilities. Pls.' PFFCL ¶ 456. In acquiring the ability to develop the facilities itself *and* the "significant progress" Allco and Oak Creek conducted in the development of the facilities, Terra-Gen also incurred the responsibility of paying the Development Fee. *See, e.g.*, DX-0918 Attachment 1.001 (15 Feb. 2011 Letter from T. Curley to P. Madsen & R. Hoyle). Stated alternatively, Terra-Gen would not be able to develop the Alta facilities without acquiring all obligations of the original agreement between Allco and Oak Creek (including the Development Rights). *See id.* Mr. Huplosky corroborated Mr. Pagano's statement the Development Fee "was just part of the transaction costs," stating "[i]t was still a fee that was payable, . . . a cost the project had to incur, and it was still all related to the . . . development activities at that point." Tr. at 3386:2–7 (Huplosky). Dr. Parsons did not dispute Terra-Gen bore the Development Fee and agreed "the Oak Creek fee were actual cash amounts that the Alta project companies . . . needed to pay out to Oak Creek." Tr. at 4426:5–8 (Parsons) ("Q. Now, the Oak Creek fee were actual cash amounts that the Alta project companies need to pay[—]needed to pay out to Oak Creek, correct? A. Correct."). Dr. Parsons explained he excluded the Development Fee, however, because "those fees paid to Oak Creek have nothing to do with the

eligible property [and are] a success fee for development of the intangible assets."  Tr. at 5355:10–24 (Parsons).

Although the Development Fee is a unique line item (given it is a cost paid based on successful development of the facilities), Dr. Parsons' testimony the Fee "ha[d] nothing to do with the eligible property" is not persuasive.  *See id.*  The Fee paid to AIPC (co-owned by Terra-Gen and Oak Creek)[41] was contractually-required and directly related to development of the Alta facilities—moreover, Allco's Confidential Memorandum precisely describing the various agreements and rights acquired casts doubt on Dr. Parsons' conclusion the Fee has "nothing to do with" reproduction costs of the eligible assets.  *See generally* JX-0012 (Allco Info. Memo.); *see also* Tr. at 2589:22–2592:18 (Pagano).  When Terra-Gen acquired Allco's interests, it also acquired the "significant progress" the parties made on several agreements—including turbine supply agreements with turbine suppliers, county wind energy zoning applications, permitting applications, and the Master PPA[42]—which allowed Terra-Gen to develop and construct a fully integrated facility ready to generate electricity and produce revenue.  *See id.*  While the rights AIPC ultimately acquired valued on their own may reflect intangible asset value, the costs of acquiring these rights must also be valued and allocated appropriately.  *See Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376–77 (Fed. Cir. 2018).  As further support the Fee is related to reconstruction costs of the eligible assets, plaintiffs cite *Corbin West*—a Tax Court opinion—which found an "'acquisition fee' and 'developer's fee' were incident to [the] acquisition of the property" because the fees accounted for services such as "(1) [a]rranging for an option to acquire the property, (2) evaluating zoning requirements and ensuring compliance, (3) arranging and evaluating an environmental report relating to the property, and (4) establishing guidelines for compliance with the low-income housing tax credits requirements."  *Corbin W. Ltd. v. Commissioner*, T.C. Memo. 1999-7, 1999 WL 13704, *5–6.  Although Tax Court decisions are not binding on the Court, the "significant progress" Allco and Oak Creek made on the development and construction of the facilities by entering into turbine supply, land, PPA contracts and evaluating zoning requirements, *inter alia*,

---

[41] While the government argues Terra-Gen's co-ownership of AIPC suggests the Fee was not a true cost because Terra-Gen was essentially paying itself, *see, e.g.*, Gov't's Resp. to Pls.' PFFCL at 104, Terra-Gen's stake in AIPC does not affect the Court's analysis of calculating the fair market value of the tangible assets.  AIPC is an entity with its own assets and obligations, notwithstanding its ownership structure.  *See, e.g.*, JX-0037.006 (AIPC LLC Agreement) ("The purpose of the Company is to collect and disseminate information and data regarding the Tehachapi/Mojave Project, to assist in the assignment of certain BLM applications, to collect the First Phase Development Fee and apply the proceeds in repayment of the AWEM Note and the Oak Creek Note and to engage in any activities associated with or related to any of the foregoing."), 032 (noting asset distributions to AIPC members, including transfers of applications and one-half of the development fee).  Even if Terra-Gen receives a portion of the fee it pays, it is not improper to include this fee as part of reproduction costs—Terra-Gen, through AIPC, devoted labor to fulfill AIPC development tasks, and any money Terra-Gen pays its own subsidiary to fulfill these tasks simply reflects the monetary value of the real-world costs Terra-Gen had to expend to develop the Alta facilities.  *See id.*; *see also* Tr. at 2589:1–18 (Pagano) (noting Terra-Gen bought out Oak Creek so Terra-Gen could develop the facilities themselves).  In other words, these tasks needed to be completed, whether by Terra-Gen or another entity, and the fact Terra-Gen is paying itself to complete these tasks does not change the fact the tasks reflect a cost in the form of Terra-Gen's own labor.

[42] To be clear, the Court does not find the Master PPA itself is a eligible cost—but, as discussed, *infra*, the KPMG cost segregation reports appropriately allocates the Oak Creek Development Fee into eligible and ineligible assets, and, unlike Development Rights discussed in Section IX.B.2.a, *supra*, there is extensive evidence outlining what exactly the Oak Creek Development Fee comprises.

is akin to the four services in *Corbin West* where the Tax Court found such services must be capitalized and included in the property's basis. *See id.*; JX-0012 (Allco Info. Memo.); Tr. at 2589:22–2592:18 (Pagano); *see also* JX-0126.016 (Treasury Guidance). Moreover, unlike the vague categories of Development Rights discussed in Section IX.B.2.a, *supra*, plaintiffs adduced extensive evidence and testimony to describe the precise assets and rights acquired with the Oak Creek Development Fee. *See, e.g.*, JX-0012 (Allco Info. Memo.); *see also* Tr. at 2589:22– 2592:18 (Pagano).

To the extent the assets and rights acquired with the Oak Creek Development Fee must be allocated to eligible assets and ineligible assets, Mr. Huplosky testified KPMG did exactly that—the Development Fee was allocated to both eligible and ineligible property, and Dr. Parsons does not contest these allocations. *See* Tr. at 3385:4–20 (Huplosky). According to Mr. Huplosky, the Fee was an indirect cost that "had to do with the construction of the project," where Oak Creek "assisted with [early permitting work]." Tr. at 3385:12–3386:1 (Huplosky). Mr. Huplosky discussed his treatment of the Development Fee with KPMG, in addition to "[giving them] the contract, [an explanation of] the work that [Oak Creek] did, and when they stopped working[;] [KPMG was] given everything." Tr. at 3386:8–15 (Huplosky). Based on all the provided information, KPMG agreed the Oak Creek fee should be capitalized, and KPMG allocated the Fee across both eligible and ineligible property because "[Oak Creek's] work, similar to the permits, . . . was related to their construction of the entire project." Tr. at 3386:16–3387:1 (Huplosky); *see also* JX-0098.18 (Alta I KPMG Rpt.) (noting 96.2% allocation for the "Oak Creek Development Fee"); JX-0093.20 (Alta II KPMG Rpt.) (noting 96.7% allocation for the "Oak Creek Development Fee"); JX-0124.016 (Alta III KPMG Rpt.) (noting 97.12% allocation for the "Oak Creek Fee"); JX-0139.018 (Alta IV KPMG Rpt.) (noting 95.8% allocation for the "Oak Creek Development Fee"); JX-0151.017 (Alta V KPMG Rpt.) (noting 96.54% allocation for the "Oak Creek Development Fee"); JX-0185.016 (Alta VI KPMG Rpt.) (noting 96.9% allocation for the "Oak Creek Fee"). Dr. Parsons did not provide any basis to dispute Mr. Huplosky's process, KPMG's agreement with Mr. Huplosky, or the percentages of the Fee allocated to eligible property.

Finally, Dr. Parsons' characterization of the Oak Creek Development Fee as developer profits—akin to his characterization of IDC—also is not persuasive. Deconstructing the term "developer profits" into its constituent parts, developer profits must be a *profit* to a *developer*—that is, the capital a developer gained in excess of its costs. As Dr. Parsons himself opined in his initial report, "*[i]n addition to its out-of-pocket costs incurred over the course of project*, a developer requires a capital return as compensation for its up front development efforts and the risk involved." DX-0783.023 ¶ 46 (Parsons Initial Rpt.). The testimony is clear: "[The] [F]ee that was payable, . . . was still a cost that the project had to incur." Tr. at 3386:2–7 (Huplosky). Dr. Parsons did not dispute Terra-Gen bore the Development Fee: "the Oak Creek fee were actual cash amounts that the Alta project companies . . . needed to pay out to Oak Creek." Tr. at 4426:5–8 (Parsons) ("Q. Now, the Oak Creek fee were actual cash amounts that the Alta project companies need to pay -- needed to pay out to Oak Creek, correct? A. Correct."). Based on Dr. Parsons' own opinion in his Initial Report, and given the Development Fee was an out-of-pocket cost incurred over the course of the project, the Fee does not constitute developer profits.

- 85 -

In summary, considering (1) the Fee is a cost related to the development and construction of the Alta facilities; (2) KPMG allocated the Fee across eligible and ineligible assets; and (3) the fee does not comprise developer profits as characterized by Dr. Parsons, the Court finds Dr. Parsons' testimony to exclude the Development Fee unpersuasive. Accordingly, after weighing the evidence, the Court finds the Oak Creek Development fee—amounting to $100.5 million—should be included in calculating the fair market value of the Class V assets.

### 3. Step (3): Whether the Government's Rate of Return Should Include an Independent Turn-key Premium and Whether It Properly Accounts for Developer Profits

The last step in Dr. Parsons' cost approach involves applying a rate of return on the cost of capital to calculate developer profits. After removing portions of Development Rights (on the basis these reflect intangible asset costs) and then excluding Interest During Construction and the Oak Creek Development Fee (on the basis these constitute developer profits), Dr. Parsons applied a nine percent capital return to calculate developer profits. *See* DX-0783.023–025 ¶¶ 47–55 (Parsons Initial Rpt.). Dr. Parsons did not apply an independent turn-key premium because he argues some line items on the KPMG cost segregation reports already reflect Terra-Gen's costs to acquire turn-key facilities. *See* DX-0783.023–024 ¶¶ 46, 49–51 (Parsons Initial Rpt.). In response, plaintiffs contend "Dr. Parsons' cost-approach valuation is deficient because it fails to include a turn-key premium at all and includes a developer profit that is woefully inadequate to compensate for developer risk." *See* Pls.' PFFCL ¶ 467.

To arrive at fair market value for the Class V assets under Section 1060, a cost approach valuation must reflect both developer profits and turn-key value. *See* PX-1109.037 (Mark L. Zyla, *Fair Value Measurement Practical Guidance and Implementation* 195 (2d ed. 2012)) ("The cost method provides a reasonable indication of value when all cost components are considered (materials, labor, overhead, developer's profit, and opportunity cost) and when cost is reduced for all forms of obsolescence . . . ."); *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *7 (explaining the difference between turnkey and developer profits) ("The turnkey risk is the risk inherent in promising a working facility. The developer's profit represents the risk inherent in constructing a facility that cannot be sold for the price asked by the developer. Insofar as the turnkey fee and the developer's profit address different components of reproduction cost, we see no logical reason why they cannot coexist."); *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1376–77 (Fed. Cir. 2018) ("In applying the § 1060 residual method, the Claims Court must distinguish between turn-key value and goodwill and other intangibles."). Both parties' experts agree developer profits must reflect a return sufficient to compensate a developer for putting capital at risk to develop a project. *See* Tr. at 4417:21–25 (Parsons) ("Q. Now, the developer profit that you talked about in your direct testimony needs to be sufficient to compensate a developer for putting capital at risk to develop a project, correct? A. Yes."), 4002:23–4003:2 (Osborn) ("[Y]ou have to provide a mark-up over those costs that is going to provide sufficient incentive for the developer to actually bear the risks and go through the process of actually constructing that asset."). Given plaintiffs dispute both Dr. Parsons' refusal to apply an independent turn-key premium and Dr. Parson's application of a rate of return to calculate developer profits, the Court first investigates whether Dr. Parsons

should have applied an independent turn-key premium and then assesses whether Dr. Parsons' nine percent rate of capital return properly accounts for developer profits.

### a.    Whether Dr. Parsons Should Have Applied an Independent Turn-key Premium

Dr. Parsons did not apply an independent turn-key premium but instead argued the balance of plant and turbine supply agreement costs reflect turn-key because "at the end of the performance of the balance of plant contract and the turbine supply agreement, the company, Terra-Gen, had received . . . a full turnkey plant, and so . . . [the] cost estimate of the fair market value includes turnkey, which . . . is consistent with the Federal Circuit opinion." Tr. at 4271:11–17 (Parsons). Relying on the Tax Court's opinion in *Utilicorp*, plaintiffs argue Dr. Parsons' approach to turn-key is wrong because Terra-Gen bore turn-key risks in developing the Alta facilities beyond costs reflected in the KPMG cost segregation reports, so plaintiffs are "entitled to a turnkey premium over its out-of-pocket costs if the cost approach is applied." Pls.' PFFCL ¶¶ 468–70.

Turn-key value, according to the Federal Circuit's remand instructions, is "the incremental value 'a buyer would pay for such an assurance the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.'" *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365, 1377 (Fed. Cir. 2018) (quoting *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974) (cleaned up)). The Tax Court in *Utilicorp* found a turn-key premium should be added to a party's cost basis when the party "bore the ultimate risk that the facility would not function when completed." *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *6. The Federal Circuit in *Hawaiian Independent Refinery Inc.* clarified, however, the contractor who is tasked with bringing a project to turn-key status—not the developer who pays for such services—assumes all risk when the developer enters into turn-key contracts. *Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063, 1065 n.4 (Fed. Cir. 1983) ("A turn-key job is defined as 'a job or contract in which the contractor agrees to complete the work of building and installation to the point of readiness for operation or occupancy.' Up to that point, the *contractor* assumes all risks." (emphasis added) (citations omitted)).

*Hawaiian Independent Refinery* undermines Mr. Pagano's trial testimony regarding the supposed turn-key risks Terra-Gen bore. At trial, Mr. Pagano testified Terra-Gen: (1) "bore the risk of delay or nonperformance by one contractor causing a delay or nonperformance by another contractor;" (2) was limited in recovering damages due to the "absolute cap on what damages Terra-Gen could claim from [the Balance of Plant contractor,] Blattner[,] for delays;" and (3) was exposed to a *force majeure* provision in the case of a "labor strike or high wind that stops construction which often is the case on construction projects or wind projects." Tr. at 2609:17–2610:8, 2618:14–22 (Pagano). Mr. Pagano nonetheless acknowledged Terra-Gen contracted out "balance of plant" work resembling a turn-key contract: "[T]he description for what ultimately needs to be delivered in a [balance of plant] contract . . . is similar to what needs to be delivered in a *turnkey* contract, in that [Terra-Gen is] contracting for [contractors] to build [a] facility and deliver it to [Terra-Gen] as a completed facility." Tr. at 5123:19–5124:4 (Pagano) (emphasis added). The inquiry thus becomes, as Mr. Pagano correctly identified at

- 87 -

trial:  whether Terra-Gen's contracts reflect turn-key contracts, wherein the contractor assumes turn-key risks.  *See* Tr. at 5126:16–20 (Pagano) ("So then the question becomes, who takes all those risks?  The fingerpointing risk, the liquidated damage shortfall, you know, the force majeure issues, and if at the end of the day it's with Terra-Gen, we're the turnkey contractor.").

Based on Terra-Gen's contracts with its contractors and *Hawaiian Independent Refinery*, the short answer to Mr. Pagano's question is:  the contractors, not Terra-Gen, bore the turn-key risk.  For the Alta II–VI facilities, Terra-Gen selected D.H. Blattner for development "based on the following criteria:  Substantial experience and industry-leading wind EPC provider:  (i) installed over 10,000MW of a 35,000MW installed US base and (ii) installed seven wind mega-projects between 320MW and 781MW[;] Lowest price[;] Responsiveness and conformity to contract terms[; and] Financial strength, bonding, and reputation with lenders."  DX-0912.003 (8 Feb. 2010 Terra-Gen Board Meeting Slides); DX-0253.009 (Alta Wind Holdings Conf. Offering Memo.) (discussing Alta II–V); DX-0562.011 (Alta VI Conf. Info. Memo.).  After selecting Blattner, Terra-Gen entered into a balance of plant agreement ("BOP") with Blattner.  *See, e.g.*, JX-0719 (Alta II Blattner BOP).  The Blattner contracts "include liquidated damages for late completion, 10% retention and are supported by performance bonds equal to 100% of the contract price," and the liquidated damages, "if appropriately applied, are on the higher end of the industry standard."  DX-0253.009, 040 (Alta Wind Holdings Conf. Offering Memo.).  Mr. Pagano's claim Terra-Gen bore the risk for delays is therefore undermined by Terra-Gen's statement in its own Offering Confidential Memorandum—the Blattner Contract not only afforded Terra-Gen liquidated damages for delays but also afforded Terra-Gen liquidated damages "on the higher end of the industry standard."  *See id.*

The Blattner contract further required Blattner, not Terra-Gen, to "manage, supervise, inspect and furnish or caused to be furnished all materials, equipment, machinery, tools, [l]abor, transportation, temporary structures, temporary utilities, administration and other services and items required to complete and deliver to [Terra-Gen] *the fully integrated and operational Project*."  JX-0719.023 (Alta II Blattner BOP).  The contract defined "Project" as "the integrated wind-powered electric generating facility . . . consisting of all structures . . . and other property comprising and integrating the entire facility."  JX-0719.015 (Alta II Blattner BOP).  In addition to delivering a fully integrated and operational project, the Blattner Contract provided a Warranty "for a period of twenty-four (24) months after the [completion of the Project]."  JX-0719.068 (Alta II Blattner BOP, Sec. 7.1.2); *see also* DX-0562.011 (Alta VI Conf. Info. Memo.).  The warranty stated:  "If [Blattner's] Work is found to contain Defects, or [Blattner] is otherwise in breach of any Warranty set forth in this Section 7.1, [Blattner] shall at its sole cost and expense (including the cost of Labor and equipment), promptly correct, repair, replace such Defect or otherwise cure such breach as promptly as practicable upon being given prompt written notice thereof with materials of new and good quality, or re-perform all such defective components of the Work."  JX-0719.068 (Alta II Blattner BOP, Sec. 7.1.3); *see also* DX-0562.011 (Alta VI Conf. Info. Memo.) ("If Blattner fails to perform warranty service within two days of receiving notice of a defect or it delays in completing warranty service, the Project may correct the defect and Blattner will be responsible for the associated costs.").  Mr. Pagano's testimony Terra-Gen bore turn-key risks is unpersuasive considering the Blattner Contract obligated *Blattner* to:  (1) deliver a fully integrated and operational—*i.e.*, turn-key—facility; (2)

- 88 -

provide liquidated damages for late completion; and (3) guarantee a facility without defects through the 24-month warranty.

Finally, Mr. Pagano's testimony regarding Terra-Gen being exposed to *force majeure* provisions due to wind damage and labor strikes suffers from similar defects.  The Blattner Contract unambiguously states:  "*Contractor* hereby assumes all risk with respect to excessive winds at the Project Site during the performance of the Work and shall not be entitled to a Scope Change Order with respect to any such excessive winds (unless such winds *otherwise* constitute a Force Majeure Event)."  JX-0719.028 (Alta II Blattner BOP, Sec. 2.6.3).  While the Blattner contract contemplates relief from a Milestone date due to a "Force Majeure Event"[43] for some category of winds beyond those typically risking performance, Blattner explicitly takes on the risk of "excessive winds" posing a risk to performance, *see* JX-0719.028 (Alta II Blattner BOP, Sec. 2.6.3), which contradicts Mr. Pagano's testimony Terra-Gen bore the risk of "high wind that stops construction which often is the case on construction projects or wind projects."  *See* Tr. at 2609:17–2610:8 (Pagano).  Moreover, the Blattner Contract states "[t]he definition of 'Force Majeure Event' shall not include . . . strikes and other Labor disputes (except as explicitly provided above)," although the definition does include "area-wide or regional strikes and other area-wide or regional Labor disputes (including collective bargaining disputes and lockouts) involving Contractor or Subcontractors and not directed exclusively at Contractor and/or such Subcontractor."  JX-0719.008–009 (Alta II Blattner BOP).  Later in the Blattner Contract under the section labeled "Labor Disputes," however, the Contract requires Blattner to "use reasonable efforts to minimize the risk of Labor-related delays or disruption of the progress of the Work," and to "promptly take any and all reasonable steps that may be available in connection with the resolution of violations of collective bargaining agreements or Labor jurisdictional disputes."  JX-0719.039 (Alta II Blattner BOP, Sec. 2.18.6).  Although Blattner does not assume every conceivable labor-related risk, Blattner does take on significant responsibilities to minimize work-stoppage risk—further undermining Mr. Pagano's testimony Terra-Gen alone bore the risk of "a labor strike."  *See* Tr. at 2609:17–2610:8 (Pagano).

While Terra-Gen only contracted with Blattner for Alta II–VI, for Alta I, Terra-Gen entered into a balance of plant agreement with Wind Energy Consultants ("WEC"), which contained provisions similar to the Blattner Contracts.  *See generally* DX-0952 (Alta I WEC BOP).  Specifically, the WEC BOP required WEC to, *inter alia*, "deliver to [Terra-Gen] the fully integrated and operational Project," "design, engineer, procure, assemble, install, construct and start-up the Balance of Plant," and "conduct testing of the Balance of Plant," with the definition of "Project" as "the integrated wind-powered electric generating facility with a maximum, nameplate capacity of up to one hundred fifty (150) MW to be located on the Project Site, and consisting of all structures, facilities, appliances, lines, conductors, instruments, equipment, apparatus, components, roads and other property comprising and integrating the entire facility

---

[43] Even in the event of a "Force Majeure Event," Blattner was still obligated to "exercise all commercially reasonable efforts to alleviate and mitigate the cause and effect of such Force Majeure Event, remedy its inability to perform, . . . limit damages to" Terra-Gen, and, in any event, "submit a request for a Scope Change," *inter alia*.  *See* JX-0719.072 (Alta II Blattner BOP, Sec. 2.6.3).  Force Majeure Events relevant to high winds included:  tornado, hurricane, or "other acts of God including extreme weather conditions (according to the records of the National Oceanic and Atmospheric Administration over the past twenty-five (25) years for the vicinity of the Project site)," *inter alia*.  *See* JX-0719.008–009 (Alta II Blattner BOP).

described generally in the Technical Specifications." *See* DX-0952.015, 023 (Alta I WEC BOP). Under the WEC contract, WEC was "responsible for overall Project construction management, all civil and electrical infrastructure design, and the coordination and general management of the Work," *see* DX-0952.023 (Alta I WEC BOP, Sec. 2.2.1), and incurred the same risks as the Blattner Contract related to *force majeure*, warranties, and liquidated damages. *Compare* DX-0952.009, 040–041, 070–073 (Alta I WEC BOP) *with* JX-0719.028, 039, 068 (Alta II Blattner BOP). In short, for all relevant Alta facilities, the Court finds Dr. Parsons' testimony more persuasive than Mr. Pagano's testimony because Terra-Gen did not bear the turn-key risk—rather the contractors Terra-Gen paid (*i.e.*, Blattner and WEC) contractually bore the risk "to complete the work of building and installation to the point of readiness for operation." *Hawaiian Indep. Refinery*, 697 F.2d at 1065 n.4.

In addition to the balance of plant contracts, Dr. Parsons also states the costs paid to the turbine suppliers (to supply, assemble, test, commission, and start up the turbines) constitute turn-key. For Alta II–VI, Terra-Gen procured Vestas turbines. *See* DX-0253.181 (Alta Wind Holdings Conf. Offering Memo.), DX-0562.013 (Alta VI Conf. Info. Memo.). The Vestas Contracts required Vestas to "sell, procure, supply, Deliver to the Delivery Point, test, start-up and Commission the Turbine Equipment." JX-0720.037 (Vestas Turbine Supply Agreement, Sec. 3.1.1). Similarly, for Alta I, Terra-Gen procured General Electric ("GE") turbines, and the GE Contract included as part of the "Project Support Services . . . Startup and Commissioning of Turbines, WindSCADA, and WindCONTROL, SCADA Completion." JX-0008.012 (Alta I GE Turbine Supply Agreement) (generally describing WindSCADA as a user interface for monitoring and controlling wind park operations with the ability to connect directly to each turbine and store operational data). Under the Vestas Contracts and GE Contract, Terra-Gen received turbines which were commissioned[44] and started up. DX-0253.182 (Alta Wind Holdings Conf. Offering Memo.); DX-0562.013, 016, 027 (Alta VI Conf. Info. Memo.); JX-0008.012 (Alta I GE Turbine Supply Agreement). In view of the turbine supplier obligations, and given the Blattner and WEC Contracts required the contractors to "unload, inspect, assemble, erect and install the Turbine Equipment," Terra-Gen paid for and received a fully operational and integrated—*i.e.*, turn-key—facility with turbine equipment installed, commissioned, and started up. *See, e.g.*, JX-0719.023 (Alta II Blattner BOP); DX-0952.023 (Alta I WEC BOP); DX-0253.181 (Alta Wind Holdings Conf. Offering Memo.); DX-0562.013 (Alta VI Conf. Info. Memo.); JX-0008.012 (Alta I GE Turbine Supply Agreement); JX-0720.037 (Vestas Turbine Supply Agreement). Thus, as Dr. Parsons opined, the KPMG line items reflecting costs for balance of plant agreements and turbine supply agreements accounted for turn-key risk and reflected the cost of a turn-key premium. Accordingly, given the KPMG line items included payments for receiving a turn-key property, Dr. Parsons was correct in not applying an independent turn-key premium to the total cost basis as provided in KPMG's cost segregation reports.

Even if Dr. Parsons' cost approach failed to include a proper turn-key premium, plaintiffs' proposed fifteen percent turn-key premium on top of their out-of-pocket costs is unsupported by the evidence. Plaintiffs rely on the DAI appraisal reports, which concluded,

---

[44] According to the Vestas Commissioning Checklist, "[t]he start-up procedure is a final check of the assembled turbine which must be carried out before it is put into operation. The procedure covers commissioning with functional test and adjustment/calibration of the turbine." DX-0954.004 (Vestas Commissioning Checklist).

based on other projects in the wind energy industry, "a turnkey premium in the range of 10-15% . . . was appropriate for Altas II-V," and for the Alta VI facility, "DAI was more precise, concluding, based on its knowledge of other renewable-energy transactions in California and elsewhere, that a reasonable turnkey premium was 15%." Pls.' PFFCL ¶ 486 (citing JX-0047.021 (Alta II DAI Appraisal); JX-0062.021 (Alta III DAI Appraisal); JX-0060.021 (Alta IV DAI Appraisal); JX-0050.021 (Alta V DAI Appraisal); JX-0183.016-019 (Alta VI DAI Appraisal). In actuality, DAI substantially relies on the fact-specific turn-key premium in *Utilicorp* and "seven transactions involving new wind farms for which DAI had confidential original cost data from 2008-2010." JX-0112.025 n.1–2 (Alta I DAI Appraisal) (citing *Utilicorp v. Commissioner*, 1997 WL 28654). DAI's reliance on these sources is misplaced for three primary reasons. *First*, DAI admits "none of these transactions [it used to arrive at its turn-key premium] were directly comparable to the [Alta facilities]" and *Utilicorp* "involved a hydroelectric plant, not a wind farm." JX-0112.025, 025 n.2 (Alta I DAI Appraisal). While acknowledging "[t]urn-key premiums vary based on the complexity of the technology, difficulty of construction, and permitting challenges," DAI concluded based on its "experience, turn-key premiums for wind projects *normally* range from 10% to 15%." JX-0112.025 (Alta I DAI Appraisal) (emphasis added). *Second* (and relatedly), plaintiffs did not tender any witness (fact or expert) to testify to the credibility, reliability, or processes used by DAI in arriving at its turn-key premium percentage. The Court, consequently, lacks any means to assess the strength of the DAI appraisal, provide weight accordingly, and find a turn-key premium suitable for *this case*. *Third*, every case plaintiffs cited to support a fifteen percent turn-key premium—*Utilicorp*, *Forward Communications*, and *Miami Valley*—made a factual finding based on the record evidence in each respective case as to the proper turn-key premium. *See Utilicorp v. Commissioner*, 1997 WL 28654, at *7 (relying on expert witness's conclusion specific to the facility in question based on consultation with employees of company entering turnkey contracts for hydroelectric power facilities but discounting competing expert's experience with three contracts in the petrochemical industry); *Miami Valley*, 499 F.2d at 681 (affirming trial court's determination of a turn-key premium based on the record evidence); *Alta Wind I*, 897 F.3d at 1377 ("In applying the § 1060 residual method, the Claims Court must distinguish between turn-key value and goodwill and other intangibles. On remand, the Claims Court will have to make a *factual determination* as to the allocation of purchase price."); *see also Forward Comms. Corp. v. United States*, 221 Ct. Cl. 582, 633–34 (1979). Specifically, in *Forward Communications*, the Court of Claims made clear "the 24 percent approved [in *Miami Valley*] was not a legal standard but only a partial acceptance of the testimony of a single expert witness on the facts in that case." *Forward Comms.*, 221 Ct. Cl. at 633; Tr. at 5604:22–5605:1 (Closing Arguments) ("[THE GOVERNMENT:]  the same Court of Claims says later in *Forward Communications* that you shouldn't be taking the percentage used in *Miami Valley* as a matter of law precedential, it's not. It was confined to the facts of that case."), 5606:6–8 (Closing Arguments) ("[PLAINTIFFS:]  you certainly shouldn't look at *Forward Communications*, where you were dealing with a small construction project for a small newspaper."). Indeed, the Court in *Forward Communications* opted for a lower turn-key premium applied to asset book values instead of a higher turn-key premium based on fact-specific caselaw and disregarding book values. *See* Section VIII.A.3, *supra* (*Forward Comms.* case summary).

The Court here, as instructed by the Federal Circuit's Remand Opinion, must make a factual determination of turn-key (which hinges on the technology and development of each

facility, rather than the marketplace's viewpoint of the same).  Accordingly, after weighing the evidence, the Court finds the government's reliance on actual turn-key costs reflected in the KPMG cost segregation reports more persuasive than plaintiffs' appeal to general turn-key percentages used in inapposite contexts and applied to costs already comprising turn-key value.  *See Forward Comms.*, 221 Ct. Cl. at 634.

### b.    Whether Dr. Parsons' Rate of Capital Return Properly Accounts for Developer Profits

The Court next evaluates Dr. Parsons' rate of capital return proposed to calculate developer profits.  First the Court briefly reviews what "developer profits" must capture.  Second, the Court assesses Dr. Parsons' calculations for the rate of capital return.  Third, the Court assesses plaintiffs' proposal for developer profits.

Developer profits, as discussed *supra*, account for the risk inherent in constructing the Alta facilities, *Utilicorp United, Inc. v. Commissioner*, T.C. Memo. 1997-47, 1997 WL 28654, at *7, compensate the developer "for its up front developer efforts and risk involved," DX-0783.023 ¶ 46 (Parsons Initial Rpt.), and provide a "sufficient incentive for the developer to actually bear the risks and go through the process of actually constructing the asset," Tr. at 4002:23–4003:2 (Osborn).  *See also* Tr. at 4417:21–25 (Parsons).  To be clear, developer profits are returns to the *developer* incurring costs and calculating basis through those costs—developer profits do not comprise returns for all entities providing capital for development, such as, for example, a turbine supplier's profit margins on the turbines it sells to a developer.  *See* Section IX.B.2.b, *supra*.  Nearly synonymous with developer profits is the economic term of art, "entrepreneurial profits," which is "an incentive for the seller to be in business."  PX-1109.018 (Mark L. Zyla, *Fair Value Measurement Practical Guidance and Implementation* 176 (2d ed. 2012)); *see also* Pls.' PFFCL ¶ 478.  Moreover, developer profits are different from turn-key: while turn-key addresses the "risk inherent in promising a *working* facility" (*i.e.*, the costs incurred to guarantee a fully-functioning facility), developer profits reflect the risks inherent in developing the facility generally—that is, the returns a developer expects for developing and constructing the facility, based on market conditions.  *See Utilicorp v. Commissioner*, 1997 WL 28654, at *7 (emphasis added).  The DAI Appraisals corroborate this difference:  "Turn-key premiums vary based on the complexity of the technology, difficulty of construction, and permitting challenges," whereas "[d]eveloper or entrepreneurial profit in wind projects is influenced by many *market* factors."  JX-0112.025 (Alta I DAI Appraisal); *but see id.* (noting, in addition to several broader market trends influencing developer profit, "other project specific characteristics" may also be relevant).  This means, while turn-key value reflects the contracts and risks borne by Terra-Gen to ensure the Alta facilities function, developer profits correspond to the return a developer in the market (like Terra-Gen) would reasonably expect to receive by building the Alta facilities.  Accordingly, for a proper showing of a developer profit (*i.e.*, sufficient incentive for Terra-Gen to bear the risks to construct the Alta facilities), Dr. Parsons' developer profit calculations should reflect the market returns a reasonable developer would expect to receive when expending capital to construct the Alta facilities.

Dr. Parsons's rate of return is a discount rate for projected revenues—which is not a figure widely used to determine a developer's return on costs or to derive developer profits.  Dr.

Parsons "calculate[d] developer profit as a capital rate of return on money that's been invested," Tr. at 4255:1–9 (Parsons), using the Capital Asset Pricing Model ("CAPM"), DX-0783.042–043, Ex. 9 (Parsons Initial Rpt.)—a model similar to Dr. Osborn's weighted average cost of capital ("WACC") used to calculate the discount rate for plaintiffs' income approach, *see* Tr. at 3933:15–3935:1 (Osborn). CAPM, according to Dr. Parsons, is "a workhorse model in finance for calculating rates of return, *also for discount rates*." Tr. at 4255:5–4255:7 (Parsons) (emphasis added). Dr. Osborn, however, deems CAPM inappropriate for use as a rate of return, because, in his view, it is more appropriately used as a discount rate. Tr. at 5163:8–5164:10 (Osborn). As Dr. Osborn asserts, his WACC to calculate a discount rate is similar to Dr. Parsons' CAPM, *see id.*, in that WACC "is based on the cost of equity, i.e., the return demanded by an equity investor based on the riskiness of the *projected cash flows*," PX-0910.005 ¶ 8 (Blaydon/Osborn Corr. Supp. Rpt.) (emphasis added). In fact, Dr. Parsons himself testified "in many ways [Dr. Parsons did] another version of what Dr. Osborn did when he calculated a weighted average cost of capital," meaning Dr. Parsons calculated a value akin to a discount rate. *See* Tr. at 4255:5–9 (Parsons). Dr. Osborn criticized[45] the use of CAPM to calculate developer profits as he is "personally not aware of any" precedent "for using a discount rate to determine the appropriate developer profit." *See* Tr. at 5164:4–10 (Osborn). Indeed, at trial, Dr. Parsons contradicted his prior deposition testimony regarding the industry's use of CAPM for developer profits. When asked at trial whether he had "ever seen" anyone use the capital asset pricing model to derive an appropriate developer profit for purposes of applying a cost approach in valuation methodology, Dr. Parsons testified he "certainly" had, but, in his 2024 deposition, Dr. Parsons testified "nothing comes to mind" when asked the same question. *See* Tr. at 4450:3–4451:10 (Parsons).

Considering WACC and CAPM are similar models, *see* Tr. at 4255:5–9 (Parsons), the Tax Court's assessment of the use of WACC to calculate entrepreneurial profits in *Utilicorp* is instructive for evaluating Dr. Parsons' use of CAPM. There, the Tax Court characterized the expert witness's "calculation of entrepreneurial profit [a]s idiosyncratic" because he "considered a 13-percent allowance for entrepreneurial profit reasonable because it represented the weighted-average cost of capital of [plaintiff] at the time of the sale-leaseback transaction." *Utilicorp v. Commissioner*, 1997 WL 28654, at *8. The Tax Court found "[i]n neither his written report nor his oral testimony did [the expert witness] state that he performed any market analysis or interviewed any developers to determine the expectations of profit required to undertake a project such as the hydroelectric facility." *Id.* The same is true for Dr. Parsons—he applied a CAPM (analogous to the WACC in *Utilicorp*) without any market analysis specific to the eligible assets. *See* DX-0783.042–043, Ex. 9 (Parsons Initial Rpt.); *see also* Tr. at 5169:19–23 (Osborn) ("And so one basic flaw with [how Dr. Parsons calculates developer profits using the enterprise method] is he is using his own estimate using his 9 percent capital return, and he's ignoring actual information about economic costs that he says Terra-Gen paid to other providers of capital into the project."). Considering Dr. Parsons concedes he is unaware of the use of CAPM elsewhere to calculate developer profits and considering Dr. Parsons does not

---

[45] Dr. Osborn also takes issue with Dr. Parsons' developer profits because "it in fact results in a negative developer return on that property because he excludes from his calculations two categories of costs – interest paid to lenders during the construction of the projects and the so-called "Oak Creek fee." PX-1110.016 ¶ 50 (Osborn Corr. Sur-Rebuttal Rpt.). As discussed at length in Sections VIII.B.2.b–c, *supra*, the Court agrees with Dr. Osborn IDC and the Oak Creek Development Fee are properly viewed as components of cost basis.

otherwise substantiate this idiosyncratic methodology with reference to market norms, the Court finds Dr. Parsons' use of CAPM to calculate developer profits for the Alta facilities unpersuasive.[46]

Although Dr. Parsons did not perform a market analysis or consult other developers, DAI—one of Terra-Gen's appraisals—did. While the Court did not find DAI's Appraisals persuasive when assessing turn-key value, *see* Section IX.B.3.a, *supra*, the Appraisals evaluating "seven transactions involving new wind farms for which DAI had confidential original cost data from 2008-2010," JX-0112.025 n.2 (Alta I DAI Appraisal), sufficiently capture the market's overall treatment of developer profit—especially considering developer profits correspond with market returns of similarly situated facilities while turn-key value corresponds to the specific functioning of the facilities-at-hand, *see* Section IX.B.3.a, *supra*. Mr. Revock's testimony further supports using DAI's developer profit values. He testified he reviewed DAI's reports for

---

[46] The Court finds unpersuasive Dr. Parsons' determination of developer profits, not only because his use of CAPM is an idiosyncratic and unsubstantiated estimate of developer profits, but also because Dr. Parsons' application of CAPM itself lacks sufficient substantiation in market practice. *See* DX-0783.025 ¶ 53 (Parsons Initial Rpt.), 042, Ex. 9 (Parsons Initial Rpt.). The formula for CAPM is $R = R_f + \beta R_m$, where $R_f$ is "the return on a risk-free asset," $\beta$ is the "relative risk of the development business," and $R_m$ is the "market risk premium." DX-0783.042, Ex. 9 (Parsons Initial Rpt.). The combination of $\beta R_m$ is the "total risk premium on the development business" which is added to the return on a risk-free asset. DX-0783.042, Ex. 9 (Parsons Initial Rpt.). First, Dr. Parsons started off with base riskless value—*i.e.*, the $R_f$ value—using the "yield on a 5-year Treasury note which in 2008 was 2.58%." DX-0783.042, Ex. 9 (Parsons Initial Rpt.) (citing "Federal Reserve Statistical Release H.15 Selected Interest Rates March 31 2008"). Then, Dr. Parsons determined "the premium [that needs to be] add[ed] on top of that for the risk of doing this kind of work"—*i.e.*, the $\beta$ value: using a "standard . . . information service for reporting betas of different industries . . . from [the] Ibbotson company," Dr. Parsons utilized the average relative risk associated with companies in the heavy construction industry, which "Ibbotson reports to be 1.29." DX-0783.042, Ex. 9 (Parsons Initial Rpt.) (citing "Ibbotson Cost of Capital 2008 Yearbook, SIC Code 162"); Tr. at 4255:18–4256:8 (Parsons). Most significantly, for the market risk premium—*i.e.*, the $R_m$ value—Dr. Parsons appropriately starts with Ibbotson's historical risk premium based "on a well diversified portfolio of stocks, like the S&P500 or a global portfolio like the MSCI Index," which in 2007 was 7.1%. DX-0783.042, Ex. 9 (Parsons Initial Rpt.) (citing "Ibbotson SBBI 2008 Valuation Yearbook Market Results for Stocks Bonds Bills and Inflation 1926-2007 Key Variables in Estimating the Cost of Capital located inside back cover of book"). Then, however, Dr. Parsons reduced this 7.1% value to "a market risk premium of 5 percent above th[e] Treasury rate" because "a number of academic studies have demonstrated that the historical premium is biased estimate of the going forward risk premium, by about 2-3 percentage points." DX-0783.042, Ex. 9 (Parsons Initial Rpt.); Tr. at 4256:9–11 (Parsons). To support this reduction, Dr. Parsons cites his own presentation from May 2006 titled "The Equity Risk Premium and the Cost of Capital." DX-0783.042, Ex. 9 n.3 (Parsons Initial Rpt.). After implementing the variables into the CAPM formula, Dr. Parsons concludes with a developer profit percentage of nine percent, and applies this nine percent rate "to the schedule of costs" at the time each capital expenditure was incurred. *See* DX-0783.025 ¶¶ 53–55 (Parsons Initial Rpt.).

While Dr. Parsons' Initial Report is properly in evidence, *none* of the sources Dr. Parsons relied on in Exhibit 9 to his Initial Report were entered into evidence. Critically, the presentation Dr. Parsons relied on to reduce the risk premium by 2–3 percentage points (which was authored by himself in 2006) is not in evidence, nor is the link Dr. Parsons included in his report accessible. *See* DX-0783.042, Ex. 9 n.3 (Parsons Initial Rpt.). Without any support in evidence for his proposition "a number of academic studies have demonstrated that the historical premium is biased estimate of the going forward risk premium, by about 2-3 percentage points," the Court struggles to assess whether this reduction was proper. At trial, Dr. Parsons did not clarify the bases to support this reduction either (which would have helped the Court appreciate the reasoning for his reduction): instead he simply testified "I used a market risk premium of 5 percent above that Treasury rate." Tr. at 4256:9–11 (Parsons). The dearth of supporting record evidence and CAPM being unsuitable for calculating developer profits in this case results in the Court finding Dr. Parsons' calculation of developer profits lacks credibility.

- 94 -

Alta II–V and Citibank "felt that [DAI's appraisers] were consistent with [Citibank's] estimate of fair market value." *See* Tr. at 3248:22–3251:1 (Revock). DAI found a developer profit in the range of 15–30% was appropriate for Alta II-V, *see* JX-0047.021 (Alta II DAI Appraisal), JX-0062.021 (Alta III DAI Appraisal), JX-0060.021 (Alta IV DAI Appraisal), JX-0050.021 (Alta V DAI Appraisal), 20% was appropriate for Alta VI, *see* JX-0183.016–019 (Alta VI DAI Appraisal), and a range of 10–15% was appropriate for the Alta I facility, *see* JX-0112.026 (Alta I DAI Appraisal). Generally, "[i]n DAI's experience, given the lengthy and high-risk nature of developing energy projects in California combined with the lucrative market for renewable energy projects in California, typical developer profit for California wind projects range from 15% to 30% of the actual project construction cost." JX-0112.025 (Alta I DAI Appraisal).

Accordingly, given Dr. Parsons' CAPM model effectively calculated a discount rate but ineffectively calculated developer profits, and because DAI calculated developer profit ranges which reflected the windfarm market and Citibank agreed were indicative of fair market value, the Court finds DAI's developer profit values more persuasive than Dr. Parsons' CAPM model. While DAI provided a range of appropriate developer profits according to each Alta facility, plaintiffs' Response to the Government's PFFCL requested "20% for developer profit." Pls.' Resp. to Gov't's PFFCL at 54. Considering DAI calculated developer profit of twenty percent for Alta VI and fifteen-to-thirty percent for Alta II–V (in which twenty percent falls), the Court finds the DAI Appraisals support developer profit of twenty percent for Alta II–VI. *See* JX-0047.021 (Alta II DAI Appraisal); JX-0062.021 (Alta III DAI Appraisal); JX-0060.021 (Alta IV DAI Appraisal); JX-0050.021 (Alta V DAI Appraisal); JX-0183.016–019 (Alta VI DAI Appraisal). For Alta I, however, DAI calculated a developer profit range of ten-to-fifteen percent which is lower than plaintiffs' request of twenty percent. *Compare* JX-0112.026 (Alta I DAI Appraisal) *with* Pls.' Resp. to Gov't's PFFCL at 54. The Court thus finds the Alta I DAI Appraisal supports developer profits of fifteen percent for Alta I.

## X.     Conclusion and Directive for the Parties

The Court finds plaintiffs' income approach is not a suitable method to value the Alta facilities because plaintiffs did not factually support the inclusion of the anticipated value of the cash grant as a Class V asset or substantially exclude the anticipated value of the cash grant from Class V assets. *See* Section IX.A, *supra*. The Court finds government's cost approach—with some of plaintiffs' modifications—properly calculates the fair market value of the Class V assets in accordance with the Federal Circuit's Remand Opinion. *See* Section IX.B, *supra*.

Before the Court enters judgment, the parties **SHALL FILE** a Joint Status Report on or before **31 July 2026** calculating the fair market value of the Class V assets and cash grant consistent with this Order and Opinion (and the Federal Circuit's Remand Opinion), by providing a table containing: (1) the result of calculations of fair market value of the eligible assets for each of the Alta facilities in accordance with the following steps; and (2) the cash grant value (thirty percent of the fair market value of the eligible assets):

(1) Start with the KPMG cost segregation reports for each of the Alta facilities;
(2) Exclude "Development Rights" from the cost basis for each Alta facility;
(3) Include "Interest During Construction" and "Oak Creek Development Fee" as

indirect costs (and capitalize these costs into direct costs) for each Alta facility;

(4)  Apply the grant-eligibility ratios reflected in the KPMG cost segregation reports;

(5)  Do not include an independent turn-key premium for any Alta facility; and

(6)  Apply a developer profit percentage on the cost basis for each facility based on the following:

(a)  for Alta I, apply a 15% developer profit on the cost basis; and

(b)  for Alta II–VI, apply a 20% developer profit on each facility's cost basis.

After the parties file their Joint Status Report, the Court will enter judgment accordingly. Further, the Court **DENIES** the government's Motion *in Limine* to Limit or Exclude Testimony of Dr. Matthew Osborn, ECF No. 393, *see* Section VII.A, *supra*; **DENIES as MOOT** the government's Motion *in Limine* to Limit Dr. Edward L. Maydew's Testimony, ECF No. 394, *see* Section VII.B, *supra*, **DENIES as MOOT** the government's Motion *in Limine* to Limit Plaintiffs' Fact Witnesses, ECF No. 395, *see* Section VII.C, *supra*, **DENIES as MOOT** the government's Motion *in Limine* to Exclude the Pagano Exhibit and Testimony from Fact Witnesses Regarding the Exhibit, ECF No. 396, *see* Section VII.D, *supra*, **DENIES as MOOT** the government's 13 July 2025 Motion *in Limine*, ECF No. 437, *see* Section VII.E, *supra*, and **DENIES as MOOT** the government's 21 July 2025 Motion *in Limine*, ECF No. 441, *see* Section VII.F, *supra*.  The Court also **FINDS as MOOT** the government's Motion for Status Conference, ECF No. 331.

The Court also notes, pursuant to the Court's 2 July 2024 Order in *Alta Wind VIII, LLC v. United States*, No. 17-998—which is currently stayed pending the trial in this case—"[t]he parties **SHALL FILE** a JSR [on the *Alta Wind VIII* docket] within 30 days of the Court's entry of a decision resolving *Alta Wind I* detailing their positions regarding next steps in [*Alta Wind VIII*]. 2 July 2024 Order at 1, *Alta Wind VIII*, No. 17-998, ECF No. 85.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge